## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAMUEL KATZ, ALEXANDER BRAURMAN, LYNNE RHODES, individually, and on their own behalf and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>LIBERTY POWER CORP., LLC, LIBERTY POWER HOLDINGS, LLC, Delaware limited liability companies,<br><br>               Defendants. | No. 1:18-cv-10506-ADB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Samuel Katz ("Plaintiff"), Lynne Rhodes, and Alexander Braurman make this complaint against Defendants Liberty Power Corp., LLC and Liberty Power Holdings, LLC (collectively "Liberty Power" or "Defendants"). Plaintiffs' allegations as to their own actions are based on personal knowledge. The other allegations are based on their counsel's investigation, and information and belief.

### Introduction

1.     Plaintiffs, individually and as class representatives for all others similarly situated, bring this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") for unsolicited telemarketing calls made by or on behalf of Defendants. Plaintiffs, individually, and for class members, seek an injunction and an award of statutory damages to the members of the Classes under the TCPA, together with costs and reasonable attorneys' fees.

### Parties

2.     Plaintiff Samuel Katz is a natural person. Mr. Katz was a resident of Bellingham, Massachusetts at all times during the events alleged in this Complaint. At all relevant times

Plaintiff Katz was the user, subscriber, owner, and possessor of the residential telephone number (508) 966-XXXX.

3.      Plaintiff Lynne Rhodes is a natural person. She was a resident of Barnstable County, Massachusetts at all times during the events alleged in this Complaint. At all relevant times, she was a user, subscriber, owner, and/or possessor of the residential telephone numbers 508-540-XXXX and 617-962-XXXX. Telephone number 617-962-XXXX is a cellular telephone. Rhodes does not use 617-962-XXXX for business purposes, but for personal calls.

4.      Plaintiff Alexander Braurman is a natural person. He was a resident of New Jersey at all times during the events alleged in this Complaint. At all relevant times Plaintiff Braurman was the user, subscriber, owner, and possessor of the residential telephone number 908-879-XXXX.

5.      Liberty Power Corp, LLC ("Corp") is a limited liability company duly organized under the laws of the State of Delaware with a principal place of business located at 2100 West Cypress Creek Road, Suite 130, Fort Lauderdale, Florida.

6.      Liberty Power Holdings, LLC ("Holdings") is a limited liability company duly organized under the laws of the State of Delaware with a principal place of business located at the same address as Corp.

7.      Corp. and Holdings are part of a joint enterprise. Corp. and its subsidiaries (including Holdings) operate under common branding and a shared registered trademark for "Liberty Power," in connection with their common retail electric service business. This common branding describes "Liberty Power" as Corp.'s "registered trademark," and describes Corp. as "encompassing Liberty Power Holdings LLC" and its other subsidiaries, or Corp. "whose subsidiaries are certified and licensed to provide retail electric service" in various states.

Likewise, Defendants' website states "Liberty Power operates through various legal entities to provide retail electricity and related services in the states open to retail electric competition. Those Liberty Power companies and affiliates (as they may change from time to time) are collectively referred to in this website as 'Liberty Power', 'we,' 'us' or 'our' . . . " Liberty Power, *Terms of Use*, *at* https://www.libertypowercorp.com/terms/ (last updated Jan. 28, 2013). Corp. and its subsidiaries (including Holdings) use the same facilities, including the same offices, the same form contracts, the same website, the same email server, and the same telephone number (1-866-769-3799). Corp. and Holdings have the same managers (David Hernandez, Alberto Daire, and Eliezer Hernandez).

8.      Corp. is the ultimate parent of Holdings and the other subsidiaries. Holdings (and Corp.'s other subsidiaries) have obtained and maintain licenses to operate as retail electric providers in various states. Corp. operates as a retail electric provider through Holdings and the other subsidiaries. For instance, Holdings is licensed to operate as a retail electric provider in Massachusetts. Holdings' Massachusetts license allows it to enter into retail electric service contracts with consumers and businesses in the state of Massachusetts, and to collect revenue from those contracts.

9.      In contrast, Corp.'s officers, employees, and agents are responsible for actually operating the joint enterprise's day-to-day business, and controlling that business. Corp. operates the business of registering and enrolling customers in Holdings' contracts, scheduling and providing electricity, maintaining reliable electrical service, and settling payments with utilities which provide the electricity that Holdings sells to its customers.

10.      Corp. uses its own financial resources to provide the financial security Holdings needs to obtain and maintain its retail electricity service licenses with state regulators. Corp. has

posted collateral and paid regulatory fines for Holdings and other subsidiaries. Upon information and belief, the same set of personnel—the same officers, employees, and agents—often hold themselves out as having a title or position at either Corp. or Holdings (depending on whom the personnel are interacting with, including state regulators), and sometime use the exact same position. More frequently, however, the personnel provide their title at "Liberty Power," simply leaving the identity of the relevant Defendant ambiguous.

11.     Corp. personnel are responsible for contracting and working with the telemarketers which Holdings uses to generate electric service contracts with consumers and businesses. Thus, for instance, Defendants' counterclaim in this proceeding adduces a Telesales Channel Agreement with Mezzi Marketing LLC ("Mezzi"). (ECF No. 28-1.) While Holdings is Mezzi's counterparty in the Telesales Channel Agreement, Harris Rosen signed the Telesales Channel Agreement as "VP, Law and General Counsel" of "Liberty Power Corp." Likewise, Corp. alleges that it was the "known and intended third-party beneficiary" of Telesales Channel Agreement. (ECF No. 28 ¶13.) This arrangement (where Corp. actually executed the contract to which Holdings is the counterparty, while Corp. remains an intended beneficiary) reflects how Defendants' business and operations are generally intertwined and interrelated. Defendants' operations are so intertwined that it is often impossible to definitively attribute the acts of their personnel to Corp. or Holdings.

12.     Plaintiffs are informed and believe and based thereon allege that all Defendants were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent,

authorization and ratification of their co-defendants; however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contradiction with the other allegations.

13.     Whenever this complaint refers to any act of Defendants or acts of Liberty Power, the allegations shall be deemed to mean the act of those defendants named in the particular cause of action, and each of them, acting individually, jointly and severally, unless otherwise alleged.

## Jurisdiction and Venue

14.     The Court has federal subject matter jurisdiction under 47 U.S.C. § 227. *Cf. Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012).

15.     This Court has personal jurisdiction over Defendants under Mass. Gen. Laws ch. 223A, § 3, because they do business in the Commonwealth of Massachusetts (including obtaining and maintaining licensing with the Commonwealth to provide electricity to customers in Massachusetts, and telemarketing retail electricity contracts to Massachusetts residents), and because the wrongful acts alleged in this Complaint were committed in and/or caused injury in the Commonwealth of Massachusetts.

16.     Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227

17.     In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices. Congress found that "automated and prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call," and decided that "banning" such calls made without consent was "the only effective means of protecting telephone consumers from the nuisance and privacy invasion." Pub. L. No. 102-243,

§§ 2 (10-13) (Dec. 20, 1991), *codified* at 47 U.S.C. § 227. *See also Mims v. Arrow Fin. Services, L.L.C.*, 565 U.S. 368, 132 S. Ct. 740, 744, 181 L. Ed. 2d 881 (2012) ("The Act bans certain practices invasive of privacy").

18.     The TCPA makes it unlawful for any person to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call is initiated for emergency purposes. 47 U.S.C. § 227(b)(1)(B).

19.     The TCPA also makes it unlawful for any entity to make more than one call in a 12-month period to any number that is registered with the National Do-Not-Call Registry. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

20.     The National Do-Not-Call Registry allows residential telephone subscribers to register their telephone numbers with the Registry to indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing of the Registry "must be honored indefinitely or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

21.     The Federal Communications Commission ("FCC") has promulgated regulations under the TCPA which also require that sellers and telemarketers maintain an "internal do-not-call list" ("IDNC" list) — i.e., a "list of persons who request not to receive telemarketing calls made by or on behalf of that [seller]" — and further prohibits sellers from "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d). Cf. 47 U.S.C. § 227(b)(1).

22.    The FCC's regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995). The FCC reiterated this principle in 2013, when it explained that "a seller …. may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013).

**Factual Allegations Regarding Liberty Power's Telemarketing Activities**

23.    Liberty Power uses telemarketers to solicit potential residential customers in several states to purchase Liberty Power's products and services through aggressive, outbound telemarketing campaigns. These telemarketing campaigns are conducted for the benefit of and on behalf of Holdings, in order to enroll new customers for Holdings.  Corp. operates, manages, monitors, and controls these telemarketing campaigns.

24.    Liberty Power and its agents use pre-recorded and/or artificial voices to make telephone calls to consumers *en masse* to promote and market Liberty Power's products and services.

25.    The prerecorded messages utilized by Liberty and its agents induce consumers, including Plaintiff and Class Members, to press 1 to save on their electric bills by making specific reference to the consumer's local electric utility.

26.    Liberty Power and its agents call consumers with whom they have no prior relationship and who did not provide consent for Liberty Power or its agents to call them.

27.    Liberty Power and its agents systemically fail to obtain legally effective consent before placing calls to potential customers, including Plaintiff and the Class Members (as defined

below).

28.     Liberty Power and its agents make repeated and unwanted calls to consumers whose telephones service numbers are listed on the National Do Not Call Registry. Consumers place their phone numbers on the National Do Not Call Registry for the express purpose of avoiding unwanted telemarketing calls like those alleged here.

29.     The outgoing telephone numbers used by Liberty Power and its agents include local area-code numbers, but the numbers are misleading and inaccurate—calls to the outgoing telephone numbers used by Liberty Power and its agents typically do not connect to any telephone line.

30.     Liberty Power had actual knowledge that its vendors used "spoofed numbers" to make unsolicited telemarketing calls to consumers on its behalf (that is, replacing the actual originating number displayed to recipients caller ID systems—which could be used to reliably identify the vendors' calls—with a falsified ostensible outgoing telephone number). Notwithstanding this actual knowledge, when consumers complained to Liberty Power, it denied any responsibility for the calls and denied the spoofed numbers were used by any of its telemarketing vendors.[1] By causing its vendors to make calls with spoofed numbers, Liberty

---

[1]     According to the FTC, advancements in technologies, such as Voice Over Internet Protocol (VoIP) technology have increased the number of illegal telemarketing calls made to telephone numbers on the National Do Not Call Registry and allowed telemarketers to evade detection by "spoofing" the caller ID information that accompanies their calls:

> VoIP technology allows callers, including law-breakers, to make higher volume of calls inexpensively from anywhere in the world…Technological developments also allow illegal telemarketers to easily fake the caller ID information that accompanies their calls, which allows them to conceal their identity from consumers and law enforcement. In 2017, reports of "neighborhood" caller ID spoofing, where the caller displays a caller ID number with the same area code and exchange as the called party, have also increased. Further, many telemarketers use automated dialing technology to make calls that deliver prerecorded messages (commonly referred to as "robocalls", which allow violators to make very high volumes of illegal calls without significant expense. The net effect of

Power has violated the TCPA. *Cf.* 47 U.S.C. § 227(e) (prohibiting "any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value")

31.    Liberty Power and its agents systemically fail to honor Plaintiffs and Class Members' requests to be placed on Liberty Power's internal Do Not Call List.

32.    By making these robocalls, and ignoring the national Do-Not-Call registry and Do Not Call requests, Liberty Power has caused Plaintiffs and Class Members actual injury and harm, including the aggravation, nuisance, and invasion of privacy that results from the receipt of unsolicited and harassing telephone calls.

33.    Liberty Power controls the manner and method of their agent's telemarketing campaigns.

34.    Liberty Power provides the agents with "lead lists," lists of prospective consumers for the agents to call. Liberty Power requires their agents to call only those telephone numbers included in these lead lists. On information and belief, all recipients of Defendants' calls—including Katz, Braurman, and Rhodes—are on such lead lists. Defendants upload these lead lists to their agents multiple times, over a period of years, and Defendants never remove

---

these technological developments is that individuals and companies who do not care about complying with the Registry or other telemarketing laws are able to make more illegal telemarketing calls cheaply and in a manner that makes it difficult for the FTC and other law enforcement agencies to find them.
Federal Trade Commission, Biennial Report to Congress, Under the Do Not Call Registry Fee Extension Act of 2007: The Operation of the National Do Not Call Registry During Fiscal Year 2016 and Fiscal Year 2017, December 2017, at 3. available at https://www.ftc.gov/reports/biennial-report-congress-under-do-not-call-registry-fee-extension-act-2007-operation (last visited July 16, 2018).

prospective customers from these lists. For instance, Defendants uploaded a list with Plaintiff

Samuel Katz's information to Defendants' agents in 2015 and again in late 2016. When

recipients of Defendants' calls request not to receive further calls, Defendants may or may not

indicate that request on their lead lists, and rely entirely on their agents to honor the request not

to call that prospective customer. Because Defendants are (at a minimum) lax about enforcing

policies which prohibit their agents from calling prospective customers who have requested not

to receive calls from Defendants, or even actively discourage their agents from honoring such

requests, Defendants' lead lists do not protect call recipients who have requested not to receive

further calls—any call recipient on Defendants' lead lists is exposed to further calls.

35.     Liberty Power instructs the agents on the dates and times to place telemarketing

calls on behalf of Liberty Power.

36.     Liberty Power provides the agents with telemarketing scripts and requires strict

adherence to these scripts.

37.     Liberty Power requires the agents to advise prospective customers that they are

calling on behalf of Liberty Power.

38.     Liberty Power requires the agents to have a certain number of full-time agents

engaged on Liberty Power's outbound calling campaigns.

39.      Liberty Power prohibits the agents from hiring subcontractors to telemarket for

Liberty Power without Liberty Power's prior written approval.

40.     Liberty Power trains and coaches the agents' employees on strict adherence to

Liberty Power's telemarketing scripts and all other aspects of the telemarketing campaigns.

41.     Liberty Power trains and certifies the employees of its agents soliciting on its

behalf. This training involves extensive scripting and coaching on script adherence.

42.     Liberty Power restricts its agents to selling its products and services in geographical territories assigned by Liberty Power.

43.     Liberty Power requires its agents to provide them with the names of any customers who were interested in purchasing electricity from Liberty Power on a daily basis. Liberty Power requires its agents to provide, among other information, the account name, utility name and account number, kWh rate, service address, billing address, and name of the person authorized to sign a contract on the customer's behalf.

44.     Liberty Power knew or should have known that its agents were violating the TCPA. Liberty Power has the right to perform unannounced audit visits of its agents to assure compliance with the TCPA.

45.     Liberty Power requires agents to record all telephone solicitations.

46.     Liberty Power has the right to monitor its agents' telemarketing activities to assure adherence to its telemarketing scripts and compliance with Liberty Power's telemarketing rules and policies. Liberty Power had the right to terminate the agents for noncompliance.

47.     Liberty Power conducts evaluations of active employees of the agents who perform telemarketing of Liberty Power's services/products. Liberty Power monitors these employees' calls on a weekly basis, and reserves the right to address violations of its rules and policies in real-time with both the agent and their employees. Liberty Power also conducts weekly analysis of all of its agents to review quality assurance scores and determine whether the agents adhered to Liberty Power's "best practices".

48.     Liberty Power requires its agents to promptly notify Liberty Power and permanently remove any individual who has engaged in fraudulent or deceptive solicitation, or who violated any state or federal law or regulation. Such notification must include the nature of

the violation and customers that may be impacted.

49.      Liberty Power also reserved the right to suspend or terminate its relationships with its agents for non-compliance with TCPA rules and regulations.

50.      Holdings requires the agents to sign and comply with its telemarketing rules and policies, which included scripts controlling the wording that the agents must use in calls made on Liberty Power's behalf. Holdings reserved the right to terminate agents in the event that the agents violated its telemarketing policies or deviated from its scripts.

51.      In recent years, Liberty Power's telemarketing practices have been the subject of numerous consumer complaints and increased regulatory scrutiny. Liberty Power knew or should have known that its agents were violating the TCPA from the vast number of consumer and state regulatory complaints and investigations regarding Liberty Power's unsolicited telemarketing practices.

52.      Liberty Power knew or should have known that the agents systemically violate the TCPA because of its strict telemarketing rules and policies, including Liberty Power's ability to audit and perform quality controls, its weekly call audits, and the fact that Liberty Power itself supplied the list of numbers that its agents called.

53.      Nonetheless, Liberty Power and the agents made, and continue to make, these telemarketing calls to individuals nationwide without their prior written express consent to do so.

54.      Liberty Power also ratified the agents' conduct by accepting the benefits of the calls, including but not limited to enrolling customers generated by these calls into Holdings' contracts, despite being aware that these calls were unsolicited and made in violation of the TCPA.

55.      Liberty Power's agents were, at all relevant times, acting as actual agents,

conspirators, ostensible agents, partners and/or joint venturers and employees of Liberty Power, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Liberty Power.

56.     Each of these allegations are "alternative" theories of liability whenever not doing so would result in a contradiction with the other allegations.

### Plaintiff Samuel Katz's Individual Allegations

57.     On or about August 16, 2003, Mr. Katz's residential telephone number (508) 966-XXXX was placed on the National Do-Not-Call Registry. Despite this, Mr. Katz received unsolicited calls by or on behalf of Liberty Power promoting Liberty Power's products and/or services on the following dates and times:

|    | Call Date and Time | Calling Number |
|----|--------------------|----------------|
| 1  | 9/8/2016 12:17:11  | (508) 202-1270 Framingham MA |
| 2  | 9/8/2016 12:23:44  | (508) 202-1270 Framingham MA |
| 3  | 9/8/2016 12:23:46  | (508) 202-1270 Framingham MA |
| 4  | 9/8/2016 12:23:51  | (508) 202-1270 |
| 5  | 9/8/2016 12:29:45  | (508) 202-1270 Framingham MA |
| 6  | 9/8/2016 12:35:56  | (508) 202-1270 Framingham MA |
| 7  | 9/8/2016 12:36:19  | (508) 202-1270 |
| 8  | 9/23/2016 15:42:58 | (508)-202-1270 |
| 9  | 9/27/2016 16:24:47 | (508) 202-1270 |
| 10 | 10/3/2016 13:27:28 | (508) 202-1270 Framingham MA |
| 11 | 10/3/2016 13:29:24 | Anonymous |

12      10/14/2016 16:45:21  (508) 202-1270 Framingham MA

13      10/14/2016 16:45:51  (508) 202-1270

58.      There may be additional calls made by or on behalf of Liberty Power and Plaintiff reserves the right to identify such additional calls upon receipt of additional evidence which demonstrates such calls.

59.      While the caller ID identified above belongs to Liberty Power and/or its agents and reflect local Massachusetts area codes, calls to these telephone numbers do not connect to any telephone.

60.      Several of these calls used an artificial or prerecorded voice to deliver a message, including calls that started with a message that stated "Press 1 to save on your electricity bill," or words to that effect.

61.      In one of these calls, Mr. Katz advised Liberty Power's caller that his telephone number was registered with the National Do Not Call Registry, that he did not consent to the calls, and asked to be placed on Liberty Power's Do Not Call list. The caller advised Mr. Katz would have to purchase Liberty Power's services to get on Liberty Power's Do Not Call list and to stop getting calls. The caller in this call stated he was calling from Liberty Power, solicited Mr. Katz to enroll in Liberty Power's electricity program, and provided Liberty Power's telephone number (866-769-3799).

62.      In another of these calls, Mr. Katz asked for a copy of Liberty Power's Do Not Call Policy, and the caller responded he did not have a copy; the caller hung up when Mr. Katz then asked if Liberty Power had a Do Not Call list. Again, the caller in this call solicited Mr. Katz to enroll in Liberty Power's electricity program, and provided Liberty Power's telephone number (866-769-3799).

63.     Plaintiff Katz never gave Liberty Power or its agents legally effective consent to make telemarketing calls to him.

64.     None of Liberty Power's calls to Plaintiff were for emergency purposes or were exempted by the FCC's rules or orders.

65.     Plaintiff Katz complained to Liberty Power about calls from the 508-202-1270. In response, by email dated October 19, 2016, Defendants' Compliance and Quality Assurance Team denied responsibility for the calls. Liberty Power denied that the number belonged to any of Liberty Power's third party vendors:

> With your last email you alleged that you received another call again this time from the phone number 508-202-1270. We can confirm that phone number does not belong to any of our third party vendors and in calling that phone a recorded message responded with "this number is currently un-configured".
>
> Please note that we had previously received similar allegations from consumers and upon conducting a google search with the phone number reflected upon the caller ID, the results confirmed "spoof" calls were made to other consumers.

*See* KATZ 000147.

66.     Defendants' subsequent investigation determined that Defendants' telemarketing vendor, Mezzi, made the spoofed (508) 202-1270 calls on behalf of Liberty Power. Defendants failed to disclose this to Katz. (However, Plaintiffs further allege Defendants have not made any judicial admission about Mezzi's involvement in these calls, and Plaintiffs cannot make any assumptions about the validity of Defendants' investigation.)

67.     However, there is evidence that Liberty Power believes that Mezzi in fact made this calls on its behalf, despite its representations to Katz. The plaintiff in the related case, *McDermet v. Liberty Power Corp., LLC*, No. 18-10043 (also pending before this Court) alleges he received calls using the same originating number ((508) 202-1270) a few months after Mr. Katz received calls which spoofed the same 1270 number. *Cf.* Pl.'s Compl., ECF No. 1, ¶50 *with*

Complaint by William McDermet, Ex. A to Notice of Removal, *McDermet v. Liberty Power Corp., LLC*, No. 18-10043 (D. Mass. Jan. 8, 2018), ECF No. 1-1, ¶8.)

68.     On June 25, 2018, Liberty Corp. filed a third party complaint against Mezzi in the *McDermet* Case based on the allegation that the calls complained of by Mr. McDermet were made by Mezzi pursuant to a telesales agreement. (*See* Third-Party Complaint by Liberty Power Corp., LLC, *McDermet v. Liberty Power Corp., LLC*, No. 18-10043 (D. Mass. Feb. 13, 2018), ECF No. 11, ¶14.).

69.     In support of the third party complaint, Liberty Corp. submitted a declaration which stated, in relevant part: "Liberty Power did not make any of the telephone calls that are the subject of [McDermet's] Complaint. **All such calls were made by Mezzi** . . . " (Declaration of Gary Donaldson, *McDermet v. Liberty Power Corp., LLC*, No. 18-10043 (D. Mass. June 5, 2018), ECF No. 25-1, ¶8 (emphasis added).)

70.     Plaintiff Katz and Mr. McDermet are not the only consumers who complain about unwanted telemarketing calls by or on behalf of Liberty Power from the spoofed (508) 202-1270 number. On or about May 11, 2018, Plaintiff's received a response to Freedom of Information Act request from the Federal Trade Commission regarding Liberty Power's telemarketing. A true and correct copy of the response, together with pdf containing portions of the data provided together with the FTC's response, which has been edited and altered for reproduction and convenient viewing in a pdf file, is attached to as Exhibit 1 to this Complaint. Other consumers complained to the Federal Trade Commission about calls by or on behalf of Liberty Power originating from the same number. (*See* Ex. 1, Rows 108, 188, 198, 202, 213, and 230 (reflecting complaints to the FTC about calls regarding Liberty Power from (508) 202-1270 between July 20, 2016 and July 5, 2017).)

71.     These calls damaged and harmed Plaintiff. Plaintiff found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from his daily activities. Plaintiff continually screens the calls he receives to avoid telemarketing calls from Defendants and others. Plaintiff put his telephone number on the national Do-Not-Call registry specifically to avoid telemarketing calls. However, Plaintiff only seeks statutory damages and does not seek actual damages.

72.     On or about January 5, 2018, Liberty Power's in-house counsel informed Mr. Katz that Liberty Power had two individual owners, and that every dollar that goes into Liberty Power goes into their wallets, so that every dollar that comes out of Liberty Power comes out their wallets, or words to that effect. On information and belief, Katz alleges Hernandez and Daire are the two individuals referenced by Liberty Power's in-house counsel.

**Plaintiff Braurman's Individual Allegations**

73.     On or about September 28, 2003, Mr. Alexander Braurman's residential telephone number 908-879-XXXX was placed on the National Do-Not-Call Registry. Despite this, Mr. Braurman received unsolicited calls by or on behalf of Liberty Power promoting Liberty Power's products and/or services on the following dates and times:

|   | **Call Date and Time** | **Calling Number** |
|---|---|---|
| 1 | 10/24/2016 12:13 p.m. | (908) 387-4845 |
| 2 | 12/23/2016 1:31 p.m. | (508) 523-6101 |
| 3 | 12/24/2016 12:52 p.m. | (508) 523-6101 |

74.     There may be additional calls made by or on behalf of Liberty Power and Plaintiff reserves the right to identify such additional calls upon receipt of additional evidence which demonstrates such calls.

75.     All of these calls used an artificial or prerecorded voice to deliver a message,

including calls that started with a message that stated "Press 1 to save on your electricity bill," or words to that effect.

76.     On October 24, 2016, Braurman received a phone call at his residential number, 908-879-XXXX. When Braurman answered the call, he heard a pre-recorded message inviting him to press "1" to receive a discount on his energy bill. Braurman pressed "1" and was transferred to a live telemarketer who attempted to sell to him Liberty's electricity supplier services. During this call, the caller stated he was calling from Liberty Power, solicited Mr. Braurman to enroll in Liberty Power's electricity program, and provided Liberty Power's telephone number (866-769-3799). Plaintiff Braurman stated that he was not interested and asked, "Put my name and number on your Do-Not-Call list and never call again."

77.     Upon information and belief, Braurman received additional calls which were part of a telemarketing campaign which was directed at Massachusetts residents, and/or which made calls from Massachusetts. The area code 508 corresponds to the greater Boston metropolitan area. On December 23, 2016, Braurman received another pre-recorded call stating that he was eligible to receive a discount on his energy bill. Following the voice prompt, Braurman pressed "1" and got transferred to a live telemarketer, who identified himself as calling from Liberty Power and attempted to sell Braurman Liberty Power's electricity supplier services. Once again, Braurman said, "I'm not interested, just take my name and my phone number off your calling list and don't call again" (or words to that effect) and hung up.

78.     Despite Braurman's clear instructions to cease calling, Liberty called Braurman the next day, on December 24, 2016. This time, Braurman recognized Liberty's Caller ID and didn't answer the call, which got routed to Braurman's voice mail system. Liberty left a prerecorded message "…Phone now to talk to an account representative to receive your discount

off your energy bill…"

79.     These December 2016 telephone calls were part of a telemarketing campaign directed at Massachusetts residents. In each of the December calls, Liberty Power used the caller ID Number (508) 523-6101 and corresponding caller ID name "Cell Phone MA." Either this call originated from Massachusetts, or the caller spoofed the caller ID and caller ID name to suggest the call originated from Massachusetts, as part of an effort specifically designed to induce Massachusetts residents to pick up what appeared to be local call. However, when Braurman tried to call back at that number to demand for Liberty to cease calling him, he heard the message that the number he dialed was "disconnected or out of service."

80.     Plaintiff Braurman is not the only consumer who complains about unwanted telemarketing calls by or on behalf of Liberty Power from the spoofed (508) 523-6101 number. Other consumers complained to the Federal Trade Commission about calls by or on behalf of Liberty Power originating from the same number. (*See e.g*., Ex. 1, Rows 120, 166, 169, 172, 175, and 179, from November 7, 2016 to May 17, 2017.) Indeed, several of these complaints also reflect calls to Massachusetts around the same time Plaintiff Braurman received a call. (*Id*., Rows 172 (November 25, 2016); 175 (November 17, 2016); 179 (November 7, 2016).)

81.     Another consumer has complained, that during the same period, in or around November 2016, they, too, received repeated unsolicited calls offering a discount on electricity rates from this same caller ID number (508) 523-6101 and another number 508-202-1270 – the same number used by Liberty and its agents to call Plaintiff Katz and Mr. McDermet in Massachusetts. (*See* https://800notes.com/Phone.aspx/1-508-523-6101 (last visited July 14, 2018)).

82.     FTC complaints show that Defendants' Massachusetts-directed marketing reached

other customers outside of Massachusetts like Braurman. One former Massachusetts resident

complained of telemarketing calls from Liberty Power, which stated the recipient "qualif[ied] for

a rebate because [she was] an Eversource customer," but the recipient lived in Texas. (See ECF

No. 34-1, line 235 (calls to former Eversource customer; "Eversource is an electric company I

used in MA and I have lived in Austin since August 2015.")) Eversource operates in

Massachusetts, but does not operate in Texas.

83.     Plaintiff never gave Liberty Power or its agents legally effective consent to make

telemarketing calls to him.

84.     None of Liberty Power's calls to Plaintiff were for emergency purposes or were

exempted by the FCC's rules or orders.

85.     These calls damaged and harmed Plaintiff. Plaintiff found these repeated

unsolicited calls to be intrusive and harassing, as they diverted attention away from his daily

activities. Plaintiff continually screens the calls he receives to avoid telemarketing calls from

Defendants and others. Plaintiff put his telephone number on the national Do-Not-Call registry

specifically to avoid telemarketing calls. However, Plaintiff only seeks statutory damages and

does not seek actual damages.

**Plaintiff Lynne Rhode's Individual Allegations**

86.     On or about February 4, 2008, Plaintiff Lynne Rhodes' residential telephone

number 508-540-XXXX was placed on the National Do-Not-Call Registry.

87.     During the calls alleged in this Complaint, Plaintiff Rhodes lived with her father,

Scoba Rhodes, a senior citizen who was suffering from dementia. In mid-November 2017, Scoba

Rhodes had a stroke; he passed away on June 23, 2018 at the age of 79. Plaintiff Rhodes will be

the executrix of Scoba Rhodes's estate.

88.     Beginning in November 2017, Plaintiff Rhodes began receiving numerous unsolicited calls several times a week by or on behalf of Liberty Power promoting Liberty Power's products and/or services.

89.     During these calls, she told Liberty Power to stop calling and to add the phone number to the company Do-Not-Call list.

90.     During at least one call in November 2017, she told the caller that she would not do business with telemarketers over the phone.

91.     Notwithstanding the clear direction that the calls stop and that the Rhodes family was not interested in the services offered by Liberty Power, on or about December 6, 2017, the Rhodes residence received yet another unsolicited call by or on behalf of Liberty Power promoting Liberty Power's products and/or services. Scoba Rhodes answered this call. He provided information that was requested by the caller and was signed up for Liberty Power's services over the phone.

92.     Several days later, on or about December 15, 2017, upon discovering that the household's electricity service was switched to Liberty Power without permission, Plaintiff Lynne Rhodes cancelled the enrollment with Liberty Power and again demanded that Liberty Power add the 508-540-XXXX to its Internal Do Not Call List. On or about December 20, 2017, Plaintiff Rhodes obtained power of attorney for Scoba Rhodes. Ms. Rhodes's complaint that Defendants' telemarketers targeted vulnerable elderly people is not isolated. (*See* Ex. 1, Rows 8, 44 (Defendants calling father with dementia), 149, 153 (Defendants calling mother who has Alzheimer's; "I believe they are preying on the elderly"), 284 (Defendants calling elderly parents for about a year; "My mother has memory problems and can not remember they are scammers"),

364 ("I am an elderly woman and this company is preying on me").)[2]

93.     On or about January 15, 2018, Liberty Power called yet again trying to get

Plaintiff Rhodes to enroll in the electricity services. When she demanded that Liberty Power stop

calling her, she was told that Liberty Power would continue to call until and unless she switched

the services over to Liberty Power.

94.     On or about January 25, 2018, Plaintiff Lynne Rhodes received another

unsolicited telemarketing call from Liberty Power promoting Liberty Power's services.

95.     On or about March 17, 2018, Plaintiff Lynne Rhodes received another unsolicited

telemarketing call from Liberty Power promoting Liberty Power's services.

96.     There may be additional calls made by or on behalf of Liberty Power and Plaintiff

reserves the right to identify such additional calls upon receipt of additional evidence which

demonstrates such calls.

97.     Neither Plaintiff Lynne Rhodes nor Scoba Rhodes gave Liberty Power or its

agents legally effective consent to make telemarketing calls to the residential telephone number

508-540-XXXX.

98.     None of Liberty Power's calls to Plaintiff were for emergency purposes or were

---

[2]     Likewise, one consumer complained to the BBB with a startlingly similar issue:
          I am filing this complaint on the behalf of my mother, ***** ******* I take care
          of my mom's billing due to the fact that she has dementia. Liberty power had got
          her to switch over to them (she didn't understand what it was about). I talked to
          her about it and we decided to cancel with them. They canceled it with no
          problem but still keep calling her trying to get her to switch back. I have called
          them, a couple of times, and told them to take her name off their list and to not
          call her anymore. They say they won't call her anymore. Last week they called
          while I was at her house. So I checked her caller ID and found that they call her
          every week day. I just want them to stop calling. Her address is **** ****** ***
          *** ******** ** XXXXX. The phone # that they call is XXX-XXX-XXXX
See Better Business Bureau, Liberty Power Corp., LLC, at https://www.bbb.org/us/fl/fort-
lauderdale/profile/electric-companies/liberty-power-corp-llc-0633-23005899/complaints (last
visited September 18, 2018).

exempted by the FCC's rules or orders.

99.     On or about August 12, 2006, Plaintiff Rhodes' wireless residential number 617-962-XXXX was placed on the National Do-Not-Call Registry.

100.    Despite this, on or about June 21, 2018, Plaintiff Rhodes received an unsolicited prerecorded message stating that she was eligible to receive a discount on her energy bill, or words to that effect.

101.    The call prompted the listener to "Press 1 to save on your electricity bill," or words to that effect. When Ms. Rhodes was transferred to a representative, the representative identified himself as calling from Liberty Power. The caller ID that appeared on Ms. Rhodes' cellphone was 339-888-6412.

102.    There may be additional calls made by or on behalf of Liberty Power and Plaintiff reserves the right to identify such additional calls.

103.    Plaintiff Rhodes did not give Liberty Power or its agents legally effective consent to make telemarketing calls to her residential wireless telephone number.

104.    None of Liberty Power's calls to Plaintiff Rhodes were for emergency purposes or were exempted by the FCC's rules or orders.

105.    These calls damaged and harmed Plaintiff Rhodes. Plaintiff found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from her daily activities. Plaintiff continually screens the calls she receives to avoid telemarketing calls from Defendants and others. Plaintiff put her telephone numbers on the national Do-Not-Call registry specifically to avoid telemarketing calls. However, Plaintiff only seeks statutory damages and does not seek actual damages.

## Class Certification Allegations

106.    **Class Definitions:** Plaintiffs bring this Complaint against Defendants, pursuant to

Federal Rule of Civil Procedure 23, on behalf of himself and the following Classes:

> **Robocall Class:** All persons in the United States who received one
> or more telemarketing calls to their wireless telephone numbers by
> or on behalf of Liberty Power, that were made using an autodialer
> or an artificial or prerecorded voice, from March 16, 2014 through
> the date the Court certifies the class.

> **Residential Class:** All persons in the United States who received
> one or more telemarketing calls to their residential (wireless or
> landline) telephone numbers by or on behalf of Liberty Power, that
> were made using an artificial or prerecorded voice, from March 16,
> 2014 through the date the Court certifies the class.

> **National Do Not Call Class ("NDNC Class"):** All persons in the
> United States whose residential (wireless or landline) telephone
> number was registered with the national Do-Not-Call registry for
> at least thirty days prior to receiving at least two telemarketing
> calls by or on behalf of Liberty Power to such number within any
> 12-month period at any time from March 16, 2014 through the date
> the Court certifies the class.

> **Internal Do Not Call Class ("IDNC Class"):** All persons in the
> United States who received at least two telemarketing calls to their
> residential (wireless or landline) telephone number by or on behalf
> of Liberty Power within any 12-month period at any time from
> March 16, 2014 through the date the Court certifies the class.

107.    Excluded from the classes are any entity in which Defendants have a controlling

interest or which has a controlling interest in Defendants, and Defendants' agents, legal

representatives, predecessors, successors, assigns, and employees. Also excluded from the

classes are the judge and staff to whom this case is assigned, and any member of the judge's

immediate family. Plaintiffs reserve the right to revise the class definitions based on facts learned

during discovery.

108.    **Class Numerosity:** The exact number of members of each class is unknown and

is not available to Plaintiffs at this time, but such information is readily ascertainable by

Defendants and their agents' call records and customer relations management databases. The

classes are so numerous that joinder of all members is impractical. Plaintiffs allege that there are

more than 40 members of each Class.

109.    **Class Commonality:** Plaintiffs and class members' experiences receiving calls

by or on behalf of Liberty Power are common. They received multiple, incessant, uninvited calls

that included a prerecorded message/artificial voice for the purposes of marketing Liberty

Power's products or services. The calls were made irrespective to whether Plaintiffs and class

members were on the National Do Not Call Registry and their requests that the calls cease.

110.    In addition, common questions of fact and law exist as to all members of the

classes and predominate over the questions affecting only individual members of the classes.

Identification of the individuals who qualify as a member of the classes will be sufficient to

establish liability to the class member. The predominant common questions include:

    a.    Whether Defendants and/or their agents used an "artificial or prerecorded
          voice" when placing calls, as such terms are defined or understood under
          the TCPA and applicable FCC regulations and orders;

    b.    Whether Defendants are vicariously liable for their agents' calls;

    c.    Whether Defendants and/or their agents had legally effective consent to
          place telemarketing calls to Plaintiffs and class members;

    d.    Whether Defendants and/or their agents made telephone calls to members
          of the National DNC Class whose telephone numbers were registered with
          the national Do-Not-Call registry;

    e.    Whether Defendants and/or their agents instituted procedures and
          minimum standards prescribed by 47 C.F.R. § 64.1200(d) for maintaining
          a list of persons who request not to receive telemarketing calls made by or
          on behalf of that person or entity;

    f.    Whether Plaintiffs and class members are entitled to damages, including

whether Defendants' violations were performed willfully or knowingly such that Plaintiff and class members are entitled to treble damages;

g.      Whether Plaintiffs and class members are entitled to injunctive relief for violations of their privacy and attorney's fees and costs.

111.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the classes. Plaintiffs are not different in any relevant way from any other member of the classes, and the relief he seeks is common to each class.

112.    **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the classes: Plaintiffs' interests do not conflict with the interests of the other class members. Plaintiffs have retained counsel competent and experienced in complex class actions, including class actions arising under the Telephone Consumer Protection Act and other consumer protection laws, and they intend to prosecute this action vigorously.

113.    **Predominance and Superiority:** The classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual member of the classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for class members to individually obtain effective relief from Defendants' misconduct. Even if class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

114.    **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each class a whole. The policies of the Defendants challenged herein apply and affect members of each class uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiffs.

115.    **Injunctive Relief is Appropriate:** Based on information and belief, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiffs and class members for which they have no adequate remedy at law. In particular, Plaintiffs seek the following specific relief:

a)    Require Defendants to purchase the subscription to the National DNC registry and scrub their "lead lists" against the up-to-date federal DNC list at least every 30 days;

b)    Require Defendants to retain call records;

c)    Prohibit Defendants from hiring telemarketers which do not comply with state regulations to maintain a valid license, registration, and/or bond to call customers/prospects residing in that state.

The presence of Plaintiffs and other class members' information on Defendants' lead lists exposes them to further calls from Defendants and their agents in the future.

**FIRST CLAIM FOR RELIEF**
**Violation of 47 U.S.C. § 227(b)(1)(a)(iii) Against All Defendants**
**by Lynne Rhodes, Individually, and on Behalf of the Robocall Class**

116.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff Lynne Rhodes asserts this claim on behalf of herself and the members of the Robocall Class.

117.     The TCPA prohibits certain uses of telecommunication equipment that would interfere with telephone service subscribers' privacy and/or property rights with respect to their telephone. In particular, the TCPA provides that:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service . . .

47 U.S.C. § 27(b)(1)(A).

118.     The TCPA provides telephone service subscribers a private right of action for injunctive relief and statutory damages for violations:

> A person or entity may . . . bring . . . an action based on a violation of [47 U.S.C. § 227(b)] to enjoin such a violation, an action to recovery for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or both . . . If the court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b),] the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the [statutory damages available above].

47 U.S.C. § 227(b)(3).

119.     Defendants make outgoing calls to consumers and others in the regular course of their business.

120.     Defendants placed calls to Rhodes and other Robocall Class members using predictive dialers. The predictive dialers are an automatic telephone dialing system; no human

manually entered the cellular telephone numbers which Defendants called at the time the call was made. Rather, the predictive dialers electronically dialed the Robocall Class members' cellular telephones in an automated fashion. The predictive dialers are capable of storing, producing, and dialing any telephone number, and are capable of storing, producing, and dialing telephone numbers using a random or sequential number generator. The predictive dialers otherwise constitute an "automatic telephone dialing system" under the meaning of 47 U.S.C. § 227(a)(1).

121.    Defendants also utilized artificial and/or prerecorded voice calls to call the cellular telephones of Plaintiff and Robocall Class Members.

122.    Defendants do not and did not obtain legally effective prior express consent to call the Robocall Class members' cellular telephone numbers.

123.    Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) by placing telephone calls to Plaintiffs and the other members of the Robocall Class that were automatically dialed by Defendants' telephone system and/or used an artificial or prerecorded voice; made to a cellular telephone number; and not as the result of the Robocall Class member's transaction with Defendants or its agents.

124.    Defendants' violations are willful because Defendants knew that Rhodes and members of the Robocall Class had not given prior express consent to receive calls made using an automatic telephone dialing system, artificial, and/or prerecorded voice and that Defendants used these methods to call the cell phones of Plaintiff and Robocall Class members.

125.    Plaintiff Lynne Rhodes, on her own behalf, and on behalf of the other members of the Robocall Class, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(b)(3),

against Defendants.

## SECOND CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 227(b)(1)(B) Against All Defendants
### by Plaintiffs, Individually, and on Behalf of the Residential Class

126.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert this claim on behalf of themselves and the members of the Residential Class.

127.     The TCPA prohibits certain uses of telecommunication equipment that would interfere with telephone service subscribers' privacy and/or property rights with respect to their telephone. In particular, the TPCA makes it unlawful for any person:

> to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B).

47 U.S.C. § 227(b)(1)(B).

128.     The TCPA provides telephone service subscribers a private right of action for injunctive relief and statutory damages for violations of 47 U.S.C. § 227(b) or "regulations prescribed under" 47 U.S.C. § 227(b) "to enjoin such a violation" and/or to recover actual damages or "$500 in damages for each such violation," as well as treble damages where the "court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b).]" 47 U.S.C. § 227(b)(3).

129.     Liberty Power and its agents also utilized artificial and/or prerecorded voice messages in calls to residential telephones of Plaintiffs and Residential Class members.

130.     Liberty Power and its agents do not and did not obtain legally effective prior express consent to call the Residential Class members' residential telephone numbers.

131.     Liberty Power and its agents violated 47 U.S.C. § 227(b)(1)(B) by placing telephone calls to the residential telephone numbers of Plaintiffs and the other members of the Residential Class using an artificial or prerecorded voice without their prior express written consent.

132.     Liberty Power willfully violated 47 U.S.C. § 227(b)(1)(B) because it knew that Plaintiffs and the other Residential Class members had not given prior express consent to receive calls made using an artificial, and/or prerecorded voice and that Liberty Power and its agents used these methods to call the residential telephone numbers of Plaintiffs and the other Residential Class members.

133.     Plaintiffs, individually, and on behalf of the other members of the Residential Voice Class, seek to recover statutory damages (including treble damages for willful violations), as well as injunctive and equitable relief under 47 U.S.C. § 227(b)(3) against Liberty Power.

### THIRD CLAIM FOR RELIEF
**Violation of 47 U.S.C. § 227 (c)(5) Against All Defendants
by Plaintiffs, Individually and on Behalf of the NDNC Class**

134.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert this claim on behalf of themselves and members of the NDNC Class.

135.     The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection [i.e., 47 C.F.R. § 64.1200(c)(2)] may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). 47 C.F.R. § 64.1200(c)(2) provides that "[n]o person or entity shall initiate any telephone solicitation" to a "residential telephone subscriber who has registered his or her telephone number on the national

do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(e) extends the privacy protection in subsection 64.1200(c) to wireless telephone numbers.

136.    Liberty Power and its agents violated 47 C.F.R. § 64.1200(c) by initiating telephone solicitations to wireless and wireline residential telephone subscribers such as Plaintiffs and the other NDNC Class members.

137.    Liberty Power did not have an established business relationship with Plaintiffs and the other NDNC Class members.

138.    Liberty Power and its agents made more than one unsolicited telephone call to Plaintiffs and members of the NDNC class within a 12-month period without their legally effective consent to receive such calls. Plaintiffs and members of the NDNC Class never provided any form of consent to receive telephone calls from Liberty Power and/or Liberty Power does not have any evidence of consent to place telemarketing calls to them.

139.    Plaintiffs and the other members of the NDNC Class have a claim against Liberty Power because Plaintiffs and the other members of the NDNC Class received more than one telephone call within a 12-month period made by or on behalf of the Liberty Power in violation of 47 C.F.R. § 64.1200. As a result of the conduct of Liberty Power and its agents, Plaintiffs and the class suffered actual damages and have a claim for $500 in statutory damages for each such violation of 47 C.F.R. § 64.1200, and injunctive relief. 47 U.S.C. § 227(c)(5).

140.    Liberty Power willfully violated 47 C.F.R. § 64.1200(c). Liberty Power knew Plaintiffs and the other NDNC Class members had not given legally effective consent to receive telemarketing calls, and that many of the calls made by Liberty Power and its agents were received by individuals on the National Do Not Call registry.

141.     Plaintiffs, individually, and on behalf of the other members of the NDNC Class,

seeks to recover statutory damages (including treble damages for willful violations), as well as

injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Liberty Power.

**FOURTH CLAIM FOR RELIEF**
**Violations of the TCPA, 47 U.S.C. § 227 (c)(5) Against All Defendants**
**by Plaintiffs, Individually, and on Behalf of the Internal DNC Class**

142.     Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint. Plaintiffs assert these claims on behalf of themselves and

members of the IDNC Class.

143.     47 C.F.R. § 64.1200(d) provides that "[n]o person or entity shall initiate any call

for telemarketing purposes to a residential telephone subscriber unless such person or entity has

instituted procedures for maintaining a list of persons who request not to receive telemarketing

calls made by or on behalf of that person or entity. The procedures instituted must meet the

following minimum standards:

> (1) Written policy. Persons or entities making calls for telemarketing purposes must have
> a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of
> telemarketing must be informed and trained in the existence and use of the do-not-call
> list.
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for
> telemarketing purposes (or on whose behalf such a call is made) receives a request from a
> residential telephone subscriber not to receive calls from that person or entity, the person
> or entity must record the request and place the subscriber's name, if provided, and
> telephone number on the do-not-call list at the time the request is made. Persons or
> entities making calls for telemarketing purposes (or on whose behalf such calls are made)
> must honor a residential subscriber's do-not-call request within a reasonable time from
> the date such request is made. This period may not exceed thirty days from the date of
> such request. . . .
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for
> telemarketing purposes must provide the called party with the name of the individual

caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised."

144.     The TCPA creates a private right of action for injunctive and monetary relief for any "person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of [e.g., 47 C.F.R. § 64.1200(d).]" 47 U.S.C. § 227(c)(5). *See also* 47 C.F.R. § 64.1200(d)(3) (liability for company specific DNC list violations).

145.     Liberty Power and its agents made more than one unsolicited telephone call to Plaintiffs and members of the IDNC class within a 12-month period in violation of 47 C.F.R. § 64.1200(d).

146.     Liberty Power did not institute minimum procedures required under 47 C.F.R. § 64.1200(d); Liberty Power consistently fail to honor the requests of Plaintiffs and other individuals to stop calling, and specifically to place their name and telephone number on Liberty Power's internal do not call list and to otherwise maintain an adequate do not call policy required under 47 C.F.R. § 64.1200(d).

147.     Liberty Power and its agents violated 47 C.F.R. § 64.1200(d) by initiating calls for telemarketing purposes to wireless and wireline residential telephones of Plaintiffs and members of the class without instituting minimum procedures required under 47 C.F.R. § 64.1200(d).

148.     Liberty Power willfully violated 47 C.F.R. § 64.1200(d). Liberty Power knew that it and its agents failed to institute minimum procedures for maintaining a list of persons who

request not to receive telemarketing calls made by or on behalf of Liberty Power and that they repeatedly ignored and/or refused to honor Plaintiffs and class members' requests to be placed on a company DNC list.

149.    Plaintiffs, individually, and on behalf of the other members of the IDNC Class, seeks to recover statutory damages (including treble damages for willful violations), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Liberty Power.

<strong>FIFTH CLAIM FOR RELIEF<br>
Actual Fraudulent Transfers under Fla. Stat. § 726.105(1)(a)<br>
Against All Defendants by Plaintiffs<br>
Individually and on Behalf of the All Classes</strong>

150.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert these claims on behalf of themselves and members of each Class alleged in this complaint.

151.    Plaintiffs allege that Liberty Power regularly and continuously transfers its assets (including its profits) to its owners or others ("Transfers"). On information and belief, Liberty Power's assets exist and are maintained in Florida, and the Transfers primarily occur within Florida. These Transfers qualify as fraudulent transfers under Florida's Uniform Fraudulent Transfer Act ("UFTA") (as well as the corresponding UFTA of any other state which might conceivably apply), and Plaintiffs seek to prevent further Transfers.

152.    These Transfers may take the form of dividends, loans, release of loans, wages, payment of expenses, or any other compensation to the owners, assignment of liens, debts, or accounts receivables held by Liberty Power, or Liberty Power's acceptance of any sort of lien or other encumbrance to its owners' benefit, or any and every other form of payment. The Transfers also include indirect payments to the benefit of Liberty Power's owners—for example, payments to spendthrift trusts, gifts (or other payments without reasonably equivalent value) to their

children or relatives, or to nominally exempt assets in owners' names or for their benefits. Other Transfers include inter-corporate payments from Holdings to Corp. All these Transfers fit within the Florida UFTA's broad definition of "transfer." *See* Fla. Stat. § 726.102(14) ("every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance").

153.     Upon information and belief, Liberty Power's owners operate Corp. and Holdings as a closely-held corporation. Upon information and belief, throughout the class period, Corp. and Holdings pay Transfers (in the various forms alleged above) to their owners to coincide with the end of Liberty Power's tax year and/or Liberty Power's quarterly tax filings throughout the class period. Liberty Power has not received reasonably equivalent value for the Transfers: as a matter of law, Liberty Power does not receive value for payment of profits (or any other return on equity) to its owners.

154.     Under the Florida UFTA's definitions, Liberty Power's liability on the TCPA claims of Plaintiff and the other class members alleged above constitutes a "debt," Plaintiffs and the other class members are "creditors" of Liberty Power, and Liberty Power is a "debtor" in relation to Plaintiffs and the other class members. *See* Fla. Stat. § 726.102(5), (6), (7).

155.     In 2014, Liberty Power reported it had nearly 200,000 customers—it is reasonable to infer Liberty Power's telemarketing activity is very significant from this large customer base. It is further reasonable to infer from Plaintiffs' experience with Liberty Power's telemarketing that Liberty Power's corresponding TCPA liability is equally significant. The potential liability for large-scale TCPA litigation is frequently massive. *Cf. United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 982 (C.D. Ill. 2017) (awarding $280 million in TCPA case after significant

reductions from face value of statutory penalties). Plaintiffs allege, on information and belief, that Liberty Power and its agents routinely violate the TCPA on a massive scale, and their total liability on the class TCPA claims alleged above significantly exceeds Liberty Power's assets.

156.    Hence, Transfers of Liberty Power's assets alleged above inevitably reduce the total amount of assets available to satisfy a judgment in favor of Plaintiffs and the other class members. The Transfers have injured and threaten to injure Plaintiffs and the other class members by impairing or prejudicing (or threatening to do so) their ability to collect a class judgment and/or settlement which covers the total value of the TCPA claims asserted against the Defendants in this Complaint.

157.    Liberty Power's revenue has declined over the last few years. Liberty Power's gross revenue has declined from $891 million in 2015, to $595 million in 2016, to $335 million in 2017. Upon information and belief, this decline is because Liberty Power cannot economically compete with electric utilities which have the capacity to generate and supply their own electricity to customers, as well as actions by state regulators to increasingly curtail Liberty Power's operations and marketing.

158.    For instance, the Office of the Attorney General for Massachusetts has released a report supporting Plaintiffs' allegations that Defendants' business model is not viable, absent significant abuse of their customer base:

> Competitive suppliers generally do not generate electricity themselves. Rather, they buy electric supply on the wholesale market and sell it to retail consumers. . . . Electricity consumers taking service from a competitive supplier receive their electric supply from a supplier, but continue to have that electricity delivered to them by their electric company. . . .
>
> Massachusetts residential electricity consumers who took service from a competitive supplier paid a total of $176.8 million more than they would have paid if they had received basic service from their electric company over the course of the two study periods. . . .

> The large and growing annual consumer losses (which disproportionately harm low-income and minority communities) suggest that suppliers have found Massachusetts markets to be attractive precisely because they are able to charge high rates.

State of Massachusetts, Office of the Attorney General, Are Consumers Benefiting from Competition? 1, 6, 41 (Mar. 2018), at https://www.mass.gov/files/documents/2018/03/29/ Comp%20Supply%20Report%20Final%20032918.pdf. The report concludes that "stronger consumer protection measures are insufficient to transform the competitive supply market from one that causes significant net harm to one that provides net benefits," and calling for the complete elimination of "the electric supply market for individual residential consumers." *Id.* at x.

159.    The report from the Massachusetts Attorney General also collects data of customer complaints which is strikingly consistent with many of the allegations above, and which suggests that retail electricity suppliers' business model is ultimately not sustainable absent significant marketing abuses:

> In the seven years from 2006 to 2013, the AGO received approximately 215 complaints about competitive suppliers. Since 2014, however, the AGO has received more than 700 complaints regarding competitive suppliers. The complaints often allege a variety of unfair or deceptive acts or practices, many times alleging more than one type of misconduct per complaint.
>
> The complaints typically include one or more of the following common allegations:
> • the competitive supplier promised savings, but the consumer ultimately pays substantially more for electric supply than he or she did before;
> • the competitive supplier took advantage of the consumer's age, disability, or language barrier in order to sign the consumer up for the supplier's product; competitive suppliers employing high-pressure, aggressive sales tactics, including harassing consumers by coming to their door or calling their phone over and over again in a short time span;
> • the competitive supplier solicited the consumer on the phone, even where the consumer is on the "Do Not Call" list . . .

> These allegations are not just common in Massachusetts, but across the fourteen states and jurisdictions in which the electric supply market was deregulated for residential consumers (the "deregulated states"). A perfunctory internet search indicates that in the last five years, thirteen of the fourteen deregulated states have launched investigations regarding unfair or deceptive acts or practices by electric suppliers who also are licensed to do business in Massachusetts. This includes at least 35 investigations or lawsuits by state public utility commissions and state attorneys general and/or consumer advocates. Moreover, suppliers who are licensed to do business in Massachusetts have been the subject of at least 59 class action lawsuits, as well as numerous individual lawsuits—all alleging unfair and deceptive acts and practices consistent with the types of complaints regularly received by the AGO. Unfortunately, the investigations and lawsuits appear to have little deterrent effect—rather, they seem to be borne by the suppliers as a mere cost of doing business.

*Id.* at 39.

160.    Likewise, on April 19, 2018, the Connecticut Office of Consumer Counsel has petitioned the Connecticut Public Utility Regulatory Authority to order Holdings to cease and desist telesales and door-to-door marketing because it alleged Holdings overcharged Connecticut customers over $7.7 million the prevailing rates of electric utilities. Connecticut Office of Consumer Counsel, *News Release*, at http://www.ct.gov/occ/lib/occ/occ_press_release_cease __desist_liberty_power_04_19_18.pdf (dated April 19, 2018). The OCC identified other state regulatory actions against Liberty Power:

> On April 11, 2018, the New York Attorney General announced a settlement with Liberty, under which Liberty agreed to implement new restrictions on its marketing practices to prevent future frauds and pay $550,000 to refund eligible New York consumers. The New York Attorney General found that Liberty's contractors and subcontractors lured consumers with false promises of savings and other deceptive means to enroll consumers, such as falsely claiming to represent the consumer's current utility provider. In 2013, the New York Public Service Commission suspended Liberty's authorization to conduct door-to-door marketing in New York after finding that Liberty exhibited a pattern of marketing that appeared to include misrepresentations and unauthorized account transfers. Liberty is also under investigation by the Massachusetts Attorney General Maura Healey, who recently issued a report calling for an end to the competitive electricity supply market for individual residential customers in Massachusetts.

*Id. See also* State of Massachusetts, Office of the Attorney General, *Press Release AG Healey*

*Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers*, at https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect (Mar. 29, 2018).

161.    The financial strain on Liberty Power and its scramble to alleviate that strain is evident in other regulatory actions. For instance, the Connecticut Public Utilities Regulatory Authority has also found that Holdings charged its customers vastly inflated rates for electricity, and violated Connecticut law by attempting to back-bill these customers without offering a payment plan.

162.    These regulatory actions threaten the continued ability of Holdings to generate revenue for Defendants (and indeed the viability of Liberty Power's market in Massachusetts). Further, any financial assets which remain in Liberty Power are threatened not only with depletion from the costs of running Liberty Power's business but also by the prospect of continued regulatory action (as well as liability for TCPA violations). Indeed, during the class period, Liberty Power has faced several significant and material class action lawsuits which have threatened its financial viability. Plaintiffs further allege, on information and belief, that Liberty Power's owners know that Liberty Power regularly and routinely violates the TCPA in the course of operating its business, so that Liberty Power's TCPA liability dwarfs its profits. Nonetheless, upon information and belief, Liberty Power routinely and regularly Transfers every dollar in profit to its owners—the owners deliberately keep Liberty Power very thinly capitalized. On information and belief, this inadequate capitalization has created financial problems for Liberty Power, including problems attracting and retaining employees. One former employee sued Defendants, and alleged that he was told Defendants were "having financial problems and [were] in need of raising capital," and Defendants' owners "misrepresented the

financial problems and amount of capital needed by [Defendants.]" Upon information and belief, Liberty Power's owners routinely strip out as much of Liberty Power's assets as they can while continuing to operate its business. On information and belief, Liberty Power's owners expressly organized and operate Corp. and Holding to convey the impression and pretense they are "bankruptcy remote," so that once Liberty Power Transfers its assets to its owners, those assets are no longer available to satisfy Liberty Power's liability.

163.    Liberty Power has not received reasonably equivalent value for such Transfers: as a matter of law, Liberty Power does not receive value for payment of profits (or any other return on equity) to its owners. Finally, Liberty Power has been insolvent (and/or its assets have been unreasonably small in relation to its TCPA liability) throughout the class period. The circumstances alleged above indicate that Liberty Power and its owners intended the Transfers "to hinder, delay, or defraud any creditor" of Liberty Power. *See* Fla. Stat. § 726.105(1)(a). The Transfers are fraudulent under the Florida UFTA's actual fraud prong.

164.    Plaintiffs, individually, and on behalf of the other members of the classes, seek injunctive and equitable relief against Defendants including prospectively enjoining fraudulent Transfers, attachment of assets, appointment of a receiver, and imposition of a constructive trust under Florida Statute 726.108.

### SIXTH CLAIM FOR RELIEF
### Constructive Fraudulent Transfers under Fla. Stat. §§ 726.105(1)(b), 726.106
### Against All Defendants by Plaintiffs
### Individually and on Behalf of the All Classes

165.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert these claims on behalf of themselves and members of each class alleged in this complaint.

166.    Consistent with paragraphs in the Fifth Claim above, Plaintiffs allege that Liberty

Power has made Transfers to its owners throughout the class period. Liberty Power has not received reasonably equivalent value for the Transfers: as a matter of law, Liberty Power does not receive value for payment of profits (or any other return on equity) to its owners. The Transfers did not preserve or increase the net worth of Liberty Power, and were not for fair market value of the assets transferred. Upon information and belief, Liberty Power engages business or transactions (including telemarketing campaigns which inevitably serve to increase its TCPA liability) for which its remaining assets are unreasonably small in relation to the business or transaction, especially considering its TCPA liability. Nonetheless, Liberty Power continues to conduct telemarketing campaigns that subject it to additional TCPA liability. By doing so, Liberty Power is both insolvent (in light of its TCPA liability) and intends to incur, or reasonably should have believed it would incur debts on TCPA claims beyond its ability to pay as such debts became due. The Transfers are fraudulent under the Florida UFTA's constructive fraud prong. *See* Fla. Stat. §§ 726.105(1)(b), 726.106.

167.    Plaintiffs, individually, and on behalf of the other members of the classes, seek injunctive and equitable relief against Defendants including prospectively enjoining fraudulent Transfers, appointment of a receiver, and imposition of a constructive trust under Florida Statute 726.108.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that the Court enter judgment and orders in their favor and against Defendants as follows:

a.    An order certifying the classes, directing that this case proceed as a class action, and appointing Plaintiffs and their counsel to represent the classes;

b.    Judgment against Defendants, and in favor of Plaintiffs and the other class members in the amount of $1,500 per violation of the TCPA as proven at trial;

c.       Equitable and injunctive relief, including injunctions enjoining further violations
         of the TCPA;

d.       Injunctive and equitable relief including enjoining fraudulent transfers,
         attachment of assets, appointment of a receiver, and imposition of a constructive
         trust under Florida Statute 726.108;

e.       And such other and further relief as this Court may deem appropriate.

Dated: November 14, 2018          By: /s/Ethan Preston
                                  Yitzchak H. Lieberman (*pro hac vice*)
                                  ylieberman@parasmoliebermanlaw.com
                                  Grace E. Parasmo (*pro hac vice*)
                                  gparasmo@parasmoliebermanlaw.com
                                  **PARASMO LIEBERMAN LAW**
                                  7400 Hollywood Blvd, #505
                                  Los Angeles, California 90046
                                  Telephone: (844) 200-5623
                                  Facsimile: (877) 501-3346

                                  John L. Fink, Esq.
                                  jfink@westborolawyer.com
                                  **FINK LAW OFFICE**
                                  18 Lyman St., Suite 208
                                  J&N Professional Building
                                  Westborough, Massachusetts 01581
                                  Telephone: (508) 433-0529

                                  David C. Parisi (*pro hac vice*)
                                  dcparisi@parisihavens.com
                                  Suzanne Havens Beckman (*pro hac vice*)
                                  shavensbeckman@parisihavens.com
                                  **PARISI & HAVENS LLP**
                                  Santa Monica, California  90405
                                  Telephone: (818) 990-1299
                                  Facsimile: (818) 501-7852

                                  Ethan Preston (*pro hac vice*)
                                  ep@eplaw.us
                                  **PRESTON LAW OFFICES**
                                  4054 McKinney Avenue, Suite 310
                                  Dallas, Texas 75204
                                  Telephone: (972) 564-8340
                                  Facsimile: (866) 509-1197

                                  Matthew R. Mendelsohn (*pro hac vice*)

mrm@mazieslater.com
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 228-0391
Facsimile: (973) 228-0303

*Attorneys for Plaintiffs Samuel Katz, Lynne
Rhodes, and Alexander Braurman, individually and
on behalf of similarly situated individuals*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: November 14, 2018               By:   /s/Ethan Preston

Yitzchak H. Lieberman (*pro hac vice*)
ylieberman@parasmoliebermanlaw.com
Grace E. Parasmo (*pro hac vice*)
gparasmo@parasmoliebermanlaw.com
**PARASMO LIEBERMAN LAW**
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (844) 200-5623
Facsimile: (877) 501-3346

John L. Fink, Esq.
jfink@westborolawyer.com
**FINK LAW OFFICE**
18 Lyman St., Suite 208
J&N Professional Building
Westborough, Massachusetts 01581
Telephone: (508) 433-0529

David C. Parisi (*pro hac vice*)
dcparisi@parisihavens.com
Suzanne Havens Beckman (*pro hac vice*)
shavensbeckman@parisihavens.com
**PARISI & HAVENS LLP**
Santa Monica, CA  90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Ethan Preston (pro hac vice)
ep@eplaw.us
**PRESTON LAW OFFICES**
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

Matthew R. Mendelsohn (*pro hac vice* to be filed)
mrm@mazieslater.com
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068

Telephone: (973) 228-0391
Facsimile: (973) 228-0303

*Attorneys for Plaintiffs Samuel Katz, Lynne Rhodes,
and Alexander Braurman, individually and on
behalf of similarly situated individuals*

## CERTIFICATE OF SERVICE

I, Grace E. Parasmo, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: November 14, 2018     By:  /s/Ethan Preston

Ethan Preston (*pro hac vice*)
ep@eplaw.us
**PRESTON LAW OFFICES**
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197