# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAMUEL KATZ, ALEXANDER BRAURMAN, LYNNE RHODES, individually, and on their own behalf and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>   v.<br><br>LIBERTY POWER CORP., LLC, LIBERTY POWER HOLDINGS, LLC, Delaware limited liability companies,<br><br>        Defendants. | No. 1:18-cv-10506<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>**Leave to File Excess Pages Granted on 1/15/2019** |
| LIBERTY POWER CORP., LLC, and LIBERTY POWER HOLDINGS, LLC,<br><br>        Third-Party Plaintiffs,<br>   v.<br><br>MEZZI MARKETING, LLC,<br><br>        Third-Party Defendant. | |

# TABLE OF CONTENTS

I.      Rhodes Has Standing to Assert All the Claims She Alleges in the SAC ........................ 1

II.     Katz and Braurman Have Standing to Assert Claims for Injunctive Relief ...................... 2

    A.      The Motion Is Moot Because Rhodes Has Standing ................................................. 2

    B.      Katz and Braurman Allege Standing for Injunctive Relief.................................... 2

    C.      Defendants Have Not Demonstrated Voluntary Cessation.................................... 3

    D.      Katz and Braurman Have Standing as Class Representatives ............................... 6

III.    The Court Has Jurisdiction and Venue Over Braurman's Claims ................................... 7

    A.      Defendants Do Not Dispute the Prima Facie Case That Braurman Received a
           Call in a Massachusetts-Targeted Telemarketing Campaign................................. 7

    B.      The Court Has Pendent Personal Jurisdiction Over Braurman's Claims ............. 10

    C.      The Court Has Pendent Personal Jurisdiction Over Braurman's Claims ............. 14

IV.     The SAC Sufficiently Alleges Defendants Acted Together Under Rule 8(a) ................ 15

    A.      The SAC Alleges Defendants Violated the TCPA Together, and Both
           Defendants Made Fraudulent Transfers.............................................................. 15

    B.      The SAC Properly Alleges Defendants Violated the TCPA Together ................. 16

    C.      Discovery Is Appropriate if More Details Were Required ................................... 18

    D.      Defendants' Cases Are Inapposite ...................................................................... 19

V.      The TCPA Does Not Violate the First Amendment ...................................................... 20

    A.      Under Prevailing First Circuit Jurisprudence, the TCPA Is Content Neutral
           and Subject to Intermediate Scrutiny.................................................................. 20

    B.      The TCPA Protects a Compelling Interest in Telephones' Continued Viability
           as a Means of Communication.............................................................................. 23

    C.      The TCPA Protects a Compelling Interest in Residential Privacy ...................... 24

    D.      The TCPA Is Narrowly Tailored ........................................................................ 26

    E.      Equal Protection Analysis Reaches the Same Result .......................................... 29

    F.      Even if Unconstitutional, the 2015 Amendment Should Simply Be Severed ...... 29

VI.     The SAC Amply States Uniform Fraudulent Transfer Act Claims ................................ 30

    A.      Defendants Ignore the SAC's Detailed Allegations ........................................... 31

    B.      The SAC Adequately Alleges Transfers.............................................................. 33

    C.      Defendants Are Left with Unreasonably Small Capital After Paying Profits ...... 34

         1.      Under a Proper UFTA Analysis, the SAC's Pending TCPA Claims
                 Count as Present Liabilities for Defendants.............................................. 35

         2.      Payment of Profits Left Defendants with Unreasonably Small Capital ... 36

    3.    Defendants Obtain No Value in Exchange for Their Profits ................... 38

D.    Rule 9(b) Does Not Apply to Constructive Fraudulent Transfer Claims ............ 40

E.    Plaintiffs Allege Intent to Hinder or Defraud ....................................................... 42

    1.    The SAC Alleges Badges of Fraud ........................................................ 43

    2.    Rule 9(b) Provides Intent May Be Alleged Generally............................. 43

F.    Discovery Is Proper, If More Details Were Required.......................................... 44

VII.   Conclusion ................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*ACA Int'l v. Fed. Commc'ns Comm'n*,
  885 F.3d 687 (D.C. Cir. 2018) ................................................................1

*In re Adelphia Commc'ns Corp.*,
  323 B.R. 345 (Bankr. S.D.N.Y. 2005) ...................................................39

*In re Agric. Research & Tech. Grp., Inc.*,
  916 F.2d 528 (9th Cir. 1990) .................................................................39

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) ..............................................................................30

*Am. Ass'n of Political Consultants v. Sessions*,
  323 F.Supp.3d 737, 744 (E.D.N.C. 2018) ...........................24, 26, 27, 29

*Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic
  Bishops*,
  705 F.3d 44 (1st Cir. 2013) .....................................................................4

*Am. States Ins. Co. v. Capital Assocs.*,
  392 F.3d 939 (7th Cir. 2004) .................................................................25

*AngioDynamics, Inc. v. Biolitec AG*,
  780 F.3d 429 (1st Cir. 2015) ...................................................................9

*In re Appleseed's Intermediate Holdings, LLC*,
  470 B.R. 289 (D. Del. 2012) ..................................................................40

*Azza v. Grp. Voyagers, Inc.*,
  No. 16-11981, 2018 WL 1513559 (D. Mass. Mar. 27, 2018) ...............20

*Bagheri v. Galligan*,
  160 F. App'x 4 (1st Cir. 2005) ...............................................................19

*In re Bay Plastics, Inc.*,
  187 B.R. 315 (Bankr. C.D. Cal. 1995) ..................................................39

*Bd. of Trustees of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989) ..............................................................................27

*In re Bernard L. Madoff Investment Securities LLC*,
  445 B.R. 206 (Bankr. S.D.N.Y. 2011) ..............................................34, 40

*BMS. Allen v. ConAgra Foods, Inc.*,
No. 13-01279, 2018 WL 6460451 (N.D. Cal. Dec. 10, 2018)........................................ *passim*

*In re Brentwood Lexford Partners, LLC*
(Bankr. N.D. Tex. 2003) 292 B.R. 255.................................................................................40

*Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*,
137 S. Ct. 1773 (2017)................................................................................................7, 12

*Calvi v. Knox Cty.*,
470 F.3d 422 (1st Cir. 2006).................................................................................................19

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016)............................................................................................................16

*Carey v. Brown*,
447 U.S. 455 (1980)..............................................................................................................25

*Carreras v. PMG Collins, LLC*,
660 F.3d 549 (1st Cir. 2011)...................................................................................................9

*Carter v. Newland*,
441 F. Supp. 2d 208 (D. Mass. 2006) ..................................................................................18

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
No. 09-2047, 2017 WL 5971622(E.D. La. Nov. 30, 2017) ....................................................13

*Christopher v. Mount Snow, Ltd.*,
No. 95-10352, 1996 WL 590738 (D. Mass. Sept. 24, 1996)...................................................8

*In re Comprehensive Power, Inc.*,
578 B.R. 14 (Bankr. D. Mass. 2017) .....................................................................................45

*Cota v. U.S. Bank Nat'l Ass'n*,
No. 15-486, 2016 WL 922784 (D. Me. Mar. 10, 2016)...........................................................17

*Cty. of Riverside v. McLaughlin*,
500 U.S. 44 (1991)..................................................................................................................6

*Davimos v. Halle*,
No. 13-225, 2013 WL 5353005 (D. Me. Sept. 24, 2013) .................................................34, 44

*Decarvalho v. Telford*,
No. 17-11224, 2017 WL 3668411 (D. Mass. Aug. 24, 2017) ................................................19

*In re Dewey & LeBoeuf LLP*,
518 B.R. 766 (Bankr. S.D.N.Y. 2014) ...................................................................................39

*e.,g., Ott v. Mortg. Inv'rs Corp. of Ohio*,
    65 F. Supp. 3d 1046, 1057 (D. Or. 2014) ...............................................................8

*Echavarria v. Roach*,
    No. 16-11118-ADB, 2017 WL 3928270 (D. Mass. Sept. 7, 2017) ...........................19

*In re Editorial Flash, Inc.*,
    No. 13-08014, 2016 WL 3638471 (Bankr. D.P.R. June 29, 2016)............................40

*In re El Comandante Mgmt.*,
    388 B.R. .............................................................................................................34, 45

*Energizer Brands, LLC v. Procter & Gamble Co.*,
    No. 16-223, 2016 WL 2894708 (E.D. Mo. May 18, 2016.....................................18

*Erickson v. Pardus*,
    551 U.S. 89 (2007)................................................................................................16

*Fed. Home Loan Bank of Boston v. Moody's Corp.*,
    821 F.3d 102 (1st Cir. 2016).................................................................................14

*In re Felt Mfg. Co., Inc.*,
    371 B.R. 589 (Bankr. D.N.H. 2007) .....................................................................41

*In re Fin. Res. Mortg., Inc.*,
    454 B.R. 6 (Bankr. D.N.H. 2011) .........................................................................40

*Fin. Res. Network, Inc. v. Brown & Brown, Inc.*,
    867 F. Supp. 2d 153 (D. Mass. 2012) ...................................................................10

*Fisher v. Kadant, Inc.*,
    No. 07-12375, 2008 WL 11389384 (D. Mass. Nov. 19, 2008), *aff'd*, 589 F.3d
    505 (1st Cir. 2009)................................................................................................20

*Fisher v. MJ Christensen Jewelers, LLC*,
    No. 15-00358, 2018 WL 1175215 (D. Nev. Mar. 6, 2018) .....................................5

*Flaherty v. Knapik*,
    999 F. Supp. 2d 323 (D. Mass. 2014) ...................................................................27

*Foster-Miller, Inc. v. Babcock & Wilcox Canada*,
    46 F.3d 138 (1st Cir. 1995)....................................................................................9

*Frisby v. Schultz*,
    487 U.S. 474 (1988)..............................................................................................25

*Garcia v. Carrion*,
    No. 09-1507, 2010 WL 3662593 (D.P.R. Aug. 11, 2010)......................................44

*Gerstein v. Pugh*,
   420 U.S. 103 (1975) ...................................................................................6, 7

*GMO Tr. ex rel. GMO Emerging Country Debt Fund v. ICAP plc.*,
   No. 12-10293, 2012 WL 5197545 (D. Mass. Oct. 18, 2012) ...................................18

*Greenley v. Laborers' Int'l Union of N. Am.*,
   271 F. Supp. 3d 1128, 1150 (D. Minn. 2017) ................................................24, 26

*Gresham v. Swanson*,
   866 F.3d 853 (8th Cir. 2017) ...............................................................22

*Griffith v. ContextMedia, Inc.*,
   235 F. Supp. 3d 1032, 1035 (N.D. Ill. 2016) ...................................................5

*Hannon v. Beard*,
   524 F.3d 275 (1st Cir. 2008) ................................................................8

*In re The Heritage Organization, LLC*,
   413 B.R. 438 (Bankr. N.D. Tex. 2009) .......................................................40

*Hill v. Colorado*,
   530 U.S. 703 (2000) ...................................................................25, 28

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016) ................................................................2

*Holmes Grp., Inc. v. RPS Prod., Inc.*,
   No. 03-40146, 2010 WL 7867756 (D. Mass. June 25, 2010).................................44

*Holt v. Facebook, Inc.*,
   240 F. Supp. 3d 1021, 1033 (N.D. Cal. 2017) .....................................24, 26, 27, 30

*Houlton Citizens' Coal. v. Town of Houlton*,
   175 F.3d 178 (1st Cir. 1999) ................................................................2

*Howell v. Advantage Payroll Servs., Inc.*,
   No. 16-438, 2017 WL 782881 (D. Me. Feb. 28, 2017) .........................................44

*Hudak v. Berkley Grp., Inc.*,
   No. 13-00089, 2014 WL 354676 (D. Conn. Jan. 23, 2014).....................................17

*In re Indrescom Sec. Tech. Inc.*,
   559 B.R. 305 (Bankr. D.P.R. 2016) ...................................................40, 44, 45

*In re Iridium Operating LLC*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007) .......................................................38

*In re James River Coal Co.*,
    360 B.R. 139 (Bankr. E.D. Va. 2007) ....................................................................45

*Janvey v. Golf Channel, Inc.*,
    792 F.3d 539 (5th Cir. 2015) ..............................................................................35

*Johansen v. Liberty Mut. Grp., Inc.*,
    No. 15-12920, 2016 WL 7173753 (D. Mass. Dec. 8, 2016) ................................4

*KG Urban Enters., LLC v. Patrick*,
    969 F. Supp. 2d 52 (D. Mass. 2013) ...................................................................4

*Kirkeby v. Furness*,
    92 F.3d 655 (8th Cir. 1996) ...............................................................................25

*Knotts v. Nissan N. Am., Inc.*,
    No. 17-05049, 2018 WL 4922360 (D. Minn. Oct. 10, 2018) .....................12, 13

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ...............................................................................2

*La Casse v. Aurora Loan Servs., LLC*,
    No. 15-11672, 2016 WL 4535338 (D. Mass. Aug. 30, 2016) ............................19

*Leyse v. Bank of Am. Nat. Ass'n*,
    804 F.3d 316 (3d Cir. 2015) ................................................................................1

*A.G. ex rel. Maddox v. v. Elsevier, Inc.*,
    732 F.3d 77 (1st Cir. 2013) ...........................................................33, 34, 38, 42

*March v. Mills*,
    867 F.3d 46 (1st Cir. 2017) .........................................................................21, 22

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998) .................................................................................9

*In re McCarn's Allstate Fin., Inc.*,
    326 B.R. 843 (Bankr. M.D. Fla. 2005) ..............................................................31

*Mejia v. Time Warner Cable Inc.*,
    No. 15-6445, 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017) ......................... *passim*

*Mejia v. Time Warner Cable Inc.*,
    No. 15-6445, 2017 WL 5513638 (S.D.N.Y. Nov. 17, 2017) ..............................23

*Metcalf v. Bay Ferries Ltd.*,
    937 F. Supp. 2d 147 (D. Mass. 2013) ...............................................................10

*Mey v. Venture Data, LLC,*
    245 F. Supp. 3d 771, 792 (N.D.W. Va. 2017) ................................................................22, 23

*Meyer v. Portfolio Recovery Assocs., LLC,*
    707 F.3d 1036 (9th Cir. 2012) ...........................................................................................4

*Milford Power Ltd. P'ship v. New England Power Co.,*
    918 F. Supp. 471 (D. Mass. 1996) ...............................................................................9, 45

*In re Miller,*
    188 B.R. 302 (Bankr. M.D. Fla. 1995) ..............................................................................43

*Montalvo-Huertas v. Rivera-Cruz,*
    885 F.2d 971 (1st Cir. 1989)..............................................................................................2

*Morales v. Chadbourne,*
    996 F. Supp. 2d 19 (D.R.I. 2014) ...................................................................................3, 5

*Moser v. FCC,*
    46 F.3d 970 (9th Cir. 1995) .........................................................................................28, 30

*Nesco, Inc. v. Cisco,*
    No. 05-142, 2005 WL 2493353 (S.D. Ga. Oct. 7, 2005).......................................................41

*New England Data Servs., Inc. v. Becher,*
    829 F.2d 286 (1st Cir. 1987)........................................................................................44, 45

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
    335 F. Supp. 2d 126 (D. Me. 2004) ..............................................................................10, 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
    522 F.3d 6 (1st Cir. 2008)...............................................................................................11

*In re NM Holdings Co., LLC,*
    407 B.R. 232 (Bankr. E.D. Mich. 2009) ............................................................................41

*Norwood Co-op. Bank v. Gibbs,*
    No. 10-11647, 2012 WL 4094328 (D. Mass. Sept. 13, 2012)................................................31

*U.S. ex rel. Nowak v. Medtronic, Inc.,*
    806 F. Supp. 2d 310 (D. Mass. 2011) ...............................................................................44

*Nowak v. Tak How Invs., Ltd.,*
    94 F.3d 708 (1st Cir. 1996)..............................................................................................8

*Nuzzo v. O'Brien,*
    No. 17-10297, 2018 WL 615665 (D. Mass. Jan. 29, 2018)...................................................19

*In re O'Day Corp.*,
   126 B.R. 370 (Bankr. D. Mass. 1991) ................................................................37

*In re Old Naples Sec., Inc.*,
   343 B.R. 310 (Bankr. M.D. Fla. 2006) ...............................................................31

*Omran v. United States*,
   No. 1:14-CV-13881, 2016 WL 4158556 (D. Mass. June 22, 2016)......................14

*Osorio v. State Farm Bank, F.S.B.*,
   746 F.3d 1242 (11th Cir. 2014) ............................................................................1

*In re Packaged Seafood*,
   338 F. Supp. 3d ...........................................................................................12, 13

*In re Packaged Seafood Prod. Antitrust Litig.*,
   338 F. Supp. 3d 1118, 1173 (S.D. Cal. 2018)..................................................11, 12

*Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*,
   842 F. Supp. 2d 661 (S.D.N.Y. 2012)..................................................................41

*Parchman v. SLM Corp.*,
   896 F.3d 728 (6th Cir. 2018) ................................................................................1

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................................18

*Patriotic Veterans, Inc. v. Zoeller*,
   845 F.3d 303 (7th Cir. 2017) ..............................................................................22

*In re Payton Const. Corp.*,
   399 B.R. 352 (Bankr. D. Mass. 2009) .............................................................33, 34

*Pena-Borrero v. Estremeda*,
   365 F.3d 7 (1st Cir. 2004)...................................................................................17

*Platten v. HG Bermuda Exempted Ltd.*,
   437 F.3d 118 (1st Cir. 2006)..................................................................................9

*Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*,
   478 U.S. 328 (1986).............................................................................................29

*Rappa v. New Castle Cty.*,
   18 F.3d 1043 (3d Cir. 1994).................................................................................30

*Reed v. Town of Gilbert, Ariz.*,
   135 S. Ct. 2218 (2015)....................................................................................21, 22

*Remijas v. Neiman Marcus Grp., LLC*,
 794 F.3d 688 (7th Cir. 2015) ................................................................3

*Reno v. Am. Civil Liberties Union*,
 521 U.S. 844 (1997)..............................................................................26

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*,
 869 F. Supp. 152 (S.D.N.Y. 1994) .......................................................14

*Rodi v. S. New England Sch. of Law*,
 389 F.3d 5 (1st Cir. 2004).....................................................................44

*Romani v. Shearson Lehman Hutton*,
 929 F.2d 875 (1st Cir. 1991)..................................................................44

*Roy v. FedEx Ground Package Sys., Inc.*,
 No. 17-30116, 2018 WL 6179504 (D. Mass. Nov. 27, 2018) ...............13

*Saldivar v. Racine*,
 818 F.3d 14 (1st Cir. 2016)............................................................16, 19

*Salpoglou v. Shlomo Widder, M.D., P.A.*,
 899 F. Supp. 835 (D. Mass. 1995) ..................................................11, 12

*Sanchez v. Launch Tech. Workforce Sols., LLC*,
 297 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) .......................................13

*Sawtelle v. Farrell*,
 70 F.3d 1381 (1st Cir. 1995)...................................................................8

*Schlick v. Penn-Dixie Cement Corp.*,
 507 F.2d 374 (2d Cir. 1974)...................................................................45

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
 742 F.2d 786 (3d Cir. 1984)...................................................................34

*Signs for Jesus v. Town of Pembroke, NH*,
 230 F. Supp. 3d 49, 59 (D.N.H. 2017)............................................21, 24

*Sliwa v. Bright House Networks, LLC*,
 No. 16-235, 2018 WL 1531913 (M.D. Fla. Mar. 29, 2018) ............29, 30

*Sloan v. Gen. Motors LLC*,
 287 F. Supp. 3d 840 (N.D. Cal. 2018) .............................11, 12, 13, 24

*Snyder v. Ocwen Loan Servicing, LLC*,
 258 F. Supp. 3d 893 (N.D. Ill. 2017) ......................................................6

*Soppet v. Enhanced Recovery Co., LLC*,
   679 F.3d 637 (7th Cir. 2012) ................................................................1

*Stone v. Winter Enters., P.C.*,
   No. 12-465, 2012 WL 6155606 (D.N.J. Dec. 11, 2012).......................18

*Subsalve USA Corp. v. Watson Mfg., Inc.*,
   462 F.3d 41 (1st Cir. 2006).................................................................15

*In re Teknek, LLC*,
   343 B.R. 850 (Bankr. N.D. Ill. 2006) ..................................................40

*In re Terry Mfg. Co., Inc.*,
   No. 05-3050, 2007 WL 274319 (Bankr. M.D. Ala. Jan. 25, 2007) ........39

*Texas v. Am. Blastfax, Inc.*,
   121 F. Supp. 2d 1085 (W.D. Tex. 2000)..............................................29

*Thorburn v. Austin*,
   231 F.3d 1114 (8th Cir. 2000) ............................................................25

*Ticketmaster-New York, Inc. v. Alioto*,
   26 F.3d 201 (1st Cir. 1994)..................................................................9

*In re Trace Int'l Holdings, Inc.*,
   289 B.R. 548 (Bankr. S.D.N.Y. 2003) .................................................39

*Tri-Continental Leasing Corp., Inc. v. Zimmerman*,
   485 F. Supp. 495 (N.D. Cal. 1980) .....................................................36

*Troncoso v. Middlesex Sheriff's Office*,
   No. 18-10110, 2018 WL 1783801 (D. Mass. Apr. 13, 2018)................16

*In re Tronox Inc.*,
   429 B.R. 73 (Bankr. S.D.N.Y. 2010) ...................................................41

*Turner Broad. Sys., Inc. v. FCC*,
   520 U.S. 180 (1997)...........................................................................28

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*,
   960 F.2d 1080 (1st Cir. 1992).............................................................20

*United States v. Bestfoods*,
   524 U.S. 51 (1998).............................................................................20

*United States v. Booker*,
   543 U.S. 220 (2005)...........................................................................30

*United States v. Dish Network LLC*,
   256 F. Supp. 3d 810, 982 (C.D. Ill. 2017) .......................................................................36

*United States v. Mueffelman*,
   327 F. Supp. 2d 79 (D. Mass. 2004) ...............................................................................30

*United States v. Playboy Entertainment Group, Inc.*,
   529 U.S. 803 (2000)...................................................................................................27, 28

*United States v. Pratt*,
   913 F.2d 982 (1st Cir. 1990) ...........................................................................................42

*United States v. Rocky Mountain Holdings, Inc.*,
   782 F. Supp. 2d 106 (E.D. Pa. 2011) ..............................................................................40

*In re Vadnais Lumber Supply, Inc.*,
   100 B.R. 127 (Bankr. D. Mass. 1989) .......................................................................37, 38

*Vaello-Carmona v. Siemens Med. Sols. USA, Inc.*,
   781 F.3d 1 (1st Cir. 2015) .................................................................................................1

*Val Leasing, Inc. v. Hutson*,
   674 F. Supp. 53 (D. Mass. 1987) ....................................................................................11

*Van Bergen v. State of Minn.*,
   59 F.3d 1541 (8th Cir. 1995) ..........................................................................................22

*Connor B. ex rel. Vigurs v. Patrick*,
   771 F. Supp. 2d 142 (D. Mass. 2011) ...........................................................................3, 5

*W Holding Co. v. AIG Insur. Co.*,
   943 F. Supp. 2d 313 (D.P.R. 2013)..................................................................................43

*In re W.R. Grace & Co.*,
   281 B.R. 852 (Bankr. D. Del. 2002) ..........................................................................31, 36

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989).........................................................................................................21

*Wayne Investment, Inc. v. Gulf Oil Corp.*,
   739 F.2d 11 (1st Cir. 1984)........................................................................................34, 45

*Wiand v. Morgan*,
   919 F. Supp. 2d 1342 (M.D. Fla. 2013) ..........................................................................37

*Williams-Yulee v. Fla. Bar*,
   135 S. Ct. 1656 (2015).....................................................................................................27

*Wilson v. N. Am. Reinsurance Corp.*,
  No. 86-4968, 1988 WL 48561 (E.D. Pa. May 13, 1988)........................................................42

*Zond, Inc. v. Fujitsu Semiconductor Ltd.*,
  990 F. Supp. 2d 50 (D. Mass. 2014) ...........................................................................17, 18, 19

**State Cases**

*Friedman v. Heart Inst. of Port St. Lucie, Inc.*,
  863 So. 2d 189 (Fla. 2003)....................................................................................................35

*Gen. Elec. Co. v. Chuly Int'l, LLC*,
  118 So. 3d 325 (Fla. Dist. Ct. App. 2013) ...........................................................................43

*Paragon Health Servs., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc.*,
  859 So. 2d 1233 (Fla. Dist. Ct. App. 2003) .........................................................................37

*Smith v. Effective Teleservs., Inc.*,
  133 So. 3d 1048 (Fla. Dist. Ct. App. 2014) .........................................................................39

*Yaralli v. Am. Reprographics Co., LLC*,
  165 So. 3d 785 (Fla. Dist. Ct. App. 2015) ...........................................................................44

**Federal Statutes**

28 U.S.C. § 1391 ...........................................................................................................................14

28 U.S.C. § 1391(b)(1) .................................................................................................................14

28 U.S.C. § 1391(c)(2)..................................................................................................................14

28 U.S.C. § 1407 ...........................................................................................................................13

28 U.S.C. § 1631...................................................................................................................14, 15

47 U.S.C. § 227(b)(1)(A)............................................................................................................1, 21

47 U.S.C. § 227(b)(1)(B) ...............................................................................................................21

47 U.S.C. § 227(b)(3) ....................................................................................................................32

47 U.S.C. § 608 .............................................................................................................................30

**State Statutes**

Fla. Stat. § 726.102(4)...................................................................................................................35

Fla. Stat. § 726.102(6)...................................................................................................................35

Fls. Stat. § 726.105 ............................................................................................................31, 36

Fla. Stat. § 726.105(1) .................................................................................................................37

Fla. Stat. § 726.105(1)(a) .......................................................................................................36, 41

Fla. Stat. § 726.105(2) .................................................................................................................43

Fla. Stat. § 726.105(2)(a) .............................................................................................................43

Fla. Stat. § 934.06 .......................................................................................................................42

UFTA ................................................................................................................................. *passim*

Unif. Voidable Transfers Act § 4 cmt. 10 ...................................................................................41

Unif. Voidable Transfers Act § 15 cmt. 1 ...................................................................................41

Unif. Voidable Transfers Act § 15 cmt. 5 ...................................................................................42

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................................17, 19

Fed. R. Civ. P. Rule 8(a) .................................................................................................... *passim*

Fed. R. Civ. P. Rule 8(a) .............................................................................................................34

Fed. R. Civ. P. Rule 9(b) .................................................................................................... *passim*

Fed. R. Civ. P. Rule 12(b)(6) .......................................................................................................33

Fed. R. Civ. P. Rule 23 ..........................................................................................................13, 14

Fed. R. Civ. P. Rule 23(b)(2) .........................................................................................................5

Fed. R. Civ. P. Rule 56(c)(4) .......................................................................................................10

L.R. 7.1(d) ......................................................................................................................................9

**Regulations**

47 C.F.R. § 64.1200(d)(3) ..............................................................................................................4

**Constitutional Provisions**

First Amendment ............................................................................................................... *passim*

## Other Authorities

137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper)..........................23

137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper).
137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) (statement of Rep.
Markey)..............................................................................................................................23

137 Cong. Rec. S18,784 (daily ed. Nov. 27, 1991) (statement of Sen. Pressler)..........................27

14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §
3826 (4th ed. 2018)..........................................................................................................14

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
1298 (3d ed. 2018)............................................................................................................45

Hamza Shaban, *Nearly half of cellphone calls will be scams by 2019, report says*,
Wash. Post, September 19, 2018, *available at*
https://www.washingtonpost.com/technology/2018/.................................................24

*Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*,
115th..........................................................................................................................23, 24

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991, 2015 Report and Order*,
30 FCC Rcd. 7961 ¶¶73-74 (July 10, 2015)......................................................1, 28

S. Rep. No. 102-178 (1991)................................................................................................23

Plaintiffs Samuel Katz, Lynne Rhodes, and Alexander Braurman (collectively, "Plaintiffs") hereby submit their opposition to Defendants Liberty Power Corp., LLC and Liberty Power Holdings, LLC's ("Defendants'") Motion to Dismiss ("Motion") Plaintiffs' Second Amended Complaint ("SAC").

## I.        Rhodes Has Standing to Assert All the Claims She Alleges in the SAC

Defendants assert Rhodes has no TCPA claims for calls to her father's telephone number (508-540-XXXX) because she "was not the 'called party' with a legally protected interest under the TCPA." (Def.s' Mot. 5.) Rhodes lived with her father at his house while he had dementia, and she answered Defendants' calls. (SAC ¶¶87-93.) Rhodes is a "called party" under these facts, whether or not she was Defendants' intended recipient—Defendants are simply wrong on this point of law, contradicted by their own cases.[1] And even if she did not have standing in her own right, Rhodes asserts those claims as the executrix of her father's estate. She independently has standing to bring claims that are the property of her father's estate.[2] (SAC ¶87.)

Rhodes also alleges a call to her cellular telephone at 617-962-XXXX. (*Id.* ¶100.)

---

[1]   The FCC has defined a "called party" to include a "non-subscriber customary user of a telephone number," "the person whose privacy is interrupted by unwanted calls." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 2015 Report and Order*, 30 FCC Rcd. 7961 ¶¶73-74 (July 10, 2015) ("2015 Order"). The D.C. Circuit recently held the 2015 Order's interpretation of "called party" was permissible, *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 706 (D.C. Cir. 2018), and it is consistent with every other Court of Appeal to consider the issue, including cases Defendants cite, *cf. Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012) ("called party" means "person who answers the call" or subscriber; rejecting argument that "called party" is limited to "intended recipient"; followed by *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251-52 (11th Cir. 2014) (rejecting "argument that the 'intended recipient' is the 'called party' referred to in 47 U.S.C. § 227(b)(1)(A)"); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 326 (3d Cir. 2015) (TCPA protects "regular user of the phone line who occupies the residence")).

[2]   *See Parchman v. SLM Corp.*, 896 F.3d 728, 741 (6th Cir. 2018) ("claims under the TCPA do survive a plaintiff's death"); *Vaello-Carmona v. Siemens Med. Sols. USA, Inc.*, 781 F.3d 1, 6 (1st Cir. 2015) ("When a cause of action arises from a federal statute, we generally apply federal law to determine whether that claim survives the plaintiff's death").

Defendants make no argument that she does not have standing to bring claims for this call.

## II.     Katz and Braurman Have Standing to Assert Claims for Injunctive Relief

Defendants argue that Katz and Braurman cannot seek injunctive relief because Katz has

not alleged he received a call since he was put on Defendants' internal DNC list since March 29,

2017, and "Braurman is in essentially the same position." (Def.s' Mot. 6.)

### A.     The Motion Is Moot Because Rhodes Has Standing

Defendants do not dispute Rhodes has standing to seek injunctive relief for the June 20,

2018 call she alleges. (*Cf.* Def.s' Mot. 10-11 *with* SAC ¶¶100-101.) There is no need to consider

standing for injunctive relief further: "[w]here coplaintiffs have a shared stake in the litigation . .

. the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs'

standing." *Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976 (1st Cir. 1989).[3] Defendants

also say Katz and Braurman's injunctive claims "should be dismissed with prejudice." (Def.s'

Mot. 6.) This is wrong: "dismissal for lack of Article III standing must operate without

prejudice." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 736 (1st Cir. 2016) (collecting cases).

### B.     Katz and Braurman Allege Standing for Injunctive Relief

In any event, all the Plaintiffs allege they are exposed to further calls because Defendants

do not comply with the TCPA: Plaintiffs were called while their telephone numbers were on the

national do-not-call list, and after they should have been on Defendants' internal do-not-call list.[4]

Defendants' agents told Plaintiffs they would keep calling until Plaintiffs purchased Defendants'

---

[3]     *See also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676-77 (7th Cir. 2009) (rejecting challenge to two class members' standing because, even if the challenge was meritorious "that left one named plaintiff with standing, and one is all that is necessary"); *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999) ("when one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of the others"; citations omitted).
[4]     (*See* SAC ¶¶31, 34, 61-62, 76-78, 87-95, 115, 146.)

electricity.[5] This threat was and is credible: the complaints in the FTC database shows that Defendants will continue to call the same consumers for years,[6] and that the telemarketing complaints against Defendants continued to accumulate through the date of the original complaint.[7] Finally, Defendants' agents conceal their identity (using spoofed telephone numbers)—so Plaintiffs are not in a position to identify subsequent calls from Defendants.[8] Thus, Plaintiffs face continued injury because Defendants' continued TCPA violations mean Plaintiffs must continually screen their calls to avoid answering unwanted telemarketing calls.[9] *Cf. Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (prophylactic measures can establish standing).

This is sufficient to allege standing for injunctive relief: "'at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 151 (D. Mass. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "'Even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of hypothetical,'" and suffices to "survive a motion to dismiss an injunctive claim based on the assertion of lack of standing . . ." *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 37 (D.R.I. 2014) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 525 n. 23 (2007)).

### C.    Defendants Have Not Demonstrated Voluntary Cessation

Conversely, Defendants submit declarations that Katz and Braurman are on Defendants'

---

[5]    (*Id*. ¶¶61, 93.)

[6]    (ECF No. 109-1 (Ex. 1 to SAC), Row 147 ("I've asked them to take my number off their list. They agree to do it but three years later...they are still calling"). *See also id.*, Rows 64, 139.)

[7]    (SAC ¶¶70, 80-81, 100; ECF No. 109-1 (Ex. 1 to SAC).)

[8]    (*Id*. ¶¶30, 58-70, 74-82, 96.)

[9]    (*See id*. ¶¶71, 85, 105.)

internal do-not-call list. (Def.s' Mot. 10-11.) Defendants invoke the voluntary cessation rule, where "the defendant voluntary ceases the challenged practice," thereby allegedly "mooting the plaintiff's case." *Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 54 (1st Cir. 2013). But "voluntary cessation of challenged conduct does not ordinarily render a case moot unless the defendant meets the 'formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *KG Urban Enters., LLC v. Patrick*, 969 F. Supp. 2d 52, 56 (D. Mass. 2013).[10] This prevents "a manipulative litigant [from] immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Catholic Bishops*, 705 F.3d at 54-55.

Defendants rely on their internal do-not-call policy to demonstrate Katz and Braurman have no risk of further injury, but concede they took *months* to add them to their internal do-not-call list.[11] And Defendants' persistence in their claim there is nothing wrong with their existing telemarketing and do-not-call practices—in the face of hundreds of complaints to the contrary—indicates injunctive relief is appropriate. (*Cf.* ECF No. 109-1; SAC ¶¶159-60 *with Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (affirming preliminary injunction where defendant "did not acknowledge the wrongful nature of its conduct" and

---

[10]   This Court has held that a TCPA plaintiff's claims are not moot even where defendants offered to stipulate to certain injunctive relief, where the plaintiff had "not received all of the relief he seeks." *See Johansen v. Liberty Mut. Grp., Inc.*, No. 15-12920, 2016 WL 7173753, *4 (D. Mass. Dec. 8, 2016) (quoting *Piro v. Exergen Corp.*, No. 15-11834, 2016 WL 1255630, *6 (D. Mass. Mar. 29, 2016) that "[o]pen questions as to the adequacy of Exergen's self-designed corrective measures preclude the Court from concluding, as a matter of law, that Exergen has addressed the Named Plaintiffs and the Putative Class Members' injury in full").

[11]   (*See* SAC ¶¶31, 34, 61-62, 76-78, 87-95, 115, 146.) Defendants added Katz and Braurman to their internal do-not-call list five and 20 months, respectively, after they requested Defendants stop calling. This reflects a defective do-not-call policy. 47 C.F.R. § 64.1200(d)(3) (do-not-call request must be honored "within a reasonable time from the date such request is made," which "may not exceed thirty days from the date of such request").

"would have continued to violate the TCPA if an injunction had not been issued," even though it

"assured the court it would stop calling [Plaintiff] without making any assurance regarding other

[class] members")).[12] All this provides a strong record that Defendants' do-not-call practices fail

to protect consumers like Katz and Braurman. Other courts have rejected premature efforts to

foreclose injunctive relief on TCPA claims at the pleading stage:

> [B]ecause Plaintiffs have not yet been able to take discovery into Time Warner's systems and procedures, it would be premature for the Court to determine that Time Warner has adequately foreclosed the possibility of future violations. . . . Further discovery may reveal that Time Warner has, in fact, taken steps to ensure that future violations will not occur, rendering injunctive relief unnecessary, but the Court [cannot conclude] so at this juncture.

*Mejia v. Time Warner Cable Inc.*, No. 15-6445, 2017 WL 3278926, *11 (S.D.N.Y. Aug. 1,

2017). *See Griffith v. ContextMedia, Inc.*, 235 F. Supp. 3d 1032, 1035 (N.D. Ill. 2016) (denying

motion to dismiss injunctive relief in TCPA case; "plaintiff's allegations—particularly those

directed to her months-long efforts to stop defendants' unwanted texts—are sufficient to entitle

her to develop the factual record as to whether injunctive relief is appropriate").[13] Defendants'

cases concern the *plaintiffs* affirmatively moving for injunctive relief, after they had a full

opportunity to present a complete factual record.[14] Here, Defendants have moved to dismiss and

have withheld class-wide discovery, including relevant information about their do-not-call

---

[12]   *Cf. Morales*, 996 F. Supp. 2d at 38 (plaintiff had standing for injunctive relief where defendants' agents "told her that this could happen to her again").

[13]   "Defendants' arguments may have greater force if, after discovery, it becomes clear that a named Plaintiff cannot link the harm he or she suffered to a particular action or inaction by [Defendants]. In response to a threshold motion to dismiss, however, such a finding would be premature." *Connor B.*, 771 F. Supp. 2d at 152.

[14]   (*Cf.* Def.s' Mot. 7, 8 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (plaintiff's motion for injunctive relief); *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015) (same); *Bank v. Caribbean Cruise Line, Inc.*, No. 12-584, 2014 WL 1883586 (E.D.N.Y. May 12, 2014) (same); *Hamilton v. Voxeo Corp.*, No. 07-404, 2009 WL 1868541 (S.D. Ohio June 25, 2009) (same); *Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 130 P.3d 1280 (2006) (same).) *See also Fisher v. MJ Christensen Jewelers, LLC*, No. 15-00358, 2018 WL 1175215, *6 (D. Nev. Mar. 6, 2018) (rejecting class certification under Rule 23(b)(2) because, e.g., it found "Plaintiff has not shown a need for injunctive relief").

policies and their telemarketers. (*See* Preston Decl. ¶9. *See also* ECF Nos. 66, 113.)

###### D.      Katz and Braurman Have Standing as Class Representatives

Even if Katz and Braurman had lost standing for injunctive relief as *individuals*, they retain standing as class representatives because Defendants' TCPA violations are "capable of repetition, yet evading review." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). The record shows Defendants made a genuine effort to ensure their telemarketers stop calling leads on their lead lists *only after* the lead escalated to a complaint. On these facts, Katz and Braurman's injunctive relief "'are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980); citing *Gerstein*, 420 U.S. at 110 n.11)).

Moreover, Defendants' own case shows Braurman has standing for injunctive relief: Defendants added Braurman's number to their do-not-call list on August 2, 2018—*only after Plaintiffs filed the first amended complaint on July 26, 2018*. (Martinez Decl. ¶3, ECF No. 119-5 (cited by Def.s' Mot. 10-11).) *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893 (N.D. Ill. 2017) recognizes "the named plaintiff [simply has] to have a live claim at the time that the complaint was filed." *Id.* at 901 (citation omitted). *Snyder* granted an injunction in a TCPA case where one of the class representatives continued to receive calls after the original complaint was filed, even though neither class representative "face[d] a current threat of receiving calls . . . that violate the TCPA" at the time of the injunction. *Id.* 900, 901 (noting "other members of the proposed class continued to receive phone calls" after the defendants stopped calling the class representatives).[15] Otherwise, defendants "could evade prospective injunctive relief simply by . .

---

[15]    Again, Ms. Rhodes alleges she received telemarketing calls which violated the TCPA after Plaintiffs filed their initial complaint. (SAC ¶100.)

. ceasing the alleged violations with respect to plaintiffs who step forward." *Id*. at 901 (following *Gerstein*, 420 U.S. at 110 n.11).

### III.    The Court Has Jurisdiction and Venue Over Braurman's Claims

Defendants argue the Court does not have jurisdiction or venue over Braurman's claims. (Def.s' Mot. 10-16.) The SAC alleges Braurman's claims arose from Defendants' telemarketing campaign targeting Massachusetts—and makes detailed allegations how other out-of-state residents received calls targeting Massachusetts, indeed from the same 508 area code telephone number. (SAC ¶¶79-82.) While Defendants deny that Braurman received a call in a Massachusetts-targeted telemarketing campaign, they do not dispute those facts are sufficient for jurisdiction. (Def.s' Mot. 13.) As Braurman explains, the Court cannot credit Defendants' denial on this record—and even if it did, the Court still has pendent jurisdiction over his claims. It follows that the Court is a proper venue as well. Even if the Court disagrees, it should transfer Braurman's case rather than dismiss.

### A.    Defendants Do Not Dispute the Prima Facie Case That Braurman Received a Call in a Massachusetts-Targeted Telemarketing Campaign

Defendants argue Braurman's claims lack the "'requisite connection'" to Massachusetts. (Def.s' Mot. 12) (citing *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) (hereinafter, *BMS*.) As in *BMS*, the only element of specific jurisdiction Defendants challenge is that "the plaintiff's claim must . . . relate to the defendant's forum conduct." *BMS*, 137 S. Ct. at 1786 (citations, punctuation omitted).

The SAC alleges the calls Braurman received from (508) 523-6101 "were part of a telemarketing campaign directed at Massachusetts residents." (SAC ¶79.) This is the most reasonable inference from the facts in the record. (Preston Decl. ¶8.) The SAC cites to various complaints about calls from (508) 523-6101 from Massachusetts residents, which told recipients

they could receive a discount on their Eversource bill. (SAC ¶¶80-81; Preston Decl. ¶¶4-7.) The record also identifies other instances where Defendants' telemarketing calls were directed at Massachusetts residents—but reached residents of other states.[16] The "relatedness test" is a "flexible, relaxed standard," *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995), focusing "on the nexus between the plaintiff's *claim* and the defendant's contacts with the forum state, not on the relationship between the plaintiff and defendant." *Hannon v. Beard*, 524 F.3d 275, 283 (1st Cir. 2008). Braurman's claims satisfy the relatedness element because they arise from conduct deliberately targeting Massachusetts.[17] The fact that Defendants' agents directed their calls to Massachusetts residents is sufficient to support specific jurisdiction—even if those calls reached Braurman in New Jersey by mistake.[18] Indeed, Defendants never disputed those facts sufficed for jurisdiction.

Rather, Defendants rely on Alberto Martinez's January 2019 declaration to dispute the SAC's detailed allegations— asserting neither Defendants nor "upon information and belief, their telemarketing vendors" called Braurman "as part of marketing campaign targeting

---

[16]  There is other evidence consistent with Defendants' Massachusetts-directed marketing reaching customers outside of Massachusetts. One former Massachusetts resident complained of 2016 telemarketing calls from Liberty Power which stated the recipient "qualif[ied] for a rebate because [she was] an Eversource customer," but the recipient lived in Texas. (*See* ECF No. 109-1, Row 235 (calls to former Eversource customer; "Eversource is an electric company I used in MA and I have lived in Austin since August 2015.") *See also* Preston Decl. ¶5.) Eversource operates in Massachusetts, but not in Texas. (*Id.*) The implication is that Defendants targeted Massachusetts residents, but reached a Texas resident instead.

[17]  "When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (construing relatedness element of specific jurisdiction).

[18]  *See, e.,g.*, *Ott v. Mortg. Inv'rs Corp. of Ohio*, 65 F. Supp. 3d 1046, 1057 (D. Or. 2014) (telemarketing campaign directed at forum sufficient basis for specific jurisdiction); *Christopher v. Mount Snow, Ltd.*, No. 95-10352, 1996 WL 590738, *3 (D. Mass. Sept. 24, 1996) (advertising directed at Massachusetts sufficiently related to injury in Vermont to satisfy relatedness requirement for specific jurisdiction).

Massachusetts." (Martinez Decl. ¶5, ECF No. 119-7 (cited by Def.s' Mot. 13).) The SAC has

detailed factual allegations directly contradicting and disputing this conclusion. Without an

evidentiary hearing, the Court applies the First Circuit's prima facie standard for resolving

personal jurisdiction challenges. *AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 429, 434 (1st Cir.

2015).[19] Under the prima facie standard, the Court takes "specific facts affirmatively alleged by

the plaintiff as true (*whether or not disputed*) and construe[s] them in the light most congenial to

the plaintiff's jurisdictional claim," and then adds Defendants' facts "*to the extent that they are*

*uncontradicted.*" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir.

1998) (quoted by *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006)). [20]

The Court should "draw all reasonable inferences [from the record] in the plaintiff's favor."

*Carreras v. PMG Collins, LLC*, 660 F.3d 549, 552 (1st Cir. 2011). The Court should credit

Plaintiffs' facts, and reject the Martinez declaration.

Critically, the Martinez declaration only asserts "*upon information and belief*" that

Defendants' telemarketers did not call Braurman "as part of marketing campaign targeting

Massachusetts." (Martinez Decl. ¶5, ECF No. 119-7 (emphasis added).) On a motion to dismiss

for lack of jurisdiction, the Court applies the same standards of admissibility as in a motion for

summary judgment and will only consider affidavits "if they are based on the personal

knowledge of a competent affiant." *Milford Power Ltd. P'ship v. New England Power Co.*, 918

---

[19]   Neither party requested an evidentiary hearing. *Cf.* L.R. 7.1(d). Plaintiffs ask for specific
notice if the Court decides to impose a different evidentiary standard, as Defendants have
withheld discovery on call records supporting the SAC's allegations. *See Foster-Miller, Inc.
v. Babcock & Wilcox Canada*, 46 F.3d 138, 148-49 (1st Cir. 1995). (*Cf.* Preston Decl. ¶9.)

[20]   *See also Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994) ("we draw
the facts from the pleadings and the parties' supplementary filings, including affidavits,
taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light
most hospitable to plaintiff").

F. Supp. 471, 478 (D. Mass. 1996).[21] "Motions based upon 'information and belief' do not

satisfy [this] standard." *Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 867 F. Supp. 2d 153,

171 (D. Mass. 2012) (same).

   The Martinez declaration cannot readily be made admissible. It fails to lay any

foundation for Martinez's knowledge of the activities of Defendants' telemarketers—which are

outside the scope of knowledge about *Defendants'* own activities that might be presumed to

Defendants' employees. Indeed, Defendants claim that they were "unable to [even transmit

preservation letters to] some vendors." (ECF No. 113 at 5.) If Martinez claimed personal

knowledge here, it would open Defendants up to discovery about their telemarketers' practices.

Defendants cannot disavow their telemarketers at the same time they claim personal knowledge

to challenge jurisdiction.

   **B.      The Court Has Pendent Personal Jurisdiction Over Braurman's Claims**

   Even without a Massachusetts-targeted telemarketing campaign, the Court can still

exercise pendent jurisdiction over Braurman's claims. Where multiple claims "arise out of the

same nucleus of operative facts" and there is personal jurisdiction over one claim, the Court can

exercise "pendent personal jurisdiction" over the other claims. *In re New Motor Vehicles

Canadian Exp. Antitrust Litig.*, 335 F. Supp. 2d 126, 128 (D. Me. 2004). "'It is often reasonable

to compel a defendant to answer other claims in the same suit arising out of a common nucleus

of operative facts, [where] it is in the interest of 'judicial economy, avoidance of piecemeal

litigation, and overall convenience of the parties.'" *Id*. at 128-29 (quoting *Action Embroidery

Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); other punctuation omitted).

   Courts in the First Circuit, and the "Second, Third, Fourth, Seventh, Ninth, Tenth, and

---

[21]   *See also Metcalf v. Bay Ferries Ltd.*, 937 F. Supp. 2d 147, 149-50 (D. Mass. 2013) (Rule
     56(c)(4) admissibility requirements apply to "motions to dismiss for lack of personal
     jurisdiction"). Defendants' cases are not to the contrary. (*Cf*. Def.s' Mot. 3 n.2.)

D.C. Circuits have all recognized pendent personal jurisdiction explicitly." *Id*. at 128 (cited by *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 9 (1st Cir. 2008) as one of "many thoughtful decisions of the district court"). In particular, this Court has repeatedly exercised pendent personal jurisdiction. *See Salpoglou v. Shlomo Widder, M.D., P.A.*, 899 F. Supp. 835, 839 (D. Mass. 1995) ("court may exercise both personal jurisdiction over the defendant as to the breach of contract claim and pendent personal jurisdiction over him as to the malpractice claim"); *Val Leasing, Inc. v. Hutson*, 674 F. Supp. 53, 56 (D. Mass. 1987) ("where a plaintiff has established jurisdiction over a non-resident defendant with respect to one [claim, courts] will exercise jurisdiction over that defendant with respect to related state claims").

Courts have further exercised "pendent jurisdiction over the claims by the nonresident named plaintiffs" in the face of motions to dismiss that rely on *BMS*. *Allen v. ConAgra Foods, Inc.*, No. 13-01279, 2018 WL 6460451, *8 (N.D. Cal. Dec. 10, 2018) (exercising pendent jurisdiction would "serve the interests of judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties"). In *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840 (N.D. Cal. 2018), the court found the additional burden on defendants from exercising pendent personal jurisdiction over five additional plaintiffs, with claims under two other states' laws, was "de minimis, particularly because the alternative would be for those plaintiffs to file new, separate cases under their states' laws." *Id*. at 863.[22] "The alternative to hearing those claims in a single forum is to populate the dockets of up to fifty federal courts with nearly identical legal and factual issues." *Id*. The "interest in avoiding piecemeal litigation" favored eliminating "the possibility of overlapping nationwide classes, inconsistent outcomes, . . . and an obvious waste

---

[22] *See Allen*, 2018 WL 6460451, at *8 (defendant "already before this court to defend against [class] claims, and the additional burden" litigating against other named plaintiffs was "de minimis"); *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1173 (S.D. Cal. 2018) (where defendant already litigating federal claims in federal court, "additional burden in litigating the pendent state law claims [is] minimal").

of judicial resources." *Id*.[23] Likewise, the "convenience of the parties—including Defendant's—is much better served by having the claims heard in a single forum rather than fifty." *Id*.

Plaintiffs' case compares favorably with *Sloan*. Braurman seeks to litigate the exact same claims as Katz and Rhodes: there is no discernible burden on Defendant from continuing to litigate in Massachusetts. Indeed, forcing Braurman to litigate in New Jersey would simply waste judicial resources, inconvenience the parties, and risks inconsistent outcomes.

While "pendent personal jurisdiction [is] an *independent* basis to find personal jurisdiction" over Braurman, the Court can also exercise personal jurisdiction over Braurman as a class member. *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d at 1172 (italics added). The policies behind pendent personal jurisdiction over named class plaintiffs and personal jurisdiction over class members overlap and reinforce each other. *See id*. To support their argument for dismissing Braurman on an individual basis, Defendants cite cases which suggest *BMS* bars national class actions altogether. (Def.'s Mot. 12.)

These cases are the minority. "Outside of Illinois, district courts have largely declined to extend *BMS* to the class action context." *Knotts v. Nissan N. Am., Inc.*, No. 17-05049, 2018 WL 4922360, *14 (D. Minn. Oct. 10, 2018) (collecting cases). The majority post-*BMS* rule—retaining national class actions—is better-reasoned. At the outset, *BMS* did not claim it was a drastic change, but only the "straightforward application . . . of settled principles of personal jurisdiction." *BMS*, 137 S. Ct. at 1783. Such a "characterization is hard to square with the extraordinary sea change" of barring national class actions, and "it implausible that [*BMS*] would have done so obliquely." *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 815, 819 (N.D. Ill. 2018) (cited

---

[23]   *See Allen*, 2018 WL 6460451, at *8 (exercising pendent personal jurisdiction over non-resident named plaintiffs would "prevent[] the need for multiple such actions in other states and potentially subjecting ConAgra to inconsistent obligations*"*); *In re Packaged Seafood*, 338 F. Supp. 3d at 1173 ("litigating all claims together in [one court] will reduce piecemeal litigation and improve judicial economy").

by *Allen*, 2018 WL 6460451, at *7 (*BMS* "could not have intended, in a sideways manner, to so drastically alter class action plaintiffs' ability to choose their forum")). Likewise, Defendants' reading of *BMS* would almost completely invalidate the use of the multi-district litigation statute because transferee courts would lack personal jurisdiction. *Cf.* 28 U.S.C. § 1407.

Moreover, in this action, a federal court is adjudicating federal claims: "where a federal court presides over litigation involving a federal question, the due process analysis does not incorporate the interstate sovereignty concerns that animated [*BMS*]." *Sloan*, 287 F. Supp. 3d at 859.[24] Courts also recognize there is personal jurisdiction over national classes under Rule 23 because "due process concerns for the defendant in the class action context are far less compelling than in a mass tort such as *BMS*." *Knotts*, 2018 WL 4922360, at *15.[25] Defendants' own case distinguishes between class actions under Rule 23 and FLSA collective actions, because Rule 23 provides greater due process protections. *Roy v. FedEx Ground Package Sys.,*

---

[24]   *See Allen*, 2018 WL 6460451, at *7; *In re Packaged Seafood*, 338 F. Supp. 3d at 1172 (*BMS* "dealt with limits on state sovereign power within a federal system," "where a federal court sits in federal question jurisdiction, the due process concerns are different than those animating [*BMS*]"); *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) (argument that *BMS* prohibits national classes "rests on federalism concerns that are not at issue . . . in federal court"); *Sloan*, 287 F. Supp. 3d at 859 (N.D. Cal. 2018) ("all federal courts, regardless of where they sit, represent the same federal sovereign"; in a national class action in federal court "[t]here is no risk of a state court exceeding the bounds of its state's sovereignty and subjecting residents of another state to the coercing power of its courts"); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-2047, 2017 WL 5971622, *20(E.D. La. Nov. 30, 2017) (*BMS*'s "federalism concerns do not apply . . . to nationwide class actions in federal court"; "*BMS* is about limiting a state court's jurisdiction when it tried to reach out-of-state defendants on behalf of out-of-state plaintiffs in a mass action suit").

[25]   *In re Chinese-Manufactured Drywall*, 2017 WL 5971622, at *14 (distinguishing between mass torts and class actions; "for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23"; cited by *Allen*, 2018 WL 6460451, at *7; *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prod., Inc.*, No. 17-2161, 2018 WL 1377608, *5 (E.D. La. Mar. 19, 2018) ("class actions can be contrasted from mass tort actions because of the additional due process safeguards for class certification under Federal Rule of Civil Procedure 23"); *Sanchez*, 297 F. Supp. 3d at 1365 (*BMS* does not apply to class actions "due-process protections provided by class-action procedural requirements")).

*Inc.*, No. 17-30116, 2018 WL 6179504, *7 (D. Mass. Nov. 27, 2018). *Cf. Allen*, 2018 WL

6460451, at *7 ("Personal jurisdiction is rooted in fairness to the defendant, and Rule 23

provides significant safeguards to that end").

### C.     The Court Has Pendent Personal Jurisdiction Over Braurman's Claims

Defendants dispute venue over Braurman's claims. (Def.s' Mot. 15-16.) But Defendants

have not provided admissible evidence to dispute the SAC's detailed factual allegations that the

calls Braurman received were part of a telemarketing campaign directed at Massachusetts. Venue

as to corporate defendants is co-extensive with jurisdiction, and proper under 28 U.S.C. § 1391.

*See* 28 U.S.C. § 1391(b)(1), (c)(2) (venue proper "district in which any defendant resides,"

which means with respect to corporate defendants "*any judicial district in which such defendant*

*is subject to the court's personal jurisdiction with respect to the civil action in question*"; italics

added).[26] Finally, the Court can apply pendent venue because venue is uncontested with respect

to Katz and Rhodes, and efficiency favors allocating a single venue to adjudicate all their cases.[27]

### D.     If the Court Disagrees, It Should Transfer Braurman's Case

In any event, to the extent that the Court finds it lack jurisdiction and venue, it should

transfer Braurman's case to the District of New Jersey under 28 U.S.C. § 1631. *See Fed. Home*

*Loan Bank of Boston v. Moody's Corp.*, 821 F.3d 102, 119 (1st Cir. 2016) (28 U.S.C. § 1631

provides courts "shall" transfer cases where court finds "want of jurisdiction," including lack of

---

[26]   *See* 14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3826 (4th
       ed. 2018) ("plaintiff is not required to include allegations showing that venue is proper");
       *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 869 F. Supp. 152, 154 (S.D.N.Y.
       1994) ("plaintiff need not include in his complaint an allegation showing proper venue").

[27]   *See Omran v. United States*, No. 1:14-CV-13881, 2016 WL 4158556, at *7 (D. Mass. June
       22, 2016) (under "'pendent venue, federal courts may exercise their discretion to hear claims
       as to which venue is lacking if those claims arise out of a common nucleus of operative facts
       as the claims that are appropriately venued and the interests of judicial economy are furthered
       by hearing the claims together'"; *quoting Coltrane v. Lappin*, 885 F. Supp. 2d 228, 234
       (D.D.C. 2012)).

personal jurisdiction). The Court has made meaningful rulings relevant to Braurman's claims.
(*See* ECF No. 82, 83.) Braurman intends to litigate his claims (whether here or in New Jersey),
and there is no good reason why this progress on Braurman's claims should be lost. In the First
Circuit, the presumption is in favor of transfer under section 1631 rather than dismissal.[28]

## IV.   The SAC Sufficiently Alleges Defendants Acted Together Under Rule 8(a)

Defendants complain the SAC does not sufficiently allege which Defendants committed
which act. (Def.s' Mot. 16-23.) Defendants are mistaken: the SAC adequately alleges Defendants
committed the TCPA violations *together*, and are jointly responsible for them. (SAC ¶¶7-11, 23.)
Likewise, the SAC alleges *both* Defendants regularly make fraudulent transfers to their owners,
and to one another. (*Id*. ¶¶152-53.) Contrary to Defendants, the SAC does not seek to pierce the
corporate veil or rely on that doctrine in any way. (Def.s' Mot. 19-23.)

### A.   The SAC Alleges Defendants Violated the TCPA Together, and Both Defendants Made Fraudulent Transfers

The SAC makes detailed allegations about how Liberty Power Corp., LLC ("Corp.") and
Liberty Power Holdings, LLC ("Holding") operate their telemarketing together. Plaintiffs point
to the most salient allegations below, but the Court to consider the SAC's allegations *in toto*:

- Holdings holds the license for Defendants' retail electricity business in Massachusetts, sells electricity to consumers under that license, and collects revenue from those sales. (SAC ¶8.)

- Corp. actually operates the Defendants' joint retail electricity business, and procures the electricity that Holdings sells. (*Id*. ¶8-9.) Corp. manages the "telemarketers which Holdings uses to generate electric service contracts with consumers and businesses." (*Id*. ¶10.)

---

[28]   *See also Subsalve USA Corp. v. Watson Mfg., Inc.*, 462 F.3d 41, 43 (1st Cir. 2006) (28 U.S.C. § 1631 provides authorizes "court that lacks jurisdiction" to transfer action, "subject to a rebuttable presumption in favor of [] transfer"; cited, followed by *W. Inv. Total Return Fund Ltd. v. Bremner*, 762 F. Supp. 2d 339, 341 (D. Mass. 2011) (transfer for lack of personal jurisdiction under 28 U.S.C. § 1631; "there is a rebuttable presumption in favor of transfer")).

- In particular, Corp.'s Vice President and General Counsel signed Holding's telemarketing contract on June 13, 2016. (*Id. See also* ECF No. 28-1 at 7.)

The SAC further alleges Defendants' overlapping operations—common marketing, offices, website, email server, telephone number, and management. (*Id.* ¶¶7, 10.) The SAC alleges that Defendants acted together exercising control over and directing the telemarketers who called Plaintiffs and the other class members, and ratified the telemarketers' conduct by accepting the contracts they generated. (*Id.* ¶¶23-55.) *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (recognizing "vicarious liability for TCPA violations").

Likewise, the SAC alleges both Defendants have made—and threaten to continue to make—transfers to Corp.'s owners, and that Holdings makes "inter-corporate payments . . . to Corp." (*Id.* ¶¶152-53.)

Rule 8(a) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citation, punctuation omitted). A complaint "must merely be plausible on its face" to survive a motion to dismiss. *Saldivar v. Racine*, 818 F.3d 14, 23 (1st Cir. 2016) (same). Further, "on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94 (same). The SAC's allegations exceeds these minimal standards.

**B.     The SAC Properly Alleges Defendants Violated the TCPA Together**

The cases Defendants rely on stand for the proposition that Rule 8(a) does not permit Plaintiffs to "simply refer to the defendants collectively [*only*] *where it cannot be reasonable inferred that all the defendants engaged in the alleged misconduct*." *Troncoso v. Middlesex Sheriff's Office*, No. 18-10110, 2018 WL 1783801, *4 (D. Mass. Apr. 13, 2018) (citing *Atuahene*

*v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. May 31, 2001); italics added). That does not

mean Plaintiffs generally cannot allege Defendants by one name, when they acted jointly:

> Whilst a pleading, group or otherwise, must be sufficiently clear to put the
> defendants on notice as to "who did what to whom, when, where and why", . . .
> group pleadings are not, prima facie, excluded by Rule 8(a). At the motion to
> dismiss stage a complaint generally will only be dismissed where it is "entirely
> implausible" or impossible for the grouped defendants to have acted as alleged.

*Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53 (D. Mass. 2014) (citations

omitted). Thus, an allegation that "Fujitsu" was "infringing [on] the patents-in-suit" is

permissible where it is "facially plausible—it is not impossible for both Fujitsu USA and Fujitsu

Ltd. to have engaged in each of the acts alleged by Zond." *Id*. Courts have specifically held

allegations that Defendants collectively violated the TCPA are proper:

> The complaint clearly alleges that the two defendants acted jointly in violation of
> the TCPA by causing calls to be made to plaintiff's phone. Prior to discovery,
> plaintiff need not explain the details of each defendant's role in the planning,
> funding, and executing defendants' alleged joint telemarketing scheme. Nothing
> in Rule 8 prohibits collectively referring to multiple defendants where the
> complaint alerts defendants that identical claims are asserted against each
> defendant.

*Hudak v. Berkley Grp., Inc.*, No. 13-00089, 2014 WL 354676, *4 (D. Conn. Jan. 23, 2014)

(rejecting argument "that plaintiff impermissibly lump[ed] [defendants] together, making it

unclear which defendants are alleged to have committed which wrongs"). This is consistent with

First Circuit law—all Plaintiffs need to provide is fair notice of their claims, and Plaintiffs'

claims are that Defendants' joint conduct violated the TCPA.[29] Defendants do not dispute any of

---

[29] *See Pena-Borrero v. Estremeda*, 365 F.3d 7, 13, 14 (1st Cir. 2004) (rejecting argument that
"allegations fail to attribute specific acts to either defendant"; "allegation that 'codefendants
found the court papers but ignored them completely' is properly attributable to each of the
officers on the scene" and provided "fair notice" to defendants); *Cota v. U.S. Bank Nat'l
Ass'n*, No. 15-486, 2016 WL 922784, *6 (D. Me. Mar. 10, 2016) (rejecting argument that
complaint was improper group pleading that "fail[ed] to delineate the particular allegedly
wrongful acts of each Defendant," where complaint alleged most actions that were the basis
of complaint "were taken by 'Defendants' collectively" and it was "plausible that each

Plaintiffs' case law which demonstrate the SAC properly pleads that Defendants acted together.[30]

## C.     Discovery Is Appropriate if More Details Were Required

Of course, Defendants can always demand that Plaintiffs provide ever more detail about

what specifically Corp. or Holdings did. But most of this information is in Defendants' exclusive

control. Under these circumstances, the SAC's allegations are sufficient. Where "a material part

of the information needed is likely to be within the defendant's control, some latitude may be

appropriate in applying the plausibility standard. . . . In such cases, we have said that it is

reasonable to expect that modest discovery may provide the missing link" to proceed with the

---

Defendant engaged in the actions attributed to 'Defendants' in the Complaint"; quoting *Zond*, 990 F. Supp. 2d at 53); *GMO Tr. ex rel. GMO Emerging Country Debt Fund v. ICAP plc.*, No. 12-10293, 2012 WL 5197545, *8 (D. Mass. Oct. 18, 2012) (defendant "cannot claim that the complaint leaves it with insufficient notice of the claim against it," where complaint gave "clear notice of the central allegation: that [defendant] was the counterparty [to contract]" and allegations against other defendants was "fairly generic, but not so vague that [it could] claim it lacks sufficient notice of the claim" where complaint alleged other defendant "worked as [part of] a unified front in their trading activities"; cited by *Zond*, 990 F. Supp. 2d at 53); *Carter v. Newland*, 441 F. Supp. 2d 208, 213-14 (D. Mass. 2006) ("[a]lthough each defendant may not be apprised of [the] specific allegations against him/her, the general nature of the claims against [medical defendants] is described": "cruel and unusual punishment" by failing to treat plaintiff).

30  *See Energizer Brands, LLC v. Procter & Gamble Co.*, No. 16-223, 2016 WL 2894708, *2 (E.D. Mo. May 18, 2016) ("group pleading is sufficient where it sets forth allegations that would establish the basis for holding the individual defendants liable"; quoting *Cota*, 2016 WL 922784, at *6, *Hudak*, 2014 WL 354676, at *4; collecting other cases); *Stone v. Winter Enters., P.C.*, No. 12-465, 2012 WL 6155606, *3 (D.N.J. Dec. 11, 2012) (rejecting argument that complaint did not make "any specific factual allegation" against group of defendants, where complaint alleged "all five Defendants 'operate a dental practice'" and had "common ownership and management, common business practices, common finances, and a common website," the corporate defendants were "three separate business entities that operate in concert with each other"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 288-89 (S.D.N.Y. 2005) (rejecting argument that complaint improperly referred to groups of defendants by single name and "failing to make clear which alleged actions are attributed to which entities" where "it is clear from the complaint that plaintiffs attribute the alleged misrepresentations and omissions to the Italian entities and that they sue the other [defendants] on vicarious liability theories").

case. *Saldivar v. Racine*, 818 F.3d 14, 23 (1st Cir. 2016) (citations, punctuation omitted).[31] To

the extent that Defendants demand still more detail (especially details that are in their exclusive

control), Plaintiffs are entitled to additional discovery.

### D.    Defendants' Cases Are Inapposite

Defendants' cases do not contradict the rule permitting group pleading. One simply

restated the general pleading Rule 8(a) requirement, and did not touch on group pleadings.[32]

Others reject group pleadings where it was not reasonable to infer that the defendants acted

together.[33] The remaining cases deal with conclusory allegations supporting vicarious liability;

---

[31]  *See also Echavarria v. Roach*, No. 16-11118-ADB, 2017 WL 3928270, *3, *4 (D. Mass. Sept. 7, 2017) (where "Plaintiff asserts he is unable to know, without further discovery, which Defendant committed or participated in which particular act" courts "allow[] comparable allegations to proceed to discovery"; "where a plaintiff's inability to identify which defendants committed which specific acts is due in part to defendants' alleged misconduct, courts tend to read the complaint more generously"); *Zond*, 990 F. Supp. 2d at 53 ("determining the exact operations of the Fujitsu corporate group . . . requires corporate structure information that is not readily available to the public," and it is "illogical to allow Fujitsu potentially to escape liability because of its ability to keep its corporate structure confidential").

[32]  *See Calvi v. Knox Cty.*, 470 F.3d 422, 430 (1st Cir. 2006) (general pleading standard on Rule 8; complaint failed to allege "false arrest claim against Smith and failure to intervene claims against McLaughlin and Gracie" asserted in opposition to motion to dismiss).

[33]  *See La Casse v. Aurora Loan Servs., LLC*, No. 15-11672, 2016 WL 4535338, *8 (D. Mass. Aug. 30, 2016) (wrongful foreclosure complaint against mortgagee and mortgage servicers, and unknown employees; complaint violated Rule 8 "by asserting this claim collectively against all Defendants, when it cannot be reasonably inferred that all Defendants were involved"). *See also Bagheri v. Galligan*, 160 F. App'x 4, 5 (1st Cir. 2005) (plaintiff did not distinguish between "federal official and four employees of the Massachusetts Office of Child Care Services"); *Nuzzo v. O'Brien*, No. 17-10297, 2018 WL 615665, *1-2 (D. Mass. Jan. 29, 2018) (wrongful foreclosure complaint failed to distinguish between mortgagee, different mortgage servicers, and Fannie Mae, and did not allege a viable cause of action in any event); *Decarvalho v. Telford*, No. 17-11224, 2017 WL 3668411, *1 (D. Mass. Aug. 24, 2017) (complaint for false imprisonment and malicious prosecution failed to attribute individual conduct to "Plymouth County prosecutor, the Massachusetts State Police and ten state troopers; the Brockton Police Department and two police detectives; the FBI and an FBI special agent; the City of Brockton, Plymouth County and an unnamed defendant").

the SAC's allegations about the Defendants' relationship is far from conclusory.[34]

Defendants also assert that the SAC's allegations are "insufficient to disregard the corporate form in Massachusetts," and cite to cases about piercing the corporate veil under Massachusetts state law.  (Def.s' Mot. 20-23.) This misses the point. Corp.'s own actions make piercing the corporate veil irrelevant: a "parent corporation is itself responsible for the wrongs committed by its agents in the course of its business." *United States v. Bestfoods*, 524 U.S. 51, 65 (1998). "In such instances, the parent is directly liable for its own actions." *Id.* In any event, federal law controls veil-piercing on federal subject matter claims. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091-92 (1st Cir. 1992).

## V.      The TCPA Does Not Violate the First Amendment

Defendants' First Amendment challenge to the TCPA fails. (*Cf.* Def.s' Mot. 23-33.) While Defendants concede that every court to consider a First Amendment challenge to the TCPA has rejected it, they fail to provide any basis for the Court to sweep aside the delicate balance that Congress struck under the TCPA. (Def.s' Mot. 30.)

### A.      Under Prevailing First Circuit Jurisprudence, the TCPA Is Content Neutral and Subject to Intermediate Scrutiny

Defendants urge that the 2015 TCPA amendments which provide exceptions for "pursuant to the collection of a debt owed to or guaranteed by the United States" renders the TCPA a content-based restriction. (Def.s' Mot. 25-27 (quoting 47 U.S.C. § 227(b)(1).) This is

---

[34]    *See Azza v. Grp. Voyagers, Inc.*, No. 16-11981, 2018 WL 1513559, *2 (D. Mass. Mar. 27, 2018) ("complaint was "devoid of any non-conclusory factual allegation that [tour] bus was either controlled or operated by either [travel agents and tour operators]"); *Fisher v. Kadant, Inc.*, No. 07-12375, 2008 WL 11389384, *1 (D. Mass. Nov. 19, 2008), *aff'd*, 589 F.3d 505 (1st Cir. 2009) (complaint against manufacturer, manufacturer's parent, and manufacturer's successor could not allege veil piercing claim against parent with "conclusory allegations"; citing *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 142 (D. Mass. 2005) ("corporation's parents, subsidiaries, and other affiliates are not liable for the actions of the corporation under Chapter 93A unless they played an active role in the alleged wrongful conduct")).

wrong. Consider two different hypothetical calls to a residential line, using prerecorded voice:

(1)     "This is a confidential call for John Smith about an important matter. Please press '1' if you are John Smith. Otherwise, please press '2.'"

(2)     "This is a confidential call for John Smith about an important matter. If you are John Smith, please call us back at 1-800-456-7890."

Both these calls could be made by debt collectors who seek to collect either a private debt *or* a government-backed student loan. The content is indistinguishable, and indeed it is impossible to tell the purpose for these calls by their content alone. However, only the call collecting a student loan qualifies under 47 U.S.C. § 227(b)(1)(B)'s government-debt collection exemption. Hence, the TCPA's 2015 exemption does not—cannot—depend *entirely* on content: a regulation's incidental impact on certain messages does not trigger strict scrutiny.[35] Indeed, the TCPA has always had purpose-specific exemptions, and no one but Defendants argue it should face strict scrutiny on that account. 47 U.S.C. § 227(b)(1)(A) (exempting calls "for emergency purposes").

Prevailing First Circuit law construes *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015) narrowly. In *March v. Mills*, 867 F.3d 46 (1st Cir. 2017), the First Circuit upheld a statute that prohibited making noise (1) that could be heard within a building with (2) the intent to disrupt services in such building against a First Amendment challenge. *March* recognized that the sign ordinance at issue in *Reed* "'<u>depend</u>[ed] <u>entirely on the communicative content</u> of the

---

[35]     *Cf. Reed*, 135 S. Ct. at 2222 ("Speech regulation is content based if a law applies to particular speech *because* of the topic discussed or the idea or message expressed"; citations omitted; italics added) *with Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("regulation that serves purposes unrelated to the content of expression is deemed neutral, **even if it has an incidental effect on some speakers or messages but not others**. . . . Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech'"; quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); italics in *Ward*; other emphasis added; other citations omitted); *Signs for Jesus v. Town of Pembroke, NH*, 230 F. Supp. 3d 49, 59 (D.N.H. 2017) (applying *Reed*; because provision which grandfathered certain existing electronic signs did "not directly or indirectly regulate users on the basis of the content of affected speech, it does not trigger strict scrutiny even though it treats some speakers differently from others").

sign.'" *March*, 867 F.3d at 58 (quoting *Reed*, 135 S. Ct. at 2227; emphasis in *March*). *March* distinguished the noise statute from the sign ordinance in *Reed*: "while the restriction is 'entirely depend[ent]' on the noisemaker's disruptive 'purpose' in making noise, the restriction is not entirely dependent—as was the ordinance at issue in *Reed*—on the noise's 'communicative content.'" *Id*. Because the government-debt collection TCPA exemption depends on the purpose of the call and the relationship between speaker and recipients ("pursuant to the collection of a debt owed to or guaranteed by the United States"), rather than the call's content, it cannot be entirely content-based—and therefore strict scrutiny does not apply. Defendants cite other courts which applied strict scrutiny to the TCPA. (Def.s' Mot. 27.) But none of these courts are the First Circuit, whose decisions bind this Court.

The TCPA is also content-neutral because its exemptions "'are based on the relationship of the speaker and recipient of the message rather than the content of the message.'" *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 792 (N.D.W. Va. 2017) (quoting *Patriotic Veterans, Inc. v. State of Indiana*, 177 F.Supp.3d 1120, 1125 (S.D. Ind. 2016)). The result in *Mey* is more consistent with *March*, and other Circuit decisions analyzing similar exemptions in anti-robocall statutes.[36] As explained below, the TCPA meets strict scrutiny—it also passes intermediate

---

[36]    *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305, 306 (7th Cir. 2017) (exemptions to Indiana anti-robocall statute "depend on the relation between the caller and the recipient, not on what the caller proposes to say"; "Preventing automated messages to persons who don't want their peace and quiet disturbed is a valid time, place, and manner restriction. . . . Because Indiana does not discriminate by content—the statute determines who may be called, not what message may be conveyed—these decisions have not been called into question by *Reed*"); *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1550, 1551 (8th Cir. 1995) (statute prohibiting pre-recorded calls was "content-neutral" notwithstanding various exemptions "based on relationship rather than content": "All callers, whatever the content of their messages may be, must have . . . consent . . . to deliver an ADAD message . . . exempted groups are defined by their relationship to the caller, not by the content of their messages"). *See also Gresham v. Swanson*, 866 F.3d 853, 856 (8th Cir. 2017) (distinguishing "content-based restrictions in *Reed*" from consent-based exemptions in *Van Bergen*, anti-robocall statute generally remained constitutional post-*Reed*).

scrutiny.[37]

### B.    The TCPA Protects a Compelling Interest in Telephones' Continued Viability as a Means of Communication

The TCPA's "purposes were to protect the privacy interests of residential telephone subscribers [but also to] facilitate *interstate commerce* by restricting certain uses of . . . automatic dialers." S. Rep. No. 102-178, at 1 (1991) (italics added).[38] The telephone system relies on the custom that people generally answer telephone calls to their telephone number. The TCPA's legislative history recognized the continued proliferation of telemarketing, left unchecked, would undermine that custom. "Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the telephone at night. . . .[I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper).[39] The situation has greatly worsened since 1991. Indeed, in 2018, the House of Representatives received testimony that "approximately 40% of all calls on the landline network are unwanted robocalls," and that "the number of identified scam calls [is expected] to rise . . . to as high as 15% or 16% [.]"[40] Others project "scam-calls" will reach "45 percent [of all calls to cellphones]

---

[37]  Under the intermediate scrutiny standard, "the TCPA does not run afoul of the First Amendment so long as it is narrowly tailored to serve a significant governmental interest and leave[s] open ample alternative channels for communication of information." *Mey*, 245 F. Supp. 3d at 793 (citation, punctuation omitted). *See also Mejia v. Time Warner Cable Inc.*, No. 15-6445, 2017 WL 5513638, *4 (S.D.N.Y. Nov. 17, 2017) ("If *Mey* is correct, then this Court was unduly cautious in applying strict scrutiny. But the statute survives—and Time Warner remains potentially liable—either way.")

[38]  *See also id*. at 2, 5.

[39]  "Computerized calls are the scourge of modern civilization . . . they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper). 137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before our home telephones become the receptacles of junk calls in the same way that junk mail often inundates our mailboxes").

[40]  *Do Not Call: Combating Robocalls and Caller ID Spoofing, Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*, 115th Cong. 1 (testimony of Aaron Foss), *available at* https://energycommerce.house.gov/sites/democrats.energycommerce.house.

by early 2019."[41] Unless telemarketing is curbed, fewer and fewer telephone users will answer

fewer and fewer telephone calls, especially those from unknown numbers:

> As a result of the sheer volume of scam and unwanted calls, consumers . . . are being conditioned to not answer the phone unless they know exactly who is calling them, and it is increasingly difficult to know. . . . [The] utter lack of trust in the voice channel must also change for us all to reap the benefits of a properly functioning voice communications system. . . . [C]onsumers have simply become conditioned to NOT answer their voice calls —whether to their landlines or their cell phones. [42]

Interstate commerce depends on the ability to reach others via telephone. The continued function

of the telephone system is a clearly compelling government interest.

## C.    The TCPA Protects a Compelling Interest in Residential Privacy

Defendants cite cases applying strict scrutiny to the TCPA. (Def.s' Mot. 27.) Each of

these cases have found the TCPA constitutional because it "serves a compelling government

interest in promoting residential privacy." *Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036,

1046 (N.D. Cal. 2017).[43] Nevertheless, Defendants argue privacy is not a compelling interest.

---

gov/files/documents/Testimony-Garr-DCCP-Hrg-on-Do-Not-Call-Combating-Robocalls-and-Caller-ID-Spoofing-2018-04-27.pdf; *Do Not Call: Combating Robocalls and Caller ID Spoofing, Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*, 115th Cong. 11 (testimony of Scott Hambuchen), *available at* https://energycommerce. house.gov/sites/democrats.energycommerce.house.gov/files/documents/Testimony-Hambuchen-DCCP-Hrg-on-Do-Not-Call-Combating-Robocalls-and-Caller-ID-Spoofing-2018-04-27_1.pdf.

[41]   Hamza Shaban, *Nearly half of cellphone calls will be scams by 2019, report says*, Wash. Post, September 19, 2018, *available at* https://www.washingtonpost.com/technology/2018/ 09/19/nearly-half-cellphone-calls-will-be-scams-by-report-says/.

[42]   *Do Not Call: Combating Robocalls and Caller ID Spoofing, Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*, 115th Cong. at 2, 3.

[43]   *See Am. Ass'n of Political Consultants v. Sessions*, 323 F.Supp.3d 737, 744 (E.D.N.C. 2018) ("protecting the well-being, tranquility, and privacy of the individual's residence is a compelling state interest and that the TCPA auto-dialing ban furthers that compelling interest"; citations omitted); *Gallion v. Charter Communications, Inc.*, 287 F. Supp. 3d 920, 929 (C.D. Cal. 2018) (same); *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1150 (D. Minn. 2017) ("TCPA serves a compelling government interest in promoting and protecting residential privacy"; same); *Mejia*, 2017 WL 3278926, at *16 (same). *See also Holt v. Facebook, Inc.*, 240 F. Supp. 3d 1021, 1033 (N.D. Cal. 2017).

Defendants' argument depends on impugning privacy as a lesser interest—without carefully comparing the specific privacy interests at stake in the cases they cite with the privacy interests at issue here. (*Cf*. Def.s' Mot. 28-29.) "'Privacy' is a word with many connotations" which depend on context—including secrecy of information, seclusion from intrusion, or autonomy. *Am. States Ins. Co. v. Capital Assocs.*, 392 F.3d 939, 941 (7th Cir. 2004). Context matters: the TCPA protects consumers' interest in avoiding intrusive calls in the privacy of their home. Weighing "the First Amendment rights of speakers against the privacy rights of those who may be unwilling viewers or auditors [requires] delicate balancing." *Hill v. Colorado*, 530 U.S. 703, 718 (2000) (citations, punctuation omitted). The "unwilling listener's interest in avoiding unwanted communication" is at its zenith in the context of residential privacy. *Id*. at 716, 717 ("right to avoid unwelcome speech has special force in the privacy of the home"; same).[44]

Defendants' cases involve very different privacy interests. The closest address picketing laws, and hinged on the fact they restricted speech in public fora. *Carey v. Brown*, 447 U.S. 455 (1980) recognized that the government "interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society," but that interest could not support content-based restrictions on picketing in "the public streets and sidewalks." *Id*. at 460, 471 (citations, punctuation omitted; cited by Def.s' Mot. 28).[45] Defendants' other cases likewise fall far from the residential privacy interest at issue here.[46]

---

[44]   *Cf. Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. . . . There simply is no right to force speech into the home of an unwilling listener").

[45]   *See also Thorburn v. Austin*, 231 F.3d 1114, 1118 (8th Cir. 2000) (upholding ordinance regulating picketing in public streets; recognizing that *Hill* effectively overturned *Kirkeby v. Furness*, 92 F.3d 655 (8th Cir. 1996), cited by Defendants). *Cf. Frisby*, 487 U.S. at 483 (upholding complete bar on picketing focusing on one residence).

[46]   (*Cf*. Def.s' Mot. 28 (citing *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1314 (11th Cir. 2017) (Florida laws regulating physicians inquiring about firearms in patients' home failed under intermediate scrutiny, because patients could decline to answer firearm-related

### D.       The TCPA Is Narrowly Tailored

All Defendants' strict scrutiny cases also held the TCPA is narrowly tailored to promote residential privacy. *Brickman*, 230 F. Supp. 3d at 1048.[47] Nonetheless, Defendants argue that the TCPA is overinclusive because *someone* must want their calls, and therefore cannot be narrowly tailored because it is "opt in" (i.e., it requires consent) rather than "opt out" (a do-not-call system). (Def.s' Mot. 29-33.) Defendants are wrong because the "Supreme Court has explained that '[l]ess restrictive alternatives must be *at least as effective* in achieving the legitimate purpose that statute was enacted to serve.'" *Brickman*, 230 F. Supp. 3d at 1048 (*Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997); italics in *Brickman*).[48] Every case to consider the question has held that "[d]o-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out . . . would obviously not be as effective in achieving residential privacy." *Id.* at 1049.[49]

---

questions and other laws prohibited physician's disclosure of patient's confidential information); *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1272 (11th Cir. 2014) (recognizing privacy interest in regulating noise near hospitals, narrowly construing noise ordinance to prohibit only amplified sound which is "loud and raucous," or "unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or safety" within a health care facility quiet zone); *Cooper v. Dillon*, 403 F.3d 1208, 1218 (11th Cir. 2005) (First Amendment protected publication of information about internal police investigation: "interests in privacy are insufficient to support criminal sanctions for the publication of lawfully obtained information" of "public concern" which plaintiff provided in making the complaint which triggered investigation in question)).

[47]   *See Political Consultants*, 323 F.3d at 746; *Gallion*, 287 F. Supp. 3d at 929-31; *Greenley*, 271 F. Supp. 3d at 1150-51; *Mejia*, 2017 WL 3278926, at *16-17; *Holt*, 240 F. Supp. 3d at 1032-34.

[48]   *See Political Consultants*, 323 F.Supp.3d at 746 (quoting same passage from *Brickman*); *Gallion*, 287 F. Supp. 3d at 930 (same); *Greenley*, 271 F. Supp. 3d at 1151 (same); *Holt*, 240 F. Supp. 3d at 1034.

[49]   *See Political Consultants*, 343 F.Supp.3d at 746 (quoting same passage from *Brickman*); *Gallion*, 287 F. Supp. 3d at 931 (quoting *Brickman* passage above, *Meija* passage *infra*); *Greenley*, 271 F. Supp. 3d at 1151 (quoting passage from *Holt*, *Brickman* above); *Mejia*, 2017 WL 3278926, at *16 (do not call list does not "fully foreclose the possibility that autodialer or prerecorded voice calls will be made to non-consenting consumers . . . and thus may not sufficiently further Congress's compelling interests in privacy . . . Court is unwilling

Defendants rely heavily on *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) for the proposition that strict scrutiny mandates an "opt-in" regime. (Def.s' Mot. 30-32.) First, strict scrutiny does not require perfect tailoring, or even tailoring to Defendants' satisfaction. "The First Amendment requires that [content-based restrictions] be narrowly tailored, not that [they] be *perfectly tailored*." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015) (citation, punctuation omitted; italics added).[50] "The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary"—or, for that matter, intangible interests of telephone users' privacy and the continued viability of telephones as a means of communication under the TCPA. *Id.*[51]

Moreover, *Playboy* is factually inapposite. Cable viewers have control over the channels they watch, but telephone users do not have the same control over the calls they receive.[52] Channel-blocking was a perfect technological fix that provided subscribers complete control over the speech they wanted to receive: it was "a feasible and effective" alternative to overbroad regulation that met the same "compelling interests." *Cf. Playboy*, 529 U.S. at 815 ("a key difference between cable television and the broadcasting media [and] the point on which this case turns: Cable systems have the capacity to block unwanted channels on a household-by-

---

to let perfect tailoring be the enemy of narrow tailoring"); *Holt*, 240 F. Supp. 3d at 1034 (quoting *Brickman* passage above).

[50] *See Political Consultants*, 323 F.Supp.3d at 744 (quoting, following passage from *Williams-Yulee*, 135 S. Ct. at 1671); *Gallion*, 287 F. Supp. 3d at 929 (same); *Mejia*, 2017 WL 3278926, at *17 (same). *See also Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) ("narrowly tailored" requirement does not require speech restriction to be "absolutely the least severe that will achieve the desired end," but rather "a fit that is not necessarily perfect, but reasonable").

[51] *See Flaherty v. Knapik*, 999 F. Supp. 2d 323, 338-39 (D. Mass. 2014) (narrowly-tailored "restriction need not be the least discriminatory alternative available, it can only burden speech tied to the stated ends"; cited Def.s' Mot. 23).

[52] "Unlike other communications media, the telephone demands our instant attention. Junk mail can be thrown away. Television commercials can be turned off. The telephone demands to be answered." 137 Cong. Rec. S18,784 (daily ed. Nov. 27, 1991) (statement of Sen. Pressler).

household basis"; "targeted blocking is less restrictive than banning"). *Playboy* would not have

found channel-blocking was a viable alternative to regulation if cable companies picked the

channels shown to viewers, without viewers' consent. *Id.* at 812 (statute restricted

"communication between speakers and willing adult listeners"). *Cf. Brickman*, 230 F. Supp. 3d at

1046 ("TCPA does not restrict individuals from receiving any content they want to receive").

Forcing an "opt in" regime as a constitutional requirement on every telecommunication

regulation does not give the TCPA the "delicate balancing" required in *Hill*. *Hill*, 530 U.S. at

718. A do-not-call list cannot be compared to channel blocking, not least because it has to be

enforced (if at all) by *post hoc* litigation. Indeed, the record reflects many complaints about

Defendants' calls, even though their telephone numbers are already on the do-not-call list.

Congress explicitly found that the TCPA was the only effective way to protect these

privacy interests.[53] The Court should defer to Congress's findings on this point. *Cf. Turner*

*Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("[w]e owe Congress' findings deference in

part because the institution is far better equipped than the judiciary to amass and evaluate the

vast amounts of data bearing upon legislative questions"; citation, punctuation omitted;

collecting cases). *See also Moser v. FCC*, 46 F.3d 970, 974 (9th Cir. 1995) (reversing ruling that

47 U.S.C. § 227(b)(1)(B) was unconstitutional which "did not give sufficient weight" to

"extensive findings" by Congress about "consumer concerns about telephone solicitation,"

---

[53]   *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(12), 105 Stat.
2394-95 (1991) ("Congress finds that . . . [b]anning such automated or prerecorded telephone
calls to the home, except when the receiving party consents to receiving the call . . . is the
only effective means of protecting telephone consumers from this nuisance and privacy
invasion"; cited by *Brickman*, 230 F. Supp. 3d at 1045-46). The record suggests these privacy
concerns have not diminished, but have grown instead. *See also In the Matter of Rules and
Regulations Implementing the Telephone Consumer Protection Act of 1991, 2015 Report and
Order*, 30 FCC Rcd. 7961, 7963, ¶1 (July 10, 2015) ("Month after month, unwanted
robocalls and texts, both telemarketing and informational, top the list of consumer complaints
received by the Commission").

especially "automated calls").

### E.    Equal Protection Analysis Reaches the Same Result

Defendants reference the Equal Protection clause in passing. (Def.s' Mot. 23.) This

challenge fails on the same grounds as their First Amendment challenge. ("If there is a sufficient

'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment,

the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis."

*Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 344 n.9 (1986)

(quoted, followed by *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1093 (W.D. Tex. 2000)).

The TCPA does not involve any "fundamental right or suspect class," so if the TCPA fits state

interests sufficient for review under the First Amendment, it survives review under the Equal

Protection clause as well.[54] Indeed, courts have recognized that the TCPA's government debt

exemption serves compelling interests related to government finances.[55]

### F.    Even if Unconstitutional, the 2015 Amendment Should Simply Be Severed

Finally, even if the 2015 amendment rendered the TCPA unconstitutional, the remedy is

to simply sever the government-debt collection exemption. *See Sliwa v. Bright House Networks,*

*LLC*, No. 16-235, 2018 WL 1531913, *5-6 (M.D. Fla. Mar. 29, 2018) (rejecting First

Amendment challenge to TCPA section 227(b)(1)(A)(iii) because remedy would be to sever

unconstitutional exemption); *Brickman*, 230 F. Supp. 3d at 1047 (court "would not deem the

entire TCPA to be unconstitutional because the exception would be severable from the remainder

---

[54]    *Texas*, 121 F. Supp. 2d at 1093 (where court found "a reasonable fit exists between the TCPA's identified interests and the means used to protect these interests" for "First Amendment purposes," "same analysis is sufficient to satisfy equal protection rationality review").

[55]    *See Political Consultants*, 323 F.Supp.3d at 745 ("TCPA's government-debt exception is a narrow exception that furthers a compelling interest"); *Mejia*, 2017 WL 3278926, at *16 ("federal government's interest in collecting debts owed to it supports the finding of a particularly compelling interest"; quoted by *Gallion*, 287 F. Supp. 3d at 930).

of the statute"; cited, followed by *Holt*, 240 F. Supp. 3d at 1034 n.4). The Communications Act, which encompasses the TCPA, contains an express severability provision (47 U.S.C. § 608), but even without this "there can be no doubt that Congress would have enacted the remainder of the anti-robocall provision, irrespective of the constitutional fate of the Government–Debt Exception; Congress **did** enact the provision prior to adding that clause" nearly 24 years before the 2015 amendment. *Sliwa*, 2018 WL 1531913, at *6. While Defendants contend it is "wholly unsupported conjecture" that Congress would have passed the TCPA without the government-debt collection exemption, they bear the burden of persuasion on this point.[56] (Def.s' Mot. 32.)

## VI.   The SAC Amply States Uniform Fraudulent Transfer Act Claims

Defendants argue that Plaintiffs have not stated claims under Florida's Uniform Fraudulent Transfer Act ("UFTA") claims. (Def.s' Mot. 33-44.) Defendants have failed to address the case law Plaintiff previously cited which shows Plaintiffs do not need to allege details of specific financial transactions which are in the Defendants' exclusive knowledge, but Plaintiffs nonetheless address this argument again, *infra* at 33-34.[57] Instead, Defendants have shifted their focus to the supposed conflict between their Defendants' insolvency and their continued payment of profits to their owners. (Def.s' Mot. 37-39; 41-44.) Defendants mischaracterize the SAC's allegations and misstate the applicable UFTA provisions: Defendants'

---

[56]   "Unless it is evident that [Congress] would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (same). *See United States v. Booker*, 543 U.S. 220, 258 (2005) (courts "must refrain from invalidating more of the statute than is necessary"; citations, punctuation omitted). *See also United States v. Mueffelman*, 327 F. Supp. 2d 79, 91 (D. Mass. 2004). The record in *Rappa v. New Castle Cty.*, 18 F.3d 1043 (3d Cir. 1994) is entirely different: it involved a single set of regulations, not an arguably problematic amendment passed nearly 25 years after the primary statute (which had consistently passed constitutional muster prior to the amendments). *Cf. Moser*, 46 F.3d 970 (finding TCPA constitutional in 1995).

[57]   *See* ECF No. 96 at 31-32, 34-35 (citing, e.g., *Davimos v. Halle*, No. 13-225, 2013 WL 5353005, *5 (D. Me. Sept. 24, 2013)).

profits are subject to the UFTA because Defendants could not pay any profits if they were

actually paying the liabilities incurred from their incessant TCPA violations as those debts were

incurred. *Cf. In re W.R. Grace & Co.*, 281 B.R. 852, 862 (Bankr. D. Del. 2002) (asbestos

manufacturer was insolvent under UFTA because asbestos products liability claims exceeded

assets, even before liability was known).[58]

Plaintiffs rebut Defendants' other arguments below as well. The better-reasoned majority

rule is that Rule 9(b) does not apply to constructive fraudulent transfers. Defendants do not

acknowledge or properly apply the "badges of fraud" alleged in the SAC, and they conflate the

application of Rule 9(b)'s particularity requirement in cases where the plaintiffs had access to

relevant information with its proper application here.

### A.    Defendants Ignore the SAC's Detailed Allegations

Plaintiffs allege Defendants' profits are subject to the UFTA because of Defendants'

liabilities from TCPA violations. Defendants' recitation of the SAC's UFTA allegations manages

to omit the most salient details. The Court should consider the SAC's allegations *in toto*, but

Plaintiffs provide a partial summary of the most salient details below:

- Defendants have a large (200,000+) customer base. (SAC ¶155.) Given the experiences of Plaintiffs and hundreds of complaints to the FTC, Defendants and their telemarketers "routinely violate the TCPA on a massive scale." (*Id. See also id*. ¶¶23-105, especially 70 and Exhibit 1.)

---

[58]    Again, Plaintiffs rely on cases regarding fraudulent transfers under the Bankruptcy Code interchangeably with cases regarding Florida's UFTA law. "Bankruptcy Code section 548 and Florida Statutes section 726.105 are substantially the same, and both address claims under the same legal framework." *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 849 (Bankr. M.D. Fla. 2005) (collecting cases). "Both provisions require the proof of substantially identical elements, and have been interpreted in the same manner." *In re Old Naples Sec., Inc.*, 343 B.R. 310, 319 (Bankr. M.D. Fla. 2006) (same). *See also Norwood Co-op. Bank v. Gibbs*, No. 10-11647, 2012 WL 4094328, *7 n.7 (D. Mass. Sept. 13, 2012) (Massachusetts UFTA updated "to be consistent with the Bankruptcy Code of 1978"; court "look[s] to the law of other jurisdictions that have adopted the UFTA for guidance in interpreting" Massachusetts UFTA).

- The SAC does *not* allege Defendants pay the debts arising from these TCPA violations as they are incurred—Defendants could not continue to operate on that basis. Because the TCPA's statutory damages violations range from $500 to $1,500 *per violation*, "potential liability for large-scale TCPA litigation is frequently massive," to the tune of hundreds of millions of dollars. (*Id.* ¶155. *See* 47 U.S.C. § 227(b)(3).)

- Plaintiffs allege Defendants' business model is not viable—without breaking the law, including violating the TCPA on a massive scale. (SAC ¶¶157-162.) Plaintiffs are not alone in this conclusion. The Massachusetts Attorney General has concluded "Defendants' business model is not viable, absent significant abuse of their customer base," so *that Massachusetts should eliminate the electricity supply market completely*. (*Id.* ¶157. *See also id.* ¶157 (cataloguing abuses by retail electricity providers).)

- Likewise, state authorities are litigating to stop Defendants from offering retail electricity in Connecticut, noting that New York and Connecticut authorities had previously found Defendants' business practices violated the law and required changes. (*Id.* ¶¶160-61.)

- Since March 2014, Defendants have "faced several significant and material class action lawsuits which have threatened [their] financial viability." (*Id.* ¶162.)

- In the meantime, on a regular basis dictated by tax concerns, Defendants pay "every dollar in profit to [their] owners," who "deliberately keep [Defendants] very thinly capitalized." (*Id.* ¶¶152, 162.)

- As it stands, Defendants' "gross revenue has declined from $891 million in 2015, to $595 million in 2016, to $335 million in 2017." (SAC ¶157.)

- One of Defendants' former employees alleged in a lawsuit that Defendants had told him they "were 'having financial problems and [were] in need of raising capital,' and Defendants' owners 'misrepresented the financial problems and amount of capital needed by [Defendants.]'" (*Id.* ¶162.) Defendants' owners organize and operate Defendants "to convey the impression and pretense they are 'bankruptcy remote,' so that" once profits are paid to the owners, those funds "are no longer available to satisfy [Defendants'] liability." (*Id.*)

Based on the foregoing facts, the SAC alleges Defendants and their owners intended the payment of profits "to hinder, delay, or defraud" Defendants' creditors, left Defendants with unreasonably small capital, and that Defendants received no value for the profits. (*Id.* ¶¶163, 166.)

Defendants are wrong to contend these allegations are either "pure speculation or entirely

irrelevant." (Def.s' Mot. 33.) Defendants cannot discredit state agencies' public statements,

complaints by hundreds of consumers, other class actions, their own revenue figures, or an ex-

employee's specific pleadings about their own statements, based simply on their say so. These

are "factual allegations . . . which must be accepted as true" on a motion to dismiss. *A.G. ex rel.*

*Maddox v. v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (citation, punctuation omitted).

> ### B.      The SAC Adequately Alleges Transfers

The SAC alleges Defendants' "owners operate [Defendants] as a closely-held

corporation," and that Defendants paid profits to their owners timed to "coincide" with tax

deadlines "throughout the class period." (SAC ¶¶153, 166.) Defendants again complain that the

SAC does not "provide any actual details of [fraudulent] payments," or "allege any . . . specific

conveyances." (Def.s' Mot. 36, 38. *See also id*. 42.) Certainly, Plaintiffs do not have access to

Defendants' bank statements or accounting records that would provide the additional details

Defendants demand. That may be why Defendants demand those same details.

However, this District's bankruptcy court has found that similar categorical identification

of fraudulent transfers provides "sufficient specificity at least to overcome a Rule 12(b)(6)

challenge." *In re Payton Const. Corp.*, 399 B.R. 352, 365 (Bankr. D. Mass. 2009) (payments to

insurer "on or within two years before the Petition Date on account of insurance coverage"

sufficient to allege constructive fraudulent transfer). Even a complaint that does not "identify

specific payments by amount, date, and manner effected" is sufficient if it "give[s] a time frame

and specify the nature of the transfers" subject to the UFTA claim. *Id*. Plaintiffs' UFTA claims

provide a time frame (during the class period, coinciding with tax deadlines) and specify the

nature of the transfers (profits).

Other First Circuit courts have also found actual fraudulent transfer claims sufficient

without alleging the "'name, date, amount, circumstances, and transferee.'" *Davimos v. Halle*, No. 13-225, 2013 WL 5353005, *5 (D. Me. Sept. 24, 2013) (such allegations complied with Rule 8(a) and 9(b), refusing "probing inquiry into the precise dates of the fraudulent transfers"; "Court will not try this case on a motion to dismiss").

> Allegations of date, place and time certainly fulfills the heightened pleading requirement, however, nothing in [Rule 9(b)] requires them. [*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)] "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* Nonetheless, *the particularity requirement of Rule 9(b) is satisfied if the fraudulent transfer claim details the transfers alleged to be fraudulent, the reasons the transfers are fraudulent, and the roles of the defendants in the transfers.*

*In re El Comandante Mgmt.*, 388 B.R. at 473 (citations omitted; italics added). Plaintiffs cited *Payton*, *Davimos*, and *El Comandante* in their motion to amend. Defendants wholly failed to respond to those cases: the implication is that Defendants still contend Plaintiffs must allege details in Defendants' exclusive knowledge, but cannot distinguish these cases.

Certainly, Plaintiffs must infer that Defendants continue to pay profits to their owners based on Defendants' continued operation. But on a motion to dismiss, the Court "draw[s] all reasonable inferences" in favor of Plaintiffs from every "well-pleaded fact[] alleged in" the SAC. *A.G.*, 732 F.3d at 80. Finally, Defendants' suggestion there is a special pleading standard that only applies in bankruptcy is wrong: Plaintiffs' authorities apply to their UFTA claims here.[59]

### C.    Defendants Are Left with Unreasonably Small Capital After Paying Profits

---

[59] In a footnote, Defendants urge that Plaintiffs rely on cases using "the more generally relaxed pleading standard applied in bankruptcy proceedings," but there is no special pleading standard for bankruptcy. (Def.s' Mot. 34 n.24.) Defendants' only support for that is a passage from *In re Bernard L. Madoff Investment Securities LLC*, 445 B.R. 206, 219 (Bankr. S.D.N.Y. 2011) which simply applies the general notion that there should be "greater liberality in . . . pleading" where the plaintiff is "a third party outsider to the fraudulent transaction" to the bankruptcy context. Contrary to Defendants, *Wayne Investment, Inc. v. Gulf Oil Corp.*, 739 F.2d 11 (1st Cir. 1984) does not even hint at any special relaxation of pleading rules "outside of the bankruptcy context." *See infra*, at 40-41.

The gist of Plaintiffs' UFTA claim is that Defendants' payment of profits are fraudulent transfers because Defendants' ongoing TCPA violations rack up debts far faster and far higher than their revenue. Like a Ponzi scheme, Defendants' telemarketing operations "create greater liabilities than assets with each subsequent transaction," with every TCPA violation "decreas[ing] the value of the [assets] by creating a new liability that the insolvent business could never legitimately repay." *Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 546 (5th Cir. 2015) (citations omitted).

1.      **Under a Proper UFTA Analysis, the SAC's Pending TCPA Claims Count as Present Liabilities for Defendants**

Defendants' debts include class members' TCPA claims—even though Defendants dispute those claims.[60] It is "universally accepted, as well as settled in Florida, 'A "claim" under the [UFTA] may be maintained even though 'contingent' and not yet reduced to judgment.'" *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189, 192 (Fla. 2003) (quoting *Cook v. Pompano Shopper, Inc.*, 582 So. 2d 37, 40 (Fla. Dist. Ct. App. 1991) ("tort claimant or contingent claimant is as fully protected under the [UFTA] as a holder of an absolute claim")). Thus, plain statutory language of the Florida UFTA rebuts Defendants' belief that Plaintiffs' claims are "a square peg [in] a round hole" because they arose outside of "bankruptcy, or similar proceedings." (Def.s' Mot. 42.)

The application of disputed TCPA claims as debts for UFTA purposes also undermines Defendants' assertion that the SAC is "not plausible" because "a business entity that is insolvent does not produce profits." (Def.s' Mot. 42.) The "expansive language" of the UFTA's definition of a claim "must negate any residual inference that a right to payment must be known and

---

[60]    *See* Fla. Stat. § 726.102(6) ("'Debt' means liability on a claim"); Fla. Stat. § 726.102(4) ("'Claim' means a right to payment, *whether or not the right is reduced to judgment*, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured"; italics added).

asserted to be a claim," and thus claims apply "for purposes of the solvency analysis of the UFTA" even before they are known or asserted—let alone actually paid out. *In re W.R. Grace & Co.*, 281 B.R. at 862.[61] Because Defendants' debts under the UFTA include disputed TCPA claims, their debts exceed their assets. *Cf. United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 982 (C.D. Ill. 2017) ($280 million damages award in TCPA case) (cited in SAC ¶155).

Defendants urge that Plaintiffs' UFTA theory proves too much. (Def.s' Mot. 37 (if Plaintiffs' UFTA claims proceed, "almost every corporate [defendant] would potentially be subject to a fraudulent transfer claim").) But Defendants ignore the unique facts here: consumer complaints about systematic TCPA violations together with declining revenue, the potential loss of markets, and assertions by a former employee that Defendants themselves indicated they are "'having financial problems and [were] in need of raising capital.'" (SAC ¶162.)

In a footnote, Defendants dispute that Plaintiffs are creditors under the UFTA, because the SAC "fail[s] to specify which of the Defendants is the actual debtor." (Def.s' Mot. 35 n.26.) This is simply a variation on Defendants' earlier Rule 8(a) argument. Defendants violated the TCPA together, and share joint liability: they are both debtors on Plaintiffs' TCPA claims.

### 2.    Payment of Profits Left Defendants with Unreasonably Small Capital

To be clear, Defendants' arguments on insolvency are misplaced—they have moved the goal posts. (Def.s' Mot. 40-44.) Plaintiffs' claims for actual fraudulent transfers arise under section 726.105(1)(a), and their claims for constructive fraudulent transfers section 726.105(1)(b). *Insolvency is not an element for either claim*: insolvency is a requirement for claims under section 726.10**6**, but not 726.10**5**. Transfers are fraudulent under section 726.105

---

[61]    *See Tri-Continental Leasing Corp., Inc. v. Zimmerman*, 485 F. Supp. 495, 499 (N.D. Cal. 1980) ("in computing the total liabilities on then-existing debts, the trier of fact must estimate the ultimate amount of a contingent claim at its maturity without regard to the merits of the claim" under California fraudulent conveyances law; "pending lawsuits must be treated as existing debts" for purposes of solvency analysis).

where they are made:

> (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> 1.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> 2.  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1). Thus, there is no solvency element at all for Plaintiffs' claim for actual fraudulent transfers (although the SAC alleges it anyways). (SAC ¶163.) Conversely, Plaintiffs' claim for constructive fraudulent transfers requires both (1) lack of "reasonably equivalent value" and (2) one of several alternatives relating to the transferor's financial conditions.[62]

Unreasonably small capital is most easily met of these alternative financial conditions. "Unreasonably small capitalization is not the equivalent of insolvency in either the bankruptcy or equity sense. [It] encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989) ("equitable insolvency, inability to pay debts as they mature").[63] The UFTA applies Defendants' disputed TCPA liabilities now. Faced with a challenge to the plausibility of the SAC's allegations, the Court must "draw on its judicial

---

[62]  *See Wiand v. Morgan*, 919 F. Supp. 2d 1342, 1355 n.14 (M.D. Fla. 2013) (constructive fraud met by unreasonably small capital, actual or constructive belief debts would be incurred beyond ability to pay, or insolvency).

[63]  *See also In re O'Day Corp.*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually"); *Paragon Health Servs., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc.*, 859 So. 2d 1233, 1237 (Fla. Dist. Ct. App. 2003) (debtors' failure "to pay his or her debts as they become due [has] sometimes been referred to as 'equitable insolvency,'" citing Fla. Stat. § 726.103(2)).

experience and common sense."*A.G.*, 732 F.3d at 80 (citations, punctuation omitted). But it is common sense that a business with dramatically shrinking revenue and threatened with the loss of access to two major markets cannot afford to pay the TCPA liabilities Defendants incur, as well as continue to siphon off its profits to its owners. *Cf. In re Vadnais*, 100 B.R. at 139 (payment after debtor entered "loss mode of operations, with less management, more competition, and a tenuous banking relationship" and "its poor financial condition was obvious" left debtor with unreasonably small capital).

There are other objective factors supporting the conclusion that Defendants' payment of profits left them with unreasonably small capital. "Courts examining the question of adequate capital also place great weight on the ability of the debtor to obtain financing." *In re Iridium Operating LLC*, 373 B.R. 283, 349 (Bankr. S.D.N.Y. 2007) (citation omitted). Here, Defendants have stated they "were 'having financial problems and [were] in need of raising capital,'" and "'misrepresented the . . . amount of capital [they] needed.'" (SAC ¶162.) At a minimum, the SAC amply alleges Defendants are left with unreasonably small capital.

### 3. Defendants Obtain No Value in Exchange for Their Profits

Plaintiffs allege Defendants do "not receive value for payment of profits (or any other return on equity) to its owners." (SAC ¶¶163, 166.) Defendants contend this allegation "does not reflect how the real world functions, is not reflected in any case law, and fails any reasonable standard of plausibility," because investors expect "they will receive a reasonable return on [their] investment." (Def.s' Mot. 44.)

Ample case law bluntly rebuts this contention. "The concern of [Florida's UFTA] is to protect the rights of creditors . . . 'from transactions which . . . unfairly drain[] the pool of assets available to satisfy creditor claims or which dilute legitimate creditor claims at the expense of

false or lesser claims." *Smith v. Effective Teleservs., Inc.*, 133 So. 3d 1048, 1051 (Fla. Dist. Ct. App. 2014). This concern means payment of profits to equity owners or other return on equity is not "value" under the UFTA.

> [P]artnership distributions [are] not for value [where they made] on account of the partnership interests . . . [V]alue is to be determined in light of the [UFTA's] purpose, in order to protect the creditors. Any consideration not involving utility for the creditors does not comport with the statutory definition. Thus, distributions to limited partners is not value because any other definition would not further protection of creditors.

*In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 540 (9th Cir. 1990) (citing Unif. Fraudulent Transfer Act § 3, cmt. 2 (1985)).[64] Fraudulent transfer cases uniformly hold there is no value obtained for profits or return on equity paid to owners. *See In re Terry Mfg. Co., Inc.*, No. 05-3050, 2007 WL 274319, *4 (Bankr. M.D. Ala. Jan. 25, 2007) (where "an insolvent corporation nevertheless continues to pay dividends, those payments are made for no value to the corporation and such payments are necessarily fraudulent conveyances"; quoting, e.g., *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 376 n.104 (Bankr. S.D.N.Y. 2005) ("dividends from insolvent entities are classic fraudulent conveyances"]; *In re Trace Int'l Holdings, Inc.*, 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003) (corporation "cannot lawfully distribute its assets to shareholders to the prejudice of those creditors")).[65] Courts have specifically rejected the

---

[64]   *See In re Bay Plastics, Inc.*, 187 B.R. 315, 329 (Bankr. C.D. Cal. 1995) ("reasonable equivalence must be determined from the standpoint of creditors . . . Payment of funds to a parent corporation prevents a transaction from satisfying the 'reasonably equivalent value' requirement"; collecting cases).

[65]   "Equity distributions are not ordinarily . . . considered to be made in exchange for 'reasonably equivalent value.'" *In re Dewey & LeBoeuf LLP*, 518 B.R. 766, 789 (Bankr. S.D.N.Y. 2014) (citation omitted).
> The distribution of assets of a business entity to one of its equity interest holders 'without adequate consideration" is deemed constructively fraudulent as to unpaid creditors without regard to actual intent. . . . Similarly, a distribution of profits or dividends to L.L.C. members that is not compensation or salary for services rendered is not a transfer in exchange for reasonably equivalent value under the Uniform Fraudulent Transfer Act.

contention that investors' expectations of profits gives value to their investment under the UFTA. *See United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 122 (E.D. Pa. 2011) (rejecting contention investment in debtor partnership "conferred 'value' on the partnership via the risk it undertook by investing with the hope of a future economic benefit").

### D.      Rule 9(b) Does Not Apply to Constructive Fraudulent Transfer Claims

As Plaintiffs' motion indicated, the courts in this Circuit do not apply Rule 9(b) to constructive fraudulent transfer claims. "[C]laims for constructive fraudulent transfer need only satisfy the less rigorous requirements of Rule 8(a)."  *In re Fin. Res. Mortg., Inc.*, 454 B.R. 6, 22 (Bankr. D.N.H. 2011) (collecting cases, including *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 225 (Bankr. S.D.N.Y. 2011) (""heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent")); *In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 317 (Bankr. D.P.R. 2016); *In re Editorial Flash, Inc.*, No. 13-08014, 2016 WL 3638471, *4 (Bankr. D.P.R. June 29, 2016) ("Complaints alleging constructive fraudulent transfers need only to set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him," quoting *In re U.S. Digital, Inc.*, 443 B.R. 22, 38 (Bankr. D. Del. 2011), punctuation omitted).

Defendants' Motion cites contrary authority. (Def.s' Mot. 34 (citing *Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997).) But Plaintiffs' authorities are not only

---

*In re Teknek, LLC*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (citing, e.g., *In re Brentwood Lexford Partners, LLC* (Bankr. N.D. Tex. 2003) 292 B.R. 255, 267 (where "distributions were made to the equity holders of [the debtor] amounted to dividends," debtor "did not receive reasonably equivalent value for the distributions"). *See also In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 300 (D. Del. 2012) ("voluntarily disbursed dividend to preferred shareholders [did not] constitute[] reasonably equivalent value"); United States v. Rocky Mountain Holdings, Inc., 782 F.Supp.2d 106, 122-24 (E.D. Pa. 2011) ("distributions [from limited partnership do not] constitut[e] an exchange 'for value' for the purposes" of Pennsylvania UFTA); *In re The Heritage Organization, LLC*, 413 B.R. 438, 472-73 (Bankr. N.D. Tex. 2009).

the consensus rule in this Circuit, they reflect "the 'better and majority rule' . . . that a claim for

constructive fraud under that section need not be plead with particularity." *In re Felt Mfg. Co.,

Inc.*, 371 B.R. 589, 637 n. 13 (Bankr. D.N.H. 2007) (citation omitted).[66] Rule 9(b) does not apply

"because [constructive fraudulent transfers] do not require the intent to defraud as an element."

*Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 667 (S.D.N.Y. 2012).

*See also In re NM Holdings Co., LLC*, 407 B.R. 232, 259 (Bankr. E.D. Mich. 2009) (expressing

same rationale; "Most cases have held that Rule 9(b) does not apply" to constructive fraudulent

transfers; collecting cases). The National Conference of Commissioners on Uniform State Laws

(NCCUSL) codified the UFTA: in 2014, it promulgated an amended version to change the name

to the "Uniform Voidable Transfers Act" to avoid precisely the confusion evidenced here:

> The 2014 amendments change the short title of the Act from "Uniform Fraudulent
> Transfer Act" to "Uniform Voidable Transactions Act." The change of title is not
> intended to effect any change in the meaning of the Act. The retitling is not
> motivated by the substantive revisions made by the 2014 amendments, which are
> relatively minor. Rather, the word "Fraudulent" in the original title . . . was a
> misleading description of the Act . . . Fraud is not, and never has been, a
> necessary element of a claim for relief under the Act. *The misleading intimation
> to the contrary in the original title of the Act led to confusion in the courts*.

Unif. Voidable Transfers Act § 15 cmt. 1, *at* https://www.uniformlaws.org/viewdocument/final-

act-3816 (italics added). Indeed, the NCCUSL comments suggest Rule 9(b) should not apply to

Plaintiffs' claims under section 726.105(1)(a).[67]

---

[66]   See also *In re Tronox Inc.*, 429 B.R. 73, 96 (Bankr. S.D.N.Y. 2010) ("the overwhelming
weight of authority is that the heightened pleading requirements of Rule 9(b) are
inapplicable" to "constructive fraudulent conveyance" claim; collecting cases); *Nesco, Inc. v.
Cisco*, No. 05-142, 2005 WL 2493353, *3 (S.D. Ga. Oct. 7, 2005).

[67]   UVTA "§ 4(a)(1) applies to a transaction that 'hinders' or 'delays' a creditor even if it does
not 'defraud,'" so that § 4(a)(1) claims "need not bear any resemblance to common-law
fraud." Unif. Voidable Transfers Act § 4 cmt. 10. Thus, "*a procedural rule that imposes
extraordinary pleading requirements on a claim of 'fraud,' without further gloss, should not
be applied to a claim for relief under § 4(a)(1).*" *Id. Cf.* Fla. Stat. § 726.105(1)(a) (covering
transfers with "actual intent to hinder, delay, or defraud any creditor of the debtor"). These
changes do not reflect a material change from the UFTA. The UFTA uses the word "fraud"

### E.        Plaintiffs Allege Intent to Hinder or Defraud

Contrary to Defendants, Plaintiffs' UFTA claims do not rely on "mutually exclusive inferences" that Defendants simultaneously operate a normal and "fraudulent" business. (Def.s' Mot. 37.) Certainly, the SAC alleges generally Defendants pays its owners profits at regular intervals during the class period like a normal business. (SAC ¶¶153, 162.) But the inference that a commercial enterprise will pay profits to its owners is simply a matter of "judicial experience and common sense." *A.G.*, 732 F.3d at 80 (citation, punctuation omitted).

Conversely, the UFTA does not require Plaintiffs to show Defendants' business is "fraudulent" (at least, not in the sense they mean)—Plaintiffs only need to allege Defendants pay profits to their owners (1) in order to hinder claimants and/or (2) while its TCPA liabilities are likely to lead to insolvency. The SAC cites hard facts about mounting regulatory pressure on Defendants' business, mounting TCPA liabilities (including hundreds of consumer complaints to the FTC and several prior class actions), and declining revenue, their own reports of financial problems and difficulty obtaining capital, and their emphasis on a "bankruptcy remote" financial structure. (SAC ¶¶70, 157-162, Exhibit 1.) Together with the allegation that Defendants transfer "every dollar in profit to [their] owners" who "deliberately keep [Defendants] very thinly capitalized," these facts are sufficient to state claims for actual fraudulent transfer.[68]

---

for historical reasons only: the replacement of "fraudulent" with "voidable" does not "effect[] any change in the meaning of the Act, and those amendments should not be construed to affect any of the foregoing matters." Unif. Voidable Transfers Act § 15 cmt. 5.

[68]  Citing Florida and Massachusetts law, Defendants contend the "substance" of a conversation between its employee and Samuel Katz "may not be used in any way in this proceeding." (Def.s' Mot. 38 n.29.) Massachusetts law does not apply to a call from Florida to Maine, and Defendants have not proved the Florida statute applies. Even if it did, the statute proscribes the use of recordings as "evidence in any trial, hearing, or other proceeding in or before any court . . . *of the state.*" Fla. Stat. § 934.06. Moreover, state wire-tapping laws do not control admissibility of evidence in federal court. *See United States v. Pratt*, 913 F.2d 982, 987 (1st Cir. 1990) ("evidence admissible under federal law cannot be excluded simply because it would be inadmissible under state law"); *Wilson v. N. Am. Reinsurance Corp.*, No. 86-4968,

### 1.      The SAC Alleges Badges of Fraud

Defendants dispute this, complaining that Plaintiffs have not alleged enough "badges of fraud" listed in Florida Statutes section 726.105(2). In the first place, this is a red herring: the plain statutory text UFTA does not limit proof of actual fraudulent transfers to the "badges of fraud" listed in section 726.105(2).[69] Second, the SAC plainly does allege several badges of fraud. The SAC alleges payments of profits to Defendants' owners ("transfer . . . to an insider" for no value), while Defendants faced extensive litigation and/or threats of litigation ("[b]efore the transfer was made . . . the debtor had been sued or threatened with suit"), while Defendants' TCPA liabilities exceeded its assets ("debtor was insolvent or became insolvent shortly after the transfer was made"). *See* Fla. Stat. § 726.105(2)(a), (d), (h), (i).[70] Defendants concede "payment is made in anticipation of litigation" is "an indicia of fraudulent intent," but argue they did not learn of Plaintiffs' claims before the transfers. (Def.s' Mot. 38.) Of course, Defendants would have been aware of the *other* "class action lawsuits which have threatened [their] financial viability" during the class period alleged in the SAC. (SAC ¶162.)

### 2.      Rule 9(b) Provides Intent May Be Alleged Generally

Defendants argue the SAC does not allege facts with "particularity establishing intent to defraud." (Def.s' Mot. 38.) Defendants misconceive the applicable standard. Rule 9(b)'s

---

[69] 1988 WL 48561, *2 (E.D. Pa. May 13, 1988) ("Federal Rules of Evidence—not Florida law—govern[ed] the admissibility of" recorded conversation).

[69] *See* Fla. Stat. § 726.105(2) ("consideration may be given, **among other factors**, to" badges of fraud listed in statute; emphasis added). "It is clear from the language of [Fla. Stat. § 726.105(2)] that in determining intent, consideration may be given to factors other than those listed above." *In re Miller*, 188 B.R. 302, 306 (Bankr. M.D. Fla. 1995); quoting Fla. Stat. § 726.105(2); *Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 327 (Fla. Dist. Ct. App. 2013) ("Consideration may also be given to factors other than those listed"; citing *Miller*)).

[70] *See W Holding Co. v. AIG Insur. Co.*, 943 F. Supp. 2d 313, 318 (D.P.R. 2013) (citing *FDIC v. Anchor Props.*, 13 F.3d 27, 32 (1st Cir. 1994) for the proposition that "identifying actual or threatened litigation, a purported transfer of all or substantially all property, insolvency or other unmanageable indebtedness, and a special relationship between debtor and transferee as badges of fraud").

"specificity requirement extends only to the particulars of the allegedly misleading statement itself. . . .  The other elements of fraud, such as *intent and knowledge, may be averred in general terms*." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004) (citing Fed. R. Civ. P. 9(b); other citation omitted; italics added).[71] Instead, "[i]ntent is quintessentially an issue for trial." *Holmes Grp., Inc. v. RPS Prod., Inc.*, No. 03-40146, 2010 WL 7867756, *12 (D. Mass. June 25, 2010) (quoting *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 n. 2 (1st Cir. 1999) for proposition that "'[c]ertain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment'"). In fraudulent transfer cases, the "existence of fraudulent intent is a factual question, usually inappropriate for summary judgment." *In re Indrescom*, 559 B.R. at 318 (citation omitted).[72]

### F.    Discovery Is Proper, If More Details Were Required

To the extent Defendants contend Plaintiffs need to allege details in Defendants' exclusive knowledge (like the dates, amounts, and form of specific transfers), the First Circuit authorizes discovery where information to allege fraud with particularity under Rule 9(b) "is likely in the exclusive control of the defendant," and it is "impossible" for the plaintiff to know such information without discovery. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). *See also U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 351 (D. Mass. 2011) ("where facts underlying the fraud are peculiarly within the defendant's control, a

---

[71]   *See also Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991) ("plaintiff need not specify the circumstances or evidence from which fraudulent intent could be inferred"); *Howell v. Advantage Payroll Servs., Inc.*, No. 16-438, 2017 WL 782881, at *6 (D. Me. Feb. 28, 2017) ("plaintiff may allege the defendant's intent or knowledge generally"; citing Fed. R. Civ. P. 9(b)); *Garcia v. Carrion*, No. 09-1507, 2010 WL 3662593, *7 (D.P.R. Aug. 11, 2010) ("As for the mental state that establishes fraud, one need only allege knowledge, intent, and other mental conditions generally"; citing Rule 9(b)).

[72]   *See also Davimos*, 2013 WL 5353005, at *5 ("Court will not try [fraudulent transfer] case on a motion to dismiss"); *Yaralli v. Am. Reprographics Co., LLC*, 165 So. 3d 785, 789 (Fla. Dist. Ct. App. 2015) ("issue of fraud is [typically] not a proper subject of a summary judgment"; Florida UFTA case).

plaintiff may be excused from pleading the circumstances of the fraud with a high degree of precision"; citations omitted). *New England* authorized discovery on RICO wire and mail fraud predicates because "[i]n this day and age, it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires." *New England*, 829 F.2d at 291. *Cf. In re Comprehensive Power, Inc.*, 578 B.R. 14, 31 (Bankr. D. Mass. 2017) (courts take "more liberal view when examining allegations of actual fraud," where plaintiff's knowledge is "second-hand"; citing *Indrescom*, 559 B.R. at 317, collecting other cases).[73] The SAC provides enough details to warrant discovery of Defendants' financial transfers.[74]

## VII.   Conclusion

The Court should deny Defendants' Motion to dismiss the SAC in its entirety.

---

[73]  *See also In re James River Coal Co.*, 360 B.R. 139, 163 (Bankr. E.D. Va. 2007) ("disingenuous for the defendants to attempt to shield themselves from liability [on argument] Trustee has failed to plead with sufficient particularity [when] defendants possess knowledge regarding the subject transactions and the Trustee has limited access to such information without discovery"; cited by *In re El Comandante Mgmt.*, 388 B.R. at 473).

> [I]t is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading the circumstances of fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the federal rules and the many cases construing them; in a sense, therefore, the rule regarding the pleading of fraud does not require absolute particularity or a recital of the evidence, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery.

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2018).

[74]  In a footnote, Defendants cite *Wayne Investment*, 739 F.2d 11, to suggest it stands for the proposition that Plaintiffs must allege details, even when they are "peculiarly within the knowledge of the opposing party." (Def.s' Mot. 34 n.24.) This is not consistent with *New England*, *supra*, and is not a fair reading of *Wayne*. Rather, *Wayne* cites *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974) which held "the particularity requirement may be satisfied if, as here, the allegations are accompanied by a statement of the facts upon which the belief is founded." *Id*. First Circuit courts have adopted this proposition. *See In re Comprehensive Power*, 578 B.R. at 31 (citing *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) for holding "relaxed standard does not eliminate the particularity requirement, although the degree of particularity required should be determined in light of circumstances such as opportunity for discovery"); *In re Indrescom*, 559 B.R. at 317 (court have "adopted a more liberal view [regarding fraud pleadings where the plaintiff] is an outsider to the transaction who must plead fraud from second hand knowledge").

Dated: February 13, 2019      By: _____/s/Ethan Preston_____

David C. Parisi
dcparisi@parisihavens.com
Suzanne Havens Beckman
shavens@parisihavens.com
**PARISI & HAVENS LLP**
212 Marine Street, Unit 100
Santa Monica, California 90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Matthew R. Mendelsohn
mrm@mazieslater.com
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 228-0391
Facsimile: (973) 228-0303

Yitzchak H. Lieberman
ylieberman@parasmoliebermanlaw.com
Grace E. Parasmo
gparasmo@parasmoliebermanlaw.com
**PARASMO LIEBERMAN LAW**
7400 Hollywood Boulevard, Suite 505
Los Angeles, California 90046
Telephone: (917) 657-6857
Facsimile: (877) 501-3346

Ethan Preston
ep@eplaw.us
**PRESTON LAW OFFICES**
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Plaintiffs Samuel Katz,*
*Alexander Braurman, and Lynne Rhodes, on their*
*own behalf, and behalf of all others similarly*
*situated*

**<u>CERTIFICATE OF SERVICE</u>**

I, David C. Parisi, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 13, 2019      By: _____ /s/David C. Parisi_____
                                              David C. Parisi