# In The Matter Of:

*Katz v.*
*Liberty Power*

*Samuel Katz*
*May 16, 2019*
*CONFIDENTIAL*



*Min-U-Script® with Word Index*

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

113

1    A.   I don't remember.  I don't know that it was
2  a newspaper.
3    Q.   Let's start with the first call you said
4  you answered, October 3, 2016, 1:27 p.m.  Can you
5  tell me about that call, please?
6    A.   My recollection is that I received a call
7  and I could not hear the caller.
8    Q.   Did the caller say anything?
9    A.   He was saying things; I don't believe that
10 I could understand him.
11   Q.   How long was the call?
12   A.   It looks like it was less than two minutes.
13   Q.   Where is that data point, length of call,
14 on here?
15   A.   That would be 13:29 minus 13:27.
16   Q.   So your basis for that, the October 3,
17 2016, 1:27 p.m. call was less than two minutes is
18 that you got an anonymous call two minutes later?
19   A.   Yes.
20   Q.   How does an anonymous call link to
21 508-202-1270?
22   A.   My recollection is that the party called me
23 back again due to the connection issue.
24   Q.   It was the same individual?

114

1  A.  Could we listen to the recordings?
2  Q.  Do you know if it was the same individual?
3  A.  Well, I'm asking if we could listen to the
4  recordings.  I don't know that if -- I don't know if
5  it was the same individual.
6  Q.  How long was that second call?
7  A.  I believe it was fairly lengthy.
8  Q.  What was the substance of it?
9  A.  I believe that that was the call where I
10 was -- asked to not be called anymore.  I think it
11 was also when I asked for a copy of the Do Not Call
12 policy.  I think I was transferred to Calibrus three
13 times.  I think the agent -- I think that that was
14 also the call where the agent told me that if I
15 wanted to stop receiving calls, I had to sign up for
16 Liberty Power service.
17 Q.  Does 29 minutes sound right for the length
18 of that call?
19 A.  It sounds about right.  I think that might
20 be the call.
21 Q.  You seek to avoid telemarketing calls,
22 correct?
23 A.  Yes.
24 Q.  You seek to avoid interacting with

                                                              115

1  telemarketers, correct?
2       A.  What do you mean by "seek to avoid"?  My
3  number is already on the Do Not -- these numbers
4  were on the Do Not Call List.
5       Q.  So why would you stay on the phone with
6  them for 29 minutes?
7       A.  Well, you know, as has happened in other
8  cases, there are other situations, you know, parties
9  claim that they're impersonated, and they claim,
10 "Oh, there's no records," "the records are
11 offshore."  You know, they have all kinds of games
12 that they play.  And in my experience the best way
13 to insure that -- the correct party responsible for
14 illegal telemarketing is to engage with them and
15 follow the sales process that they're trying to go
16 through with the called party, and then ultimately
17 the party responsible for the call will become known
18 as a result of that process.
19      Q.  So you feign interest to gain knowledge?
20      A.  I don't know that "feign" is the correct
21 adjective because there's a legitimate interest in
22 learning who is responsible for the call, and the --
23 you know, this is a tactic that the federal
24 government has condoned for catching telemarketers

119

1    A.  I don't know if that was said by the caller
2  or not.
3    Q.  You also testified a moment ago that you
4  answered one call on October 14.  There are four
5  listed here.  This is obviously not a memorization
6  test; I'm not going to ask you which call it was;
7  but do you recall the substance of whatever call
8  that you answered?
9    A.  No, I don't -- my memories are particularly
10 around the frustration of the 10/3 call.
11   Q.  Why were you frustrated?
12   A.  The -- can we listen to the tape and maybe
13 we can go play-by-play over the misrepresentations
14 made about the money that I would be saving or the
15 illusion the caller was attempting to create, that
16 it was Eversource placing the call, prominently
17 saying the Eversource name as a brand, to attempt to
18 confuse consumers?  Can we listen to the recording
19 so that we can talk about why I felt that it was so
20 important to determine the identity of the caller?
21   Q.  You just explained.
22   A.  Okay.
23   Q.  Do you recall being deposed in Slovin v.
24 Sunrun in -- on June 26, 2017?

139

1   the public records requests with Massachusetts,
2   where I found the investigation that occurred
3   shortly after my complaints in Massachusetts with
4   the DPU, and also what's happened with PURA in
5   Connecticut and I think New York as well also for
6   the door-to-door solicitation, that there are very
7   serious compliance and ethical issues with how
8   Liberty Power attempted to acquire customers, and
9   one of those methods was telemarketing, which they
10  included -- which they openly admit to in their
11  public records when they're filing with regulatory
12  authorities.
13       Q.   The only reason ▇▇▇ rang in 20 --
14  September and October of 2016 is because you set up
15  call forwarding to your cell phone, correct?
16       A.   No.  The reason it rang is because I set up
17  call forwarding so that my wife wouldn't have to
18  hear the annoying calls or so that I wouldn't have
19  to walk across the house and pick up the phone.
20       Q.   Couldn't you just turn off the ringer
21  instead of setting up call forwarding?
22       A.   I'm under no obligation to accommodate the
23  needs of telemarketers who habitually violate the
24  law.

140

1  Q.  You are not, that is correct, but you could
2  have avoided what you allege to be intrusive and
3  harassing by simply turning off the ringer, correct?
4  A.  Well, I was already on the National Do Not
5  Call List, so that was my effort, which I think
6  would be much more broad than turning off the
7  ringer.
8  Q.  But instead, you set up call forwarding to
9  create records of these calls, correct?
10 A.  So that I could identify and hold the
11 parties accountable who are responsible for those
12 calls, I engaged in steps required to positively
13 identify the companies responsible for those calls.
14 Q.  On your call log which we looked at a
15 moment ago, you identified 508-202-1270 as a Liberty
16 Power telephone number, but you said you didn't pick
17 up the telephone until the tenth call, which is on
18 October 3, the first call being on September 8.  If
19 you knew it was from Liberty Power, why would you
20 pick up at all?
21 A.  Why do you think that I knew that the call
22 was from Liberty Power?
23 Q.  Well, your log says on September 8 you got
24 a call from Liberty Power.

141

1  A.  That doesn't necessarily -- that doesn't --
2  that's not an indication that the entry of Liberty
3  Power was made on September 8.
4  Q.  So it's backfilled?
5  A.  I don't think that "backfilled" -- I don't
6  think that "backfilled" is an appropriate way to
7  describe it.  It was filled in when the party
8  responsible for 508-202-1270 was discovered, is what
9  my guess would be.
10  Q.  Was that on October 3, when you took that
11  29-minute call?
12  A.  I think so, but I don't remember exactly.
13  Q.  So if you identified Liberty Power as an
14  unsolicited telemarketer on 10/3, why did you answer
15  the phone again on October 14?
16  A.  How would I know who was calling me on
17  October 14?
18  Q.  Because it's the same telephone number.
19  A.  That phone number wouldn't have shown up on
20  my cell phone when it was ringing; it would have
21  shown up as the Google Voice number, the ▮▮▮▮
22  number.
23       I should also add, my recollection is
24  that on October 3, after receiving the call from

```
                                                          142

 1   Liberty Power, I directly complained to them in an
 2   email, and they lied to me in their response after
 3   Mezzi had confirmed that they were the part -- they
 4   did make those calls or they did make that call.
 5               MR. BRUNDAGE:  I think that's lunch.
 6               VIDEOGRAPHER:  The time is approximately
 7   1:32, and we are off the record.
 8               (Luncheon recess at 1:32 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

171

1    Q.  If you turn to KATZ 14, which is page 2,
2    please.  Is this an email from you to Liberty Power
3    saying, "Please add me to your Do Not Call List" and
4    providing three telephone numbers?
5    A.  Yes.
6    Q.  The numbers you provided are your cell
7    phone, ███, one of your Fios numbers at the time,
8    ███, and your Google number of ███; is that
9    accurate?
10   A.  That's correct, yes.
11   Q.  Why did you not also include your ███
12   Verizon Fios number which you had at the time?
13   A.  I mean, I think it's important to add the
14   context that this was October 3, which was the same
15   day that I had received a call on my ███ number.  I
16   don't remember why I didn't include ███.  I don't
17   know.
18   Q.  Why did you send this email to David -- to,
19   among others, David Hernandez?
20   A.  I wanted to make sure that my phone
21   number -- also, my understanding is that even though
22   they told me that they had DNC'd me, they didn't
23   actually do it until several months later; but my
24   inclusion of David Hernandez would be to try to

172

1  ensure that the right people got the message and
2  that it didn't just end up in a customer service
3  queue with employee -- in an effort to contact the
4  -- one of the listed owners of the company, it would
5  be to make sure that the right people at the company
6  who have the capability to make decisions would make
7  that -- make sure that it was followed through with.
8      Q.  On the first page, Bates 13, you write at
9  the top, "The calls were claiming to be made on
10 behalf of Eversource"; is that correct?
11     A.  That's what it says, yes.
12     Q.  In the telephone calls were they claiming
13 to be made on behalf of Eversource?
14     A.  Can we listen to the calls, please?
15     Q.  I don't have every call recording in front
16 of me.
17     A.  Well, I think if we listen to the calls,
18 then we would be able to ascertain, you know, the --
19 why I felt like they were rep -- Eversource was
20 the -- they were representing that they were made by
21 Eversource.
22     Q.  Absent the calls, you have no recollection?
23     A.  My recollection is that the language and
24 the way that the representative was speaking on the

173

1  phone, as well as the prerecorded message was
2  clearly and prominently using the Eversource name in
3  an effort to mislead company -- mislead consumers
4  about the companies who were -- the company who was
5  making the call.  I think it -- the recordings will
6  provide clarity on that.
7       Q.  You wrote, "I've been receiving them for
8  months."  Isn't it true, though, that you'd only
9  been receiving calls allegedly for one month,
10 September 8, 2016?
11      A.  No, I had received prerecorded voice calls
12 claiming affiliation with Eversource for much longer
13 than the calls that are indicated here (indicating).
14      Q.  Affiliation with Eversource or affiliation
15 with Eversource and Liberty Power?
16      A.  The prerecorded messages for a -- months,
17 as indicated here, were referencing Eversource.
18      Q.  Do you see underneath your email, where
19 it's an email from customercare@libertypowercorp, it
20 says, "Hello, we do apologize for any inconvenience.
21 We have submitted your request to have the below
22 numbers added to the Do Not Call List.  Can you
23 please also provide what state you're located in"?
24 Do you see that?

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

174

1    A.  Yes.

2    Q.  Why didn't you tell them what state you

3  were located in?

4    A.  I don't know.

5    Q.  Well, I would think if you wanted the calls

6  to stop, you would provide them information that

7  they requested.

8    A.  I had already done what I was required to

9  do by asking the calls to stop, by being on the Do

10  Not Call List, and by providing them with my phone

11  numbers, indicating that I wanted to be added to

12  their Do Not Call List.

13    Q.  But if you had received a call from Liberty

14  Power after October 3 to your ▮▮▮▮, it would be part

15  of this lawsuit, wouldn't it?

16        MS. PARASMO:  Objection.

17    A.  I don't know that that's necessarily the

18  case.  It didn't happen.

19    Q.  If it did happen, wouldn't it be part of

20  this lawsuit?

21        MS. PARASMO:  Objection.

22    A.  No, I don't know whether I can conclusively

23  state that.

24    Q.  So it may be?

**CONFIDENTIAL**

200

1             CERTIFICATE OF COURT REPORTER

2         I, Joan M. Cassidy, Registered

3 Professional Reporter and Certified Realtime

4 Reporter, do certify that the deposition of Samuel

5 I. Katz, in the matter of S. Katz, et al. vs.

6 Liberty Power Corp., LLC, et al., on May 16, 2019,

7 was stenographically recorded by me; that the

8 witness provided satisfactory evidence of

9 identification, as prescribed by Executive Order 455

10 (03-13) issued by the Governor of the Commonwealth

11 of Massachusetts, before being sworn by me, a Notary

12 Public in and for the Commonwealth of Massachusetts;

13 that the transcript produced by me is a true and

14 accurate record of the proceedings to the best of my

15 ability; that I am neither counsel for, related to,

16 nor employed by any of the parties to the above

17 action; and further that I am not a relative or

18 employee of any attorney or counsel employed by the

19 parties thereto, nor financially or otherwise

20 interested in the above action.

21

22                 _____
                     Joan M. Cassidy, RPR, CRR
                     Commission expires 5/1/2020

23

24