Contains Confidential Portions
**Page 82, 104, & 136**

Page 1

1              UNITED STATES DISTRICT COURT
2                DISTRICT OF MASSACHUSETTS
3

SAMUEL KATZ, ALEXANDER BRAURMAN,      No. 1:18-CV-10506
4   LYNNE RHODES, individually, and
on their own behalf and on behalf
5   of all others similarly situated
6           Plaintiffs,
-vs-
7

LIBERTY POWER CORP., LLC,
8   LIBERTY POWER HOLDINGS, LLC,
Delaware limited liability companies,
9

             Defendants.
10  _____/
LIBERTY POWER CORP., LLC, and
11  LIBERTY POWER HOLDINGS, LLC,
12           Third-Party Plaintiffs,
-vs-
13

MEZZI MARKETING, LLC,
14

             Third-party Defendant.
15  _____/
16           **CONTAINS CONFIDENTIAL PORTIONS**
17              **PAGES 82, 104, & 136**
18              **BOUND SEPARATELY**
19        DEPOSITION OF MICHELLE CASTILLO
20           Wednesday, May 8, 2019
21           10:36 a.m. - 5:07 p.m.
22           110 East Broward Boulevard
                    Suite 1700
23        Fort Lauderdale, Florida 33301
24  Stenographically Reported By
Pamela J. Pelino, RPR, FPR, CLR
25  Notary Public, State of Florida      JOB # 160216

Contains Confidential Portions
**Page 82, 104, & 136**

1              M. CASTILLO
2                 –  –  –
                I N D E X
3                 –  –  –
4   MICHELLE CASTILLO    DIRECT    CROSS    REDIRECT
5   BY MR. PRESTON          6                 175
6   BY MR. BRUNDAGE               168
7

              –  –  –
8       E X H I B I T S   M A R K E D
              –  –  –
9   DESCRIPTION                              PAGE
10  Plaintiff's Exhibit 5                     19
       (Key Words List)
11

    Plaintiff's Exhibit 6                     34
12     (Emails, LP_002389-1.pdf through -3.pdf)
13  Plaintiff's Exhibit 7                     48
       (Emails with Attachment
14      LP_004075-1.pdf through -5.pdf)
15  Plaintiff's Exhibit 8                     51
       (Emails, LP_004099.pdf)
16

    Plaintiff's Exhibit 9                     66
17     (Emails with Attachments, LP_001242 through 57)
18  Plaintiff's Exhibit 10                    74
       (Email with Leeds List attached
19      LP_003528-1.pdf through -2.pdf)
20  Plaintiff's Exhibit 11                    97
       (Emails, LP_004157.pdf)
21

    Plaintiff's Exhibit 12                   101
22     (2/10/17 Email to J. Toussaint from J. Toussaint)
        LP_004133.pdf
23

    Plaintiff's Exhibit 13                   103
24     (Emails, LP_000058.pdf)
25                  -Continued-

Contains Confidential Portions
**Page 82, 104, & 136**

Page 4

1                       M. CASTILLO
2                         -   -   -
              E X H I B I T S    M A R K E D
3                         -   -   -
4                       (CONTINUED)
5    DESCRIPTION                                       PAGE
6    Plaintiff's Exhibit 14                            106
       (Emails, all marked LP_002373.pdf)
7
     Plaintiff's Exhibit 15                            110
8      (Emails, all marked LP_002385-1.pdf)
9    Plaintiff's Exhibit 16                            111
       (Emails, all marked LP_002391-1.pdf)
10
     Plaintiff's Exhibit 17                            116
11     (5/25/18 Email from C. Zdebski
        all marked LP_000015.pdf)
12
     Plaintiff's Exhibit 18                            117
13     (Emails with attachments, KATZ 007733,
        007746, 007747, 007748, KATZ 049763, 049764,
14      049765, 049766)
15   Plaintiff's Exhibit 19                            122
       (Emails with Attachments, LP_001242 through 57)
16
     Plaintiff's Exhibit 20                            125
17     (7/26/18 Email to A. Leon from I. Milenkov
        LP_003528-1.pdf through -2.pdf)
18
     Plaintiff's Exhibit 21                            128
19     (7/26/18 Email to A. Leon from I. Milenkov
        LP_003528-1.pdf through -2.pdf)
20
21
22                  CONFIDENTIAL PORTIONS:
23                        Page 82
24                        Page 104
25                        Page 136

Contains Confidential Portions
**Page 82, 104, & 136**

1               M. CASTILLO

2                  -   -   -

            E X H I B I T S   A T T A C H E D

3                  -   -   -

    (Marked in the deposition of Matthew Fuller at the

4                request of counsel)

5

6   DESCRIPTION

7   Plaintiff's Exhibit 1
        (Notice of Rule 30(B)(6) Deposition)

8

    Plaintiff's Exhibit 2
9       (Defendants Liberty Power Corp., LLC and
         Liberty Power Holdings, LLC's Second Amended
10       Fed. R. Civ. P. 26(a)(1) Disclosures)

11  Plaintiff's Exhibit 3
        (Defendants Liberty Power Corp., LLC and
12       Liberty Power Holdings, LLC's Objections
         and Answers to Plaintiffs' Second Set
13       Interrogatories)

14  Plaintiff's Exhibit 4
        (Defendants' Objections and Responses to
15       Plaintiff Samuel Katz's First Set of
         Requests for Production to Defendants
16       Liberty Power Corp., LLC and Liberty Power
         Holdings, LLC)

17

18

19

20

21

22

23

24

25

Contains Confidential Portions
**Page 82, 104, & 136**

Page 34

1                      M. CASTILLO

2   telemarketers' recordkeeping requirements.

3            Is it your understanding that that would be a

4   regulation that the vendors would comply with?

5       A.    Yes.

6            MR. BRUNDAGE:  Objection.

7            You can answer.

8            THE WITNESS:  Sorry.

9   BY MR. PRESTON:

10      Q.    Who is Mezzi Marketing?

11      A.    They're one of our sales channels.

12      Q.    Okay.  Is Mezzi Marketing a good corporate

13   citizen?

14            MR. BRUNDAGE:  Same objection.

15            You can answer.

16            THE WITNESS:  I mean, as far as I'm aware.  I

17      don't know.

18            (Plaintiff's Exhibit 6 was marked for

19   identification.)

20   BY MR. PRESTON:

21      Q.    This is an email that defendants produced

22   marked LP2389.

23            MR. BRUNDAGE:  Do you have a question?

24            MR. PRESTON:  I do, but I want the witness to

25      read the email first.

Contains Confidential Portions
**Page 82, 104, & 136**

1                         M. CASTILLO

2              THE WITNESS:  (Document review.)

3              Okay.

4    BY MR. PRESTON:

5         Q.    What is your understanding of that document?

6         A.    That they couldn't find the number in their

7    system when they ran a search to see if they dialed it.

8         Q.    I want you to look at page 2 at the top of

9    the page.

10        A.    Okay.

11        Q.    What does it say?

12        A.    "This number is not dialed from our end."

13        Q.    Okay.  Is that true?

14             MR. BRUNDAGE:  Objection.

15             You can answer.

16             THE WITNESS:  Oh, it is not true.

17   BY MR. PRESTON:

18        Q.    Okay.  Do you know why that this -- the last

19   page of the screen shot, do you know why that screen

20   shot shows no calls made?

21             MR. BRUNDAGE:  Objection.

22             You can answer.

23             THE WITNESS:  I do not.

24   BY MR. PRESTON:

25        Q.    Do you know why J.T. asked for the screen

Contains Confidential Portions
**Page 82, 104, & 136**

Page 36

                         M. CASTILLO

1

2    shot?

3              MR. BRUNDAGE:  Objection.

4              You can answer.

5              THE WITNESS:  Because of the complaints.

6    BY MR. PRESTON:

7        Q.    Sure.  But Mezzi had already told J.T. that

8    he had not called.  Why did J.T. need the screen shot?

9              MR. BRUNDAGE:  Objection.

10             You can answer.

11             THE WITNESS:  It's part of the process.  Just

12        to show proof that it was searched.

13   BY MR. PRESTON:

14       Q.    Who created that process?

15       A.    I don't know.  That's the sales team.  I

16   would have to say Gary since he's the manager.

17       Q.    Okay.  Why did Gary create that process?

18       A.    Just to prove that if we're going to say it's

19   not that it was actually searched.

20       Q.    Why didn't compliance create that process?

21             MR. BRUNDAGE:  Objection.

22             You can answer.

23             THE WITNESS:  I believe sales creates their

24        own process as far as how they're going to keep

25        tabs on their channels, their vendors.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 57

M. CASTILLO

1  document?

2        THE WITNESS:  Yeah.

3  BY MR. PRESTON:

4        Q.    Okay.  Look, if it's not a document, then let

5  me know.

6        A.    I believe this is the confirmation, the

7  email.

8        Q.    What was the last communication between

9  defendants and Mezzi?

10        MR. BRUNDAGE:  Objection.

11        You can answer.

12        THE WITNESS:  The last communication, I would

13  guess, would be the hold letters.

14  BY MR. PRESTON:

15        Q.    Were there telephone calls that postdated the

16  litigation hold letters?

17        A.    I don't know.

18        Q.    Were there Skype communications?

19        A.    I don't believe so.  Not anymore.

20        Q.    What's the basis of that belief?

21        A.    A lot of our employees use their personal

22  Skype, and once it was determined that that can actually

23  be used, they encouraged against it.

24        Q.    I want to clarify that testimony.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 58

M. CASTILLO

1

2      A.     Okay.

3      Q.     When you say, "Once it was determined that it

4   could actually be used," what I understood you to mean

5   was once defendants understood that their employees'

6   personal Skype addresses could be used to communicate

7   with the vendors, they discouraged the use of

8   personal --

9      A.     That it could be used in --

10         MR. BRUNDAGE:  You have to let him finish.

11   BY MR. PRESTON:

12      Q.     Right.  They discouraged the use of personal

13   Skype addresses to communicate with the vendors; is that

14   correct?

15      A.     That their personal Skype messages as a whole

16   could be --

17      Q.     Discovered?

18      A.     -- discovered, yes.  So not just specific to

19   whatever case is happening but also their personal

20   interaction.

21      Q.     When was it discovered -- when did the

22   defendants learn that Skype logs could be discovered?

23      A.     When it was requested.

24      Q.     So does December 2018 sound correct?

25      A.     Yes.

Contains Confidential Portions
**Page 82, 104, & 136**

1                         M. CASTILLO

2        Q.    Okay.  And did defendants not understand that

3   Skype communications could be requested in discovery

4   before December 2018?

5        A.    I don't believe so.

6        Q.    Is Skype an important mode of communication

7   at Liberty Power?

8        A.    It was.

9        Q.    You say it was?  Why is it not important now?

10       A.    Because it was inexpensive, and we could

11   communicate with other channels that were located in

12   Canada or the Dominican Republic.  Because the employees

13   were using their personal Skype, there was no charge.

14   So now they would prefer a business Skype, which hasn't

15   been implemented.

16       Q.    Okay.

17       A.    So that's why they're not using it anymore.

18       Q.    I want to make that record clear.

19       A.    Uh-huh.

20       Q.    You indicated that Skype is free to use, and

21   it was a convenient way to communicate with vendors who

22   are overseas; correct?  And what I understood you to

23   mean was that was -- those were reasons why defendants

24   used Skype?

25       A.    Yes.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 65

1                          M. CASTILLO

2    able to pull and capture the 30 days --

3         A.     I believe that was part of whenever his

4    computer was stored.

5         Q.     Okay.  Do you know why J.T. set his Skype to

6    delete after 24 hours?

7         A.     I didn't even know it was an option.

8         Q.     Do you know if anybody else working for

9    Liberty Power has set their chat logs to delete?

10        A.     No.

11               MR. BRUNDAGE:  You have to let him finish the

12        question.

13               THE WITNESS:  Sorry.

14   BY MR. PRESTON:

15        Q.     The question was done.

16        A.     No.

17               MR. PRESTON:  That's it.  We can reconvene.

18               THE WITNESS:  Okay.

19               (A luncheon recess was taken from 12:02 p.m.

20   until 12:57 p.m.)

21   BY MR. PRESTON:

22        Q.     So we're resuming.  I want to go back to

23   Exhibit 1, paragraph -- but 1 is just the calls made,

24   but then paragraph 2 talks about lead data containing

25   plaintiffs' personal information.  Do you understand

Contains Confidential Portions
**Page 82, 104, & 136**

Page 66

M. CASTILLO

2   what that means?

3        A.    I believe so.

4        Q.    Okay.  What does that mean?

5        A.    Their phone numbers.

6        Q.    Yes.  But what documents contain that data?

7        A.    The leads lists.

8        Q.    The lead list.  Okay.  So are lead lists

9   provided to the vendors?

10       A.    I believe they come from both.  The vendors

11  will provide us a list, and we scrub it.

12       Q.    Okay.

13       A.    Actually I'm not sure if we provide a leads

14  list.  I don't know that, off the top of my head.

15       Q.    There's a document I want to show you.

16             MR. BRUNDAGE:  Thank you.  Are we marking

17       this?

18             MR. PRESTON:  Yeah.  I have Exhibit 8 as the

19       last exhibit.  Okay.  We're marking this Exhibit 9.

20             (Plaintiff's Exhibit 9 was marked for

21  identification.)

22  BY MR. PRESTON:

23       Q.    All right.  So this is an email chain that

24  was produced to us.  Do you recognize this document?

25       A.    I may have seen this, but I don't remember it

Contains Confidential Portions
**Page 82, 104, & 136**

Page 67

1                         M. CASTILLO

2    all.

3         Q.    Okay.

4         A.    Yeah.  I mean...

5         Q.    Let's talk about 1242.  There's a screen shot

6    of DNC number research for an 809 [sic] number.  Do you

7    see that?  I'm sorry.  A 908 number.  Do you see that?

8         A.    Yes.

9         Q.    Do you know where that screen shot is from?

10        A.    It looks like we scrubbed it.  Is that a

11   New Jersey number?

12        Q.    Let me clarify.  The screen shot itself,

13   that's not the text of the email?

14        A.    Right.

15        Q.    Somebody took a screen shot of a --

16        A.    I'm not --

17               (Reporter requests discontinuation of

18   simultaneous conversation.)

19   BY MR. PRESTON:

20        Q.    Somebody took a screen shot of some system,

21   and I'm asking:  Do you know the system from which that

22   screen shot was obtained?

23        A.    I'm not certain the name of the system.  I

24   believe it's called Possible Now.

25        Q.    Okay.  Does Possible Now store lead data?

Contains Confidential Portions
**Page 82, 104, & 136**

Page 70

1                          M. CASTILLO

2   1244, that looks like enrollment.libertypowercorp.com.

3   Is that kind of where deal capture lives?

4        A.    Yes.

5        Q.    Let's go back to 1243.  There's a column that

6   says "Customer Date."

7        A.    Okay.

8        Q.    Do you know what that column means?

9        A.    I believe that's the date they -- I believe

10  that is the day that they asked to be placed on -- I

11  can't answer for sure.  I'm not sure.  I'm not certain.

12       Q.    All right.  So on 1242 it says this 908

13  number was scrubbed on August 3rd, 2016, and

14  September -- excuse me -- was scrubbed on August 30th,

15  2016, and September 30th, 2016.  So that meant that it

16  was in a -- that 908 number was in a lead list that was

17  passed on to vendors to call; correct?

18       A.    I don't know if that leads list was actually

19  passed on, but it would have been on a leads list to be

20  checked, if that makes sense.

21       Q.    Well, it was checked because it was scrubbed;

22  correct?

23       A.    Right.

24       Q.    So it would have been sent out -- I mean, it

25  was prepared for transmission --

Contains Confidential Portions
**Page 82, 104, & 136**

Page 71

M. CASTILLO

2    A.    Transmission.

3    Q.    -- to a vendor; correct?

4    A.    Yes.

5    Q.    Do you know how leads lists are sent to

6    vendors?

7    A.    I do not.

8    Q.    Do you know who would?

9    A.    Albert.

10   Q.    Okay.  Do you know if this leads list was

11   ever sent out -- if these lead lists were ever sent out?

12   A.    By the email it appears, yes, that they were.

13   Q.    Okay.  So the next page, 1243, there's a 508

14   number, and there's, you know, instances where the

15   number was uploaded in a call list, and there's a number

16   of call lists.  Does it appear those lead lists were

17   sent out to vendors?

18   A.    Yes.

19   Q.    And the MEZ call list -- you'll see a file

20   name and one of the file names -- actually three of the

21   file names has the letters MEZ?

22   A.    Yes.

23   Q.    Does that reflect that the call list was sent

24   to Mezzi?

25   A.    I believe so.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 72

1                          M. CASTILLO

2        Q.    What's your basis for that belief?

3        A.    It's mentioned on the screen shot.

4        Q.    All right.  So 1245.  There's a set of

5   instances where a number was uploaded in a call list.

6   Do those files reflect that the -- that telephone number

7   was sent in a call list to vendors?

8        A.    Yes.  The 617 number.

9        Q.    Yes.  Okay.  Let's be careful.  There's two

10  617 numbers, 617 and 742?

11       A.    Yes.

12       Q.    So that 617-742 number was sent to the

13  vendors in a call list?

14       A.    Yes.

15       Q.    Was it sent to Mezzi?

16       A.    Yes.

17       Q.    Okay.  So then there's another number, if you

18  look a little bit below, a 617-962 number.

19       A.    Yes.

20       Q.    Okay.  Does that reflect that that 617-962

21  number was sent to Mezzi?

22       A.    Yes.

23       Q.    Do you know if defendants -- defendants

24  obviously searched for our clients' numbers?

25       A.    Yes.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 73

1                          M. CASTILLO

2          Q.    They did not produce these call lists to us?

3          A.    These?  Their deal -- the Possible Now?

4          Q.    Yes, the Possible Now files.  Do you know

5    why?

6          A.    So these documents were not given by us?

7          Q.    No.

8          A.    I do not.

9          Q.    They would be responsive; correct?  They had

10   our clients' telephone numbers in them?

11         A.    It appears so.

12         Q.    At least some of those have the numbers that

13   are in Exhibit 5, that list of key words; correct?

14         A.    Yes.

15         Q.    Okay.  And you do not know why they were

16   withheld?

17         A.    I do not.

18         Q.    Okay.

19         A.    I do know we did two searches.  So --

20         Q.    I'm going to talk to you about that, but

21   I -- there's another document I want to show you first.

22         A.    Okay.

23               MR. PRESTON:  So I'm going to mark

24         Exhibit 10, and it is LP3528.

25               There you go.

Contains Confidential Portions
**Page 82, 104, & 136**

1           M. CASTILLO

2    CSV file name, that starts -- it doesn't start.  It says

3    Honduras Winbacks.  Okay?  And then there's a column

4    that is a 508-540 number; correct?

5        A.    Yes.

6        Q.    And then there's a call center outbound?

7        A.    Yes.

8        Q.    And then there's a date?

9        A.    Yes.

10       Q.    And you don't know what that is?

11       A.    I don't know what that signifies, no.

12       Q.    Okay.  And then there is a MA1; correct?

13       A.    Yes.

14       Q.    And you don't know what that is?

15       A.    Right.

16       Q.    Does it appear based on those, the data in

17   the CSV file, that these telephone numbers were called

18   by defendants or Mezzi?

19            MR. BRUNDAGE:  Objection.

20            You can answer.

21            THE WITNESS:  It appears that way, yes.

22   BY MR. PRESTON:

23       Q.    Okay.  But you don't know where this came

24   from?  And by "this" I mean Exhibit 10.

25       A.    I do not.

Contains Confidential Portions
**Page 82, 104, & 136**

1                         M. CASTILLO

2         Q.    And you don't know what Mr. Milenkov was

3    searching?

4         A.    I do not.

5               MR. BRUNDAGE:  Is Matt still on the phone?

6               MR. PRESTON:  I think they both are.  They

7         may have stepped away but...

8               MR. BRUNDAGE:  Matt and Shaun?

9               MR. PRESTON:  Yeah.

10              MR. BRUNDAGE:  Okay.  Thanks.

11   BY MR. PRESTON:

12        Q.    Is there any reason why those numbers -- if

13   they're in those lists why they would not have been

14   called?

15              MR. BRUNDAGE:  Objection.

16              You can answer.

17              THE WITNESS:  Why they would not have been

18        called?

19   BY MR. PRESTON:

20        Q.    Right.

21        A.    No.

22        Q.    Okay.  So we have them -- clients appearing

23   in lead lists.  We have lead lists that contain our

24   clients' numbers that were not produced to us; correct?

25        A.    It appears that way, yes.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 100

1                         M. CASTILLO

2          Q.    Do the vendors' dialers accurately reflect

3     all the calls made by the vendors?

4                    MR. BRUNDAGE:  Objection.

5                    You can answer.

6                    THE WITNESS:  I don't know.  I don't know if

7            it was the way it was entered.  I don't know why it

8            would miss it.

9     BY MR. PRESTON:

10         Q.    Can the vendors delete calls of other

11    dialers?

12                   MR. BRUNDAGE:  Objection.

13                   You can answer.

14                   THE WITNESS:  I don't know.  I don't believe

15           so.

16    BY MR. PRESTON:

17         Q.    What's the basis for that belief?

18         A.    Well, then it would make -- I'm assuming it

19    would make it a nonsystem if they're able to delete

20    everything off of there or anything off of there.

21         Q.    So it would make the system unreliable?

22         A.    Right.

23         Q.    Do you know why the vendors would delete

24    records?

25                   MR. BRUNDAGE:  Objection.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 101

                        M. CASTILLO

1

2            You can answer.

3            THE WITNESS:  I do not.

4            MR. PRESTON:  I'm going to mark 12.  So

5      Exhibit 12 is LP4133.

6            (Plaintiff's Exhibit 12 was marked for

7      identification.)

8      BY MR. PRESTON:

9       Q.    Is that your understanding of the policy --

10      A.    I believe so.

11      Q.    -- at Liberty?

12      A.    I believe so.

13      Q.    So there could technically be a whole series

14   of disposition reports reflecting calls to a particular

15   number; correct?

16      A.    There could be.

17      Q.    And it depends on whether or not they show up

18   in the weekly disposition reports?

19      A.    Yes.

20      Q.    Okay.  So Liberty requires its vendors to

21   provide disposition reports every week?

22      A.    Yes.

23      Q.    Do you know how those disposition reports are

24   conveyed back to Liberty?

25      A.    Via email.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 102

M. CASTILLO

2    Q.    Okay.  Do you know if those disposition

3  reports are saved in the network drive?

4    A.    I do not.

5    Q.    Do you know if the -- Liberty Power searched

6  its network drive?

7    A.    I believe it did.

8    Q.    For disposition reports?

9    A.    Not specifically disposition reports, but

10  using those key words, it should have hit.

11    Q.    How do you know?

12    A.    Because I provided them the request.

13    Q.    And do you know who carried that out?

14    A.    I was under the impression that when they do

15  search emails, that's on the network.  I can't answer if

16  they went off the emails and into --

17    Q.    Okay.  So you don't know for sure if they

18  searched beyond emails?

19    A.    Right.

20    Q.    Okay.  Is there any reason why the calls to

21  my clients -- well, let me rephrase.

22        Is there any reason why the disposition

23  reports showing calls to my clients were not produced?

24        MR. BRUNDAGE:  Objection.

25        You can answer.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 103

1                         M. CASTILLO

2              THE WITNESS:  I don't know the reason why

3        that would happen.

4                  (Plaintiff's Exhibit 13 was marked for

5        identification.)

6    BY MR. PRESTON:

7        Q.    This is labeled 13 and this is LP58.  Is it

8    fair for me to characterize this as an email from Mezzi

9    to J.T., indicating that Mezzi called (508)966-

10

11

12   (CONFIDENTIAL PORTIONS CONTINUE ON NEXT PAGE)

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Confidential Portions
**Page 82, 104, & 136**

Page 104

1                            M. CASTILLO

2    (CONFIDENTIAL PORTION)

3    ███ .

4

5

6

7

8

9

10   (NON-CONFIDENTIAL PORTIONS CONTINUE ON NEXT PAGE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Confidential Portions
**Page 82, 104, & 136**

Page 105

1                           M. CASTILLO

2    BY MR. PRESTON:

3        Q.    And, again those four digits, last four

4    digits, are confidential.

5              -- on October 3rd, 2016.

6        A.    Yes.

7        Q.    So by October 17th, 2016, defendants knew

8    that Mr. Katz had complained; correct?

9              MR. BRUNDAGE:   Objection.

10             You can answer.

11             THE WITNESS:   Yes.

12   BY MR. PRESTON:

13       Q.    And with this email, defendants knew that

14   Mezzi had called Mr. Katz; correct?

15       A.    Yes.

16       Q.    Why did defendants not seek Mezzi's call

17   records at this time?

18       A.    I don't know that that wasn't done.

19       Q.    Okay.  So there could be call records that

20   defendants could have received from Mezzi in October of

21   2016?

22       A.    I don't know.

23       Q.    Okay.  Do you have any basis to believe that

24   they did preserve call records from Mezzi at that point?

25       A.    That Mezzi preserved call records?

Contains Confidential Portions
**Page 82, 104, & 136**

Page 106

M. CASTILLO

1

2      Q.    Or defendants preserved Mezzi's call records.

3      A.    I don't know unless it was a TPV.  If it was

4  a TPV, it would have been stored.

5      Q.    But the question is:  Did defendants preserve

6  call records from Mezzi which show this call

7  in -- depicted in LP58?

8      A.    I don't know.

9      Q.    Is there any particular reason why they would

10  not have preserved it?

11      A.    No.

12      Q.    Okay.  So I'm going to show you Exhibit 14.

13  I'm marking Exhibit 14, and it is LP2373.

14          (Plaintiff's Exhibit 14 was marked for

15  identification.)

16  BY MR. PRESTON:

17      Q.    Is it fair to say that this is an email from

18  J.T. to a bunch of people in QA and sales just a few

19  minutes after Exhibit 13 was sent?

20      A.    Yes.

21      Q.    Okay.  What does it say?

22      A.    "MEZ confirmed to have not dialed them added

23  them to their internal DNC."

24      Q.    Why did J.T. deny that Mezzi called Katz?

25          MR. BRUNDAGE:  Objection.

Contains Confidential Portions
**Page 82, 104, & 136**

1                              M. CASTILLO

2                You can answer.

3                THE WITNESS:  I don't know.

4   BY MR. PRESTON:

5        Q.    Can we go back to Exhibit 6?

6        A.    (Witness complies.)

7        Q.    All right.  Looking at page 2.  Exhibit 6 is

8   in January 12th -- let me rephrase this.

9                Exhibit 6 is an email chain; correct?

10       A.    Yes.

11       Q.    And the first email in that chain is dated

12  January 12th, 2017?

13       A.    13.  Yes.  January 13, 2017.  Am I not

14  looking at the right --

15       Q.    No, no.  You can read from -- so it's an

16  email chain --

17       A.    Oh, I'm sorry.  Yes.

18       Q.    Chronologically on the page.  Okay.

19       A.    Yes.

20       Q.    So the first -- chronologically the first

21  email in that email chain on Exhibit 6 is from

22  January 12th, 2017; correct?

23       A.    Yes.

24       Q.    Okay.  And in it J.T. is asking for

25  information in Mezzi's dialers.  It's about a call to

Contains Confidential Portions
**Page 82, 104, & 136**

1                        M. CASTILLO

2    Samuel Katz?

3         A.    Correct.

4         Q.    And why is he asking that?

5               MR. BRUNDAGE:  Objection.

6               You can answer.

7               THE WITNESS:  I believe it was another

8         complaint or when the complaint came in.  I'm not

9         sure what -- the dates.

10   BY MR. PRESTON:

11        Q.    But if we look at the Exhibit 13, he -- Mezzi

12   had previously told J.T. that Mezzi had called

13   Mr. Katz's number in October of 2016.

14        A.    I do see that.

15        Q.    So why is J.T. asking again?

16               MR. BRUNDAGE:  Objection.

17               You can answer.

18               THE WITNESS:  I don't know.

19   BY MR. PRESTON:

20        Q.    Why does J.T. ask for a screenshot?

21               MR. BRUNDAGE:  Objection.

22               You can answer.

23               THE WITNESS:  I believe that's the process to

24        show proof.

25

Contains Confidential Portions
**Page 82, 104, & 136**

Page 109

1                           M. CASTILLO

2    BY MR. PRESTON:

3        Q.    Proof of what?

4        A.    That he searched.

5        Q.    But the search is incorrect.

6              MR. BRUNDAGE:  Objection.

7              THE WITNESS:  That's true.

8    BY MR. PRESTON:

9        Q.    What does that tell you about the purpose of

10   the search, Ms. Castillo?

11             MR. BRUNDAGE:  Objection.

12             You can answer.

13             THE WITNESS:  I don't know.  I don't know why

14        they conflict.

15   BY MR. PRESTON:

16       Q.    The sales process is used to confirm that

17   calls are not made; correct?

18       A.    Right.  Yes.

19       Q.    Does the sales process sometimes confirm

20   calls are not made when, in fact, the calls are made?

21       A.    It appears.  Yes.

22       Q.    It appears so --

23       A.    Yes, it appears so.

24       Q.    -- based on Exhibit 6, 13, and 14?

25       A.    Yes.

Contains Confidential Portions
**Page 82, 104, & 136**

Page 182

1                          M. CASTILLO

2                    C E R T I F I C A T E

3                          –   –   –

4    THE STATE OF FLORIDA

5    COUNTY OF PALM BEACH

6           I hereby certify that I have read the

7    foregoing deposition by me given, and that the

8    statements contained herein are true and correct to the

9    best of my knowledge and belief, with the exception of

10   any corrections or notations made on the errata sheet,

11   if one was executed.

12

13          Dated this _____ day of _____,

14   2019.

15

16

17

18

19   _____

     MICHELLE CASTILLO
20

21

22

23

24

25