Exhibit 2:  Portions of May 14, 2019
Deposition Transcript of Lynne Rhodes

**CONFIDENTIAL**

1

1                                          Volume 1
                                           Pages 1-138
2                                          Exhibits:  1-17

3          CONTAINS CONFIDENTIAL BUSINESS INFORMATION,
                   SUBJECT TO A PROTECTIVE ORDER
4
                  UNITED STATES DISTRICT COURT
5            FOR THE DISTRICT OF MASSACHUSETTS
             Civil Action No.  1:18-cv-10506-ADB
6
      --------------------------------------
7   SAMUEL KATZ, et al., an individual,
    on his own behalf and on behalf of
8   all others similarly situated
                     Plaintiffs
9   vs.
    LIBERTY POWER CORP., LLC, et al.
10                   Defendants
      --------------------------------------
11

12

13

14

15          CONFIDENTIAL VIDEOTAPED DEPOSITION OF
                        LYNNE A. RHODES
16           Tuesday, May 14, 2019, 10:02 a.m.
                Eckert Seamans Cherin & Mellott, LLC
17           Two International Place, 16th Floor
                     Boston, Massachusetts
18

19

20

21

22   ---Reporter:  Joan M. Cassidy, CSR, RPR, RMR, CRR---
                  EPPLEY COURT REPORTING LLC
23         P.O. Box 382, Hopedale, Massachusetts 01747
                  508-478-9795  Fax 508-478-0595
24               www.eppleycourtreporting.com

17

1  the question?

2      Q.  Sleeping there.

3      A.  So I know there was Helen Blake, who spent

4  the summer there, because she had a formal residence

5  in Florida --

6      Q.  Who is Helen --

7      A.  -- that --

8      Q.  I'm sorry, I didn't mean to cut you off.

9      A.  No.

10     Q.  Who is Helen Blake?

11     A.  Helen Blake is a family friend.

12     Q.  Do you have any siblings?

13     A.  Yes.

14     Q.  How many siblings do you have?

15     A.  Five -- or four.  I'm one of five.

16     Q.  Did there come a time when you signed up

17 Scoba Rhodes to receive electronic electricity bills

18 from Eversource?

19     A.  Did I sign him up to receive electricity

20 bills from Eversource?

21     Q.  I appreciate you requesting clarification;

22 it was a poorly phrased question.  Did there come a

23 time when you signed up your email address to

24 receive electronic bills from Eversource?

18

1      A.   Yes.

2      Q.   Approximately when was that?

3      A.   I would say June or July of 2017.

4      Q.   Why did you take that action?

5      A.   My dad was needing support with handling

6   the bills.  I moved in to help him financially, as

7   well as help him get himself more organized in the

8   handling of the regular life activities.

9      Q.   Prior to you signing up to receive

10   electronic bills, how were the bills received at ██

11   ████████?

12      A.   They were -- have always been received by

13   mail, U.S. postal mail.

14      Q.   Before you moved in in approximately

15   Memorial Day 2017, who would pay the Eversource

16   bill?

17      A.   Primarily, it was my father, although my

18   siblings and I have taken times when we've had to

19   pay the bill to keep it up to date.

20      Q.   Do you know how your father was paying the

21   bill?

22      A.   By check, I believe.  No, I don't know for

23   sure, but...

24      Q.   You assume he was sending a check --

1      A.  I would pay by check electronically through

2  my checking account or my dad's checking account.

3      Q.  How often was it your checking account and

4  how often was it your dad's checking account?

5      A.  It's a joint checking account.  My name is

6  on the same account as his.

7      Q.  When was that account opened?

8      A.  I don't know.

9      Q.  When did you become an account holder on

10  that account?

11      A.  Sometime in June/July of 2017.

12      Q.  And I'm sorry, I don't mean to belabor this

13  point; I'm just trying to establish how you -- how

14  the bill was paid.  Did you log into Eversource.com

15  for example and make a payment or -- that's what I'm

16  getting at with this line of questioning.

17      A.  There were times when I would check into my

18  bank account and issue a check there.  There were

19  times when I had an account established with my

20  dad's account and my account on Eversource and would

21  do that.  Wherever there was money available was the

22  format that I used to pay the bills.

23      Q.  How many electricity accounts did ███████

24  ████████████  have when you moved in approximately

22

1   Memorial Day 2017?

2        A.   How many accounts?

3        Q.   Yes.

4        A.   One account.

5        Q.   Who were the names on that account?

6        A.   My dad's name was on the account, Scoba

7   Rhodes.  I was added later as an interested person

8   to do information and take -- handle any issues on

9   the account.

10        Q.   How were you added as an interested person?

11        A.   We called them on the phone, and he spoke

12   and asked them to add me.

13        Q.   Do you recall the approximate date of that?

14        A.   No.

15        Q.   It was after you moved in, though, correct?

16        A.   Yes.

17        Q.   Who is the current account holder on the

18   electricity account at ████████████████?

19        A.   I am.

20        Q.   Did there come a time when your father was

21   dropped off the account?

22        A.   He was dropped off the account after he

23   passed, so the account was closed and it was opened

24   specifically in my name alone.

31

1           MR. BRUNDAGE:  We need to not have

2     colloquies.

3           MR. PRESTON:  I understand that.  I --

4     and I'm not trying to be difficult.

5      Q.  What do you hope to gain out of this

6     lawsuit?

7      A.  My short-term gain is to have these calls

8     and this abuse of power against my dad and me

9     acknowledged, and I hope to represent other people

10    who are in the same, similar situation who aren't

11    able to advocate for themselves.

12     Q.  When you say -- I think you said "abuse of

13    power acknowledged"?

14     A.  Mm-hm.

15     Q.  What do you mean by that?

16     A.  I repeatedly asked to be removed from the

17    call list.  I was continued to be called, and people

18    were giving misinformation to my father to gain

19    business, and he was not of the capacity to

20    independently verify the incorrect statements that

21    were given to him.  That's an abuse of somebody who

22    is elderly, has dementia issues, and I am livid that

23    occurred.

24           (Marked, Exhibit 3, Second amended class

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

32

1    action complaint and jury demand.)

2        Q.   Ms. Rhodes, the court reporter has marked a

3    document as Exhibit 3.  I'd like you to please take

4    a look at it and let me know if you recognize it.

5        A.   (Witness reviews document.) Yes, I do

6    recognize this.

7        Q.   What is that document?

8        A.   This is the second amended class action

9    complaint and jury demand.

10       Q.   Did you read that document before it was

11   filed?

12       A.   I went over the document, I believe, yes.

13       Q.   I want to ask you about some specific

14   allegations that you make in the document, and this

15   is starting on Paragraph 86, which is page 20.  Do

16   you see Paragraph 86 there?

17       A.   Yes.

18       Q.   It reads, "On or about February 4, 2008,

19   plaintiff Lynne Rhodes' residential telephone number

20   508-540-redacted was placed on the National Do Not

21   Call Registry"?

22       A.   Mm-hm.

23       Q.   Is that accurate?

24       A.   The statement is accurate, yes, and this is

33

1    the residence where my dad lives, yes.

2        Q.  The 508-540 telephone number is associated

3    with ███████████?

4        A.  Yes.

5        Q.  What is your basis for the factual

6    assertion in this paragraph that it's your

7    residential telephone number?

8        A.  That's the house I grew up in, and this is

9    the house -- if ever I had a residential permanent

10   address, this would be where I would have any

11   necessary documents sent.  I, sitting in my father's

12   living room, did this with him on my computer.

13       Q.  Were you living there at the time that you

14   did this in February 2008?

15       A.  I was not living there permanently.  I did

16   have a key to get access at any time I needed to.

17       Q.  The telephone number identified in

18   Paragraph 86, 508-540-redacted -- and I think we all

19   know the last four digits --

20       A.  Mm-hm.

21       Q.  -- does that telephone number have your

22   name on the account?

23       A.  Currently, yes.

24       Q.  Did it have your name on the account in

35

1      Q.   Is your name on this document?

2      A.   My name is not on the document, no.

3      Q.   On the top of the document where it lists a

4   telephone number 508-540, and a bill date and an

5   account number, what name is listed there?

6      A.   Scoba Rhodes.

7      Q.   What is the bill date?

8      A.   The bill date, 6/16/2018.

9      Q.   So this document would contradict what you

10  said a moment ago, that you were added to this

11  account in June or July 2017; is that correct?

12     A.   No, it does not contradict, because any

13  secondary name is not listed.  There's only room for

14  one name.

15     Q.   How do you know that?

16     A.   I called and asked repeatedly, and I was

17  assured that my calling in and I had access to do

18  anything with the account, but the bill name would

19  not change.

20          MR. PRESTON:  Hey, Jeff, I just want to

21  flag, she's got some issues; I think it would be

22  better if we planned on taking a break kind of every

23  hour.  It doesn't have to be a long break, but we

24  just do need to break.

37

1        Q.   Who is that attorney?

2        A.   John Fink.

3        Q.   I just want to make sure I understand

4    correctly.   The first document filed in the case was

5    yesterday?

6        A.   Yes.

7        Q.   Do you know the name of that document that

8    was filed?

9        A.   I do not.   No, I don't know the name of it.

10        Q.   Is anyone else besides John Fink

11    representing you in that case?

12        A.   For the executorship?

13        Q.   Yes.

14        A.   No.

15        Q.   I'd like to turn your attention to the next

16    page, please, page 21, Paragraph 88.   In this

17    paragraph you allege you began receiving numerous

18    unsolicited calls several times a week by or on

19    behalf of Liberty Power?

20        A.   Mm-hm, yes.

21        Q.   Do you have an approximation of how many

22    calls you received per week in November 2017 on

23    behalf of Liberty Power?

24        A.   On average, I was getting anywhere between

38

1    four and six calls a week, almost daily.

2        Q.  These calls were being -- sorry.  Let me

3    rephrase that.

4            Did you receive these calls on the

5    508-540 telephone number?

6        A.  On the home phone, yes.

7        Q.  Out of the four to six calls per week, how

8    many did you answer and how many did your father

9    answer?

10       A.  In November my dad had a stroke and was in

11   the hospital, so he wasn't answering any of the

12   calls in the later part of the month, so I got the

13   majority of the phone calls.  Before that he was

14   getting a lot of the phone calls.

15       Q.  What time of the day -- what times of the

16   day did the calls come into the house telephone

17   number?

18       A.  I answered the phones in the evenings, and

19   I believe he was getting calls during the day.

20       Q.  You were at work during the day, correct?

21       A.  For the first part of the month, yes.

22       Q.  Did you keep a log or any sort of

23   documentation on these calls?

24       A.  No, I did not.

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

41

1  rates for the other companies; and once I verified

2  that the rate was going to be significantly higher,

3  and they said in error that they were better than

4  what we had and suggested that my father change, and

5  he did, believing them, and I found and verified

6  that it was not true, I had them go back.

7      Q.  Did your father ever complain to you about

8  receiving unsolicited telephone calls in November of

9  2017?

10     A.  He didn't need to complain; the look of

11  exasperation of having to deal with the numerous

12  phone calls was evident.

13     Q.  So that's a no?

14     A.  He did not complain; he did show evidence

15  of distress and being annoyed at the information.

16          MR. BRUNDAGE:  I'm going to play some

17  audio.

18          Do you take this down as an exhibit or

19  do I just play it?  I'll just play it.

20          (Discussion off the record.)

21     Q.  Ms. Rhodes, I'm going to play an audio

22  clip.  I will represent to you this was produced by

23  your attorneys in discovery.  It has a Bates number.

24  That Bates number is 307690.

Lynne Rhodes - May 14, 2019
**CONFIDENTIAL**

42

1      A.  Is there a letter in front of that?

2              MR. PRESTON:  This is, I assume, KATZ

3      307690.  Do I have that correct?

4              MR. BRUNDAGE:  That's correct.

5              MR. PRESTON:  Okay.

6              (Audio played.)

7      Q.  That's the entirety of the recording.  Is

8      that your voice on the recording?

9      A.  Yes, it is my voice, and no, it's not the

10     entirety.  That's the entirety of the recording;

11     that's not the entirety of the phone call.

12     Q.  Do you recall that telephone call?

13     A.  Yes, I do.

14     Q.  Why did you impersonate your father on that

15     telephone call?

16     A.  I did not --

17             MR. PRESTON:  I'm going to object.  That

18     mischaracterizes the record.

19             THE WITNESS:  Thank you.

20     A.  I did not.  It asked for the name, and I

21     said the name, which was the name on the account,

22     Scoba Rhodes.

23     Q.  Why didn't you tell them that Scoba Rhodes

24     wasn't on the phone?

43

1       A.   I wasn't asked.

2       Q.   What was your purpose in completing or

3   attempting to complete that third-party

4   verification?

5       A.   My attempt was -- they said I was getting a

6   better rate.  I wanted written documentation so I

7   can take and review with my father to show if in

8   fact there was a better rate, we would change

9   providers.  Based on what they said, they were

10  giving me a better rate than what I had.  And when

11  they refused to give me information at the end of

12  the call that's not there, I said, "Remove this

13  number from your list."

14      Q.   I want to turn your attention back to the

15  second amended complaint.  And this is page 21.

16  Paragraph 89 says that you told Liberty Power to

17  stop calling and to add the number to the company Do

18  Not Call List?

19      A.   Yes.

20      Q.   Do you remember the approximate number of

21  times you did that?

22      A.   Every time they called me, after that call

23  especially, I said, "Remove this number from your

24  list."

44

1     Q.  And how many calls -- let me rephrase that.

2          Do you recall the date of that call?

3     A.  That call, if I serve correctly, was Friday

4  of Thanksgiving 2017.

5          MR. PRESTON:  Can we take a break?

6          THE WITNESS:  Yes, please.

7          MR. BRUNDAGE:  Sure.

8          THE WITNESS:  Thank you.

9          VIDEOGRAPHER:  The time is approximately

10  10:53, and we are off the record.

11          (Recess.)

12          VIDEOGRAPHER:  The time is approximately

13  11:03.  We are back on the record.  Counsel, you may

14  proceed.

15  BY MR. BRUNDAGE:

16     Q.  Ms. Rhodes, you testified earlier that a

17  Helen Blake lived at ▮▮▮▮▮▮▮▮?

18     A.  Mm-hm.

19     Q.  When did she live there?

20     A.  She came for a summer in 2014 and was

21  staying -- I know I visited in 2014 and she was

22  staying there, so...  And she was basically for the

23  summer for that year.

24     Q.  Did she stay there anytime after 2014?

45

1     A.   I don't know.

2     Q.   Did anyone else reside with you or your

3  father in 2017 or 2018?

4     A.   No.

5     Q.   Did anyone else at ███████ claim to

6  receive calls from Liberty Power besides you or your

7  father?

8     A.   No, no one else lived there.

9     Q.   In late 2017/early 2018, did the 508-540

10  telephone number have caller identification?

11     A.   Yes.

12     Q.   Do you recall any of the telephone numbers

13  that came up when you answered and it was Liberty

14  Power?

15     A.   No, I don't recall the numbers.

16     Q.   Did you write any of them down?

17     A.   Not that I know of.

18     Q.   Does that caller ID still exist?

19     A.   It's built into the phone, yes.

20     Q.   You testified your father had a stroke in

21  mid-November of 2017; is that correct?

22     A.   Yes, yes.

23     Q.   Did he receive any sort of diagnosis in

24  2017 either before or after the stroke that he

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

46

1   needed assistance with his living needs?

2       A.   In 2017?

3       Q.   (Nodding.)

4       A.   No, he did not.

5       Q.   What about in 2018?

6       A.   No, he did not.

7       Q.   So he never received a --

8       A.   It was before that.

9       Q.   Can you tell me about it?

10      A.   In May of 2016 I started getting notices

11   from his doctor, his friends, that he needed to have

12   more assistance.  He had lost a lot of weight, and I

13   had met with his doctors, who indicated that he

14   needed to have more -- someone involved to help him

15   navigate and handle his issues.  He was diagnosed

16   with Lewy body dementia.

17      Q.   What was the approximate date of that

18   meeting with the doctor?

19      A.   It was a phone call, and it was in the

20   first week -- it was sometime in May of 2016.  He

21   had taken a trip to California and had significant

22   problems on that trip.

23      Q.   Was what the doctor told you during that

24   phone call advice, or was it a diagnosis?

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

47

1      A.   On that phone call he told me he -- my dad

2   had been diagnosed.   The recommendation was he

3   needed care and that he needed to have more

4   involvement because he was isolated and it wasn't

5   real clear how much he really needed assistance.

6      Q.   Do you have any reason to believe Liberty

7   Power knew your father was ill?

8      A.   In some phone calls I have let them know

9   that my dad was -- had dementia and that they were

10   taking advantage of him.

11      Q.   Is there a reason you did not include that

12   in your lawsuit?

13          MR. PRESTON:   I'm going to object.   I

14   think that misstates the record.

15      A.   His sole -- his illness is secondary to the

16   fact that he was getting repeated phone calls and we

17   told them to not call, so his illness was of concern

18   to me and added pressure to me.   Regardless of

19   whether -- the reason, "do not call" means "do not

20   call," and that was not adhered to.

21      Q.   I want to be certain I understand your

22   testimony.   Is your testimony that you believe

23   Liberty Power knew your father was ill?

24      A.   In follow-up phone calls they knew, yes;

48

1  they were told that my dad was ill.

2      Q.  Were they told by you?

3      A.  Yes.

4      Q.  Were they told by your father?

5      A.  Probably not.  I don't know.  Most people

6  don't disclose diagnoses when they talk to someone

7  on the phone, especially strangers.

8      Q.  Before we took a break we listened to an

9  audio recording; do you recall that?

10     A.  Yes.

11     Q.  Do you recall saying there was more to the

12 call?

13     A.  Yes.

14     Q.  What else was a part of that telephone call

15 that we didn't hear?

16     A.  I was asking for clarification of what the

17 changes were that they were looking for, and I

18 wanted written documentation because the call before

19 stated they had a better rate, and I wanted it in

20 writing.  And after going back and forth, the person

21 said she wouldn't give me something in writing until

22 I was approved -- until I authorized the change, at

23 which point I said I was not going to authorize the

24 change and because I couldn't get anything in

49

1  writing, remove me from the list.

2      Q.  Is there anything else that occurred on

3  that telephone call?

4      A.  I know my sister was on a Skype phone call

5  in my hand, so she heard the phone call, and you

6  could probably hear her in the background, yelling

7  to remove us from the list.

8      Q.  Your testimony is that the recording we

9  just listened to is the recording your sister

10  overheard that you referenced in your interrogatory

11  responses?

12      A.  Yes.

13      Q.  All right.  We'll get to that.  I

14  appreciate the clarification.

15          Again, looking at page 21, Paragraph 90

16  now, it says that you told the caller that you would

17  not do business with telemarketers over the phone;

18  is that accurate?

19      A.  That is accurate, although it is somewhat

20  incomplete, and I believed the telemarketers,

21  meaning these people that were continuing to call

22  me.

23      Q.  How is it incomplete?

24      A.  Because the company that was calling

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

63

1  he told me it was Liberty Power, and I told him not

2  to pay any bills because I was handling the bills

3  and that we didn't have anything that needed to be

4  paid in such an urgent manner.  I also sent an email

5  to Donna whose response was, "Liberty Power wouldn't

6  do something like that."

7       Q.  I want to turn to the next page, please, of

8  Exhibit 3.  This is page 22, Paragraph 93.  Do you

9  see Paragraph 93?

10      A.  Yes, I do.

11      Q.  Can you tell me about that call, please?

12      A.  I believe I was highly upset with Liberty

13  Power for yet again calling; and again, I asked them

14  to stop calling.  And they basically told me that

15  they -- once I told them who my provider was or I

16  switched services, they would call -- they would

17  stop calling but not before.

18      Q.  Was it a male or a female voice that called

19  you?

20      A.  Male.

21      Q.  Did the voice have an accent?

22      A.  Yes.

23      Q.  Are you able to place the accent?

24      A.  It sounded more of the Indian area, the

64

1   continent, Asian, Indian, a rather thick accent.

2       Q.   The next paragraph, the January 25 call --

3       A.   Mm-hm.

4       Q.   -- can you tell me about that call, please.

5       A.   Well, a lot of these calls were the same.

6   They were looking to change.  They said that they

7   were from Liberty Power and they wanted to change

8   the provider, and I told them, "Stop calling," and

9   they continued to call.

10      Q.   Was the call on January 25 a male or a

11  female?

12      A.   I believe all of the calls that I have, the

13  majority of them were male calls.  Every once in a

14  while there was a female call, but I can't tell you

15  specifically what dates those were.

16      Q.   Did the January 25 caller have an accent?

17      A.   Yes.

18      Q.   Are you able to place that accent?

19      A.   Again, it's the same general area as the

20  Indian continent and that Asian accent.

21      Q.   Can you please tell me about the call on

22  March 17, Paragraph 95.

23      A.   So again, the call was the same, looking to

24  have us change to Liberty Power, and again, I told

**Lynne Rhodes - May 14, 2019**
**CONFIDENTIAL**

65

1  them, "Stop calling.  Remove me from the Do Not Call

2  List (sic)."

3       Q.  Do you have a recollection if these tel --

4  these calls you received had a telephone number

5  associated with them?

6       A.  I had calls that had Liberty Power listed

7  on the caller ID, and I started receiving numerous

8  calls that were numbers that when I called back were

9  not valid.

10      Q.  How many calls, approximately, said

11 "Liberty Power" on your caller ID?

12      A.  I believe up until mid-January/February,

13 the calls had Liberty Power listed, after which

14 those calls ended up getting spoofed, and the

15 numbers that were listed were not valid numbers.

16      Q.  What do you mean by "spoofed"?

17      A.  The number on my caller ID when I would

18 call them back would not be a valid number.

19      Q.  Did you call the number back every time you

20 got one of these unsolicited calls that are

21 referenced in the complaint?

22      A.  The numbers I would call when the name did

23 not say "Liberty Power" to see where the number

24 actually went to.

111

1       A.   That phone number I had access to and my

2   dad had access to.  That's the house phone.

3       Q.   I want to distinguish between physical

4   access and name on the account.  We looked at a

5   document earlier today from Verizon which only

6   showed Scoba Rhodes on the account.  Are you

7   asserting that you were also on the account?

8       A.   Yes.

9            MR. PRESTON:  I'm going to object to

10  form.

11      Q.   He was asserting that despite what the

12  Verizon document said?

13      A.   The Verizon document only lists one person

14  as the billing person.  I was also listed as a user,

15  provider, and access to the account.

16      Q.   Beginning what date?

17      A.   It was formally introduced somewhere in

18  June or July of 2017, when I moved into the house in

19  May.

20      Q.   So how do you reconcile what you just said

21  with what you wrote here on the top of 36, that that

22  telephone number did not have separate user

23  accounts?

24            MR. PRESTON:  I'm going to object that

112

1  it misstates the records.

2      A.  It says what is accurate, which is, the

3  house phone is in my father's name and the cell

4  phone is in my name and no one else had access to

5  that cell phone.

6      Q.  Did there come a time in 2017 where you

7  became responsible for the payment of the 508-540-

8  redacted telephone number?

9      A.  Yes, I was paying that since July.

10     Q.  July 2017?

11     A.  Yeah, July 2017.  I was taking and adding

12  myself to all the accounts at my dad's request,

13  given that we were having issues with the -- all of

14  the utilities staying on 'cause of nonpayment.

15     Q.  How were you paying the telephone bill for

16  the 508-540-redacted telephone number?

17           MR. PRESTON:  Objection, asked and

18  answered.

19           THE WITNESS:  Yes.

20           MR. PRESTON:  You should answer but the

21  objection's there.

22     A.  Again, I was using my account.  I was using

23  the joint account with my father's name, and I also

24  paid by credit card, depending on where funds were

113

1   available.

2            (Marked, Exhibit 13, Verizon payment

3   history, LP_004325.)

4      Q.  The court reporter is handing you a

5   one-page document which has been marked as Exhibit

6   13.  Please take a look and let me know if you

7   understand the information on this document.

8      A.  (Witness reviews document.) This looks like

9   this was payment for the Verizon bill.

10     Q.  Who is the customer name on this Verizon

11  telephone number?

12     A.  Scoba Rhodes.

13     Q.  Is it correct that payments from July 2017

14  through April 2018 are listed here?

15     A.  It appears so, yes -- I'm sorry, April of

16  2018.

17     Q.  If you know, which one of these listed

18  payments did you make?

19     A.  I can't tell you -- I know I was making

20  payments with my dad.  I can't tell you what

21  specifically he wrote a check for and what I wrote.

22  We were working on this together.

23     Q.  So sometimes he would solely write a check?

24     A.  Yes.

127

1   Mezzi Marketing?

2        A.  In my complaint on page 16 -- I knew I saw

3   it in here -- the information here on page 16 is

4   where I know Mezzi Marketing.

5        Q.  Where -- what paragraph on page 16?

6        A.  So this Paragraph 68, Mezzi is referred to,

7   69 they're referred to.  They're referred to earlier

8   as well, I believe.  But that's where I know Mezzi

9   Marketing from, and the pages before.

10       Q.  Beyond what you've identified in the

11  complaint and beyond conversations with your

12  attorneys, do you know anything else about Mezzi

13  Marketing?

14       A.  No, I do not.  They're also listed in other

15  places in the complaint, but those are just ones

16  that I picked out.

17               (Marked, Exhibit 15, Verizon talk

18  activity billing document for 5/24/18 to 6/23/18 for

19  L. Rhodes phone, redacted, KATZ 307758.)

20       Q.  The court reporter has handed you what's

21  been marked as Exhibit 15.  Please take a look at it

22  and let me know if you recognize it.

23       A.  (Witness reviews document.) There's one

24  three-minute call on June 20, I don't know what

128

1  year, possibly 2018, incoming call of three minutes.

2      Q.  Have you seen that document before?

3      A.  The one you just handed me?

4      Q.  Yes, ma'am.

5      A.  No.

6      Q.  No?  Do you see the telephone number at the

7  top of that document, top left?

8      A.  Yes.

9      Q.  Is that your cell phone number?

10     A.  Yes, it is.

11     Q.  Do you recall this June 20 call that is not

12  redacted in this document?

13     A.  I do not know who that number belongs to,

14  so I have nothing in context to tell me what this

15  call is.

16     Q.  In your second amended complaint, you

17  allege that this call is a call that was identified

18  as coming from Liberty Power.

19     A.  Okay.

20     Q.  Can we agree on that?

21     A.  Okay -- you said in the second amended

22  complaint?

23     Q.  So if you have the interrogatories, it's

24  page 21.  If you have the second amended complaint,

129

1    it's page 22.

2        A.   (Witness reviews documents.) So this is the

3    first set -- I'm sorry.

4        Q.   Why don't you grab what you just had, the

5    interrogatories.  It's page 21.

6        A.   Okay, thank you.  (Witness reviews

7    document.) Okay.  So that's the phone number, yes.

8        Q.   Can you tell me about this call, please.

9        A.   It was a robocall, and they said, "You've

10   been selected because you have a great payment

11   history to change your electric company to a more

12   affordable electric company.  Press 1 if you're

13   interested in doing so."  I pressed 1 and they said,

14   "Hello," and was very happy.  I asked who did they

15   represent.  They said, "Eversource."  I said,

16   "Eversource does not call people.  Who do you

17   represent?"  Then they said, "Eversource."  And I

18   said, "Are you calling from Liberty Power?"  They

19   said, "Yes."  I said, "Take me off your call list.

20   I do not want to be -- do business with you."

21       Q.   What's a robocall?

22       A.   A robocall is an automated -- actually, I

23   don't have an actual definition of a "robocall," but

24   my understanding is people get -- or companies get

130

1   automated, generated lists of numbers that they call

2   in successive order trying to gain business.

3       Q.  You identified this call as a robocall.

4   What facts support that assertion?

5       A.  It was an electronic call, an electronic

6   message, and it wasn't a person until I pressed 1 to

7   connect with a person.

8       Q.  Well, that would make it a prerecorded

9   call, wouldn't it?

10              MR. PRESTON:  I'm going to object to the

11  extent it misstates the record.

12      A.  And it would still be a robocall.  I don't

13  understand what the difference between a robocall

14  and a prerecorded call is.  The result is the same.

15      Q.  From what I heard a moment ago from your

16  testimony, you're saying a robocall is a call made

17  with an auto-dialer, and I'm asking you if this call

18  is not that, but rather a call with a prerecorded

19  message.

20      A.  Okay.  Did I say "auto-dialer"?  I don't

21  think I said "auto-dialer."  I said a list of calls

22  generated, and the calls go out in some successive

23  order, meaning more than one call is made in

24  successive order until they get people to talk to

131

1   them.

2        Q.  Has Liberty Power or anyone on behalf of

3   Liberty Power ever dialed your cell phone besides

4   this one call that you've identified?

5        A.  Yes, I had several calls in 2016.

6        Q.  Why are those calls not in your complaint?

7        A.  These are calls that we found as we've been

8   going along and researching at this time.  I expect

9   to find more calls as we identify the calls listed.

10       Q.  When you heard the prerecorded message, did

11  you identify the call as coming from an electricity

12  supply company?

13       A.  They identified themselves as saying they

14  wanted to give me a better rate with my electricity.

15       Q.  And the messages went on to say, "Press 1"?

16       A.  Yes.

17       Q.  Why did you press 1?

18       A.  To tell them to stop calling me.

19       Q.  Is it accurate to say that Exhibit 15 lists

20  the call as three minutes long?

21       A.  Possibly, yes.

22       Q.  Well, take a look at Exhibit 15.  Does it

23  identify the call as three minutes?

24       A.  Yes.

132

1      Q.  It took three minutes to tell them not to

2  call you?

3      A.  When a call is listed as three minutes,

4  they take a whole minute, so even if it's ten

5  seconds long, they queue it -- they put it on a

6  whole minute, so there's no way to know if that

7  three minutes is an actual exact three minutes or if

8  it's rounded out.  But I can say yes, the call was

9  at least two to three minutes long.

10     Q.  What did you talk about for two to three

11  minutes?

12     A.  They had their automated message, and I

13  told them, remove me from their list, I did not want

14  to do business with them.  There's no way that this

15  phone number is listed to any house that needs

16  electricity, so there's no need for them to call me.

17     Q.  What were you doing when you received this

18  call, if you remember?

19     A.  I don't know.  I was in my living room.

20     Q.  You were at home?

21     A.  I was at home, most likely, yes.  I don't

22  know.  I need a calendar; I need a date; I need a

23  context.  I have no idea.  June 20, 2018, really

24  doesn't mean anything.