Exhibit 16:May 16, 2019 Deposition Transcript
of Samuel Katz

**CONFIDENTIAL**

1

                                        Volume 1
                                        Pages 1-202
                                        Exhibits:  1-14

        CONTAINS CONFIDENTIAL BUSINESS INFORMATION,
                SUBJECT TO A PROTECTIVE ORDER

                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
            Civil Action No. 1:18-cv-10506-ADB

--------------------------------------
SAMUEL KATZ, et al., an individual,
on his own behalf and on behalf of
all others similarly situated
                    Plaintiffs
vs.
LIBERTY POWER CORP., LLC, et al.
                    Defendants
--------------------------------------

CONFIDENTIAL VIDEOTAPED DEPOSITION OF SAMUEL I. KATZ
          Thursday, May 16, 2019, 9:51 a.m.
          Eckert Seamans Cherin & Mellott, LLC
          Two International Place, 16th Floor
                 Boston, Massachusetts

---Reporter:  Joan M. Cassidy, CSR, RPR, RMR, CRR---
              EPPLEY COURT REPORTING LLC
        P.O. Box 382, Hopedale, Massachusetts 01747
              508-478-9795  Fax 508-478-0595
                www.eppleycourtreporting.com

6

1                    P R O C E E D I N G S

2              VIDEOGRAPHER:  The time is approximately

3    9:51 a.m.  We are now on the record.  My name is

4    Patrick Blaskopf.  I'm a videographer retained by

5    Eppley Court Reporting.  This is a video deposition

6    for the U.S. District Court, District of

7    Massachusetts.  Today's date is May 16, 2019.  The

8    deposition is being held at Eckert Seamans located

9    at Two International Place, Boston, Massachusetts.

10             The case is Samuel Katz, et al., versus

11   Liberty Power Corp., LLC, et al.  The deponent today

12   is Samuel Katz.  The court reporter is Joan Cassidy.

13             And would counsel please identify

14   themselves and the parties they represent, and

15   afterwards our court reporter will swear in the

16   witness and we can proceed.  Counsel?

17             MR. BRUNDAGE:  Jeffrey Brundage for the

18   defendants.

19             MS. MOYNIHAN:  Rachel Moynihan for

20   defendants.

21             MS. PARASMO:  Grace Parasmo for

22   plaintiffs.

23             MR. LIEBERMAN:  Yitzchak Lieberman for

24   plaintiff Samuel Katz.

18

1      A.   One of my managers referred to me as that

2   in regards to a program when describing it to

3   someone, yes.

4      Q.   What is his or her name?

5      A.   His name is Jeff Batula.

6      Q.   What's your current address?

7      A.   ███████████████████████, Maine.

8      Q.   How long have you lived there?

9      A.   Since December of 2017.

10      Q.   Where did you live before then?

11      A.   ██████████████.

12      Q.   Why did you move?

13      A.   I bought a house.

14      Q.   Were you renting at ███████████████?

15      A.   Yes.

16      Q.   How close are these two houses to each

17   other?

18      A.   Maybe a quarter of a mile or less.

19      Q.   Are you currently employed?

20      A.   Yes.

21      Q.   Who is your employer?

22      A.   ██████████████████████████.

23      Q.   Is it all right if I just refer to them as

24   "██████

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**

19

1    A.   Yes.

2    Q.   ████████████████████ ████████

 ██   ██   ████████████████████████████

 ██   ██   █████████████████████████████████

 ██   ██   ████████████████████████████████████

 ██   ██   █████████████████████████████████████

 ██   ████ ████ ████████████

 ██   ██   ████

 ██   ██   ██████████████ ████ ████████████████

 ██   ██   ████████████████████████████████████████

 ██   █████████████████████████████████████████

 ██   █████████████████████████████████████

 ██   ████████ ██████████████████████████████████████

 ██   ██████████████████████████████████

15   Q.   How long have you been in that role?

16   A.   Since December of 2015.

17   Q.   Do you work from home?

18   A.   Yes.

19   Q.   Do you travel for work?

20   A.   Sometimes.

21   Q.   How often is sometimes?

22   A.   It has ranged in frequency.  This year I

23   have only traveled once.  Last year I think I

24   traveled less than five times.

30

1      Q.  Who do you communicate with on WhatsApp?

2   I'm sorry, you don't have to answer that.

3              Have you ever communicated with anyone

4   on WhatsApp regarding Liberty Power?

5      A.  No.

6      Q.  Have you ever texted with your wife about

7   Liberty Power?

8      A.  No.

9              (Ms. Parasmo confers with the witness.)

10              MR. BRUNDAGE:  (To the reporter) Did you

11   get all that?

12              THE REPORTER:  I didn't hear it.

13              MR. BRUNDAGE:  We have to have our

14   record here.

15              MS. PARASMO:  Sure.  I'm instructing the

16   witness to take him -- of the marital privilege and

17   not to divulge communications with his wife.

18              MR. PRESTON:  Which are confidential.

19              MS. PARASMO:  Which are confidential.

20      Q.  What's your telephone number?

21      A.  What time frame are you referring to?

22      Q.  Today.

23      A.  I have more than one telephone number.

24      Q.  What are they?

31

1      A.   617-997-███   978-877-███   305-363-████

2   207-802-████   857-540-████

3      Q.   ████ is your cell phone, correct?

4      A.   Yes.

5      Q.   ████ is a Google Voice number, correct?

6      A.   No.

7      Q.   What is that number?

8      A.   It's a Voice-over-IP number.

9      Q.   Is it associated with Google?

10     A.   No.

11     Q.   What is the 305 number?

12     A.   A work number.

13     Q.   Is it a residential number?

14     A.   What do you mean by "residential"?

15     Q.   If I call that number, will it ring in your

16  home in Maine?

17     A.   Connected to a landline; is that what

18  you're asking?

19     Q.   If I call that number, will it ring in your

20  home in Maine?

21     A.   It's a VoIP number, V-o-I-P.

22     Q.   It's a yes-or-no question.  If I call the

23  305 number, will it ring in your home in Maine?

24     A.   It will not cause a landline to ring in my

32

1    home in Maine.

2        Q.   How long have you had that telephone

3    number?

4        A.   Between a year and two years.

5        Q.   You testified a moment ago it won't ring.

6    Can you tell me why it doesn't ring?

7        A.   It's a phone number that forwards calls to

8    my ▮▮▮▮ number.

9        Q.   Why do you have that call forwarding set

10   up?

11       A.   So that I can answer calls.

12       Q.   Answer calls from whom?

13       A.   People calling it.

14       Q.   Who calls it?

15       A.   That's a very broad answer.

16       Q.   Can you give me three examples of the

17   people who call it?

18       A.   Defendants, but not -- sorry, not

19   defendants.   A party who I had corresponded with

20   about allegations of TCPA violations.

21       Q.   Can you give me two more examples?

22       A.   Illegal telemarketers.

23       Q.   Is it accurate to say that the 305

24   telephone number receives telemarketing calls?

Samuel Katz - May 16, 2019
CONFIDENTIAL

33

1      A.   Yes.

2      Q.   What percentage of the calls on -- received

3  on the 305 number are telemarketing calls?

4      A.   I don't know.

5      Q.   Can you give me an approximation?

6      A.   The phone number is listed -- in question

7  is listed on the National Do Not Call Registry.

8      Q.   Can you give me an approximation of how

9  many telephone calls received on the 305 number are

10  telemarketing calls?

11      A.   The majority of them.

12      Q.   Over 75 percent?

13      A.   I would say that overall at least 75

14  percent of the phone calls that I receive on any

15  given number are unwanted and unsolicited phone

16  calls.

17      Q.   Are they telemarketing calls?

18      A.   What do you mean by "telemarketing"?

19      Q.   I will define that as calls in which you're

20  being solicited to purchase something.

21      A.   I don't know.

22      Q.   You don't know if you're being solicited to

23  purchase something?

24      A.   I don't have any way of classifying a call

**CONFIDENTIAL**

45

1      A.   The 207 number, we originally had tried to

2   set up as a landline in the house, but the phone --

3   there's some sort of an issue with the phone lines

4   in my house where we're unable to get a dial tone,

5   and ultimately that number was ported over to

6   NumberBarn.

7      Q.   What was your reaction when you were told

8   that you can't get a dial tone at your residence?

9      A.   I was frustrated.

10      Q.   Why?

11      A.   Because I wanted a landline in my house.

12      Q.   Why?

13      A.   For emergency calls.

14      Q.   When the 305 number forwards to the ████

15   number, is an email created?

16      A.   No.

17      Q.   Is any sort of document created when a call

18   is forwarded?

19      A.   What do you mean by "document"?

20      Q.   A record.

21      A.   A record is created with the NumberBarn

22   system probably similar to a CDR.

23      Q.   Do you have access to that record in the

24   NumberBarn system?

46

1       A.  Yes.

2       Q.  Do you use that number to create your call

3   archive?

4       A.  That number is included in part of my call

5   archive.

6       Q.  With regards to the 207 number, does that

7   number create a record in NumberBarn?

8       A.  Yes.

9       Q.  Can you describe this record for me,

10  please?

11      A.  I've already described it.

12      Q.  Can you describe this record for me,

13  please, of NumberBarn?

14      A.  The record is a date, time, displayed

15  caller ID, the length of the call and the number

16  that was called.

17      Q.  Do you copy all of that information into

18  your call archive?

19      A.  Yes.

20      Q.  Do you do that manually, or is it done

21  automatically?

22      A.  I do it manually.

23      Q.  How often do you do that?

24      A.  Once a month.

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

47

1      Q.  Why once a month?

2      A.  NumberBarn only retains records for a year,

3  so at the end of every month, I export the -- sorry.

4  At the conclusion of one month, one -- for example,

5  at the end of April, I exported the April call --

6  the April call records that came out of NumberBarn

7  and included them in my archive.

8      Q.  You're referring to last month, April 2019?

9      A.  Yes.

10     Q.  Do you have an approximate number of how

11  many calls that was?

12     A.  I don't know.

13     Q.  Do you have an approximate number?

14     A.  No.

15     Q.  Was it zer -- was it 50?

16     A.  I don't know.

17     Q.  Was it a hundred?

18     A.  I don't know.

19     Q.  You referenced an 857 number.

20     A.  Yes.

21     Q.  Is that your wife's cell phone number?

22     A.  No.

23     Q.  What number is that?

24     A.  It was her previous cell phone number, and

48

1   she wanted to have a Maine phone number, and we

2   wanted to retain that number so that if anybody had

3   that number, they would still be able to contact us,

4   or if anybody texted that number, I would be able to

5   direct them to her new number.

6       Q.  Is the 857 number a VoIP number?

7       A.  Yes.

8       Q.  Is it VoIP'd through NumberBarn?

9       A.  Yes.

10      Q.  Do you export the NumberBarn data to your

11  call archive for that number?

12      A.  Yes.

13      Q.  Is that number included in your call

14  archive for the 207 and the 305 numbers?

15      A.  Yes.

16      Q.  Is the 305 number on the Do Not Call List?

17      A.  Yes.

18      Q.  After you obtained the 305 number, when did

19  you put it on the Do Not Call List?

20      A.  I don't remember if it was on the Do Not

21  Call List when I first obtained it, but I believe

22  that I did put it on the -- either attempt or did

23  put it on the Do Not Call List.

24      Q.  Would it be accurate to say you checked to

61

1     Q.   Right, okay.   Why do you have the 305

2   telephone number?

3     A.   As the result of some situations that have

4   occurred in the past, I'm no longer comfortable

5   giving out my direct phone number to some --

6   particularly some TCPA defendants or TC -- potential

7   TCPA violators.

8     Q.   So you have that cell phone number to catch

9   potential TCPA violators, correct?

10    A.   No.   I have that phone number to facilitate

11  communications so that I don't need to give out my

12  direct 617 number to people who I don't know.

13    Q.   Facilitate communications about what?

14    A.   Talking.

15    Q.   On what subjects?

16    A.   I don't know that there's a specific

17  subject that I -- there's -- I don't think that

18  there's a specific bucket of, you know, if someone

19  is going to call me about this subject, then I give

20  this number, but -- no, on occasions I have -- when

21  I don't trust that my information is going to be

22  held securely, I will enter the 305 number or one of

23  my other phone numbers so that it will ring there

24  and that a party will not have my direct 617 number.

62

1      Q.   What area code is 305?

2      A.   South Florida.

3      Q.   Did you request that area code?

4      A.   Yes.  There's a song that I used to listen

5   to and sometimes still listen to when I work out.  I

6   think it's called like "305 Till I Die," or

7   something like that.  It's a rap song.

8      Q.   What area code is 207?

9      A.   Maine.

10     Q.   Did you request that area code?

11     A.   It was provided to me, but on top of that I

12   wanted a Maine phone number.

13     Q.   You testified a moment ago that you give

14   out the 305 or 207 numbers to parties you don't

15   trust; is that correct?

16     A.   Or 978, yes.

17     Q.   Or 978.  What would cause you not to trust

18   a party?

19     A.   That I don't have confidence that they

20   would be able to handle my information in a secure

21   and professional manner.

22     Q.   What facts create a lack of confidence that

23   they would not handle your number in a safe and

24   professional manner?

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**

63

1      A.  What do you mean by "facts"?  Are you
2  asking for historical incidents where there have
3  been indications of misconduct?
4      Q.  I'm asking, what would cause you to give
5  someone the 305 or 207 VoIP numbers, as opposed to
6  your actual cell phone number, 617?
7      A.  If I was not comfortable and did not know
8  them, particularly a business or, you know, putting
9  it on a document, I would put down alternate phone
10  numbers so they wouldn't have my 617 number.
11      Q.  What would make you not comfortable?
12      A.  Doing business with -- locally in Maine,
13  you know, I prefer to just -- people don't -- Maine
14  only has one area code, so I'd prefer to not give
15  out a cell phone number that indicates I'm not from
16  the area, just because it's also inconvenient 'cause
17  oftentimes people will assume that the first three
18  digits are 207, and then if I give them a -- I say,
19  you know, "████████████ then they go, "Oh," you
20  know, "61" -- "oh, it's that area code," and, you
21  know, it just creates a little more -- it's just
22  unnecessary friction.
23      Q.  When you say "friction," you mean people
24  think you're not from Maine?

64

1       A.   Not even -- in some cases, yes, but, you

2    know, not necessarily that.  You know, that's not

3    the only reason to do that; it's just the

4    convenience factor as well.

5       Q.   The end result of this convenience factor,

6    though, is you alleging TCPA violations, correct?

7       A.   No.   It's easier to screen calls if I see

8    that a party calling me is, you know, calling one of

9    the -- kind of the private -- the numbers I use to

10   protect my privacy.  Then I'll know, you know,

11   whoever it is that's calling me, you know, "they're

12   not a trusted party that has my direct number" sort

13   of a thought.

14       Q.   When you say "to screen calls," you mean

15   when you screen the calls on the ▆▆▆▆ number?

16       A.   When I screen the incoming calls.

17       Q.   On the ▆▆▆▆ cell phone number?

18       A.   Yes.

19       Q.   So if you see on the ▆▆▆▆ cell phone number

20   the 305 or the 207 number, your testimony is that

21   they're not a trusted party?

22       A.   No, I don't know that that's completely

23   accurate.  It could be, you know, a phone number

24   that was given out out of convenience to, you know,

65

1    not having to state the area code and just say

2    "802-1001."

3        Q.  Do you allege that Liberty Power called the

4    305 number?

5        A.  No.

6        Q.  Do you allege that Liberty Power called the

7    207 number?

8        A.  Let me say this:  For production of

9    documents, it's my understanding discovery was

10   bifurcated and production of defendants' documents

11   is still ongoing.  As of this time I'm not aware of

12   any calls to those numbers, but that could certainly

13   change in the future.

14       Q.  Your testimony is that you're not at this

15   time alleging that Liberty Power called the 207

16   number?

17       A.  Correct.

18       Q.  Are you alleging that Liberty Power called

19   the 857 number?

20       A.  I don't know.

21       Q.  You don't know if you're alleging it?

22       A.  As of this time, I'm not aware of any phone

23   calls that Liberty placed to the 857 number.

24       Q.  At this time you're not alleging Liberty

74

1   facts the same for the ███ number?

2       A.  Yes.  My wife -- when we had that ████

3   number set up for emergency purposes, my wife got

4   sick of the continual phone calls, and I set up call

5   forwarding so that she would still be able to make

6   an outbound emergency call.

7       Q.  Are we talking about the ███ number?

8       A.  No, we're talking about ████

9       Q.  So the ████ number did not ring in

10  September 2016, correct?

11      A.  It did ring.

12      Q.  Did it make an audible noise when someone

13  called that number?

14      A.  On my cell phone, yes.

15      Q.  In September 2016 the ████ was physically

16  connected to a telephone, correct?

17      A.  Yes.

18      Q.  It was a telephone -- well, forget that

19  question.

20          But the telephone that you're referring

21  to did not make an audible ring, correct?

22      A.  The calls were, for that line -- incoming

23  calls for that line were forwarded to ████ which

24  would then be forwarded to ████

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

75

1     Q.  Was the ███ telephone number connected to

2   a physical telephone?

3     A.  Yes.

4     Q.  Was that a separate telephone than the ███

5   number or the same telephone?

6     A.  It was separate.  It was a -- the jack was

7   in a different part of the house.

8     Q.  Why did you obtain these two telephone

9   numbers?

10     A.  The ███ number was obtained because at the

11   time I was working out of the house and my wife

12   wanted to have a phone number for emergency

13   purposes.

14         The ███ number was obtained because I

15   had intend -- initially intended to have a business

16   line at my house when I got a new job for make --

17   the ease of clients contacting me, and ultimately, I

18   did not end up using it for that purpose.

19     Q.  What was the date that you ultimately did

20   not end up using it for business?

21     A.  I never ended up using it for business.

22     Q.  Why did you keep it, then?

23     A.  There was some sort of a promotion.  And I

24   don't remember the exact details, but I got some

80

1   correct?

2       A.   Yes.

3       Q.   So you couldn't distinguish which number

4   was called?

5       A.   If some -- when you -- you mean if someone

6   called the 911 -- if someone called the ▓▓▓ number

7   and the ▓▓▓ number showed up on my phone, I would

8   not be able to distinguish; is that what you're

9   asking?

10      Q.   Close, but no.   I'm asking if you could

11  distinguish -- when you received a ▓▓▓ incoming

12  call on your cell phone, if you could distinguish

13  whether the ▓▓▓ number was called or the ▓▓▓

14  number was called.

15      A.   Well, what -- I think that what I had done

16  to try to clear that up was that when I would

17  receive a call on -- I don't remember if it -- I

18  think it was both ▓▓▓ and ▓▓▓ I think that it

19  would also a -- in addition to email, I think it

20  also would send me a text message so that I would --

21  it would be an indication that the forwarded Google

22  Voice call was a text -- was from a landline, which

23  would -- again, the ▓▓▓ number was a phone number I

24  had for a very long time, so it helped me with

81

1    screening the calls.

2        Q.  So when someone called either the ██████

3    number or the █████ number, an email and a text

4    message was generated?

5        A.  Yes.

6        Q.  Did you provide those emails and text

7    messages to your counsel?

8        A.  The text messages, I don't believe that I

9    have.  The emails, I believe I did.

10       Q.  You did not provide the text messages to

11   your counsel?

12       A.  No.

13       Q.  Why not?

14       A.  The settings on my phone are such that --

15   actually, I don't know what the settings were on --

16   I don't even know which phone I had at the time that

17   I had received those text messages, so I don't

18   believe that the text messages are -- would be in my

19   control anymore, if they even exist.  I think

20   they've been deleted, or not deleted but disappeared

21   with whatever phone I had at the time.  Does that

22   make sense?

23       Q.  It does not.

24       A.  All right.  So I had a cell phone at the

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

85

1      Q.   In September 2016 was the ███ telephone

2  number a residential telephone number?

3      A.   Yes.

4      Q.   So in September 2016 you had three separate

5  residential telephone numbers?

6      A.   No, I had four.

7      Q.   What was the fourth?

8      A.   ███████

9      Q.   How many do you have today as we sit here?

10      A.   How many residential phone numbers do I

11  have today?

12      Q.   Yes.

13      A.   Five, the numbers we discussed earlier.

14      Q.   Right.

15           MR. BRUNDAGE:   How are we doing on

16  videotape capacity?

17           VIDEOGRAPHER:   We have 20 minutes.

18           (Marked, Exhibit 2, Part of call log,

19  one page.)

20      Q.   Mr. Katz, the court reporter is handing you

21  a document which she has marked as Exhibit 2.

22  Please let me know if you recognize this document.

23      A.   (Witness reviews document.) Yes, I do.

24      Q.   What is this document?

109

1     A.  Yes.

2     Q.  And is it your testimony that this chart

3 depicts calls that the ███ number received from

4 508-202-███   I know it depicts a lot of other

5 things, but in a general sense?

6     A.  Yeah, I think you meant ███ but yeah, I

7 think it would be accurate to say that this depicts

8 calls received where the displayed caller ID was

9 that phone number.

10     Q.  Okay.  Do you know if you answered any of

11 these calls?

12     A.  Yes.

13     Q.  Do you know which ones you answered?

14     A.  Well, without the complaint in front of me,

15 I think that I answered the two on 10/3 and one on

16 10/14.

17     Q.  Why did you answer those calls?

18     A.  Because my phone was ringing.

19     Q.  Did your phone ring for the calls from

20 9/8/2016 to 9/27/2016?

21     A.  I think that it did, but, you know, there's

22 one thing that's -- the reason that you see some of

23 these -- you know, the 12/23 listed three times

24 or on 10/14 you see 16:45 listed three times and

113

1      A.  I don't remember.  I don't know that it was

2    a newspaper.

3      Q.  Let's start with the first call you said

4    you answered, October 3, 2016, 1:27 p.m.  Can you

5    tell me about that call, please?

6      A.  My recollection is that I received a call

7    and I could not hear the caller.

8      Q.  Did the caller say anything?

9      A.  He was saying things; I don't believe that

10   I could understand him.

11     Q.  How long was the call?

12     A.  It looks like it was less than two minutes.

13     Q.  Where is that data point, length of call,

14   on here?

15     A.  That would be 13:29 minus 13:27.

16     Q.  So your basis for that, the October 3,

17   2016, 1:27 p.m. call was less than two minutes is

18   that you got an anonymous call two minutes later?

19     A.  Yes.

20     Q.  How does an anonymous call link to

21   508-202-████

22     A.  My recollection is that the party called me

23   back again due to the connection issue.

24     Q.  It was the same individual?

114

1      A.   Could we listen to the recordings?

2      Q.   Do you know if it was the same individual?

3      A.   Well, I'm asking if we could listen to the

4  recordings.  I don't know that if -- I don't know if

5  it was the same individual.

6      Q.   How long was that second call?

7      A.   I believe it was fairly lengthy.

8      Q.   What was the substance of it?

9      A.   I believe that that was the call where I

10  was -- asked to not be called anymore.  I think it

11  was also when I asked for a copy of the Do Not Call

12  policy.  I think I was transferred to Calibrus three

13  times.  I think the agent -- I think that that was

14  also the call where the agent told me that if I

15  wanted to stop receiving calls, I had to sign up for

16  Liberty Power service.

17      Q.   Does 29 minutes sound right for the length

18  of that call?

19      A.   It sounds about right.  I think that might

20  be the call.

21      Q.   You seek to avoid telemarketing calls,

22  correct?

23      A.   Yes.

24      Q.   You seek to avoid interacting with

116

1    related to housing discrimination.  This is a --

2    certainly a tactic that seems to be supported by the

3    regulatory authorities who are responsible for the

4    TCPA.

5        Q.  I asked a poorly worded question.  You

6    feign interest in the service being sold to gain

7    knowledge about who is calling you?

8        A.  No, I'm interested in the service being

9    sold because I want to find out who's calling me.

10       Q.  When you had this 29-minute call on October

11   3, were you interested in switching to Liberty

12   Power?

13       A.  I didn't know conclusively whether it was

14   actually Liberty Power that was calling me.

15       Q.  Were you interested in switching

16   electricity suppliers?

17       A.  If the -- in relation to that specific

18   call?

19       Q.  Yes.

20       A.  I think that if they had actually offered a

21   discount instead of a significant increase in price

22   compared to what my electricity supply rate was, I

23   may have actually been interested.

24       Q.  Who was your electricity supplier in 2016

119

1    A.  I don't know if that was said by the caller

2  or not.

3    Q.  You also testified a moment ago that you

4  answered one call on October 14.  There are four

5  listed here.  This is obviously not a memorization

6  test; I'm not going to ask you which call it was;

7  but do you recall the substance of whatever call

8  that you answered?

9    A.  No, I don't -- my memories are particularly

10  around the frustration of the 10/3 call.

11    Q.  Why were you frustrated?

12    A.  The -- can we listen to the tape and maybe

13  we can go play-by-play over the misrepresentations

14  made about the money that I would be saving or the

15  illusion the caller was attempting to create, that

16  it was Eversource placing the call, prominently

17  saying the Eversource name as a brand, to attempt to

18  confuse consumers?  Can we listen to the recording

19  so that we can talk about why I felt that it was so

20  important to determine the identity of the caller?

21    Q.  You just explained.

22    A.  Okay.

23    Q.  Do you recall being deposed in Slovin v.

24  Sunrun in -- on June 26, 2017?

133

1      A.  I believe that those would be the calls

2   referenced in the complaint that we were discussing

3   earlier.

4      Q.  I'd like you to keep that handy, please,

5   because we're going to do a cross-reference here.

6   If you go down to the third from the bottom, is that

7   a call in the complaint?  It says "nine minutes."

8      A.  On 10/14 at 4:46 p.m.?

9      Q.  Yes, sir.  And this is on the top of page

10  14 of Exhibit 3.

11     A.  All right, thanks.  That's what I was

12  looking for.  (Witness reviews document.) Yes, I see

13  that.

14     Q.  On the top of 14 -- page 14 of Exhibit 3,

15  the second amended complaint, there are two calls

16  listed on 10/14.  The Verizon records, Exhibit 4,

17  only evidence one call.  Can you explain that

18  discrepancy?

19     A.  Could we listen to that record, please?

20     Q.  I don't know if I have it.

21     A.  I think it's been produced.  I'd like to

22  listen to it.

23     Q.  I'd like you to answer the question.

24     A.  I believe that if we were to listen to the

134

1    recording, my -- if I were to -- let me just do some

2    other cross-checks here.  So...  (Witness reviews

3    document).  Yeah, there's another example of where

4    this happens on 9/8, where there are multiple calls

5    and only one call appears to be on the Verizon

6    record.  That would be on page 32.

7        Q.  You're a smart man, Mr. Katz, 'cause that's

8    where my next questions were going.

9        A.  Oh.  I would suspect that the reason why

10   not all of them are on Verizon's end is if I was

11   connected to someone and speaking or if the line was

12   tied up, that it is probably only counting the

13   duration of when the phone line was in use, so if

14   something was -- if I had to guess, if something was

15   bounced because the phone number was already in use

16   as a result of the, you know, triple or duplicate

17   dialing, I would guess that that's what happened and

18   why the records aren't fully reflective of that.

19       Q.  You're just guessing, though, right?

20       A.  Yes.  The reason I asked if we could listen

21   to the recording was that if that had actually

22   happened, there would -- it would have been evident

23   from listening to the recording if there was a beep,

24   you know, for another incoming call.  Particularly

135

1  if I had answered the first call at 16:45:21, then

2  it almost certainly would have been -- then if I had

3  answered the 21-second call at 16:45:21, then that

4  recording would have the sound of another incoming

5  call at 16:45:51.

6      Q.  In the recordings that you are aware of in

7  this case, in the telephone call recordings that you

8  are aware of for this case, are you aware of any

9  recordings that have a call waiting beep?

10     A.  I think that one we listened to yesterday

11  did, which is why I asked to listen to the

12  recording.

13     Q.  So that's one call out of 13?

14     A.  Well, I --

15     Q.  I'm sorry, that misstates the record.

16  You're aware of one call recording that has a call

17  waiting beep?

18     A.  At least one.

19     Q.  Who is -- well, let me know if you

20  recognize this telephone number:  866-732-6182.

21     A.  Where is that listed?

22     Q.  Do you recognize that number?

23     A.  Say that number again.

24     Q.  866-732-6182.

138

1      Q.   Have you ever used the name "James McGill"?

2      A.   Jimmy -- yeah, I --yes, I believe, yes,

3   that is a reference to the television show Better

4   Call Saul.

5      Q.   Quite a good show.

6      A.   Yes.

7      Q.   Have you ever used any other fake names

8   besides those two?

9      A.   Yes.

10      Q.   What names?

11      A.   I don't know.

12      Q.   How many other names?

13      A.   I don't know.

14      Q.   Five other names?  Fifteen other names?

15      A.   I have no idea.

16      Q.   How can the telephone calls that you allege

17   in this complaint be intrusive and harassing if your

18   telephone that's called doesn't actually ring?

19      A.   They're intrusive and harassing -- the --

20   you're acting as though the only harm is if the

21   phone itself rings, but the harm is that the calls

22   exist.  I'm on the National Do Not Call List for a

23   reason.  I tried to avoid these calls to begin with.

24   And I think that it's self-evident, especially from

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**

139

1  the public records requests with Massachusetts,

2  where I found the investigation that occurred

3  shortly after my complaints in Massachusetts with

4  the DPU, and also what's happened with PURA in

5  Connecticut and I think New York as well also for

6  the door-to-door solicitation, that there are very

7  serious compliance and ethical issues with how

8  Liberty Power attempted to acquire customers, and

9  one of those methods was telemarketing, which they

10  included -- which they openly admit to in their

11  public records when they're filing with regulatory

12  authorities.

13      Q.  The only reason ████ rang in 20 --

14  September and October of 2016 is because you set up

15  call forwarding to your cell phone, correct?

16      A.  No.  The reason it rang is because I set up

17  call forwarding so that my wife wouldn't have to

18  hear the annoying calls or so that I wouldn't have

19  to walk across the house and pick up the phone.

20      Q.  Couldn't you just turn off the ringer

21  instead of setting up call forwarding?

22      A.  I'm under no obligation to accommodate the

23  needs of telemarketers who habitually violate the

24  law.

140

1     Q.  You are not, that is correct, but you could

2  have avoided what you allege to be intrusive and

3  harassing by simply turning off the ringer, correct?

4     A.  Well, I was already on the National Do Not

5  Call List, so that was my effort, which I think

6  would be much more broad than turning off the

7  ringer.

8     Q.  But instead, you set up call forwarding to

9  create records of these calls, correct?

10     A.  So that I could identify and hold the

11  parties accountable who are responsible for those

12  calls, I engaged in steps required to positively

13  identify the companies responsible for those calls.

14     Q.  On your call log which we looked at a

15  moment ago, you identified 508-202-█████ as a Liberty

16  Power telephone number, but you said you didn't pick

17  up the telephone until the tenth call, which is on

18  October 3, the first call being on September 8.  If

19  you knew it was from Liberty Power, why would you

20  pick up at all?

21     A.  Why do you think that I knew that the call

22  was from Liberty Power?

23     Q.  Well, your log says on September 8 you got

24  a call from Liberty Power.

141

1    A.   That doesn't necessarily -- that doesn't --

2    that's not an indication that the entry of Liberty

3    Power was made on September 8.

4    Q.   So it's backfilled?

5    A.   I don't think that "backfilled" -- I don't

6    think that "backfilled" is an appropriate way to

7    describe it.  It was filled in when the party

8    responsible for 508-202-█████ was discovered, is what

9    my guess would be.

10   Q.   Was that on October 3, when you took that

11   29-minute call?

12   A.   I think so, but I don't remember exactly.

13   Q.   So if you identified Liberty Power as an

14   unsolicited telemarketer on 10/3, why did you answer

15   the phone again on October 14?

16   A.   How would I know who was calling me on

17   October 14?

18   Q.   Because it's the same telephone number.

19   A.   That phone number wouldn't have shown up on

20   my cell phone when it was ringing; it would have

21   shown up as the Google Voice number, the █████

22   number.

23        I should also add, my recollection is

24   that on October 3, after receiving the call from

Samuel Katz - May 16, 2019
**CONFIDENTIAL**

142

1    Liberty Power, I directly complained to them in an

2    email, and they lied to me in their response after

3    Mezzi had confirmed that they were the part -- they

4    did make those calls or they did make that call.

5              MR. BRUNDAGE:  I think that's lunch.

6              VIDEOGRAPHER:  The time is approximately

7    1:32, and we are off the record.

8              (Luncheon recess at 1:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**



157

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**

169

1  email?

2  　　A.  I don't have any memory of this email, but

3  I'm able to interpret that it says that it is from

4  me to Oasis Energy.

5  　　Q.  And it says, "Hello, Please add me to your

6  company's Do Not Call List.  Thanks, Sam"; is that

7  correct?

8  　　A.  That is what it says.

9  　　Q.  Do you have any recollection of why you

10  wrote that email?

11  　　A.  If I had to speculate, it would probably be

12  because the contract was up and I didn't want to be

13  bothered -- I didn't want to be bothered by them

14  with trying to re-enroll me.

15  　　Q.  If you didn't want to be bothered and you

16  wanted to be on their company's Do Not Call List,

17  why didn't you email them any of your phone numbers?

18  　　A.  Because my phone number was in the original

19  email from September 30, including my account

20  number, my service address, and my name.

21  　　Q.  Well, that's one of your phone numbers, but

22  you had several others in March 2016, correct?

23  　　A.  Yes.

24  　　Q.  Why wouldn't you provide them all your

170

1  phone numbers if you didn't want to be disturbed?

2      A.  The phone number here is 617-997-█████

3      Q.  Right, but you didn't provide them your

4  █████ or █████ or your █████ phone number?

5      A.  Okay.

6      Q.  Why not?

7      A.  Because they clearly had my ████████

8  number, so if that was the number linked to my

9  account, it's reasonable to conclude that if they

10 were going to call me, they would be calling me with

11 the phone number that was already linked to my

12 account.

13              (Marked, Exhibit 8, Email chain, top one

14 of which is from S. Katz to customercare@

15 libertypowercorp.com dated 10/3/2016, KATZ

16 000013-14.)

17     Q.  All right, Mr. Katz, we're moving right

18 along, almost to the finish line.

19              The court reporter has handed you what's

20 been marked as Exhibit 8.  Please let me know if you

21 recognize this two-page document.  It is Bates KATZ

22 13 and 14.

23     A.  (Witness reviews document.) It appears to

24 be an email from October 3, 2016.

**Samuel Katz - May 16, 2019**
**CONFIDENTIAL**

171

1      Q.  If you turn to KATZ 14, which is page 2,

2    please.  Is this an email from you to Liberty Power

3    saying, "Please add me to your Do Not Call List" and

4    providing three telephone numbers?

5      A.  Yes.

6      Q.  The numbers you provided are your cell

7    phone, ███ one of your Fios numbers at the time,

8    ███ and your Google number of ███ is that

9    accurate?

10     A.  That's correct, yes.

11     Q.  Why did you not also include your ███

12   Verizon Fios number which you had at the time?

13     A.  I mean, I think it's important to add the

14   context that this was October 3, which was the same

15   day that I had received a call on my ███ number.  I

16   don't remember why I didn't include ███  I don't

17   know.

18     Q.  Why did you send this email to David -- to,

19   among others, David Hernandez?

20     A.  I wanted to make sure that my phone

21   number -- also, my understanding is that even though

22   they told me that they had DNC'd me, they didn't

23   actually do it until several months later; but my

24   inclusion of David Hernandez would be to try to

172

1   ensure that the right people got the message and

2   that it didn't just end up in a customer service

3   queue with employee -- in an effort to contact the

4   -- one of the listed owners of the company, it would

5   be to make sure that the right people at the company

6   who have the capability to make decisions would make

7   that -- make sure that it was followed through with.

8       Q.  On the first page, Bates 13, you write at

9   the top, "The calls were claiming to be made on

10  behalf of Eversource"; is that correct?

11      A.  That's what it says, yes.

12      Q.  In the telephone calls were they claiming

13  to be made on behalf of Eversource?

14      A.  Can we listen to the calls, please?

15      Q.  I don't have every call recording in front

16  of me.

17      A.  Well, I think if we listen to the calls,

18  then we would be able to ascertain, you know, the --

19  why I felt like they were rep -- Eversource was

20  the -- they were representing that they were made by

21  Eversource.

22      Q.  Absent the calls, you have no recollection?

23      A.  My recollection is that the language and

24  the way that the representative was speaking on the

173

1  phone, as well as the prerecorded message was

2  clearly and prominently using the Eversource name in

3  an effort to mislead company -- mislead consumers

4  about the companies who were -- the company who was

5  making the call.  I think it -- the recordings will

6  provide clarity on that.

7      Q.  You wrote, "I've been receiving them for

8  months."  Isn't it true, though, that you'd only

9  been receiving calls allegedly for one month,

10  September 8, 2016?

11      A.  No, I had received prerecorded voice calls

12  claiming affiliation with Eversource for much longer

13  than the calls that are indicated here (indicating).

14      Q.  Affiliation with Eversource or affiliation

15  with Eversource and Liberty Power?

16      A.  The prerecorded messages for a -- months,

17  as indicated here, were referencing Eversource.

18      Q.  Do you see underneath your email, where

19  it's an email from customercare@libertypowercorp, it

20  says, "Hello, we do apologize for any inconvenience.

21  We have submitted your request to have the below

22  numbers added to the Do Not Call List.  Can you

23  please also provide what state you're located in"?

24  Do you see that?

175

1        A.   It might or it might not.  I should add

2   that part of the situation with the ████ number is

3   when I had previously made a DNC request, companies

4   started calling me on that number, when I provided

5   all of them.

6                (Marked, Exhibit 9, Email chain, top one

7   of which is from customercare@libertypowercorp.com

8   to S. Katz dated 10/4/16, KATZ 000065.)

9        Q.   Mr. Katz, the court reporter has handed you

10  a one-page document which is labeled Exhibit 9.  It

11  is Bates 65.  Please take a look at it and let me

12  know if you recognize it.

13       A.   (Witness reviews document.) I think I

14  recognize it, yes.

15       Q.   What is this document?

16       A.   An email.

17       Q.   Did you receive this email?

18       A.   That's what it says, yes.

19       Q.   Do you have reason to believe you did not

20  in fact receive it?

21       A.   I think I did.

22       Q.   You think you did receive it?

23       A.   Yes.

24       Q.   On the third line down, do you see where it