# Exhibit 17: December 18, 2018 Deposition Transcript of Shelby Hinkley

```
 1                  UNITED STATES DISTRICT COURT
                              FOR THE
 2                    DISTRICT OF MASSACHUSETTS

 3
    * * * * * * * * * * * * * * * * * *
 4  SAMUEL KATZ, et al.,               *
                                       *
 5         Plaintiffs,                 *
                                       *
 6      vs.                            *
                                       *
 7  LIBERTY POWER CORP., LLC, et al.,  *
                                       *
 8                                     *
           Defendants.                 *
 9                                     *
    * * * * * * * * * * * * * * * * * *
10

11           **SKYPE DEPOSITION OF:   SHELBY HINKLEY**

12

13         BEFORE:  Angella D. Clukey, Notary Public, at the

14      Dover-Foxcroft District Court, 159 East Main Street,

15      Dover-Foxcroft, Maine, on Wednesday, December 19,

16      2018, beginning at 9:00 a.m.

17

18                         APPEARANCES:

19
    Grace E. Parasmo, Esq.                  For the Plaintiffs
20  (Via Skype)

21  Jeffrey P. Brundage, Esq.               For the Defendants
    (Via Skype)
22

23
                DON THOMPSON & ASSOCIATES, INC.
24                PO Box 2236, Bangor, Maine
       (Phone) 207-394-3900 (E-mail) dtreport@myottmail.com
25              www.donthompsonandassociates.com
```

```
 1              DEPONENT:  SHELBY HINKLEY
 2
         EXAMINATION                              PAGE
 3
         By Mr. Brundage:                           3
 4
 5
 6
                    *   *   *   *   *
 7
 8
                       EXHIBIT INDEX
 9
         No.           Description             Marked
10
          1              Subpoena                 13
11
          2    Hinkley's Objections and Responses   20
12
          3  8/6/18 Hinkley's Objections and Responses  28
13
          4 11/30/18 Hinkley's Objections and Responses 60
14
          5         First Amended Complaint          73
15
          6              Complaint                  72
16
          7             Declaration                 86
17
18
                    *   *   *   *   *
19
20
                        OBJECTIONS
21
                                                 PAGE
22
       By Ms. Parasmo:     6, 8, 15, 18-21, 25, 29-33, 30,
23
            42-44, 50, 51, 55-57, 59, 62, 64-66, 69, 71, 72,
24
         75, 76, 78, 80, 82, 84, 85, 87, 89, 90, 92, 93, 95
25
```

1        (This deposition was taken before Angella D. Clukey,
2   Notary Public, at the Dover-Foxcroft District Court,
3   159 East Main Street, Dover-Foxcroft, Maine, on Wednesday,
4   December 19, 2018, beginning at 9:00 a.m.)
5                          * * * * *
6        (The deponent was administered the oath by the Notary
7   Public.)
8                          * * * * *
9   SHELBY HINKLEY, called, after having been duly sworn, on
10  her oath deposes and says as follows:
11                         EXAMINATION
12  BY MR. BRUNDAGE:
13  Q   Good morning, Ms. Hinkley.  My name is Jeffrey
14      Brundage, I am an attorney.  I represent Liberty
15      Power Corp and Liberty Power Holdings in a lawsuit
16      filed in the District of Massachusetts by Samuel Katz
17      and several other individuals.  I also represent the
18      same individuals in a lawsuit filed by you in the
19      District of Maine.
20          We are here today for your deposition.  Have you
21      been deposed before?
22  A   No.
23  Q   All right.  Well, Grace may have explained to you,
24      but I will just go over a couple basics.  We're going
25      to need verbal responses.  Although I can see you and

```
 1   Q    I'm going to remind you that you're -- you're under
 2        oath.  Are you aware of that?
 3   A    I am aware of that.  It was just so long ago, I don't
 4        want to say something I'm unsure of.
 5   Q    Do you recall seeing any telephones in the condo that
 6        you lived in with Mr. Katz?
 7   A    No, I don't recall seeing any.  I -- I'm just unsure.
 8   Q    Certainly you recall seeing cell phones, correct?
 9   A    Correct.  Yes, there were cell phones.
10   Q    Are you aware that Samuel Katz has a Google Voice
11        number?
12   A    I do -- I -- yeah, I know he has a Google Voice
13        number.
14   Q    When did you first learn that fact?
15   A    I don't know.
16   Q    Do you know the telephone number of the Google Voice
17        number?
18   A    I don't know the number.
19   Q    Do you know why he has a Google Voice number?
20   A    No, I don't.
21   Q    When you were married and living in the single family
22        home in Massachusetts did you have any residential
23        telephones?
24   A    Yes, we did.
25   Q    How many did you have?
```

| | | |
|---|---|---|
| 1 | | numbers.  Are you familiar with the telephone number |
| 2 | | ███████████? |
| 3 | A | No.  No. |
| 4 | Q | Are you familiar with the telephone number |
| 5 | | ███████████? |
| 6 | A | No. |
| 7 | Q | Are you familiar with the telephone number |
| 8 | | ███████████? |
| 9 | A | No. |
| 10 | Q | Are you familiar with the telephone number |
| 11 | | ███████████? |
| 12 | A | Yes. |
| 13 | Q | What is that telephone number? |
| 14 | A | My old cell phone number. |
| 15 | Q | When did it become your old number? |
| 16 | A | When I got a new number. |
| 17 | Q | What date was that? |
| 18 | A | In September. |
| 19 | Q | Why did you get a new telephone number? |
| 20 | A | I wanted to have a Maine number. |
| 21 | Q | Is your testimony that you wanted a Maine area code? |
| 22 | A | Yes. |
| 23 | Q | Are there any other reasons you got a new telephone |
| 24 | | number? |
| 25 | A | No.  I just wanted to fit in, I guess. |

| | | |
|---|---|---|
| 1 | Q | I'm sorry, did you say fit in? |
| 2 | A | Well, not fit in, but it's just I don't want to be |
| 3 | | seen as an outsider, I want people to see me as from |
| 4 | | Maine. |
| 5 | Q | You are, in fact, from Massachusetts, though, |
| 6 | | correct? |
| 7 | A | Correct. |
| 8 | Q | Do you recognize the telephone number ▮▮▮▮? |
| 9 | A | Yes. |
| 10 | Q | What is that telephone number? |
| 11 | A | It's my husband's cell phone number. |
| 12 | Q | Is that his current cell phone number? |
| 13 | A | Yes. |
| 14 | Q | Do you recognize the telephone number ▮▮▮▮ |
| 15 | A | No.  I don't recall if I know that or not. |
| 16 | Q | Do you want me to read the number back? |
| 17 | A | Sure. |
| 18 | Q | ▮▮▮▮ |
| 19 | A | I -- don't -- I'm unsure. |
| 20 | Q | Your old cell phone ending in 9493, was that number |
| 21 | | on the do not call list? |
| 22 | A | I believe so. |
| 23 | Q | Did you place it on the do not call list? |
| 24 | A | I believe so. |
| 25 | Q | When did you place it on the do not call list? |

| | | |
|---|---|---|
| 1 | A | I -- I have no idea. |
| 2 | Q | I want to go back for a moment to when you lived in |
| 3 | | Massachusetts in the single-family home.  You |
| 4 | | testified you had a physical residential phone that |
| 5 | | is not a cell phone in your residence? |
| 6 | A | Yes. |
| 7 | Q | And you testified that it rang? |
| 8 | A | It did ring, yes. |
| 9 | Q | Did there come a time when you still had the phone, |
| 10 | | but it stopped ringing? |
| 11 | A | Yes. |
| 12 | Q | Approximately, when was that time? |
| 13 | A | I don't recall when. |
| 14 | Q | Why did it change from ringing to not ringing? |
| 15 | A | I asked my husband to mute it. |
| 16 | Q | Why? |
| 17 | A | Because it was annoying. |
| 18 | Q | How often was it ringing? |
| 19 | A | Fairly often. |
| 20 | Q | Five times a day, 25 times a day? |
| 21 | A | I -- I'm not sure how often. |
| 22 | Q | When you lived in Massachusetts and had the white |
| 23 | | cord phone, who paid the bill on that phone? |
| 24 | A | My husband. |
| 25 | Q | Do you know who the provider of service was for that |

```
 1         phone?
 2   A     I don't recall a provider.
 3   Q     Did you ever view any of the bills that your husband
 4         paid with regards to that phone?
 5   A     No.  I don't recall, no.  I don't think so.
 6   Q     Was that telephone part of a Verizon Fios package?
 7   A     I'm not sure.
 8   Q     Did you have Verizon Fios at the time?
 9   A     I'm not sure.  I don't pay the bills -- or I didn't
10         pay the bills.
11   Q     Did you have television at the time?
12   A     We had a television.
13   Q     Did you have cable TV?
14   A     No.
15   Q     So your testimony is that you used an antenna for
16         your television?
17   A     Yeah, we did have an antenna.
18   Q     What was the time frame that this white cord
19         telephone was at your residence, approximately?
20   A     I'm not sure.  It had to have been --
21   Q     It would be the beginning of December 2014, correct?
22   A     I would say between when we moved in and -- yeah.
23   Q     And what was the end date of your use of that
24         telephone?
25   A     I'm not sure.
```

| | | |
|---|---|---|
| 1 | Q | It would be before August 2017, correct? |
| 2 | A | Yeah.  So we moved out and we stopped using it. |
| 3 | Q | You testified earlier that you obtained that white |
| 4 | | cord physical telephone because of, for lack of a |
| 5 | | better word, safety reasons; is that correct? |
| 6 | A | Correct. |
| 7 | Q | Why did you not have those same safety concerns when |
| 8 | | you moved to Maine? |
| 9 | A | We moved into a really old home and we can't -- we've |
| 10 | | had somebody try and set up phones, but they were |
| 11 | | unable to because of the wiring. |
| 12 | Q | Your testimony is that you would like to have a |
| 13 | | physical phone, but are unable to due to |
| 14 | | infrastructure? |
| 15 | A | Yes, I would like to have one. |
| 16 | Q | What provider or service or utility came out and gave |
| 17 | | you that opinion? |
| 18 | A | I'm not sure.  I don't recall the name of the company |
| 19 | | or whatever. |
| 20 | Q | How many places in Maine have you lived in? |
| 21 | A | We lived in a rental, we briefly lived with family, |
| 22 | | and we moved into our home. |
| 23 | Q | What's your current address? |
| 24 | A | ███████████████████████████████████████████. |
| 25 | Q | Since December of 2014 have you ever looked at a |

```
 1   Q    That would be the single-family home?
 2   A    Correct.
 3   Q    What was the address of that home?
 4   A    ███████████████████████████████.
 5   Q    How did you determine that the video and the picture
 6        you just testified about were from September 8th,
 7        2016?
 8   A    They were dated.
 9   Q    How did you go about locating those documents?
10   A    I looked in my pictures.
11   Q    When you say in my pictures, is that on a phone or a
12        computer or some other device?
13   A    I'm not sure.  I don't remember which -- how I did
14        it.  It was on my -- I believe it was under my -- my
15        iCloud.
16   Q    Are you aware of how much income Mr. Katz has derived
17        from filing TCPA lawsuits?
18   A    No.
19   Q    Is it less than 50,000, more than 50,000?
20   A    I'm not sure.  I couldn't put a number to it.
21   Q    You are aware that he does derive income from filing
22        TCPA lawsuits, though, correct?
23   A    Yes.
24            MS. PARASMO:  Objection; vague and ambiguous.
25        You can answer.
```

```
 1   A    Yeah.
 2   BY MR. BRUNDAGE:
 3   Q    Is there a reason why you don't ask the amount that
 4        he's derived?
 5   A    No.
 6   Q    There's no reason?
 7   A    I honestly -- I really -- I don't really care.
 8   Q    Does it not affect your family's ability to pay
 9        bills, college savings and things of that nature?
10   A    No.
11   Q    Why not?
12   A    I mean, I -- I don't deal with the finances in my
13        home.  I have a weekly budget I use every week.
14   Q    What is your weekly budget?
15   A    ██████████████ .
16   Q    Did there come a time where that number was lower and
17        then was increased?
18   A    No, I don't -- I don't think so, no.
19   Q    How long has that been your weekly budget?
20   A    At least since -- I -- I'm not sure.  I couldn't put
21        a date to it.
22   Q    Before or after you were married?
23   A    After we were married.
24            MR. BRUNDAGE:  Madam court reporter, if you could
25        hand the witness and please mark -- I think we're on
```

```
 1   BY MR. BRUNDAGE:
 2   Q   All right.  Your testimony, as I heard it, is, yes,
 3       you hold the opinion, but you don't have a factual
 4       basis for why; is that accurate?
 5   A   Yes, that's accurate.
 6   Q   Thank you.  Are you aware whether or not Mr. Katz
 7       keeps Microsoft Excel spreadsheets of telephone calls
 8       he receives?
 9   A   I -- I don't know.  I'm not sure if he does or not.
10   Q   You have no knowledge and you've never seen an Excel
11       spreadsheet with TCPA -- I'm sorry, telephone calls
12       Mr. Katz has received?
13   A   I have not -- I -- I don't know.  He works in Excel
14       for his job, so I don't know.
15   Q   So your answer is, no, you have not seen that
16       document?
17   A   No, I have not seen that document.
18   Q   What is Mr. Katz's job?
19   A   He works in big data, so he's a consultant.
20   Q   Who does he -- who does he work for?
21   A   ███.
22          MS. PARASMO:  I'm going to mark this portion of
23       the deposition confidential.
24          (This portion of the deposition has been marked
25       confidential.)
```

1            MS. PARASMO:  You can answer, though.
2    A    IRI.
3    BY MR. BRUNDAGE:
4    Q    Does he work from home?
5    A    He does.
6    Q    How long has he worked from home in any job capacity?
7    A    A few years.
8    Q    How long has he worked for ▮ -- I mean, ▮
9    A    He's worked there maybe two years.
10   Q    Are you aware of Mr. Katz ever recording telephone
11        calls?
12   A    I -- I -- yeah, I know he has.
13   Q    Do you know when he began doing that?
14   A    I don't know.
15   Q    Do you know why he does that?
16   A    I suspect it's for the TCPA.  I'm not sure.
17   Q    Are you aware of if Mr. Katz has applications on his
18        cell phone to record telephone calls?
19   A    I believe he does.
20   Q    Do you know the name of the application or
21        applications?
22   A    I do not.
23   Q    What is the basis for your knowledge that he does
24        have those applications on his cell phone?
25           MS. PARASMO:  Objection.  To the extent that you

```
 1            have independent knowledge, you can testify, but I'm
 2            just instructing you not to reveal your
 3            communications with your husband.  But if you have,
 4            like, a factual basis that is outside of your
 5            communications with your husband, such as your
 6            independent knowledge or personal knowledge, then you
 7            can testify.
 8    A       It's within our spousal thing.
 9    BY MR. BRUNDAGE:
10    Q       Have you ever picked up his cell phone?
11    A       Have I ever picked up his cell phone and went through
12            it?
13    Q       Yes.
14    A       No.
15    Q       A highly contested issue among couples, as I've come
16            to learn.
17    A       Well, I trust him, so I don't need to.
18    Q       This is along a similar line of questioning.  Not
19            applications on cell phones, but actual devices or
20            machines to record, for example, the white cord
21            telephone you discussed, have you ever seen a
22            recording device like that in your residence?
23    A       I don't -- I don't think I've ever seen that, no.
24    Q       Are you aware of Mr. Katz ever ordering such a device
25            on line?
```

1  A   I am not aware.
2  Q   We talked a moment ago about Mr. Katz recording
3      calls.  Have you ever heard any of those recordings?
4  A   He's never played me any recordings or anything like
5      that.
6  Q   Well, that wasn't my question.  Have you ever heard
7      him on the phone --
8          THE REPORTER:  I'm sorry, you broke up.  Can you
9      say that again?
10 BY MR. BRUNDAGE:
11 Q   Sure.  Have you ever heard a conversation which
12     either surreptitiously or you later learned was a
13     recorded conversation?
14         MS. PARASMO:  Objection as to form, vague and
15     ambiguous.  You can answer.
16 A   I mean, I'm not -- I'm really not sure.  I mean, how
17     do you tell if it's a recorded conversation if you're
18     not in the same room?  I mean, he -- I go to bed
19     really early and he stays up late doing whatever.
20 BY MR. BRUNDAGE:
21 Q   Have you ever heard Mr. Katz on a telephone call with
22     Liberty Power?
23 A   I don't believe I have.  I'm not sure, though.  I
24     mean --.
25 Q   During -- during the workweek, which I'll define as

```
 1            Monday through Friday, are you primarily responsible
 2            for watching three children?
 3     A      Yes.
 4     Q      What does Mr. Katz do while you're doing that?
 5     A      He works.
 6     Q      Does he have a separate office in your home?
 7     A      Yes.
 8     Q      Have you ever heard the name Lynn Rhodes?
 9     A      No, I've only seen it on some of these documents.
10     Q      Have you had any communications with -- without
11            telling me the substance or contents of those
12            communications regarding --
13               THE REPORTER:  Jeff, you're breaking up again.
14            I'm sorry.  Can you repeat that?
15               MR. BRUNDAGE:  Yeah.  Please tell me any time we
16            break up.
17     BY MR. BRUNDAGE:
18     Q      Without telling me the substance or contents of the
19            conversations -- it's just a yes or no -- have you
20            had any conversations verbally, by text or e-mails
21            with Mr. Katz regarding someone named Lynn Rhodes?
22     A      I don't think so.
23     Q      Do you know the name Alexander Braurman?
24     A      No.
25     Q      Could you define for me Mr. Katz's daily activities?
```

```
 1              MS. PARASMO:  Objection as to form, vague and
 2         ambiguous as to daily activities.
 3              MR. BRUNDAGE:  The question is to as she
 4         perceives them or as she wants to describe them,
 5         however she wants to describe them.
 6              MS. PARASMO:  Same objection.  You can answer.
 7    A    Like his routine, his daily routine?
 8    BY MR. BRUNDAGE:
 9    Q    Sure.  That works.
10    A    He wakes up, helps me with the kids, get them out of
11         bed, goes to the gym, comes home, eats breakfast,
12         goes to work.  After work he hangs out with the kids,
13         we eat dinner, then we put the kids to bed.
14    Q    While he's working does he have any responsibilities
15         for helping you with the children?
16    A    On occasion I ask him to just keep an ear out for my
17         oldest if I go to the grocery store and the other two
18         are napping or if I take them with me.
19    Q    I want to turn back to -- I think it's Exhibit 6,
20         it's the lawsuit we were looking at before we took a
21         break.
22    A    Yep.
23    Q    If you could turn to Page 3, please.
24    A    Sure.
25    Q    It's Bates labeled 4337.
```