UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SAMUEL KATZ and LYNNE RHODES,
individually, and on behalf of all others
similarly situated,                                         *
                                                            *
            Plaintiffs,                                     *
                                                            *
      v.                                                    *        Civil Action No. 18-cv-10506-ADB
                                                            *
                                                            *
LIBERTY POWER CORP., LLC and                                *
LIBERTY POWER HOLDINGS, LLC,                                *
                                                            *
            Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

        In this putative class action, Samuel Katz ("Mr. Katz") and Lynne Rhodes ("Ms. Rhodes"

and together with Mr. Katz, "Plaintiffs") allege that Liberty Power Corp., LLC and Liberty

Power Holdings, LLC (together, "Liberty Power") or their agents placed calls in violation of the

Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.*[1]  They bring claims on

behalf of four putative classes and claim that Liberty Power violated the TCPA by placing

robocalls to cell phones, making telemarketing calls that used an artificial or prerecorded voice,

calling numbers that were registered on the national Do Not Call Registry, and failing to

maintain and respect an internal do-not-call list.  [ECF No. 109 ("Second Amended Complaint"

or "SAC") ¶¶ 116–49].  Additionally, Plaintiffs allege that Liberty Power is engaged in actual

---

[1] Claims were also brought by Alexander Braurman ("Mr. Braurman").  Mr. Braurman was dismissed from this action with prejudice and without costs pursuant to the parties' stipulation on August 13, 2019.  [ECF No. 192].

and constructive fraudulent transfers in violation of Florida's Uniform Fraudulent Transfer Act (the "UFTA"), Fla. Stat. § 726.105.  [SAC ¶¶ 150–67].

Presently before the Court are Liberty Power's motion to dismiss the Second Amended Complaint [ECF No. 118] and its motion for summary judgment [ECF No. 163].  For the reasons explained herein, the motion to dismiss [ECF No. 118] is <u>GRANTED</u> in part and <u>DENIED</u> in part, and the motion for summary judgment [ECF No. 163] is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Procedural History

Mr. Katz filed this lawsuit on March 16, 2018.  [ECF No. 1].  On June 25, 2018, Liberty Power filed its answer to the initial complaint together with a third-party complaint against its vendor, Mezzi Marketing LLC.  [ECF No. 28].  Plaintiffs filed an amended complaint on July 16, 2018, and the operative Second Amended Complaint on November 14, 2018.  [ECF Nos. 34, 109].  On February 27, 2019, the Court granted Liberty Power's request to bifurcate discovery and stayed class discovery pending any summary judgment motion on facts specific to the named Plaintiffs.  [ECF No. 125].  On April 11, 2019, the Court clarified that its bifurcation order did not require discovery or permit summary judgment motions associated with Liberty Power's overall implementation of its do-not-call policies or issues concerning the relationship between Liberty Power and its vendors.  [ECF No. 135].

Liberty Power filed the instant motion to dismiss on January 9, 2019.  [ECF No. 118]. Plaintiffs opposed the motion to dismiss on February 13, 2019, [ECF No. 124], and Liberty Power filed a reply on March 15, 2019, [ECF No. 130].  Because Liberty Power's motion to dismiss argues that the TCPA is unconstitutional, on May 9, 2019, the Government intervened in this lawsuit and filed a brief arguing that the TCPA is constitutional.  [ECF Nos. 141, 143, 144].

On June 21, 2019, Liberty Power and Plaintiffs responded to the Government's brief. [ECF Nos. 166, 167].

Liberty Power filed the instant motion for summary judgment on June 21, 2019. [ECF No. 163]. Its primary argument for summary judgment is that Plaintiffs lack standing to pursue their claims. On July 12, 2019, Plaintiffs opposed the motion for summary judgment, and on August 1, 2019, Liberty Power filed a reply. [ECF Nos. 175, 184]. On September 3, 2019, Liberty Power filed a notice of supplemental authority. [ECF No. 194].

### B.     The TCPA and Plaintiffs' Claims

"Congress passed the TCPA in 1991, prompted by voluminous consumer complaints about abuses of telephone technology." Physician's Healthsource, Inc. v. Vertex Pharm. Inc., 247 F. Supp. 3d 138, 147 (D. Mass. 2017) (quotation marks and citation omitted). In pertinent part, the TCPA provides that it is unlawful:

> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States; [or]

> to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B).

47 U.S.C. § 227(b)(1). The TCPA provides a private right of action to remedy violations of those provisions and allows claims for actual damages or $500 in statutory damages per violation. Id. § 227(b)(3).

Additionally, pursuant to provisions of the TCPA the Federal Communication Commission ("FCC") created a national Do Not Call Registry and promulgated regulations

requiring internal do-not-call lists.  See id. § 227(c); 47 C.F.R. § 64.1200.  The TCPA contains a

second cause of action for persons who receive "more than one telephone call within any 12-

month period by or on behalf of the same entity in violation of the" FCC's Do Not Call Registry

regulations.  47 U.S.C. § 227(c)(5).

Plaintiffs bring their claim on behalf of each of the following four putative nationwide

classes:

> **Robocall Class**: All persons in the United States who received one or more
> telemarketing calls to their wireless telephone numbers by or on behalf of Liberty
> Power, that were made using an autodialer or an artificial or prerecorded voice,
> from March 16, 2014 through the date the Court certifies the class.
>
> **Residential Class**: All persons in the United States who received one or more
> telemarketing calls to their residential (wireless or landline) telephone numbers by
> or on behalf of Liberty Power, that were made using an artificial or prerecorded
> voice, from March 16, 2014 through the date the Court certifies the class.
>
> **National Do Not Call Class ("NDNC Class")**: All persons in the United States
> whose residential (wireless or landline) telephone number was registered with the
> national Do-Not-Call registry for at least thirty days prior to receiving at least two
> telemarketing calls by or on behalf of Liberty Power to such number within any 12-
> month period at any time from March 16, 2014 through the date the Court certifies
> the class.
>
> **Internal Do Not Call Class ("IDNC Class")**: All persons in the United States who
> received at least two telemarketing calls to their residential (wireless or landline)
> telephone number by or on behalf of Liberty Power within any 12-month period at
> any time from March 16, 2014 through the date the Court certifies the class.

[SAC ¶ 106].  Ms. Rhodes is the sole named representative for the Robocall Class, and both Ms.

Rhodes and Mr. Katz purport to represent the Residential, NDNC, and IDNC Classes.  Plaintiffs

claim that Liberty Power or its agents: (1) called Robocall Class members in violation of the

TCPA's prohibition on using an ATDS or with an artificial or prerecorded voice in violation of

47 U.S.C. § 227(b)(1)(A)(iii) ("Count I"); (2) called Residential Class members using an

artificial or prerecorded voice in violation of 47 U.S.C. § 227(b)(1)(B) ("Count II"); (3) called

NDNC Class members' registered Do Not Call Registry phone numbers with impermissible

frequency in violation of 47 C.F.R. § 64.1200(c)(2) ("Count III"); and (4) placed telemarketing calls to IDNC Class members without proper internal do not call list procedures in violation of 47 C.F.R. § 64.1200(d) ("Count IV").  [SAC ¶¶ 116–49].  The Second Amended Complaint also asserts claims for actual fraudulent transfers ("Count V") and constructive fraudulent transfers ("Count VI") in violation of the UFTA, Fla. Stat. § 726.105.  [SAC ¶¶ 150–67].

### C.    Factual Summary

This summary accepts the well-pled, class-wide allegations in the Second Amended Complaint as true.  Because facts related to the named Plaintiffs and the allegedly impermissible calls they received have been the subject of discovery, those facts are drawn from Liberty Power's statement of material facts, [ECF No. 176-22 at 11–17 ("DSOFR"), 18–42 ("DSOFK")],[2] and Plaintiffs' statement of material facts, [ECF No. 187-10 ("PSOF")].  The Court draws all justifiable inferences in favor of Plaintiffs as the non-movants.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### 1.    Liberty Power

Liberty Power Corp., LLC and Liberty Power Holdings, LLC are Delaware entities with their principal place of business in Florida.  [SAC ¶¶ 5–6].  Among other businesses, Liberty Power is a retail electric provider to Massachusetts residents.  [SAC ¶ 8].  It contracts with customers to fulfill their electric needs, makes purchases from utilities that provide the electricity that it sells, and maintains reliable electric service for its customers.  [SAC ¶ 9].  Liberty Power uses aggressive, outbound telemarketing campaigns, including pre-recorded or artificial voices to solicit potential residential customers.  [SAC ¶¶ 23–24].  Potential customers are called based on

---

[2] DSOFR and DSOFK are the sections of Liberty Power's statement of facts related to Ms. Rhodes and Mr. Katz, respectively.  Both sections use numbered paragraphs starting at ¶ 1, and the Court therefore distinguishes between the two sections to avoid ambiguity.

their presence on "lead lists" that Liberty Power provides to its agents.  [SAC ¶ 34].  The calls

ask customers "to press 1 to save on their electric bills," and potential customers who press 1 are

then connected to an agent.  See [SAC ¶ 25].  Although Liberty Power exercises significant

control over the manner of its agents' telemarketing campaigns, the Second Amended Complaint

alleges that its agents fail to obtain consent from consumers before placing unwanted calls that

use prerecorded or artificial voices and make repeated calls to potential consumers, like

Plaintiffs, whose telephone numbers are listed on the National Do Not Call Registry.  [PSOF

¶¶ 1, 4, 22; SAC ¶¶ 28, 33, 45–52].

2.      Mr. Katz

At the times relevant to this lawsuit, Mr. Katz was a resident of Bellingham,

Massachusetts.  [SAC ¶ 2].  Mr. Katz, a frequent litigant in TCPA cases, closely tracks the

telemarketing calls that he receives.  See [DSOFK ¶¶ 27, 31].  He has sent at least twenty-five

TCPA claim demand letters and filed at least nine TCPA lawsuits.  [DSOFK ¶¶ 30–31].  When

Liberty Power's agents placed the calls at issue here to Mr. Katz, he had four "residential"

telephone numbers:  a Google Voice number, his cell phone number, a landline for emergencies,

and a second landline for business.  [DSOFK ¶ 27; PSOF ¶ 44].

In September and October of 2016, Mr. Katz received approximately thirteen artificial or

prerecorded voice calls from Liberty Power's agents on the residential landline that he

maintained for emergencies.  [PSOF ¶ 20; see SAC ¶ 57].[3]  Mr. Katz's landline phone was

muted, but the landline telephone forwarded incoming calls to his Google Voice number, which

then forwarded them to his cell phone.  [PSOF ¶ 21].  Although the landline phone at Mr. Katz's

---

[3] Although unclear from the statements of fact, at least one of these calls seems not to have used
a prerecorded or artificial voice.

home did not ring, Mr. Katz's cell phone did.  [PSOF ¶¶ 23, 27].  On at least one occasion, one

of Liberty Power's agents, Mezzi Marketing, used a "spoofed" number to call Mr Katz, which

Mr. Katz claims helped Liberty Power conceal the improper nature of the calls being made on its

behalf.  [PSOF ¶ 32].[4]  All of Mr. Katz's phone numbers were registered on the Do Not Call

Registry.  [PSOF ¶ 22].

### 3.    Ms. Rhodes

In 2016 and 2018, Liberty Power's agents placed several calls to Ms. Rhodes' cell phone,

which was registered on the Do Not Call Registry, and at least one of those calls used a

prerecorded voice.  [PSOF ¶¶ 1–2].  In late 2017, Ms. Rhodes also answered numerous calls on

the landline at her father's residence, which she had helped her father, Scoba Rhodes ("Mr.

Rhodes"), register on the Do Not Call Registry.  [PSOF ¶¶ 4, 15].  Ms. Rhodes answered several

of those calls after having moved back in with Mr. Rhodes, who was suffering from dementia.

[PSOF ¶ 5].  Mr. Rhodes also answered calls from Liberty Power or its agents himself.  See

[PSOF ¶ 14].  Given Mr. Rhodes' health problems, Ms. Rhodes was concerned that the callers

were trying to take advantage of him.  [PSOF ¶¶ 7, 10].  The calls were relentless; for example,

---

[4] Although not directly pertinent to the TCPA issues, there is a potentially troubling recorded discussion during which a Mezzi Marketing telemarketer operating as Liberty Power's agent seemingly tells Mr. Katz that signing up for Liberty Power's service will stop the telemarketing calls:

> Mezzi: …You told me that you are getting these calls again and again and again. Right?
> Mr. Katz:  Right.  I keep getting them and I don't know why.
> Mezzi:  Exactly.  Exactly.  I'm telling you the reason [is] because there are too many companies.  They keep on calling you.  But if you will get enrolled with Liberty Power, that is an approved supplier for Eversource.  Once you get enrolled each of these companies will come to know that you are with Liberty Power.  They will not call you even a single time.  Even you will not receive even a single call from Liberty Power.  You will be in total peace of mind.

[ECF No. 176-21].

in November 2017 Liberty Power's agents called Mr. Rhodes' landline four to six times per week, and Ms. Rhodes answered most of those calls.  [PSOF ¶ 7].  Ms. Rhodes was not officially listed on the account statements for Mr. Rhodes' landline, but Verizon recognized her authority over the account.  [PSOF ¶ 5].  Although she has brought claims in her own right, Ms. Rhodes notes that she is the personal representative of her late father's estate.  [PSOF ¶ 16].

### 4.   Fraudulent Transfers

The Second Amended Complaint alleges that Liberty Power regularly and continuously transfers its assets, including its profits, to its owners and others in the form of dividends, loans, wages, payments of debts, and in other forms without receiving equivalent value for those transfers.  [SAC ¶¶ 151–53].  Liberty Power is a closely held company with only two owners that has seen steep declines in revenue from more than $891 million in 2015 to $335 million in 2017 as a result of changes in market conditions that have challenged its business model.  [SAC ¶¶ 72, 157–58].  Plaintiffs' TCPA claims make them creditors of Liberty Power within the UFTA, see Fla. Stat. § 726.102(4), (5), and the Second Amended Complaint alleges that Liberty Power's total liability to Plaintiffs will exceed the company's total assets, in part because its owners continuously strip all profits out of the company, leaving it thinly capitalized.  [SAC ¶¶ 155–56, 162].  Plaintiffs therefore seek an injunction against further transfers, an attachment of assets, the appointment of a receiver, and the imposition of a constructive trust to ensure that Liberty Power will be able to pay any judgment that becomes due in this case.  [SAC ¶¶ 163–67].

## II.      MOTION TO DISMISS

Liberty Power has moved to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).  [ECF No. 118].[5]  It argues that Ms. Rhodes' claims should be dismissed because she lacks standing to assert claims for calls made to her late father, who was the primary target of most of the calls at issue, and that Mr. Katz's demand for injunctive relief should be dismissed because he is not likely to face future injury.  [ECF No. 119 at 4–10].[6]  The Court will address the standing issues in the summary judgment section of this memorandum and order because they concern facts that are specific to each named Plaintiff and on which discovery has been completed.  Liberty Power next argues that the TCPA claims should be dismissed because the Second Amended Complaint does not adequately distinguish between Liberty Power Corp., LLC and Liberty Power Holdings, LLC and that the TCPA is unconstitutional because it contains a content-based restriction on speech.  [Id. at 16–33].  Last, Liberty Power asserts that the UFTA claims should be dismissed because they are not pled with particularity and fail to plausibly allege a claim for fraud.  [Id. at 33–40].

### A.      Legal Standard

On a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to

---

[5] Liberty Power argues that claims brought by Mr. Braurman should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3).  Because Mr. Braurman has been dismissed from this action, those arguments are moot.  See [ECF No. 192].  The motion to dismiss also references Rule 12(b)(7), but the memorandum in support of the motion to dismiss does not argue that the Second Amended Complaint should be dismissed on that basis.  See [ECF Nos. 118, 119].

[6] The Court finds it unnecessary to address the argument that Mr. Katz lacks standing to pursue injunctive relief because the issue is not dispositive of any claim, particularly where Liberty Power has not argued that Ms. Rhodes, who received an allegedly impermissible call in 2018, lacks the requisite likely future injury.

the plaintiff-in-counterclaim's theory, and draw all reasonable inferences from those facts in favor of the plaintiff-in-counterclaim.  See United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  While detailed factual allegations are not required, a counterclaim complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005).  The facts alleged must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).

When assessing the sufficiency of a counterclaim complaint, the Court first "separate[s] the [pleading's] factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the [defendant-in-counterclaim] is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).  "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556).

### B.    Short and Plain Statement of the Claims

Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Plaintiffs meet their obligation to put defendants on notice of what they allege where

their complaint "set[s] forth minimal facts as to who did what to whom, when, where, and why."

Calvi v. Knox Cty., 470 F.3d 422, 430 (1st Cir. 2006) (quoting Educadores Puertorriqueños en

Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004)).  Where a complaint makes allegations

against more than one defendant, it should, to the extent possible, "state clearly which defendant

or defendants committed each of the alleged wrongful acts."  Bagheri v. Galligan, 160 F. App'x

4, 5 (1st Cir. 2005).

Here, the Second Amended Complaint easily meets the requirement of Rule 8(a).

Plaintiffs describe the relationship between Liberty Power Corp., LLC and Liberty Power

Holdings, LLC and allege that the entities operate their telemarketing activities together, with

Liberty Power Corp., LLC managing the telemarketers who generate electric service contracts

for Liberty Power Holdings, LLC's business.  [SAC ¶ 11].  Further, where defendants are

affiliated entities with overlapping operations, including common marketing, offices, website,

email servers, telephone numbers, and management, see [SAC ¶¶ 7, 10], a complaint does not

fail to plausibly allege a claim because it asserts that actions were taken jointly by both of the

affiliated entities, as Plaintiffs do here in referring to "Liberty Power" and "Defendants."[7]

### C.      Constitutionality of the TCPA's Government Debt Collection Exception

Liberty Power argues that the TCPA's government debt collection exception is a content-

based restriction on speech.  [ECF No. 119, at 32–42].  The exception exempts calls made

"solely to collect a debt owed to or guaranteed by the United States" from the otherwise

---

[7] Liberty Power advances a subsidiary argument that the facts alleged are insufficient to pierce the corporate veil.  Plaintiffs acknowledge that "the SAC does not seek to pierce the corporate veil or rely on that doctrine in any way."  [ECF No. 124 at 31].  Because Plaintiffs have not relied on piercing the corporate veil and the Court holds that the Second Amended Complaint has pled claims against both Liberty Power Corp., LLC and Liberty Power Holdings, LLC, the issue is moot.

applicable prohibitions on using ATDS or imitating calls to residential telephone lines using an artificial or prerecorded voice.  See 47 U.S.C. § 227.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  The Free Speech Clause prohibits Congress from restricting "expression because of its message, its ideas, its subject matter, or its content." Police Dep't of Chi. v. Mosley, 408 U.S. 92, 95 (1972).  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015).  Restrictions on speech are content based where "a law applies to particular speech because of the topic discussed or the idea or message expressed."  Id. at 2227.  In some cases, a statute or regulation that is facially neutral will still be considered "content-based" where the law at issue "cannot be 'justified without reference to the content of the regulated speech'" or was adopted "because of disagreement with the message [the speech] conveys."  Id.  (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" Ward, 491 U.S. at 791 (emphasis in original) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

Content-based restrictions on speech are subject to strict scrutiny, "which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  Citizens United v. FEC, 558 U.S. 310, 340 (2010) (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007)).  Conversely, laws that regulate the time, place, or manner of speech in a content-neutral manner are permissible if they are narrowly

tailored to serve substantial government interests and leave open ample alternative channels of communication.  See Ward, 491 U.S. at 803.  Laws that prohibit a particular communication form, such as the use of ATDS, and provide exceptions for persons with pre-existing relationships are an allowed time, place, or manner restriction so long as the related-person's right to communicate with their target does not turn on the content of communications.  See Van Bergen v. Minnesota, 59 F.3d 1541, 1550 (8th Cir. 1995) (upholding exceptions to a prohibition on automatic dialing for those with a current business or social relationship with the caller and messages from schools for parents, students, or employees).

1.   Content Based

The government debt collection exception is content based because determining whether a given call comes within the exception turns on the purpose(s) of the call and its subject matter. See 47 U.S.C. § 227(b).  In any case where the parties dispute whether a call was made "solely to collect a debt owed to or guaranteed by the United States," the purpose(s) of the call and its subject matter (i.e. what, if any, debt was at issue) will be critical and potentially dispositive of whether the call comes within the debt-collection exception.  At least two circuit courts and several district courts have also concluded that the exception is content based.  See Duguid v. Facebook, Inc., 926 F.3d 1146, 1156 (9th Cir. 2019); Am. Ass'n of Political Consultants, Inc. v. FCC, 923 F.3d 159, 166 (4th Cir. 2019); Gallion v. Charter Commc'ns Inc., 287 F. Supp. 3d 920, 927 (C.D. Cal. 2018); Greenley v. Laborers' Int'l Union of N. Am., 271 F. Supp. 3d 1128, 1149 (D. Minn. Sept. 2017); Mejia v. Time Warner Cable Inc., No. 15-CV-6445, 2017 WL 3278926, at *14 (S.D.N.Y. Aug. 2017); Holt v. Facebook, Inc., 240 F. Supp. 3d 1021, 1032 (N.D. Cal. Mar. 2017); Brickman v. Facebook, Inc., 230 F. Supp. 3d 1036, 1045 (N.D. Cal. Jan. 2017).

The Fourth Circuit recently aptly described why the debt-collection exception is content-based:

> [A] private debt collector could make two nearly identical automated calls to the same cell phone using prohibited technology, with the sole distinction being that the first call relates to a loan guaranteed by the federal government, while the second call concerns a commercial loan with no government guarantee. Although the first automated call would satisfy the debt-collection exemption and not be subject to the automated call ban, the second call would not satisfy the exemption and would be illegal. The legality of those phone calls, due solely to the debt-collection exemption, thus depends on their subject matter (i.e., their content).

Am. Ass'n of Political Consultants, 923 F.3d at 166.  The Government's response to this logic is that the debt-collection exception's applicability turns on whether the United States guarantees or owns the debt at issue and is therefore relationship-based, not content-based.  See [ECF No. 144 at 9]; see also Mey v. Venture Data, LLC, 245 F. Supp. 3d 771, 792 (N.D.W. Va. 2017) (concluding that the debt-collection exception is "based on the relationship of the speaker and recipient of the message rather than the content of the message") (quotation marks omitted), overruled by Am. Ass'n of Political Consultants, 923 F.3d at 166.  This argument is unavailing for two reasons.  First, the government may guarantee or purchase an individual's debt without their awareness or choice, which renders the relationship categorically different from the relationship between a parent and their child's school or private citizens who enter into a business venture, and the individual who places impermissible phone calls to collect government debt will be yet another actor, not the government itself.  Cf. Van Bergen, 59 F.3d at 1550.[8] Second, the permissibility of any call turns on the subject matter of the call, not merely whether the recipient owes a debt guaranteed or owned by the United States.  As the Government notes, in two hypothetical TCPA cases concerning identical telephone discussions, TCPA liability

---

[8] Although the government could theoretically have its employees place calls to collect government debt, it does not appear that the government has waived sovereign immunity and would therefore not incur liability for such calls.

could differ depending on whether the government guaranteed or owned the debt discussed.

[ECF No. 144, at 9].  That hypothetical does not prove that the debt-collection exception is not

content-based because the contents of the calls would still be necessary to determine whether the

collection of a government guaranteed or owned debt was discussed, and if so, whether

collecting that debt was the caller's sole purpose.  The Court therefore concludes that the

TCPA's debt-collection exception is content-based.

### 2. No Compelling Interest

The next question is whether the debt-collection exception is narrowly tailored to serve a

compelling state interest.  See Ward, 491 U.S. at 803.  The United States argues that the debt-

collection exception is justified because the TCPA serves the government's interest in

"protecting the well-being, tranquility, and privacy of the home[s]" and pockets of its citizens.

[ECF No. 144 at 13].  As the Ninth Circuit put it, this purported interest "is a head-scratcher."

Duguid, 926 F.3d at 1155.  The TCPA was first enacted in 1991 without the debt-collection

exception.  The exception was enacted twenty-four years later in 2015 and serves to limit rather

than to expand the privacy protections offered by the TCPA.  See Bipartisan Budget Act of 2015,

Pub. L. No. 114-74, § 301(a)(1)(A), 129 Stat. 584, 588; see also 47 U.S.C. § 227(b)(1)(A)(iii);

Duguid, 926 F.3d at 1149.  Whatever Congress's goal was in choosing to permit automated

dialing and prerecorded calls for the collection of government debt, it simply cannot have had

anything to do with protecting the tranquility or privacy of its citizens' homes and pockets.  See

Reed, 135 S. Ct. at 2232 ("[A] law cannot be regarded as protecting an interest of the highest

order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."

(quoting Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002)); Am. Ass'n of Political

Consultants, 923 F.3d at 168 ("Congress implemented the [TCPA] in order to protect privacy

interests. . . . The debt-collection exemption, however, undercuts those privacy protections.").  It is possible, and perhaps likely, that Congress chose to sacrifice some fraction of the tranquility Americans enjoy in order to achieve more efficient collection of debts guaranteed or owned by the United States for budget reasons.  That would not, however, be a compelling interest, and it is not an interest that the Government has asserted.  See [ECF No. 144].  The Court concludes that the debt-collection exception does not serve a compelling interest, and as a content-based restriction on speech, is therefore unconstitutional.  See Duguid, 926 F.3d at 1156 (holding that the debt-collection exception insufficiently tailored to advance the government's interests in protecting privacy); Am. Ass'n of Political Consultants, 923 F.3d at 168 (holding that the debt-collection exception does "not serve the compelling governmental interest of protecting privacy in a narrow fashion").

        3.      Severable

Courts "ordinarily give effect to the valid portion of a partially unconstitutional statute so long as it remains fully operative as a law, and so long as it is not evident from the statutory text and context that Congress would have preferred no statute at all."  Exec. Benefits Ins. Agency v. Arkison, 573 U.S. 25, 37 (2014) (quotation marks and citations omitted).  "Congressional intent is the touchstone of severability analysis."  Duguid, 926 F.3d at 1156.  Where Congress includes a severability clause in legislations, "that clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of [a] constitutionally offensive provision."  Aurelius Inv., LLC v. Puerto Rico, 915 F.3d 838, 861 (1st Cir. 2019) (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987)).

Here, there is little doubt that the debt-collection exception is severable.  Chapter 5 of Title 47, which contains the TCPA, has a "Separability" provision that provides, "[i]f any

provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby."  47 U.S.C. § 608.  Additionally, the 2015 adoption of the debt-collection exception occurred without any indication that Congress would not have wished to continue protecting citizens from unwanted telemarketing calls if the debt-collection exception was held unconstitutional.  See Duguid, 926 F.3d at 1157.[9]  For the same reasons articulated by the Ninth and Fourth Circuits, the Court concludes that the government debt-collection exception of the TCPA is severable.  Duguid, 926 F.3d at 1156–57; American Ass'n of Political Consultants, 923 F.3d at 170–71.  Therefore, the claims in this case are unaffected by the debt-collection exception's unconstitutionality.

> **D.     UFTA Claims**

Liberty Power argues that the Plaintiffs' claims under the UFTA should be dismissed because the Second Amended Complaint does not plausibly allege that Liberty Power has actually or constructively engaged in fraudulent transfers under Florida law.  The elements of actual fraud under the UFTA are that "(1) there was a creditor to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property which could have been applicable to the payment of the debt due."  Wiand v. Lee, 753 F.3d 1194, 1203 (11th Cir. 2014) (quoting Nationsbank, N.A. v. Coastal Utils., Inc., 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002)); see Fla. Stat. § 726(1)(a).  Constructive fraud occurs where a debtor transfers assets or incurs an obligation "without receiving a reasonably equivalent value in exchange for the transfer or

---

[9] Liberty Power also argues that the TCPA violates the Equal Protection Clause.  [ECF No. 119 at 23].  Because the Court has resolved Liberty Power's argument through an application of First Amendment jurisprudence, it finds it unnecessary to address Liberty Power's argument that the Fourteenth Amendment applies.

obligation" when the debtor is either (1) engaged or is about to engage in transactions for which it was undercapitalized or (2) intends to incur or should have believed it would incur debts beyond its ability to pay.  Fla. Stat. § 726.105(1)(b).

The Court concludes that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to an action under the UFTA, although the case law is unsettled as to whether the heightened pleading requirements should apply to allegations of constructive fraud. See In re Lawson, 791 F.3d 214, 226 (1st Cir. 2015) (holding that heightened pleading standard applies to cases of actual fraud, but declining to decide pleading standard for constructive fraud); Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997) (affirming denial of motion to dismiss constructive fraud claim under Rule 9(b)); Meridian Tr. Co. v. Batista, No. 17-CV-23051, 2018 WL 4693533, at *9 (S.D. Fla. Sept. 26, 2018) (dismissing UFTA conspiracy claim under Rule 9(b)), appeal dismissed, No. 18-14471, 2019 WL 339929 (11th Cir. Jan. 16, 2019); Lachapelle v. Kim, No. 15-CV-02195, 2015 WL 7753235, at *5–7 (N.D. Cal. Dec. 2, 2015) (holding that Rule 9(b) applies to claims of actual fraudulent transfers but not claims alleging constructive fraudulent transfers); Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp., 770 F. Supp. 2d 1315, 1336 (N.D. Ga. 2011) (same), rev'd on other grounds 677 F.3d 1286 (11th Cir. 2012).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "The circumstances to be stated with particularity under Rule 9(b) generally consist of 'the who, what, where, and when of the allegedly [misleading] representation.'"  Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016) (quoting Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004)).

Here, the Second Amended Complaint does not provide any specificity as to the allegedly fraudulent transfers.  There are no specifics as to the timing, amounts, or parties involved in any individual transfer.  Instead, Plaintiffs allege that Liberty Power has two owners and that it "regularly and continuously transfers its assets (including its profits) to its owners *or others*" and that the transfers "*may take* the form of dividends, loans, release of loans, wages, payment of expenses, . . . assignment of liens, debts, or accounts receivables held by Liberty Power, or Liberty Power's acceptance of any sort of lien . . . *or any and every other form of payment*." [SAC ¶¶ 151–52 (emphasis added)].  These general allegations do not satisfy Rule 9(b) and the claims under the UFTA must therefore be dismissed.  The dismissal is without prejudice, and because the Second Amended Complaint alleges that financial strain motivated the allegedly less than scrupulous marketing practices at issue here, some discovery into Liberty Power's capitalization, earnings, and financial conduct may still be appropriate.

## III.    SUMMARY JUDGMENT

Liberty Power argues that summary judgment should be granted on Counts II, III, and IV as alleged by Mr. Katz because, as a professional TCPA litigant, he lacks standing and further because he consented to two of the calls at issue.  [ECF No. 164 at 2–10].  Liberty Power also argues that the Court should grant summary judgment on Count I as alleged by Ms. Rhodes because she did not pay for one of the calls she received on her cell phone and on Counts II, III, and IV because she lacks standing to assert claims based on calls to her late father's residential line where she was not named as the subscriber for that phone number.  [Id. at 10–17].

### A.    Legal Standard

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under

the controlling law. . . .  A genuine issue exists as to such a fact if there is evidence from which a

reasonable trier could decide the fact either way."  Cochran v. Quest Software, Inc., 328 F.3d 1,

6 (1st Cir. 2003) (citation omitted).

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must point to "specific evidence in the record that would be admissible at trial."  Ocasio-

Hernández, 777 F.3d at 4.  "That is, it must 'affirmatively produce evidence that negates an

essential element of the non-moving party's claim,' or, using 'evidentiary materials already on

file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at

trial.'"  Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the

principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses . . . ."  Celotex, 477 U.S. at 323–24.  Once the movant takes the

position that the record fails to make out any trial worthy question of material fact, "it is the

burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions."

Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

In reviewing the record, the court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's favor."

Cochran, 328 F.3d at 6.  The First Circuit has noted that this standard "is favorable to the

nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48

(1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material,"

Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may

discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran,

328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.

1990)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Medina-Munoz, 896 F.2d at 8 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986)).

### B. Motion for Summary Judgment on Claims Asserted by Mr. Katz

Liberty Power first argues that Mr. Katz lacks prudential standing. [ECF No. 164-8 at 2–9]. Prudential standing is "a doctrine not derived from Article III" of the United States Constitution and "not exhaustively defined." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (quotation marks omitted). It embraces "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. (quoting Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12 (2004)). Liberty Power's argument rests on the third of these principles. It contends that Mr. Katz did not suffer harm within the TCPA's zone of interest because he "proactively embraces telemarketing calls" and "simply makes money from the statute because he sends TCPA demand letters and files TCPA lawsuits." [ECF No. 164 at 3]. This embrace of telemarketing calls, Liberty Power argues, is inconsistent with the purpose of the TCPA, which is to protect residential and personal privacy by enabling citizens to put a stop to unwanted telemarketing. See Maryland v. Universal Elections, Inc., 729 F.3d 370, 376–77 (4th Cir. 2013). Senator Hollings, who sponsored the TCPA, famously described telemarking calls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30, 821–22 (1991).

Although telemarketing calls may not truly be a scourge for Mr. Katz, who has turned the calls into a financial opportunity, the issue of Mr. Katz's standing boils down to whether he maintained the number that Liberty Power's agents called for any purpose other than attracting telemarketing calls to support his TCPA lawsuits.  See Van Patten v. Vertical Fitness Grp., 847 F.3d 1037, 1043 (9th Cir. 2017) ("The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm."); Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782, 805 (W.D. Pa. 2016) (finding that calls to cell phones maintained solely for the purpose of generating legal claims could not support prudential standing).  But see Salcedo v. Hanna, – F.3d —, 2019 WL 4050424, at *8 (11th Cir. Aug. 28, 2019) (instructing that TCPA case premised on a single text message be dismissed without prejudice because "concrete harm from wasted time requires, at the very least, more than a few seconds").  Mr. Katz has testified that he maintained the phone line at issue in case of an emergency.  [PSOF ¶ 44].  Maintaining a landline for emergencies is arguably prudent and certainly not beyond believable, particularly considering that Mr. Katz has three young children. [PSOF ¶ 42].  Further, Mr. Katz has demonstrated injury that supports standing by testifying that Liberty Power's agents called numerous times and conversed with him on multiple calls for extended periods of time.  [PSOF ¶¶ 32–37].

Liberty Power relies heavily on Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782 (W.D. Pa. 2016), which held that the professional plaintiff who had "purchased at least thirty-five cell phones and cell phone numbers with prepaid minutes for the purpose of filing lawsuits under the [TCPA]" had not suffered an injury in fact and lacked prudential standing.  197 F. Supp. 3d at 788, 803–06.  The court reasoned, in part, that "it is unfathomable that Congress

22

considered a consumer who files TCPA actions as a business when it enacted the TCPA as a result of its 'outrage over the proliferation of prerecorded telemarketing calls to private residences, which consumers regarded as an intrusive invasion of privacy and a nuisance.'" Id. at 805 (quoting Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 325 (3d Cir. 2015)). This case is distinguishable from Stoops because the telephone that Liberty Power or its agents called Mr. Katz on was not, at least according to Mr. Katz, maintained solely for the purpose of filing TCPA lawsuits. See JT's Frames, Inc. v. Casares, No. 16-CV-2504, 2018 WL 835225, at *2 (N.D. Ill. Feb. 13, 2018) (distinguishing Stoops because plaintiff there purchased cell phones "for the sole purpose of receiving calls to enable her to file TCPA lawsuits"); Greenley, 271 F. Supp. 3d at 1139 (similar); Cunningham v. Rapid Response Monitoring Servs., Inc., 251 F. Supp. 3d 1187, 1196 (M.D. Tenn. 2017) (holding that plaintiff did not relinquish his right to sue under the TCPA by becoming a so-called "professional plaintiff"). The fact that Mr. Katz may now, or might someday, be pleased that he received incessant calls from Liberty Power or its agents because of the financial reward this lawsuit could bring does not, by itself, deprive him of standing.[10]

Liberty Power's second argument is that Mr. Katz consented to being called on October 3, 2016, during the tenth of the thirteen calls he received and that it is entitled to summary judgment on the twelfth and thirteenth calls he received because he did not revoke his consent to be called. [ECF No. 164-8 at 9–10]. The Court has reviewed the audio recording of the call in

---

[10] Liberty Power notes that Mr. Katz has added additional phones, including at least one phone with an out-of-state area code, to his arsenal since the calls at issue here occurred. [ECF No. 164 at 12]. Although these additional lines might be relevant to a fact finder's determination of whether the phone line that Liberty Power's agents called was actually maintained for some purpose other than filing TCPA lawsuits, they are not dispositive of Mr. Katz's claims at this stage of the litigation.

which Mr. Katz supposedly consented to further calls.  It finds the argument that he gave unrestricted consent for Liberty Power to place calls that would otherwise violate the TCPA to be untenable.  The call starts with a recording informing Mr. Katz that he may be eligible to receive a discount from his Eversourse energy bill and inviting him to "press 1" to "speak to a friendly account representative."  [ECF No. 176-20].  Mr. Katz is then connected to a Liberty Power agent, but the connection quality is poor, and he informs the agent of the problem.  The Liberty Power agent then says, "let me give you a call back," and Mr. Katz consents, asking the agent to give him "*a call*" back.  [Id.].  The call back is apparently the eleventh of the thirteen calls at issue, and Mr. Katz consented to at most that one return call.

Mr. Katz makes a narrower argument that verbal consent to calls that violate the TCPA is insufficient because the relevant regulations require that consent be in writing.  See 47 C.F.R. § 64.1200(c)(2)(ii) ("Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed."); see also 47 C.F.R. § 64.1200(f)(8).  The Court finds it unnecessary to resolve that issue because it is not dispositive of any claim.

The Court finds that Mr. Katz has standing to pursue Counts II, III, and IV and therefore DENIES Liberty Power's motion for summary judgment on those claims.

### C.    Motion for Summary Judgment on claims asserted by Ms. Rhodes

Liberty Power argues that it is entitled to summary judgment against Ms. Rhodes on Count I because she did not pay for the call that she allegedly received on her cell phone.  [ECF No. 164 at 13–17].  The TCPA allows claims for calls that are made with any ATDS "or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone

service . . . or any service for which the called party is charged for the call." 47 U.S.C.

§ 227(b)(1)(A)(iii).[11]  The disjunctive "or" indicates that Congress intended to allow TCPA

claims for calls placed to cell phones regardless of whether the subscriber is charged a per call

fee.  See Breda v. Cellco P'ship, 934 F.3d 1, 9-11 (1st Cir. 2019) (acknowledging that claims

turned "on whether VoIP service" is "cellular telephone service" and implicitly acknowledging

that no per call fee requirement exists for calls to cellular telephones).  In addition to being

inconsistent with the text of the TCPA, Liberty Power's proposed standing requirement would

eliminate protections for persons with unlimited calling cell phone plans, an outcome that would

clearly be inconsistent with the objectives of the TCPA.  The Court therefore DENIES the

motion for summary judgment on Count I.

Liberty Power next argues that it is entitled to summary judgment on Counts II, III, and

IV as against Ms. Rhodes, because the claims are premised, in part, on calls to the phone number

registered to Mr. Rhodes.  [ECF No. 164 at 10–13].  Neither of the private causes of action

provided by 47 U.S.C. § 227 require that the plaintiff be the individual to whom the phone

number at issue is registered.  See 47 U.S.C. § 227(b)(3), (c)(5).  Additionally, "a mere technical

violation of the TCPA is, by itself, a concrete injury sufficient to confer standing."  Gibbs v.

SolarCity Corp., 239 F. Supp. 3d 391, 395 (D. Mass. 2017).  Liberty Power argues, however, that

---

[11] Several district courts have concluded that VoIP (voice over internet protocol) telephone services that allow calls to be made over a broadband internet connection are not cellular phones and therefore a plaintiff bringing a TCPA claim based on those services must establish that she was charged a per call charge.  See Jones v. Experian Info. Sols., No. 14-CV-10218, 2016 WL 8679218, at *2 (D. Mass. Sept. 30, 2016); Karle v. Sw. Credit Sys., No. 14-CV-30058, 2015 WL 5025449, at *6 (D. Mass. June 22, 2015).  Although modern cell phones may offer a combination of VoIP and cellular network capabilities, the First Circuit has concluded that service for such a hybrid device "constitutes 'cellular telephone service' within the meaning of the TCPA."  Breda v. Cellco P'ship, 934 F.3d 1, 10 (1st Cir. 2019).

only the "called party" has standing to bring a lawsuit for a violation of the TCPA and that only

that intended recipient of a call, here apparently Mr. Rhodes, is the called party.

There is significant disagreement in the case law over what requirements a plaintiff must

meet to bring a TCPA claim.  Leyse v. Bank of Am. Nat. Ass'n, 804 F.3d 316, 322 (3d Cir.

2015) ("District courts throughout the country have split over the question of who is entitled to

sue under the statute . . . .").  Liberty Power relies most heavily on Leyse v. Bank of America,

National Ass'n, No. 09-CV-7654, 2010 WL 2382400 (S.D.N.Y. June 14, 2010).  There, the court

held that the plaintiff lacked standing to seek statutory damages from the caller, Bank of

America, because the plaintiff's roommate was the intended recipient of the call.  Leyse, 2014

WL 2382400, at *6.  The plaintiff's roommate had filed his own lawsuit over the same call.  Id.

at *1.  That unusual circumstance presented the Southern District of New York with a difficult

question as to which roommate should be permitted to pursue the $500 in statutory damages

allowed by 47 U.S.C. § 227(b)(3).  Several district courts have declined to follow the Southern

District of New York's decision in Leyse, as does this Court.  See, e.g., Page v. Regions Bank,

917 F. Supp. 2d 1214, 1217 (N.D. Ala. 2012); Gutierrez v. Barclays Grp., No. 10-CV-1012,

2011 WL 579238, at *5 (S.D. Cal. Feb. 9, 2011).  The Southern District of New York's decision

in Leyse seems to presume that a plaintiff needs to be a "called party" to bring suit under the

TCPA because the TCPA prohibits only calls that lack the "prior express consent of the called

party," but Congress did not limit the private causes of action in that manner.  See 47 U.S.C.

§ 227; see also Page, Page v. Regions Bank, 917 F. Supp. 2d 1214, 1217 (N.D. Ala. 2012)

("[T]he Leyse court cites § 227(b)(3) for the proposition that '[a] called party who receives such

a call is permitted to bring suit to collect $500 in statutory damages.'  As explained above, the

term 'called party' does not even appear in § 227(b)(3)." (citation omitted, alteration in

original)).  Instead, Congress chose to allow private actions to remedy the impermissible use of

any ATDS or an artificial or prerecorded voice, 47 U.S.C. § 227(b)(3), and to allow Do Not Call

Registry claims by "[a] person who has received more than one telephone call within any 12-

month period by or on behalf of the same entity in violation of the regulations prescribed under

this subsection," id. § 227(c)(5).

A person may bring an ATDS or an artificial or prerecorded voice claim if they fall

within the TCPA's zone of interest, and a person may bring a Do Not Call Registry claim if, in

addition to falling within that zone, they receive multiple calls on a phone registered on the Do

Not Call Registry within twelve months from the same entity.  See Gibbs, 239 F. Supp. 3d at

395–96 ("[W]hen [Congress] enacted the TCPA, [it] recognized [that] receiving unsolicited

telemarketing calls is a legally cognizable harm and comprises a 'concrete' injury.").  As

discussed supra at Section III.B, the zone of interest is informed by the TCPA's legislative

history.  In passing the TCPA, "Congress was animated by outrage over the proliferation of

prerecorded telemarketing calls to private residences, which consumers regarded as an intrusive

invasion of privacy and a nuisance.  The congressional findings describe the persons aggrieved

by these calls using a variety of labels: consumers, residential telephone subscribers, and

receiving parties."  Leyse, 804 F.3d at 325–26 (quotation marks, modifying punctuation, and

citations omitted).  The TCPA's zone of interest therefore "encompasses more than just the

intended recipients of . . . telemarketing calls" and permits suit by "a regular user of the phone

line who occupies the residence being called" at least when she answers the calls that give rise to

her claim.  Id. at 326.  Considering that Ms. Rhodes resided at Mr. Rhode's residence, helped

register the phone number for the Do Not Call Registry, and regularly answered the phone line at

issue, including answering several of the relevant calls placed by Liberty Power's agents, the

Court concludes that she has standing to pursue Counts II, III, and IV and <u>DENIES</u> Liberty Power's motion for summary judgment on those claims.

## IV.      CONCLUSION

Accordingly, the motion to dismiss is <u>GRANTED</u> in part and <u>DENIED</u> in part and the motion for summary judgment is <u>DENIED</u>.

The Court holds that the debt-collection exception to the TCPA is unconstitutional, but it concludes that the exception is severable from the remainder of the TCPA.  The unconstitutionality of the debt-collection exception is therefore not dispositive of any claim. Counts V and VI, actual and constructive fraudulent transfers, are <u>DISMISSED</u> without prejudice.  The motion to dismiss and the motion for summary judgment are <u>DENIED</u> as to Counts I, II, III, and IV.

**SO ORDERED.**

September 24, 2019                                              <u>/s/ Allison D. Burroughs</u>
                                                                          ALLISON D. BURROUGHS
                                                                          U.S. DISTRICT JUDGE