UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SAMUEL KATZ, an individual, on his own behalf and on behalf of all others similarly situated, | ) | |
| Plaintiff | ) | No. 1:18-cv-10506-ADB |
| vs. | ) | |
| Liberty Power Corp., LLC, et al., | ) | |
| Defendants. | ) | |

BEFORE THE HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
MOTION HEARING

John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210

February 1, 2021
3:01 p.m.

Kristin M. Kelley, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

Ethan Mark Preston
Preston Law Offices
4054 McKinney Avenue
Suite 310
Dallas, TX 75204
(972) 564-8340
Ep@eplaw.us
for Plaintiffs.

Grace Parasmo
Parasmo Lieberman Law
7400 Hollywood Blvd. #505
Los Angeles, CA 90046
844-200-5623
Gparasmo@parasmoliebermanlaw.com
for Plaintiffs.

APPEARANCES:

Nicole Joyce Cocozza
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Flr.
Boston, MA 02110
617-342-6800
Ncocozza@eckertseamans.com
for Defendants.

Jeffrey P. Brundage
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 659-6676
Jbrundage@eckertseamans.com
for Defendants.

P R O C E E D I N G S

THE CLERK: This is the case of Katz versus Liberty Power Corp., et al. Civil Action No. 18-10506 will now be heard before this court.

Will counsel please identify themselves for the record.

MR. PRESTON: Good afternoon. My name is Ethan Preston. I represent the plaintiffs, Samuel Katz and Lynne Rhodes.

03:01 THE COURT: Good afternoon.

MS. PARASMO: Good afternoon. This is Grace Parasmo on behalf of plaintiffs.

THE COURT: Good afternoon to you.

I can tell you're speaking, ma'am, but no sound is coming through.

MS. COCOZZA: Can you hear me now?

THE COURT: Yes.

MS. COCOZZA: Good afternoon. Nicole Cocozza for the defendants. I'm here today with my colleague Jeff Brundage, 03:02 who is admitted pro hac vice.

THE COURT: Good afternoon to both of you.

I've read through everything and I understand there's history with respect to each one of these motions. I've read Judge Burroughs' prior order on discovery, which is implicated by these motions. It goes without saying that my goal would be

to resolve these motions consistent with the spirit and the wording of Judge Burroughs' orders. That being said, we have, at 242 on the docket, a Motion to Compel interrogatories, at 243 on the docket, a motion to enforce the Court's finance discovery order and, at 247 on the docket, a motion for privilege log.

Now, reading through the papers and the responses and replies, it was clear to me that there has been conversation all along regarding some of these and that there has likely 03:03 been conversations since the filing of the motions themselves such that the issues presented in the motions may be altered some, maybe narrower or somewhat different.

Let me take this sort of chronologically and start with the Motion to Compel interrogatories. Mr. Preston, or whoever is speaking on behalf of the plaintiff, from your vantage point have any of the issues that are raised in the motion been resolved or altered in any way by anything that's happened since the motion was filed?

MR. PRESTON: No, your Honor. The state of play is 03:04 essentially where it was left in plaintiffs' reply briefs. With respect to the interrogatories 2 and 3, we know that there's a questionnaire that was sent around identifying different dialers. We don't have that information. That implicates Interrogatory No. 2. Interrogatory No. 3 there's still, one of the answers is internal Liberty Power servers,

and we had hoped to get a bit more detail than simply a categorization of internal Liberty Power servers.

THE COURT: This is the way I typically do it when I get a discovery motion. I try as much as possible to use this as a constructive exercise to work through the issues and resolve it here in court if we can. If not, we take them under advisement what we must.

Let me turn to the defendants. With Mr. Preston's comments as sort of a prelude to this, he says on two and three

03:05 there are some discrete pieces unresolved. What do you guys say to that?

MR. BRUNDAGE: Your Honor, I would say to that they contest the veracity of testimony at depositions, which should be occurring shortly. Rule 26(G) requires a reasonable inquiry. I can represent to the Court, as an officer of the Court, that a reasonable inquiry was indeed done, and I would suggest to the Court that this issue be resolved via deposition testimony rather than amended answers.

THE COURT: I'm not sure I follow you. Are you saying

03:06 that you gave an answer that you say they don't find any answer to be satisfactory, but that answer reflects us having made a reasonable inquiry and they can explore this further at deposition or are you saying some different?

MR. BRUNDAGE: I'm saying that, your Honor.

THE COURT: Mr. Preston, to that, obviously counsel

have certain obligations. They are officers of the Court and what they say is entitled to some credence. If we've got a representation here that we understand the request the inquiry was put to the client, information was gathered that has been provided, you'll have an opportunity to explore that further in the context of a deposition, but your uncertainty as to whether that information is completely accurate is not enough to warrant a court ordering or compelling discovery, what do you say to that?

03:07 MR. PRESTON: I'd like to direct your Honor to one of our declarations. It's 257-1, paragraph 7. What we know is that the defendants sent out a questionnaire to their telesales channel asking the telesales channel to identify their dialers. At least some wrote back saying here's our dialer, a dialer called Dialer 360, and it gave a bunch of information about that particular dialer.

So there's a record that we think is incomplete. It's very definitely here are specific documents showing that it's incomplete. And we have obviously one document for Mezzi 03:08 Marketing. The nature of the questionnaire makes it clear there are other documents for other telesales telemarketers, in effect, defendant's telemarketers.

Then if you look at paragraph 2 of the same declaration, one of the answers they provided was internal Liberty Power servers. So the Interrogatory No. 2 relates to

the telemarketer dialers.

Interrogatory No. 3 relates to databases containing lead data, which was a defined term and all spelled out. One of the answers was internal Liberty Power servers, which we felt that could be improved a bit.

THE COURT: When you say can be improved, how would it be improved? I don't have all the papers in front of me. Quite frankly, it's hundreds of pages of paper. I cannot lay everything out in front of me. The interrogatory asked him to 03:10 identify something. They identified it. How is it that you believe it could be improved upon to make it sufficient?

MR. PRESTON: With respect to interrogatory 3, we would ask them to individually identify the internal Liberty Power servers.

THE COURT: What's not adequate enough to identify their internal servers as having this information as hearing here are the specific internal servers? What more do you get from that specificity?

MR. PRESTON: So when we do take someone's deposition 03:10 or we probe a little bit deeper into the meet and confer process, we're able to identify specific servers, potentially identify their capability and what data they have, and that would help us build a class list and help facilitate the eventual documentation for a motion for class certification.

MS. PARASMO: May I, your Honor?

THE COURT: Go ahead.

MS. PARASMO: To clarify, this is a TCP case. One of the allegations and classes they're seeking to certify is showing that the calls were made with an autodialer and then where the calls are, where the call records are, who were called. These would be lead data. They could be the same database, two databases, so forth. So we have two questions on that.

One of the basic things of discovery in a TCP case is identify the dialers. With respect to the reasonable inquiry, what happens here is plaintiffs and defendants have a dispute on what it means as a reasonable inquiry as that relates to third parties. Defendants' position is we don't know what dialer our third party telemarketers used. We're saying we know you know it. You put it in documents. You put it in stipulations with the Court. It's an uncontested fact that this particular telemarketer used Dialer 360. We're saying, if you're holding that back and you're not putting that, then what else? We have all these other telemarketers and what else in these interrogatories are we not getting because this is a basic fundamental thing that we need. We can't go into depositions without this. We can't go into class cert without this basic information. We're just trying to make sure that we have full answers so that we can prepare a class certification motion.

THE COURT: I'm hearing a couple of different things there. On the one hand, I'm not sure I got an answer to this particular inquiry. Then there seems to be a correlating concern, which is, and I think if I can show you're not being particularly fulsome on this, it's calling into question everything else.

So right now I want to focus on the interrogatory at issue and try to find out what it is you say about what you've gotten that's inadequate. And it seems to me that if that's reasonable, your position, I can compel the defendant to 03:13 produce it. Then we can talk about this concern that we're getting particularly truthful answers with respect to everything else.

So on interrogatory 2 and 3, let me focus on interrogatory 3 for a minute. Mr. Brundage, I don't understand what the problem is if you've already identified internal servers as being a place where this data is likely to be found or is found. What's the problem with going further and identifying the quantity or the specific internal servers?

03:14 MR. BRUNDAGE: Your Honor, I have never heard this line of argument from plaintiffs. It's tellingly not in their reply brief, so this is the first time this issue has ever come up with the phrase "internal servers". I think it would be reasonable to identify specific servers and H drive or Z drive, et cetera. I don't think defendants should be compelled to do

that given the facts.

THE COURT: If you say, okay, I responded to this by saying this data is on one or more of our servers, if you're willing to say that, what's the problem with providing this next layer of specificity to that, maybe telling where and how many servers?

MR. BRUNDAGE: Your Honor, I don't believe there is a problem providing that information. My problem rests with I've never heard this before.

03:15 THE COURT: Be that as it may, and sometimes parties swear they are hearing things for the first time in the context of a hearing, to the plaintiffs, if I'm hearing the defendant say they have no problem in providing you with greater clarity or a little bit more information on the internal servers, that is they'll tell you which servers. And I understood Mr. Preston to be saying, if you got that information, you would be satisfied with that. Is that correct?

MR. PRESTON: That's correct. I do want to point the Court to page 2 of the reply. We do raise this. It's very 03:16 brief. This is not the real crux of the reply. It's really about interrogatory 2, but we do refer to internal Liberty power servers without any further detail. That's page 2, ECF 261.

THE COURT: But we can deal with Interrogatory No. 3 by the way we just talked. Defendant will provide additional

information in terms of the specific internal servers, Liberty's servers, where this data may be found.

Now, let's go back to number two. I want to make sure I understand in light of everything and everything that's going on what the issue is. I guess Mr. -- I'll hear from either one of you. I'm hearing this joint concern. We know what we haven't gotten everything by virtue of this one particular request. That now has us worried about other stuff. Let's focus on number two. What's missing? What do you think you'd 03:17 need? Then I'll hear from the defendant as to whether they think they ought to be providing it.

MR. PRESTON: Sure. So if we go back to the declaration for the reply, which is ECF No. 257-1, and then there's a paragraph 7, I am mindful that there is a lot of documentation in this case. I have done my level best to minimize the burden on opposing counsel and the Court. This is a complicated case. It's complex litigation. Paragraph 7 talks about these two documents that we received in the defendants' productions, which are e-mail chains showing the 03:18 transmission of these questionnaires to the defendants' telemarketers.

We have another document in which that questionnaire comes back from Mezzi Marketing. The questionnaire, in effect, asks what is your dialer, identify your dialer to us and ask for some other additional information. We only have found the

one questionnaire coming back. It is evident that the questionnaire has gone out to many telemarketers. We have the one coming back. If we had all those other documents, I don't know that we would need to press further. I'm not interested in forcing defendants through this kind of empty process of amending their interrogatory response for information we already have. At least in this case it doesn't seem to be -- that search would not be worth the candle on this particular item, but we don't have those documents. We don't have that
03:19 information. So it's not a matter of getting a signed verification that shows these are the dialers that are out there. It's simply a matter of getting that information which we do not have.

THE COURT: So you want the same sort of information that Mezzi provided in response to the questionnaire? You want it from other telemarketers that were sent the questionnaire, is that right?

MR. PRESTON: Yes, sir.

THE COURT: How many other telemarketers are involved
03:20 in this?

MR. PRESTON: My understanding from the defendants' initial disclosures is that it's upwards of 40. Now, we could narrow that. We could have a meaningful conversation about -- narrowing it to just those telemarketers that were calling during the class period. For sure that would be an easy gift.

I do want to point out that, just to clarify, the questionnaire that came back from Mezzi Marketing identifies a specific dialer called Dialer 360. That dialer does not show up in the answer to interrogatory 2.

THE COURT: Okay. There could be any number of reasons for that and it could be just an oversight from whomever was answering the interrogatory.

MR. PRESTON: Any number of reasons, as your Honor says. Your Honor has read our concerns. We raised them in a number of the papers.

03:21

THE COURT: Mr. Brundage, we've got sort of these dual issues here. One, we don't know how grave it is. One, we've got you providing information in response or based on this questionnaire but not others. Plaintiff is saying, look, we don't necessarily need it for all of the telemarketers that were sent questionnaires. We would be willing to narrow it to those who were making calls during the class period. So one question is, does that strike you as a reasonable way to resolve this. At the same time, we've got sort of a quality control check. They know from the one that they got that for some reason the information didn't make it into the interrogatory answer itself. Again, that could be a product of whomever was typing this out not having everything in front of them. It could be something more.

03:22

Let's deal first with the issue of providing

information with respect to the information from questionnaires to other telemarketers. Are you amenable to producing that information with respect to those telemarketers who are making calls during the class period?

MR. BRUNDAGE: Your Honor, I think the proportionality standard of Rule 26(b)(1) applies here. The class period is over 2,500 days, goes back to March 16, 2014. It's my understanding from my clients that the number of telemarketers is 99. So we would have to get 99 separate surveys, to the
03:23 extent they exist, and I can't make a representation about whether they exist or not.

THE COURT: Hang on. One, we'll have to figure out this difference between 99 and 40. You're saying it's 99 even if it's narrowed to the telemarketers that were involved in the calling period.

MR. BRUNDAGE: That's correct, your Honor.

THE COURT: Then you went on to say to the extent surveys were sent to them -- now, if no surveys were sent, it seems to me there's nothing to fight about, right? This is an
03:24 interrogatory that turns, in part, on information may have been obtained as a result of these surveys or questionnaires. Surely it can't be that onerous to determine whether, maybe you can, whether questionnaires or surveys were sent to them during that period or with respect to that period. Are you saying that's not the case, just even trying to figure out who may

have sent these would be a difficult task?

MR. BRUNDAGE: I wouldn't label it as difficult, your Honor.

THE COURT: If the task is not difficult and the surveys were sent and information was obtained, is it reasonable to assume that information would generally be collected?

MR. BRUNDAGE: No. I think the e-mail would information would be in e-mails so we'd have to run keywords on custodians.

03:25

THE COURT: What about a search with some key terms to find out who may have gotten a survey and what information you've gotten, right?

MR. BRUNDAGE: I think so, yes.

THE COURT: So right now I'm working under the assumption that this is probably not an unreasonable ask and not an unreasonable way to resolve this interrogatory, but you said you wanted to point out something.

MR. BRUNDAGE: Yes, your Honor. There's one known

03:26

actual in this case, Mezzi Marketing. Plaintiffs allege that that entity called their clients. What is the relevance of other entities' dialing platforms, specifically 99 other entities or 98, as it were? I don't see the relevance there. We all know there's one bad actor. They allege it. We're not disputing it. I don't see the relevance of us taking time to

get 98 other dialers' information going back to 2014.

THE COURT: Was this part of Judge Burroughs' order or did she not address the relevance aspect of these other telemarketers with respect to this interrogatory?

MR. BRUNDAGE: There's been no court order on these interrogatories. We've voluntary agreed to.

THE COURT: So we've got this relevance issue, Mr. Preston. Mezzi is different because we know Mezzi was a bad actor. We don't necessarily know it about others. We shouldn't be obligated to be your fishing queen.

03:27

MR. PRESTON: Thank you, your Honor. So we have done what I think is a fairly thorough investigation of the defendants' telemarketers. What I can tell you is -- I think I can provide you with a specific example that might be pretty helpful. I think we can look at ECF 109-1. So there was a FOIA request to Federal Trade Commission regarding telemarketing complaints against the defendants. There's a list of telemarketing complaints which was attached to one of our complaints which lists the outgoing telephone number. Some of those outgoing telephone numbers correspond to numbers that we know were used by Mezzi Marketing. A lot of others, however, correspond to other outgoing telephone numbers which we have to presume relate to other telemarketers or to defendants themselves.

03:28

So there is this expectation that we would find other

bad actors if we were permitted to take discovery. There's been two other class actions, both in the Northern District of Illinois, which alleged PCPA violations. I think one is George Moore versus Liberty Power and the other one is Scott Dolembo versus Liberty Power. Those are different time periods. They presumably relate to different telemarketers. Even within our own time period when we filed in 2008 there were a number of other class actions that may very well have related to other telemarketers. So it's hard for us to know exactly which bad 03:30 actors are out there if we can't get basic discovery.

THE COURT: What if we were to say that at least with respect to those numbers that you got through your FOIA request, you give those numbers to the defendant and I compel them to provide whatever the corresponding information is for any telemarketer that they had dealings with who might use that number? That way we are not necessarily green lighting an exploration of every telemarketer with whom they've done some business but rather limiting it in the first instance to those where there's a basis to believe there may be something there 03:30 similar to Mezzi.

MR. PRESTON: Okay. If we're going to open that up, I think what would be helpful is also to include -- there's a state court action in Illinois by the Illinois Attorney General. If we could include those calls as well, I think that would be helpful.

THE COURT: Let's focus on this first. I want to make sure we would be talking about calls during the calling period and as it relates to the state case. Those numbers belong to entities that were bad actors so to speak or is it they just have some numbers? I want to make sure if we include those in I would want to make sure it's something beyond we know we've got some numbers in this Illinois action. I want to know there's been something connected to those numbers.

MR. PRESTON: My understanding of the Illinois action 03:32 is the only numbers that kind of appear in that case are numbers where the person has been signed up for Liberty Power, so you know that there's sort of an end responsibility for Liberty Power for that call, at least on the level of ultimately that caller brought them to Liberty Power. I want to be careful because I don't want to over promise. My understanding is the Illinois AG, I believe it was filed in the same kind of time period, 2018. I hope Ms. Parasmo will correct me if I'm wrong. It also includes door to door sales. So it's not every marketing practice in that case relates to 03:33 actual telemarketing. Some of them are just door to door sales, which obviously doesn't implicate our claims.

THE COURT: Yeah. So there's enough caveats there I want to make sure I have a comfort level lumping it in. I feel different about information you're getting in response to a FOIA request provided by a governmental agency, a federal

governmental agency. In that regard, roughly how many numbers are we talking about?

MR. PRESTON: The exhibit goes on for -- so I have 612 complaints in the first part and 63. So roughly six, 700 complaints, and of course there's any number of duplicates. And some of them don't go anywhere. Some are bogus numbers and could be eliminated. We do have a document where, I can't put my hand to it right now, but one of the documents we used in the Rule 30(b)(6) deposition was a spreadsheet showing the
03:35 outgoing telephone numbers used by different telemarketers. It's only a snapshot and you don't know how often it was updated and what other numbers they have available to us. I do remember that document having something like 40 numbers. I don't want to over promise but that's a back of the envelope recollection of a document I can't put my hand on right now.

THE COURT: I guess I'm not quite sure what you're saying. Are you saying that even though the information from the FOIA request may implicate 700 numbers or complaints or so, we may in reality only be talking about a total number of 40 or
03:35 so that were used by telemarketers?

MR. PRESTON: To get to that point, your Honor has to make some inferential leaps. You see a number of duplicates in the FCC FOIA request, so you know that some numbers are used again and again. We also know that there are at least one document, one Excel spreadsheet out there, that ties specific

telephone numbers to specific telemarketers and that the overall number of telephone numbers on that document is not a really high number. It's not 700. It's much more like 40 or 50.

THE COURT: So as we sit here, even if you have to paraphrase, can you tell me what the FOIA request asked for.

MR. PRESTON: I asked for complaints involving one or more Liberty companies. My recollection is it's limited to telemarketing complaints against Liberty Power.

03:37 THE COURT: That's what I wanted to make sure. That's during a specific time period?

MR. PRESTON: Yes.

THE COURT: Is that time period congruent with the time period at issue here?

MR. PRESTON: Yes, your Honor.

THE COURT: Mr. Brundage, it strikes me as reasonable that rather than having you go back and look through and make inquiries of every telemarketer with whom Liberty had dealings if we say that instead you'll get this information from the 03:37 plaintiffs and we know this will be information that relates to numbers that were provided by the government in response to a FOIA request specifically seeking information with respect to outgoing numbers used by telemarketers that were working with Liberty.

So that seems not unreasonable. Then if they give you

those numbers, then you can make that inquiry. If there's anything responsive, provide it. Does that strike you as reasonable?

MR. BRUNDAGE: Your Honor, my concern is that we're dealing in the abstract. He said there's 70 complaints and there's some duplicates. We don't know if that's 300 or 400 phone numbers.

THE COURT: He just said the likelihood is we're talking more about 40 or 50. I'm not there. I can't see what 03:38 form this is all in. I like to think that if you guys are done with me and at some point you get a list that has 800 numbers on it, that's going to be a surprise to you and that would be a surprise to me and you can come back and say this is not what we contemplated, but if you get something that is closer to the 40 or 50, then you can work with that. It may be a little abstract only because we don't know what we're going to ultimately end up with.

This is a bit of a compromise. I'm agreeing with you there's no basis to green light a full fledged expedition into 03:39 the relationships that Liberty might have with other telemarketers, but it does seem to me reasonable to allow this inquiry where we have numbers where ostensibly there's a basis to believe these numbers may actually yield responsive information.

MR. BRUNDAGE: Your Honor, I think we're conflating

two different documents. Mr. Preston referenced a deposition exhibit which had numbers on it. He said that document had about 40 or 50 telephone numbers. Then he's talking about his FOIA response. So we're talking about two different things.

THE COURT: Well, that's true, and Mr. Preston will clarify, but I thought what he was sort of suggesting was some of the numbers are bogus, some are duplicates, and we think when we crunch everything and when they do their own internal analysis, the list will actually be smaller not withstanding 03:40 the size of the list they got from the government in response to the FOIA request. The list they would send to you of numbers would be much smaller. Why don't we have Mr. Preston clarify just in case I did get it wrong.

MR. PRESTON: No, your Honor. The document we're looking at is designated LP 002515. It's an e-mail with a spreadsheet, and just kind of eyeballing it, I think it's closer to 30 or 40 numbers rather than 50. Your Honor has articulated my response, which is we have a list from the FOIA document of 70 calls, some of which have good numbers, some of 03:41 which do not. You would expect to crunch those numbers down, comparing them against other telephone numbers that show up in this 2515 document. I expect you would get a pretty small number of additional responses to the interrogatories because a lot of these telemarketers use multiple numbers. So you'd expect to see them using just one dialer, so things would get

condensed. Thank you, your Honor.

THE COURT: Thank you. All right. So I will order the defendant to supplement interrogatory No. 2 along the lines that we have been discussing. This means in the first instance that the plaintiff is going to have to provide the list of numbers to the defendant. If that number is, roughly speaking, within the range of 40 to 50, give or take factors of tens, you know, 30 or 60, 20 or 70, that's okay. If it's substantially beyond that and, in fact, that number turns out to be 03:43 substantially higher, I will leave open the notion that proportionality concerns might apply and that the defendant might have a basis to seek to have that narrowed further.

Here's what I would urge. If it turns out that the number that the plaintiff provides is substantially larger, I just encourage the parties to talk realistically, objectively, analytically, as creatures of commonsense. Figure out, okay, what really would be germane to this suit and then go from there. Reach out to us and try and tell us where the parties are at and we'll weigh in. That's how I'm going to deal with 03:44 interrogatory No. 2.

MS. PARASMO: Your Honor, may I be heard?

THE COURT: Yes.

MS. PARASMO: On number two, plaintiffs are also seeking a supplement to add Dialer 360 and any other dialers that Mezzi, the bad actor, used that defendants know about in

their documents. We've discovered this one questionnaire. We don't know if there's any others. We just want Dialer 360 to be added and any other defendants know about. If we could add that.

03:45 THE COURT: Well, the interrogatory asks -- I see. What is it about 360? You didn't get anything?

MS. PARASMO: Dialer 360 is the autodialer, sorry, the telephone dialing system used by Mezzi. Mezzi is the bad actor. No one disputes that's relevant.

03:45 THE COURT: Sorry. This is the one the information wasn't provided in response.

MS. PARASMO: Correct.

THE COURT: To be clear, yes. That, of course, should be supplemented to include what everybody seems to recognize should have been part of the response initially. I make no findings with respect to why that was not there. It should be there in any supplemental response.

MR. BRUNDAGE: Your Honor, I have a question.

THE COURT: Yes.

03:45 MR. BRUNDAGE: If I'm understanding the Court, plaintiffs would provide this list of 40 or 50 numbers and defendants are to search these numbers and produce what exactly?

THE COURT: What is it that you were going to be producing with respect to anything else that may have been

responsive? Some of this is I'm gleaning what I can from the papers. I suppose if it's a fair question you're asking, it's a question that should be fairly answered by the plaintiff. You give these numbers. You give them to the defendant. What are they supposed to do with these and what are you going to be getting in response?

MR. PRESTON: So, in an ideal world, what would happen is we would get an amended response that ties particular dialers to particular telemarketers. There is a simpler way to handle this. I actually think that it might be a better way to handle this, to simply have the defendants produce all these questionnaires that they received back. There's a subject line in all these e-mails that were sent out "Channel Partner Questionnaire-LTearcloud.XLSX". That's what came back. You could just search for the e-mails from the different telemarketers with that subject line and you might be able to -- it might be over inclusive and we wouldn't have this process where you'd submit the telephone number and they go through and figure out if they know which telephone number relates to which telemarketer. Without having any kind of comments on whether or not they should have produced all these returned questionnaires is less burdensome for them just to search e-mails with that subject line and come back with returned questionnaires.

THE COURT: So we've got two methodologies, one which

has potential to be slightly over inclusive and one which tends to be slightly under inclusive. Mr. Preston is saying this is probably the cheapest way to do it. If you sent out surveys, you just disclose the surveys. They may get some stuff that is not relevant, but you haven't had to go through -- they haven't had to go through the crunching part internally. You haven't had to necessarily go through and do all these searches to try to find surveys that are specifically responsive.

I suppose I can give you an option here. I think 03:48 Mr. Preston has a point, to a degree, which is collectively cheaper and faster, which in litigation is sometimes preferable to slower and more deliberative even if you may get a little bit more accuracy with the latter.

The reason we didn't pursue this more is you began by saying it would be burdensome for you to just produce the surveys or the questionnaires for this time period. Is that still your position or maybe you were saying something else?

MR. BRUNDAGE: Your Honor, I think it is an appropriate resolution of this for the Court to order a search 03:49 of the subject line of the e-mail. We can use that information to supplement the interrogatory, specifically interrogatory No. 2. To the extent we have more of these and we get more surveys than dialer ABC Company is using XYZ Dialer, that's the type of information we would supplement the interrogatory with. I think that's a reasonable, practical approach. Searching

telephone numbers is actually quite difficult because you have to search them in several different formats, no spacing, periods separating the spacing, hyphens with the area code.

THE COURT: The devil can be in the details. If I order you to search the subject line in the e-mails, the question is what are you searching it for. I want to make sure this is not an exercise that's not really going to yield the heartland of what is being sought through the interrogatory. If I order you to do a search of the subject line of the e-mail, what is it you're going to be searching for?

03:51

MR. BRUNDAGE: The response that comes back from telemarketers, to the extent that this survey went out to multiple telemarketers.

THE COURT: So you're saying you can fashion a search that will discover or will produce any telemarketer that responded to a survey or questionnaire that was sent to that telemarketer. Is that what you're saying?

MR. BRUNDAGE: I cannot represent that because I don't know if people change the subject lines when they send the surveys back in.

03:51

THE COURT: Then what is it you're saying you can represent? If I ordered you to do a search of the subject line of the e-mail, what is it that you're saying that would likely give us?

MR. BRUNDAGE: It would likely, I believe, provide the

responses from the telemarketers wherein they identify their dialers, which is the heart of interrogatory No. 2.

THE COURT: I thought that's what I was asking. I guess what you were saying is you can't be absolutely certain that you'll get 100 percent of it, but you're saying you think it would give us most of that.

MR. BRUNDAGE: Yes. I believe so.

THE COURT: And you believe you can fashion a search that would do the same thing, is that right?

03:52 MR. BRUNDAGE: I think that subject line would go toward that end, yes.

THE COURT: In this case with Mezzi, we know that. There's a survey. Plaintiffs have it. Is there something that's generic about the e-mail that accompanied that was sent to Mezzi that we can use as a basis and a template for searching others or is it unique? I guess I'm just saying -- I'm saying I think this would likely give us what we're looking for but you're stopping short of saying I'm sure it would give us what we're looking for.

03:53 MR. BRUNDAGE: I can't represent we're sure because I haven't actually had the search conducted. I think the best approach is the subject line, like Mr. Preston suggested.

THE COURT: Mr. Preston, if I, for now, order the defendant to do a search of the subject line of their e-mails to identify surveys or questionnaires that were sent to or

received by telemarketers or whether we're talking about both, you're okay with that?

MR. PRESTON: I think that gets us probably 95 percent of where we want to go. If your Honor will give me 2 minutes, the surveys that were sent out, there's a specific file name. Maybe we can find and search for the file name just as a backup so we're not -- if something with the subject line changes, if your Honor would give me just one second to make sure that I get the subject line with the attachment. Yeah. It's Channel 03:54 Partner Questionnaire. If they search that as the subject line and as the name -- the file name of the attachment, I think that gets us 99 percent of the where we need to go.

THE COURT: And we know that if you had a vaccine that's 99 percent effective, you can't do better than that. So I'm going to then adopt the parties' joint sense that that's the best way to proceed and that's how Interrogatory No. 2 will be supplemented. The defendant will do a search of the subject line of the e-mail, in particular, Channel Partner Questionnaire would be a term that would be included, among 03:55 others, that the parties might decide should also reasonably be included. That will be the way we will deal with supplementing Interrogatory No. 2 and, of course, the information with respect to Dialer 360 is also part of that.

It would seem to me, unless anybody says differently, and I'm not inviting them to, that that would deal with the

issues raised by the Motion to Compel interrogatories and we can then move on to the next motion, which is at 243, which is the motion to enforce the Court's financial discovery order.

I'll just say this at the outset. I actually read Judge Burroughs' opinion before I read any of the parties' papers in this case. So I had seen how Judge Burroughs had dealt with that issue there, which is essentially to say, I think the plaintiffs are entitled to information that gives them a sense of the company at large and salient aspects of the company's performance and viability and the like, but I'm going to leave it to the parties to work out the details so that truly sensitive information or information that doesn't need to be disclosed is not disclosed.

Then, it seems, from there she went on to deny or decide that other requests didn't need to be compelled based on her deciding to deal with the overarching request that way. When I look at this, it seems the parties just can't seem to agree on what information should fairly be provided versus what information doesn't need to be provided. Honestly, because I'm not in this industry, I don't know whether the critical information can be reduced to a three page spreadsheet or whether commonsense tells us it's something that's going to be far more voluminous.

So I'm hoping with you guys here we can figure something out, otherwise I don't want to have protracted

argument of this. Obviously I'll hear from the parties to give us a better sense and we'll go back and figure something out on our own. I'm hoping we can work through this.

Let me start with you, Mr. Preston. What is inadequate about the summary, the executive summary, so to speak, that you got that provided some benchmark or some metric?

MR. PRESTON: I hate to have to do this but I sort of need to deflect. I don't know. I can't assess the three page 03:58 summary. To be clear, we did not move to compel on the three page summary. It is in the background. It is cited as one of the reasons why the responses we got on the RPDs, which were kind of compelled unconditionally, are not adequate because it's like a piece of wallpaper that has a bubble in it. We got this three page summary that we struggle with. Maybe it's entirely sufficient, but I'm not in a position to really even litigate it. What we did instead was focus on the RPDs which were compelled kind of without condition and, in particular, 70, 71, 76 and 77, which are, in effect, payments from corp and 03:59 holdings or debts in corporate holdings. We knew we had those documents that should be produced and if we stayed on the trail, we would likely be in a better situation to either evaluate the three page summary or say no, this is not adequate and incomplete and here's why. So we focused on the documents we found during the meet and confer process that raised

questions.

To be clear, in one of the questions we had was do the defendants ever pay their owners. The answer that we got back in July 2020 was, in effect, we don't have documents showing that or we're not aware of documents showing that the owners get paid by the defendants. After we filed our motion, we served a subpoena on BTM, and BTM produced a ledger of payments from corp to David Hernandez, which would be inclusive. We want these financial documents for a number of reasons, but one of the reasons we want them is to amend the complaint, and these are square over the target in terms of amending the complaint.

THE COURT: So let me just ask you this as a way of sort of getting to it. It's really for my edification. As we sit here right now, what is it that you say you don't have that you are entitled to have and that you need to have? Let's focus the discussion on that.

MR. PRESTON: Okay. So we need to have an unredacted version of the Mezzi Loan Agreement. There's been redactions made to that document. It's responsive to 76. It shows a debt that Liberty Power Holdings incurred to David Hernandez. So it should be produced. I think that's fairly straightforward.

THE COURT: As part of that, what's redacted that makes what you've got inadequate?

MR. PRESTON: One of the other -- the identity of one

of the other -- so there's this intracreditor agreement that we also think should be produced and there's a first lien, second lien and third lien. The other individual who owns that second lien is redacted.

THE COURT: So you say that you need an unredacted copy of the loan agreement and including -- that will identify this person who owns the second lien. What else, if anything?

MR. PRESTON: Sure. This will go on for a little bit.

THE COURT: I don't want a big laundry list. Is there 04:03 a way to categorically tell us what you're missing and have a discussion about maybe some categories? If not, if the only way we can do it is document by document, let's take them one at a time.

MR. PRESTON: They're all related. This isn't going to take a super amount, a long time. So we have what are called the second lien documents, some of which are redacted. We think we should get unredacted parts. There are first lien documents and third lien documents. Then there is an intracreditor agreement, which ties the whole thing together. 04:04 If you look at the second lien documents, which we do have, a number of their terms, in effect, refer to terms in these other documents. So there's intracreditor agreement, first lien and third lien documents.

In addition, there's two other categories of documents that we know exist and, in our view, should have been produced.

So we got the documents from BTM which show funding requests which essentially said to BTM and we expect the other credit ors, saying please let Liberty Power Corp. pay David Hernandez. So those payments and the documents showing those funding requests should absolutely be produced. We think that David Hernandez is the owner. That's a responsive document. It's responsive to RPD 70 and it should be produced.

There is a management service agreement under which holding dollars pays corporate for certain expenses. That is 04:06 something that should be produced. I want to make sure I get that right. That's under 76. Holdings is paying Corp. Corp. is an affiliate of Holdings and those payments are, in effect, responsive to RPD 76.

Then we know there's -- Liberty Powers Financing changed in July 2020. Before that point Shell Natural Energy was the prime financier. It's now the third lien lender. Both corporate holdings are defendants, and the financing is evidently complicated. This is not a simple, straightforward sole proprietorship where all the profits flow to the owners. 04:07 Something else more complicated happens.

The three page summary that we have, especially with all the caveats that it's been presented to us, doesn't help us really get that 10,000 foot view of the defendant's finances. It may be there's no single document that provides us with that 10,000 foot view. We're willing to move on from that, but if

we're steered toward the three page summary every time we try to engage in a conversation about that, we run into limitations.

To be clear, your Honor, we were ordered to meet and confer on RPD 76, and I think 72, and we have met and conferred and there's a dispute, but the present motion in front of your Honor does not move to enforce the Court's order with respect to 67 and 72. We're here on the other RPDs where there was a kind of unilateral order to produce, and we've identified the 04:08 list of documents that I just went through. I can sit down with your Honor and we can go through the language of the RPDs themselves, but I don't think it's controversial that those documents cover -- that those RPDs cover the documents that are in question.

Thank you, your Honor.

THE COURT: Okay. Mr. Brundage, there was quite a bit offered. This may be one where I have to listen to the parties and go back and have the order in front of me and work through things that way. What do you have to say to Mr. Preston's 04:09 comments?

MR. BRUNDAGE: On the unredacted version of the Mezzi finance agreement, plaintiffs already know the redacted name. I don't understand them coming to the Court for relief on something they already know. I took a look at the case law. There's case law both ways on redactions. I couldn't find

anything in the First Circuit. My general sense of the case law is, specifically, spot redactions are generally acceptable, whereas if you have a ten page document and you redact 12 paragraphs in that ten page document with no explanation, that is not acceptable. So I think the redaction is appropriate. I think it's acceptable. More to the point, they already know the name underneath the redaction.

THE COURT: That's two conflicting things here. I agree with you that there's nothing per se improper about a redaction unless the purpose of the redaction was to conceal something that ought not be concealed. You seem to be suggesting that's not an issue here because they know who it is. If they know who it is, why can't you either produce an unredacted version or at least, at a minimum, affirmatively declare for them in a statement as a supplement to an interrogatory that the identity of the individual in the second lien is X so it's a true nonissue?

MR. BRUNDAGE: I think it already is a nonissue.

THE COURT: You say it is but I don't know how it is they know this. Maybe you're saying they're smart enough to put two and two together if they've read a number of documents it's clear who it is, but that's not the same as acknowledging. All that really does is kind of make -- it kicks the issue down the road. We don't have to decide whether the redaction is proper or not. Do you have a principal issue with them

understanding who that individual is?

MR. BRUNDAGE: Our client does, yes.

THE COURT: So then your response should not be they know who it is. Your response should be we shouldn't have to give it and here's why. So why should you not have to give it?

MR. BRUNDAGE: It's not responsive to any of the requests for production.

THE COURT: That's really what we ought to be focusing on. That's where I'm saying I may need to go back and look at
04:12 Judge Burroughs' order with a fine tooth comb. When I read it, there was so much paper. I really wanted to read everything and guide it as much as I could. I saw her as kind of saying the plaintiffs are entitled to have a sense of how things are going with the defendant. I'm going to leave it to the parties to figure out that fine line between giving them that information and withholding some details that they might have an interest in knowing but aren't necessarily entitled to. I don't know where that would fall on that. I'll have to look at her order and see if in some instances she was more generous in
04:13 terms of what she was compelling. I just don't know as I sit here. What I don't want to do is kind of go through every conceivable type of document.

More generally with respect to Mr. Preston's comments in talking about the second lien, third lien and areas where they thought we should be getting this, and this is kind of key

to some critical aspects of the defendant's structure and financing scheme, are you -- did you find that to be reasonable or disagree with that?

MR. BRUNDAGE: Your Honor, I find that to be reasonable. That's why I wrote in the opposition we should get some keywords and get moving on this.

THE COURT: Before you get to that part, let's focus on the part where you said it sounded reasonable. What that he was offering there or articulating did you say that's

04:14 reasonable to me, because we can always work out the mechanics of how we collect that information? They may say we don't need to do any searches, just give us this document and this document. What are you agreeing is reasonable in terms of what he was talking about them getting?

MR. BRUNDAGE: I want to draw a distinction. Is the Court asking about the specific documents you reference?

THE COURT: Yes. I thought I heard you to be saying some of what he's looking for you thought was reasonable and you wouldn't have a problem with providing it. If you're

04:15 saying, yes, that's correct, I'm curious to know it so we can take those out and not make an issue of them and get everybody to agree that, after this is over, the defendant is going to provide that information.

MR. BRUNDAGE: I was speaking more broadly in terms of financial discovery. I read the June 2020 order and they are

entitled to financial discovery. On that basis, I would suggest, like a written opposition, we get some custodians and keywords and take it from there. As to specific documents, I can address that if the Court wants.

THE COURT: I don't know that I want to go through all of the key documents. Let's go with the last one as an example. Mr. Preston was talking about management service agreements and he was talking about these being directly responsive under 76 which was compelled unconditionally by

04:16 Judge Burroughs. So there shouldn't be much debate to producing them. What do you say to that? You said you read her June order. Are you disagreeing with him that that's the type of document, a document or type of document that she compelled the disclosure of?

MR. BRUNDAGE: As to that specific document or sets of documents, I would agree those were compelled to be disclosed and should be disclosed.

THE COURT: So we can get agreement on those. So the management service agreements. We can have agreement on that.

04:16 What were you going to say, Mr. Preston?

MR. PRESTON: I want to clarify. We have a management service agreement. They referenced expense reports. That's our beef, with the expense reports that are cited and evidenced in the management agreement. I think we have the management agreement themselves.

THE COURT: You say you need the expense reports that are referenced in them. Are you taking the position that any document that's referenced in something that you got or are you saying this specific expense report?

MR. PRESTON: No, your Honor. We have looked very, very carefully at documents that we have. We have identified potential documents that we think are relevant in each case. We have taken those documents and compared them against the Court's order and with the full text of our RPDs and said does this document need RPD 70, 71, 76 or 77. All of these documents, I'm prepared today to go through and show you this is how this document fits into this particular RPD.

THE COURT: We're just not going to have the time to do that today. I'm hoping in the first instance that we find those areas where there's consensus so we can at least get everybody to agree. Mr. Brundage, Mr. Preston says if you hold those up to the order, they come within the ambit of it. Do you agree with that?

MR. BRUNDAGE: I do agree with that.

THE COURT: So on that, no issue. Those will be produced. Those other things Mr. Preston was talking about, I know you say maybe we should be talking about search terms, but he's identified. He's saying here are some specific categories and some documents within those. We say if you look at Judge Burroughs' order, they fall within the scope of that order. At

least with respect to those RPDs, her order was unconditional. So it's really -- it's simple. They fall within the scope of needing to be produced.

So you heard him go through that list. Can you tell me, if you can recall it, those that agree should be produced and those that you have an issue with? I'm not saying those have been exhausted. But what he mentioned, can you comment on those?

MR. BRUNDAGE: Yes. The intracreditor agreement, the first lien document involving Boston Energy and Trading and the third lien documents are not responsive under the request for production.

THE COURT: Tell me in a general term why you believe they are not responsive. Then I think it's just going to fall to us after this hearing to go back and look.

MR. BRUNDAGE: The request for production involved documents, financial documents, relating to Liberty Power entities, subsidiaries, affiliates and managers, and members and owners. That's the general general sense of the document. These documents involve third parties. They are not responsive. I have laid eyes on all three documents. That's my take after reading the request and reviewing the documents.

THE COURT: Mr. Preston, in general terms, if it's possible, why do you believe these are responsive or at least compelled to be produced pursuant to Judge Burroughs' order?

MR. PRESTON: Because in each case the RPDs, the wording says all documents concerning any debt, for instance, that Holdings incurred to an affiliate or owner. And here the second lien is Mr. Hernandez. The Holdings incurred a debt to Mr. Hernandez. So that's obviously responsive.

Then the question is all documents concerning such lien. These documents are all interrelated. If you'll look at paragraph 20 of the opening declaration, that's ECF243-1, there's an advertisement. I've looked at some of these

04:22 documents too. You can't understand the second lien documents and what they actually say because they refer out different terms to the second lien or the first lien documents, the third lien documents and the intracreditor agreement. The terms are, in effect, kind of scattered throughout these other documents. So it's not fair or possible to entirely understand the meaning of the Mezzi Loan Agreement, which we do have, without seeing all the related documents.

THE COURT: All right. I don't have a basis as I sit here to decide which position I think is the correct one so I'm

04:23 going to have to go back when this is over and look at those.

In the very limited time we have left, because we're inching up on 4:30, I did want to talk briefly about the last motion at 347, which is the motion for privilege log and other relief. This was one where I wonder whether since its filing there's been further discussion between the parties to narrow

or resolve any of the issues. If not, if there's anything beyond your papers that you wanted to say, I wanted us to really end this by 4:30, Mr. Preston, I'll hear from you and then, Mr. Brundage, I'll hear from you.

MR. PRESTON: Sure. This is fairly simple. There's a list of documents that, very specific documents, that were listed in the opening brief and in the reply that should have been produced. The big ticket item is the privilege log where we litigated and asked for a privilege log of communications

04:24 with the telemarketers after the commencement of litigation. Defendants came back and said, here's your updated privilege log. We then looked at the privilege log and the last communication is before litigation starts. So we need the privilege logs to cover the communications with the telemarketers after the commencement of litigation. There's a bunch of reasons why that's important. I do want to hit financial discovery one last time.

THE COURT: Go ahead, but real quick.

MR. PRESTON: The emphasis and the most important

04:25 category of documents are we received from BTM payment requests from Corp. to Mr. Hernandez. That is core amendment to discovery. It's critical that we get that to amend the complaint for the fraudulent transfer claims. To the extent that Mr. Hernandez and the other creditors are sucking off money from the defendant, that's something that we need to know

in terms of the overall financial picture of the defendant.

THE COURT: Okay. Mr. Brundage, on this last issue of the privilege log, basically, they're saying, look, just because we've got litigation that's commenced doesn't mean that you don't any longer have an obligation to maybe put on a log certain communications or those communications aren't going to be free from discovery. In any event, they're saying this is stuff that should be on a privilege log and you seem to take the position no. Why is that?

04:26 MR. BRUNDAGE: Well, we have a stipulated protective order that says we deem that log post communications absent good cause, and I have not heard or read any good cause.

As to the issue with the telemarketers, I don't understand how there could be a privilege with a telemarketer. That's a third party. What he's asking to log I think is not.

THE COURT: That may be. The risk is mutual. There's a risk to you from taking a position like that. On the one hand, you're almost saying we are agreeing no communication with a telemarketer post commencement of this lawsuit is

04:26 privileged. Is that what you're saying? That's, in essence, what you're saying.

MR. BRUNDAGE: Yeah. I would ask that prior to the lawsuit as well. It's a third party.

THE COURT: You're saying the absence of any of those, we're not hiding the ball. We don't deem those statements to

be privileged in that instance and that's why they're not there.

So, Mr. Preston, with that, why aren't you content with that? You've got, in essence, an admission or even possibly estoppel later if somebody takes the position that this communication was privileged. You've got the defendant saying we're not putting those on a log because it's a third nonparty. It's not privileged. It doesn't need to go on a log.

04:27 MR. PRESTON: I think that would be -- it's an interesting conception. If you look at the declaration for the reply, we identified 495 entries which do not include any attorneys who are involved as the person sending or receiving the subject communications. We have been told that all the litigation hold letters that were sent out to the telemarketers had been withheld, and we had said, okay, fine, give us a privilege log for that. Now we're being told there is, in fact, no privilege attached with any communications with telemarketers. If that's the case, then we should have 04:28 documents sending out a litigation hold letter to the different telemarketers. We don't have those except in the exception with Mezzi, which is a different case because we got it from Mezzi. They don't show up on the privilege log, and there was a court order to send out litigation hold letters to the different telemarketers.

THE COURT: In the interest of time, don't mean to cut you off, but slightly different than the original we were talking about communications post filing. Mr. Brundage, on this issue, it seems to me you're taking the position that litigation hold letters sent out in anticipation of litigation, although not privileged, are either not relevant or for some other reason do not need to be produced and does not need to be put on a log. Is that your position?

MR. BRUNDAGE: Yes. My position is that they have the one that went to Mezzi and it's a form letter. All the letters say the same thing. They want us to produce 50 of these form letters. It's unreasonable. It's not proportional.

THE COURT: You're saying it's unreasonable and not proportional. I don't know about that. I don't hear him to be saying as an intellectual matter it's not relevant, that it's not germane to the suit. If you're not taking that position, I guess proportionality is still a concern that bares on relevance, but I don't know what would be disproportionate about pressing a button and printing out copies of letters or at least telling them they exist, that you're not going to produce them for some reason.

MR. BRUNDAGE: We can produce them, your Honor. There's a larger issue here. I know we're getting short on time. The larger issue, which I hope your Honor picked up in all the papers, is 18 requests simultaneously, and we just

can't manage a case like that.

THE COURT: The requests are considerable. I will grant you. I'm not making a judgment call on the reasonableness or not of those requests. I agree with you. I think in this instance on this very discrete issue given your position that they're not irrelevant conceptually. And they're not privileged. It does seem to me they can be produced without much fanfare or burden, although I thought this was really about whether things should be on a privilege log. That 04:31 being said, if you're agreeing to produce those, then you ought to.

With respect to the motion for privilege log and other relief, if we are acknowledging here that there aren't any communications post lawsuit because the defendant is taking the position those are not privileged, those are mooted. If we're dealing with pre-lawsuit litigation hold letters by acknowledging the defendant is going to produce those, I don't know why Mr. Preston is shaking his head, it would seem those are mooted. I don't know what the issue then would remain.

04:32 Mr. Preston, why are you shaking your head?

MR. PRESTON: Because in this case the litigation hold letters that were sent out to the telemarketers occurred after litigation. I do want to point out there are entries on the recent privilege log that include communications with telemarketers.

THE COURT: How can that be, Mr. Brundage, if you said they're not privileged whether they are pre or post suit?

MR. BRUNDAGE: I am unclear what entries he's referring to. We have 790 entries. I'd have to look at them specifically.

THE COURT: Here's what I'm going to do because we are out of time. I'm just going to ask the parties after this hearing just to confer briefly on this last motion for clarity purposes. Then if you want to kind of report back to me and say, okay, here is what is the issue. I'm hearing from Mr. Preston something I didn't quite appreciate before, which is the letters were sent out after the lawsuit initiated. I thought those all took place before the lawsuit was initiated.

Given the defendant's statement here that it doesn't view any communications with third parties to be privileged, one, I don't know why we're fighting about anything in terms of their collusion on a privilege log. And then, second, we don't know why there are entries on the privilege log as Mr. Preston suggests. That's where I'm asking you guys to just kind of talk about that afterwards and maybe give us sort of a brief submission, not so much by argument, but for our edification so we can figure out where we want to go with this last motion. All right?

To wrap things up, I'm going to have to take under advisement the motion to enforce the financial discovery order.

We'll go back and kind of re-read everything. I promise to do a deeper dive than I was able to do for today.

I'll receive something from the parties within a week with respect to the motion for the privilege log and maybe help narrow what it is we have to decide there.

I have treated and addressed the Motion to Compel motion, so the parties should act in accordance with that what we discussed in Court while awaiting a written order with respect to that motion.

04:35 Okay? All right. Sorry to rush through to wrap this up. I thank you, everybody. Stay safe. We'll be in recess.

(Whereupon, the proceedings adjourned at 4:40 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS )

I, Kristin M. Kelley, certify that the foregoing is a correct transcript from the record of proceedings taken February 1, 2021 in the above-entitled matter to the best of my skill and ability.

/s/ Kristin M. Kelley February 22, 2021

Kristin M. Kelley, RPR, CRR Date
Official Court Reporter